Filed: 06/17/2016    Page 1 of 327

Document #1621558

USCA Case #16-1195

# UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT

American Rivers and Alabama Rivers Alliance,  )
)
*Petitioners*  )
)
)
v.  )
)
Federal Energy Regulatory Commission and  )
U.S. Secretary of Interior,  )
)
*Respondents.*  )
)
)

Docket No.

**16-1195**

RECEIVED
Mail Room

JUN 1 7 2016

United States Court of Appeals
District of Columbia Circuit

## JOINT PETITION FOR REVIEW

American Rivers and the Alabama Rivers Alliance ("Conservation Groups") hereby file this Joint Petition for Review of the following two orders of the Federal Energy Regulatory Commission ("FERC") granting a 30-year license on seven dams of the Coosa River: "Order Issuing New License" 143 FERC ¶ 61,249 (June 20, 2013) (Attachment 1) and "Order on Rehearing and Clarification and Dismissing Request for Stay" 155 FERC ¶ 61,080 (April 21, 2016) (Attachment 2).

The Conservation Groups also petition for review of the Biological Opinion by the Secretary of Interior, through the U.S. Fish and Wildlife Service: "Biological Opinion for the Relicensing of Alabama Power Company's Coosa River Hydroelectric Project" (June 7, 2012) (Attachment 3), issued for the FERC license under the Endangered Species Act section 7.


Dated: June 15, 2016

Respectfully submitted,

Catherine Moore Wannamaker
D.C. Circuit Bar No. 50622
Southern Environmental Law Center
cwannamaker@selcsc.org
463 King Street, Suite B
Charleston, SC 29403
Tel. (843)720-5270
Fax (843)414-7039

*Counsel for Alabama Rivers Alliance and American Rivers*

# UNITED STATES COURT OF APPEALS FOR THE D.C. CIRCUIT

| | | |
|---|---|---|
| American Rivers and Alabama Rivers Alliance, | ) | |
| | ) | |
| *Petitioners* | ) | |
| | ) | |
| v. | ) | Docket No. |
| | ) | |
| Federal Energy Regulatory Commission and | ) | |
| U.S. Secretary of Interior. | ) | |
| | ) | |
| *Respondents.* | ) | |
| | ) | |

## Rule 26.1 CORPORATE DISCLOSURE

Pursuant to Local Rule 15 of the D.C. Circuit Rules and Federal Rule of Appellate

Procedure 26.1, Petitioners submit this Corporate Disclosure Statement.

American Rivers and the Alabama Rivers Alliance are not-for-profit 501(c)(3)

conservation organizations dedicated to the protection and restoration of the rivers and streams.

They do not have any parent companies, and there are no publicly held companies that have a ten

percent or greater ownership interest in either organization.

Dated: June 15, 2016

Catherine Moore Wannamaker
D.C. Circuit Bar No. 50622
Southern Environmental Law Center
cwannamaker@selcsc.org
463 King Street, Suite B
Charleston, SC 29403
Tel. (843)720-5270
Fax (843)414-7039

*Counsel for Alabama Rivers Alliance and American Rivers*

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

## CERTIFICATE OF SERVICE

I hereby certify that I today served the foregoing Petition for Review and Rule 26.1

Corporate Disclosure by electronic mail or by first-class mail if no e-mail address is provided, to

each person below and each person on the Official Service List for FERC Docket No. P-2146.

Max Minzner
General Counsel
Federal Energy Regulatory Commission
888 First Street, NE
Washington, DC 20426

Secretary Sally Jewel
U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240

Mary Josie Blanchard
OEPC Director
U.S. Department of Interior
1849 C Street, NW MS 2462
Washington, DC 20240

Mr. Channing Phillips
United States Attorney's Office, D.C.
District
555 4th Street, NW
Washington, DC 20530

Ms. Loretta Lynch
U.S. Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

Stanley Cook
Chief of Fisheries
Alabama Department of Conservation and Natural Resources
64 North Union St
Montgomery, AL 36130
Stan.Cook@dcnr.alabama.gov
Taconya.Goar@dcnr.alabama.gov

R. Akridge
Manager - Hydro Services
Alabama Power Company
P.O. Box 2641
Birmingham, AL 35291-0001
rmakridg@southernco.com

Richard Roos-Collins
Director, Legal Services
Natural Heritage Institute
2140 Shattuck Avenue, Ste. 801
Berkeley, California 94704-1229
rrcollins@waterpowerlaw.com

Rebecca Haynes
American Rivers, Inc., ET AL.
1001 Washington St.
Suite 301
Columbia, SC 29201
rhaynes@americanrivers.org

Kevin Richard Colburn
National Stewardship Director
American Whitewater
1035 Van Buren Street
Missoula, MT 59802
kevin@amwhitewater.org

Lewis Jones
King & Spalding LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309-3521
lbjones@kslaw.com

Pat Stevens
Chief, Environmental Planning
Atlanta Regional Commission
40 Courtland St NE
Atlanta, GA 30303
pstevens@atlantregional.com

Frank Chitwood
Executive Director
Coosa Riverkeeper, Inc.
P.O. Box 373
12112 Highway 78
Riverside, AL 35135
riverkeeper@coosariver.org

Mr. Gregory Buppert
Defenders Of Wildlife
1130 17th Street, N.W.
Washington, DC 20036-4604
gbuppert@defenders.org

Robert Silliman
303 Peachtree Street
Suite 5300
Atlanta, GA 30303
tsilliman@mckennalong.com

Samuel Olens
Attorney General for the State
40 Capitol Sq. S.W.
Atlanta, GA 30334
bbomar@law.ga.gov

Pat Kelleher
6530 Wilson Creek Road
Ellensburg, WA 98926
psk98926@yahoo.com

Channing Strother
Counsel
McCarthy, Sweeney & Harkaway P.C.
1513 16th Street, NW
10639 MacArthur Blvd.
Washington, MD 20036
cstrother@mogelsweet.com

Judy Takats
Senior Program Officer
World Wildlife Fund, Inc.
2021 21st Ave S
Suite 200
Nashville, TN 37212
judy.takats@gmail.com

James F Crew
Alabama Power Company
P.O. Box 2641
Birmingham, AL 35291-0001
jfcrew@southernco.com

Corky Pugh
Alabama Department of Conservation and Natural
Resources
64 N Union St.
Montgomery, AL 36130-3020

N. Gunter Guy, Jr.
Commissioner
Department of Conservation & Natural Resources
64 N Union St., Ste. 468
Montgomery, AL 36130-3020

Robert S. Bomar
132 State Judicial Building
40 Capitol Sq. S.W.
Atlanta, GA 30334-9003

Jeffrey Komarow
Attorney
Bradley Arant Rose & White LLP
395 E. Street S.W.
Suite 1267
Washington, DC 20423-0001
jeffrey.komarow@stb.dot.gov

Brian Barr
12988 Highway 234
Gold Hill, OR 97525
bbarrr@gmail.com

John Allen
'1230 Peachtree Street
Suite 3600
Atlanta, Georgia 30309
jallen@kmcllaw.com

William Gunter
General Counsel
Alabama Department of Conservation and
Natural Resources
64 N Union St., Ste. 474
Montgomery, AL 36130-3020

Lance LeFleur
Director
Alabama Department of Environmental
Management
P.O. Box 301463
Montgomery, AL 36130-1463

Dale H. Baker
City of Sylacauga
P.O. Box 207
Sylacauga, AL 35150-0207

Craig Litteken
Chief
U.S. Army Corps of Engineers
P.O. Box 2288
Mobile, AL 36628-0001

Bill Pearson
Field Supervisor
U.S. Department of Interior
1208-B Main St.
Daphne, AL 36526-4419

John H. Harrington
U.S. Department of Interior
Office of the Solicitor
75 Spring St. S.W., Ste. 304
Atlanta, GA 30303

F. Lawrence Oaks
Executive Director
Alabama Historical Commission
State Historic Preservation Office
468 South Perry Street
Montgomery, AL 36130-0001

Dated: June 15, 2016

Catherine Moore Wannamaker
D.C. Circuit Bar No. 50622
Southern Environmental Law Center
cwannamaker@selcsc.org
463 King Street, Suite B
Charleston, SC 29403
Tel. (843)720-5270
Fax (843)414-7039

*Counsel for American Rivers and Alabama Rivers Alliance*



RECEIVED
Mail Room

JUN 1 7 2016

United States Court of Appeals
District of Columbia Circuit

# Attachment 1

Attachment 1

Filed: 06/17/2016          Document #1621558          USCA Case #16-1195          Page 10 of 327

143 FERC ¶ 61,249
UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Jon Wellinghoff, Chairman;
                      Philip D. Moeller, John R. Norris,
                      Cheryl A. LaFleur, and Tony Clark.

| | |
|---|---|
| Alabama Power Company | Project Nos. 2146-111 |
| | 618-000 |
| | 82-000 |

## ORDER ISSUING NEW LICENSE

(Issued June 20, 2013)

### Introduction

1.    Alabama Power Company has filed, pursuant to sections 4(e) and 15 of the Federal Power Act (FPA),[1] an application for a new license to continue operation and maintenance of the Coosa Project No. 2146, the Mitchell Dam Project No. 82, and the Jordan Dam Project No. 618 as one project, the Coosa River Project No. 2146.  The project's authorized capacity being licensed is a combined 960.9 megawatts (MW).  The project is located on the Coosa River, in Cherokee, Etowah, Calhoun, St. Clair, Talladega, Shelby, Coosa, Chilton, and Elmore counties, Alabama, and Floyd County, Georgia.

2.    The Coosa River Project includes seven developments that occupy about 271.9 acres of federal lands administered by the U.S. Bureau of Land Management (BLM).[2]  The Logan Martin development occupies less than an acre of federal land, the Lay development occupies 133.5 acres, the Mitchell development occupies 127.3 acres, and

---

[1] 16 U.S.C. §§ 797(e) and 808 (2006).

[2] The Federal Power Commission (FPC), now the Federal Energy Regulatory Commission, found the Coosa River to be a navigable waterway of the United States.  *See Alabama Power Company,* 54 FPC ¶ 2452 (1975).  The project is required to be licensed under section 23(b)(1) of the FPA, 16 U.S.C. § 817 (2006), because it is located on a navigable waterway of the United States.

Page 11 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

the Jordan development occupies 10.1 acres. The remaining three developments (Weiss, Neely Henry, and Bouldin) do not occupy any federal lands. As discussed below, this order issues a new license for the Coosa River Project.[3]

## Background

3.    The Federal Power Commission (FPC), predecessor to the Federal Energy Regulatory Commission (Commission), issued an original license for the Coosa Project No. 2146 in 1957.[4] The Mitchell Project No. 18 and the Jordan Dam Project No. 618 were originally licensed in the 1920s and relicensed in 1975 and 1980, respectively.[5]All three licenses expired on July 31, 2007. Since then, the projects have operated under annual licenses pending the disposition of the new license application.

4.    Alabama Power filed its relicense application on July 28, 2005. Staff found the license application to be incomplete and requested additional information from Alabama Power on April 21 and December 8, 2006. In addition, staff held technical conferences on January 11 and July 12, 2007, to discuss the additional information requests and Alabama Power's hydrological and operational model of the Coosa River Project system.

5.    On June 6, 2008, the Commission issued a public notice that was published in the *Federal Register,* accepting the application for filing, and soliciting motions to intervene and protests, indicating the application was ready for environmental analysis, and soliciting comments, recommendations, terms and conditions, and prescriptions.[6] The notice set August 6, 2008, as the deadline for filing motions to intervene, comments, recommendations, terms and conditions, and prescriptions. The Alabama Department of Conservation and Natural Resources (Alabama DCNR), the Georgia Department of Natural Resources, Environmental Protection Division (Georgia EPD), and the U.S.

---

[3] The Coosa, Mitchell, and Jordan Dam Projects, which encompass seven developments, are part of a single unit of development; therefore, they warrant being licensed as one project.

[4]*Alabama Power Company*, 18 FPC 257 (1957) (Coosa Project, which includes the Weiss, Neely Henry, Logan Martin, Lay, and Bouldin developments).

[5]*Alabama Power Company,* 54 FPC 2452 (1975) (Mitchell Project); and*Alabama Power Company*, 13 FERC ¶ 62,082 (1980) (Jordan Dam Project).

[6]73 Fed. Reg. 34,002-34,004 (June 16, 2008).

Page 12 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

Department of the Interior (Interior) filed notices of intervention.[7]  Alabama Rivers Alliance and American Rivers (jointly, Alabama Rivers), Atlanta Regional Commission (Atlanta Commission), American Whitewater, Coosa River Paddling, and World Wildlife Fund (Wildlife Fund) timely filed motions to intervene.[8]  More than four years after the deadline, the Coosa River Keeper and Defenders of Wildlife each filed a late motion to intervene, which the Commission denied by separate notices issued December 4, 2012. In addition, the U.S. Fish and Wildlife Service (FWS), Logan Martin Lake Protection Association (Logan Martin Association), and American Whitewater filed comments on the application.

6.      Commission staff issued a draft Environmental Assessment (EA) for the Coosa River Project on April 6, 2009, analyzing the potential environmental impacts of the proposed project and alternatives to it.  The U.S. Army Corps of Engineers (Corps) was a cooperating agency on the preparation of the draft and final EAs.  Alabama Power, FWS, Alabama Rivers, Georgia EPD, Wildlife Fund, the Atlanta Commission, Alabama Rivers, and Dr. James D. Williams filed comments on the draft EA.  Commission staff issued a final EA on December 31, 2009.[9]

7.      On July 8, 2010, Alabama Rivers Alliance, American Rivers, and Wildlife Fund (jointly, Conservation Groups) filed comments on the final EA.  Alabama Power, the Corps, the Atlanta Commission, the Logan Martin Association, and Mr. William J. Copeland filed comments on the final EA on October 1, 2010, November 3, 2010, November 23, 2010, May 12, 2011, and December 6, 2010, respectively.  On November 9, 2012, Alabama Rivers filed comments on the EA and on the final Biological Opinion(BO) prepared by FWS for this proceeding.  On December 19, 2012, Alabama Power filed a response to Alabama Rivers' November 9, 2012 filing.  We have considered the interventions, comments, and recommendations in determining whether, or under what conditions, to issue this license for the Coosa River Project.

---

[7] Under Rule 214(a)(2) of the Commission's Rules of Practice and Procedure, Alabama DCNR, Georgia EPD, and Interior became parties to the proceeding upon timely filing their notices of intervention.  18 C.F.R. § 385.214(a)(2) (2012).

[8] Timely, unopposed motions to intervene are granted by operation of Rule 214(c) of the Commission's Rules of Practice and Procedure.  18 C.F.R. § 385.214(c) (2012).

[9] Unless otherwise specified, references in this order to the EA are to the final EA.

Page 13 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

## Project Description

### A.    Project Area

8.    The Coosa River Basin drainage encompasses about 10,161 square miles in Alabama, Georgia, and Tennessee.  The Coosa River begins at the confluence of the Oostanaula and Etowah rivers near Rome, Georgia, and flows 267 miles in a southerly direction to its confluence with the Tallapoosa River.

9.    The Coosa River is highly regulated, with flows controlled by nine hydropower and storage developments operated by Alabama Power and the Corps.  The seven developments of the Coosa River Project are located along a 200-mile-long segment of the Coosa River.  From upstream to downstream, they are:  the Weiss development at river mile (RM) 226, the Neely Henry development at RM 148, the Logan Martin development at RM 99.5, the Lay development at RM 51, the Mitchell development at RM 38, and the Jordan and Bouldin developments near RM 18.  The Weiss, Neely Henry, and Logan Martin developments provide seasonal storage for flood control and power during peak load periods.  The Lay, Mitchell, Jordan, and Bouldin developments are operated run-of-river, with daily pool level changes of 1 foot or less.

10.    The confluence of the Tallapoosa and Coosa rivers is located about 18 miles downstream of the Jordan Dam, where they meet to form the Alabama River.

### B.    Project History

11.    As noted above, the Mitchell and Jordan Dam Projects were originally licensed and constructed in the early 1920s.  Alabama Power also constructed the unlicensed Lay development around this time.  In 1925, Alabama Power completed a study of the storage potential of the Coosa River upstream of Lay dam, which recommended the development of five additional hydropower projects in the basin.

12.    In 1934, the Corps developed a general plan for the overall development of the Alabama-Coosa River system.  In 1941, the Corps submitted a report to Congress that recommended development of the Alabama-Coosa River and tributaries for navigation, flood control, power generation, and other purposes.The Rivers and Harbors Act of 1945 authorized the Corps to develop the Alabama-Coosa River Basin in the interest of navigation, flood control, and hydroelectric power.[10]  In 1954, Congress suspended this

---

[10]Pub.L. No. 79-14 (March 2, 1945).

authorization, insofar as it concerned federal development of the Coosa River for hydropower development, to permit development of the river by private interests under a license issued by the FPC.[11]  The law stipulated that any license issued by the FPC must include provisions for flood control and navigation, and the project must be operated for flood control and navigation in accordance with reasonable rules and regulations of the Secretary of the Army.

13.     Subsequently, Alabama Power applied for, and was issued, a license for the Coosa Project in September 1957, which comprised five developments:  Lay, Weiss, Logan Martin, Neely Henry, and Wetumpka.[12]  The license was amended in August 1960 to remove the Wetumpka development and authorize the construction of the Bouldin development.  Alabama Power began commercial operations of the Weiss, Logan Martin, Neely Henry, and Bouldin developments in 1962, 1964, 1966, and 1967, respectively.

14.     The 1957 license authorized storage at the Weiss, Logan Martin, and Neely Henry developments for flood control purposes.  In the 1960s Alabama Power and the Corps developed Memoranda of Understanding to clarify the responsibilities of each entity with regard to operating the developments for flood control and other purposes.  The Corps subsequently developed Reservoir Regulation Manuals (Reservoir Manuals) for the three developments.[13]  The Corps must approve any changes in the flood control operations of the developments.  Alabama Power has operated the developments in accordance with the Reservoir Manuals, with certain variances for the Neely Henry development.

---

[11]Pub.L. No. 83-436.

[12] The existing, unlicensed Lay development was brought under license at this time.  The license authorized the Lock 3 development, which was later named Neely Henry, and the Kelly Creek development, which was later named Logan Martin.

[13] The Corps approved the existing Reservoir Manuals for the Weiss, Neely Henry, and Logan Martin developments in June 2004, January 1979, and June 2004, respectively.  These manuals were placed in the public record of this proceeding on June 6, 2013.

Page 14 of 327     Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

Page 15 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

## C.    **Project Facilities**

### 1.    **Weiss Development**

15.    The Weiss development consists of: (1) an approximately 1.5-mile-long diversion dam consisting of earthen east and west embankments, a concrete spillway with six gates, and a concrete non-overflow section; (2) a 2.5-mile-long secondary dam which includes east and west earthen embankments, two concrete non-overflow sections, and a powerhouse intake; (3) three saddle dikes; (4) a 52-mile-long, 30,200-acre reservoir at normal pool elevation 564 feet mean sea level (msl);[14] (5) a 7,000-foot-long power canal which carries water from the main reservoir to a forebay lake; (6) a powerhouse on the secondary dam with three generating units with a total rated capacity of 87.75 MW; (7) a 1,300-foot-long tailrace channel; (8) a substation; and (9) other appurtenant equipment. Additionally, a bypassed reach extends from the diversion dam to the outlet of the powerhouse tailrace channel on the Coosa River. A more detailed description of these facilities is included in Ordering Paragraph B.

### 2.    **Neely Henry Development**

16.    The Neely Henry development consists of: (1) an approximately 0.9-mile-long dam consisting of earthen east and west embankments, a powerhouse intake section, a concrete spillway with six gates, and a concrete non-overflow section; (2) a 78-mile-long, 11,235-acre reservoir at normal pool elevation 508 feet; (3) a powerhouse with three generating units with a total rated capacity of 72.9 MW; (4) a substation; and (5) other appurtenant equipment. A more detailed description of these facilities is included in Ordering Paragraph B.

### 3.    **Logan Martin Development**

17.    The Logan Martin development consists of: (1) an approximately 1.2-mile-long dam consisting of earthen east and west dikes, a concrete spillway with seven gates, and a concrete powerhouse intake section; (2) a 48.5-mile-long, 15,263-acre reservoir at normal pool elevation 477 feet; (3) a concrete powerhouse containing three generating units with a total rated capacity of 128.25 MW; (4) a substation; and (5) other appurtenant equipment. A more detailed description of these facilities is included in Ordering Paragraph B.

---

[14] All elevations referenced in this license are in msl.

Filed: 06/17/2016        Page 16 of 327

Document #1621558

USCA Case #16-1195

## 4.    **Lay Development**

18.    The Lay development consists of:  (1) an approximately 0.4-mile-long dam consisting of an earthen east embankment, concrete spillway with 26 gates, a concrete powerhouse intake section, and concrete bulkhead section; (2) a 48.2-mile-long, 12,000-acre lake at normal pool elevation 396 feet; (3) a powerhouse with six generating units with a total rated capacity of 177 MW; (4) a substation; and (5) other appurtenant equipment.  Alabama Power is in the process of upgrading turbine units 1 and 4 at this development, which will not affect the project's installed capacity but will increase generation.[15] A more detailed description of these facilities is included in Ordering Paragraph B.

## 5.    **Mitchell Development**

19.    The Mitchell development consists of:  (1) an approximately 0.32-mile-long dam consisting of a concrete spillway with 26 gates and two concrete powerhouse intake sections; (2) a 14-mile-long, 5,850-acre lake at normal pool elevation 312 feet; (3) two powerhouses, integral with the dam, the first with one operating generating unit and three non-operating generating units, and the second with three generating units, for a total rated capacity of 170 MW; (4) a substation; and (5) other appurtenant equipment.  A more detailed description of these facilities is included in Ordering Paragraph B.

## 6.    **Jordan Development**

20.    The Jordan development consists of:  (1) an approximately 0.35-mile-long dam consisting of east and west non-overflow sections, a concrete powerhouse intake section, and a concrete spillway with 35 gates; (2) an 18-mile-long, 5,880-acre lake at normal pool elevation 252 feet; (3) a concrete powerhouse with four generating units with a total rated capacity of 100 MW; (4) a substation; and (5) other appurtenant equipment.

---

[15] *See Alabama Power Company*, 138 FERC ¶ 62,248 (2012).  The order requires the licensee to:  (1) file revised Exhibit M drawings; (2) start construction within 2 years, and complete construction within 4 years, from the issuance date of the order; (3) file photo documentation of the nameplate capacity of each new turbine unit after the upgrade; and (4) file, within 90 days of completion of the facilities, revised Exhibit L (presently Exhibit F) drawings to reflect as-built conditions.  In August 2012, Commission staff approved a revised Exhibit M which reflects the turbine upgrades. *Alabama Power Company*, 140 FERC ¶ 62,126 (2012).  Article 304 of the new license requires items 2, 3, and 4 above.

Page 17 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

Alabama Power is in the process of upgrading turbine unit 4 at this development, which will not affect the project's installed capacity but will increase generation.[16] A more detailed description of these facilities is included in Ordering Paragraph B.

### 7.     **Bouldin Development**

21.     The Bouldin development is located on a power canal adjacent to a bypassed section of the Coosa River.  The power canal intake is located on Jordan Lake, about 1 mile upstream of Jordan dam, and the tailrace canal empties into the Coosa River downstream of Jordan dam.

22.     The Bouldin development consists of:  (1) a 3-mile-long power canal and forebay lake, for a total of 920 acres at normal pool elevation 252 feet; (2) an approximately 1.8-mile-long forebay dam consisting of east and west embankments, and a powerhouse intake section; (3) a concrete powerhouse with three generating units with a total rated capacity of 225 MW; (4) a 5-mile-long tailrace channel from the powerhouse to the Coosa River; (5) a substation; and (6) other appurtenant equipment.  Alabama Power is in the process of upgrading turbine unit 2 at this development, which will not affect the project's installed capacity but will increase generation.[17] A more detailed description of these facilities is included in Ordering Paragraph B.

---

[16] *Hydroelectric Power - Alabama Power Company*, 143 FERC ¶ 62,097 (2013). The order requires the licensee to:  (1) start construction within 2 years, and complete construction within 4 years, from the issuance date of the order; (2) file, within 90 days of completing construction of the facilities, revised Exhibits K, L (presently Exhibit F), and M, as applicable, to show those project facilities as-built; and (3) file, within 90 days of completion of construction, photo documentation of the nameplate capacity of the new turbine unit.  Article 305 of the new license requires items 1, 2, and 3 above.

[17] *Alabama Power Company*, 138 FERC ¶ 62,248.  The order requires the licensee to:  (1) file revised Exhibit M drawings; (2) start construction within 2 years, and complete construction within 4 years, from the issuance date of the order; (3) file photo documentation of the nameplate capacity of each new turbine unit after the upgrade; and (4) file, within 90 days of completion of the facilities, revised Exhibit L (presently Exhibit F) drawings to reflect as-built conditions.  On August 16, 2012, Commission staff approved a revised Exhibit M, which reflects the turbine upgrade.  *Alabama Power Company*, 140 FERC ¶ 62,126.  Article 304 of the new license requires items 2, 3, and 4 above.

Page 18 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

### D.    Project Recreation Sites

23.    Under the current license, Alabama Power operates and maintains, or provides for the operation and maintenance of, 28 project recreation sites.  Of these sites, two sites are at the Weiss development; two sites are at the Neely Henry development; two sites are at the Logan Martin development; and six sites are at the Lay development.[18]  At the Mitchell development there are six project recreation sites.[19]  At the Jordan and Bouldin[20] developments, there are 10 project recreation sites.[21]  These sites offer a variety of recreation amenities that include boat launches, fishing piers, docks, campsites, restrooms, and parking areas.

### E.    Project Boundary

24.    The Coosa River Project boundary consists of lands necessary for the safe operation and maintenance of the project and other purposes, such as recreation, shoreline control, and protection of environmental resources.

25.    Each of the seven developments at the Coosa River Project has its own project boundary.  The project boundary around the Weiss development is generally defined by elevations ranging from 521 to 578 feet.  It encloses about 52,000 acres and encompasses

---

[18] The Coosa River Project Recreation Plan for the Weiss, Neely Henry, Logan Martin, Lay, and Bouldin developments was approved by the Commission on February 28, 1983.  *See Alabama Power Company*, 22 FERC ¶ 62,234 (1983).

[19] The Mitchell Project Comprehensive Recreation Master Plan was approved on February 17, 1982.  *See Alabama Power Company*, 18 FERC ¶ 62,249 (1982).  The plan was amended on November 7, 1985, to add a tailrace fishing access facility.  *See Alabama Power Company*, 33 FERC ¶ 62,175 (1985).

[20] The Bouldinforebay is connected to Jordan Lake through a canal, which provides public boat access to the Bouldinforebay.  The current Coosa River Project Licensed Hydropower Development Recreation Report (Form 80) combines recreation data for the Bouldin and Jordan developments.

[21] The Jordan Dam Project Recreation Use Plan was approved by the Commission on October 27, 1980.  *See Alabama Power Company*, 13 FERC ¶ 62,082.  The plan was amended on October 24, 2001, to add a tailrace fishing access facility.  *See Alabama Power Company*, 97 FERC ¶ 62,072 (2001).

all project structures, including the 20-mile-long bypassed reach, two project recreation sites, and the Weiss reservoir. The project boundary around the Neely Henry development is generally defined by elevations ranging from 509 to 527 feet, and encloses about 12,941 acres and encompasses all project structures, two recreation sites, and the Neely Henry reservoir. The project boundary around the Logan Martin development is generally defined by elevations ranging from 473.5 to 489 feet, and encloses about 27,000 acres and encompasses all project structures, two recreation sites, and the Logan Martin reservoir. The project boundary around the Lay development is generally defined by elevations from 397 to 413 feet, and encloses about 21,700 acres and encompasses all project structures, six recreation sites, and Lay Lake. The project boundary around the Mitchell development is generally defined by elevation 317 feet, and encloses about 9,494 acres and encompasses all project structures, six recreation sites, and Mitchell Lake. The project boundaries around the Jordan and Bouldin developments are generally defined by elevations 252 and 253 feet, respectively. They enclose about 7,819 acres and encompass all project structures, 10 recreation sites, Jordan Lake, and the Bouldin forebay.

## F.    **Current Project Operation**

### 1.    **Weiss Development**

26.    The Weiss development is a peaking project operated to provide energy during peak demand periods. The project typically generates power 1 to 6 hours per day Monday through Friday. Flows from the Weiss reservoir, impounded by a 1.5-mile-long diversion dam, pass through an unregulated 7,000-foot-long canal into a forebay lake impounded by a second 2.5-mile-long dam, which includes the Weiss powerhouse. After exiting the Weiss powerhouse, flows pass through a 1,300-foot-long tailrace which empties into the Coosa River.

27.    Discharges from the powerhouse vary from leakage (during non-generation) to 25,200 cubic feet per second (cfs; maximum hydraulic capacity). Currently, there is no minimum flow requirement for the 20-mile-long bypassed reach of the Coosa River. Flows in excess of the powerhouse capacity are spilled into the bypassed reach through one or more of its six spillway gates, providing controlled releases.

28.    Alabama Power operates the Weiss development to maintain the reservoir level at or below an operating curve.[22] The operating curve begins at a winter pool elevation of

---

[22] Since 1965 the reservoir elevation has averaged less than 6 inches below the operating curve during the months April through June. From July through mid-

Continued…

Filed: 06/17/2016          Page 19 of 327

Document #1621558

USCA Case #16-1195

Filed: 06/17/2016      Page 20 of 327

USCA Case #16-1195      Document #1621558

558 feeton January 1, and linearly rises to elevation 564 feetby April 30. From May 1 through August 31 the curve remains at elevation 564 feetto provide for summer recreation at the reservoir. From September 1 through December 31 the curve linearly declines six feet, to elevation 558 feet, to make room for spring flood flows. The operating curve also delineates storage in the reservoir available for power generation and flood control. Storage varies monthly, but generally elevations 558 to 564 feetprovide 148,400 acre-feet of storage for power generation, and elevations 564 to 574 feet provide 397,000 acre-feet of storage for flood control.

29.     Flood control operations are defined by the Corp's June 2004 Alabama-Coosa River Basin Reservoir Regulation Manual for the Weiss Reservoir (Weiss Manual).[23] Chart No. 19 in the Weiss Manual shows Alabama Power's operating curve, as described above, which is the maximum elevation at which Alabama Power may maintain the reservoir during normal (i.e., non-flood control) inflow conditions. As long as the Weiss reservoir surface elevation is below the operating curve, Alabama Power may operate the Weiss development to "satisfy normal system load requirements."[24] Once the reservoir levels reach the operating curve, Alabama Power must operate the development in accordance with the Corps' Weiss Manual for flood control.[25]

30.     Chart No. 20 of the Weiss Manual defines the basic regulation schedule for flood control, showing required operations and reservoir outflows for various pool elevations and inflow rates. In general, Chart No. 20 requires that when the reservoir levels are at the operating curve and below 564 feet,[26] releases up to hydraulic capacity may be made

---

September, the average water elevation has been 1 foot or less below the operating curve. On a daily basis, the changes in water elevation are minor.

[23] *See* Weiss Manual.

[24] *See* Weiss Manual, Chart 20, Flood Control Regulation Schedule, Weiss Reservoir, Operating Instruction 1.

[25] Article 40 of the original license for the Weiss, Neely Henry, and Logan Martin developments specifies operations for flood control, "…including the control of the level of the pool caused by the dam, and the discharge of water through the spillways or any outlet structures of such dams, shall be in accordance with such reasonable rules and regulations as may be prescribed by the Secretary of the Army."

[26] As noted above, Alabama Power's operating curve is below 564 feet between January 1 and April 30, and September 1 and December 31.

Filed: 06/17/2016      Page 21 of 327

Document #1621558

USCA Case #16-1195

through the powerhouse. At reservoir levels above the operating curve and below 564 feet, releases are to be made through the powerhouse at its full hydraulic capacity. When the reservoir level is at 564 feet, powerhouse and spillway releases are to be used to evacuate the reservoir up to a total of 40,000 cfs. An alternate flow schedule is used to specify releases from 40,000 cfs to 175,000 cfs when the reservoir level is above 564 feet, and rising. However, releases from the dam above 40,000 cfs rarely occur (i.e., since 1965 maximum releases of 50,000 cfs were recorded in two years).

## 2.   **Neely Henry Development**

31.    The Neely Henry development is a peaking project operated to provide energy during peak demand periods. The project typically generates power 1 to 6 hours per day Monday through Friday. Flows from the Neely Henry reservoir, impounded by the 0.9-mile-long dam, pass through a powerhouse which is integral with the dam. After exiting the Neely Henry powerhouse, flows pass directly into the Coosa River.

32.    Discharges from the powerhouse vary from leakage (during non-generation) to 26,700 cfs (maximum hydraulic capacity). Flows in excess of the powerhouse capacity are spilled into the Coosa River through one or more of its six spillway gates at the dam, providing controlled releases.

33.    Alabama Power operates the Neely Henry development to maintain the reservoir level at or below an operating curve.[27] The operating curve begins at a winter pool elevation of 507 feeton January 1, and remains at 507 feetuntil March 31. From April 1 through April 30 the curve linearly rises to 508 feet. From May 1 through September 30 the curve remains at elevation 508 feetto provide for summer recreation at the reservoir. From October 1 to November 31 the curve linearly declines to 507 feetto make room for spring flood flows, and remains at 507 feetuntil December 31.[28] The operating curve also

---

[27] Since 2002 the reservoir elevation has averaged 6 inches or less below the operating curve from November through July, and about 1 foot or less from August through October.

[28] Article 50 of the original license specifies the operating curve for the Neely Henry reservoir. On June 30 1999, Alabama Power requested: (1) a temporary 3-year variance to Neely Henry's operating curve to maintain higher water levels during the winter (i.e., an increase the winter pool level by 2 feet from 505 to 507 feet); and (2) a revised reservoir regulation schedule. The Commission and Corps staffs prepared a joint EA to evaluate the environmental effects of modifying the operating curve and the pre-flood evacuation schedule. On February 26, 2001, the Commission approved the revised

Continued…

delineates storage in the reservoir available for power generation and flood control. Storage varies monthly, but generally elevations 505 to 508 feet provide 30,640 acre-feet of storage for power generation, and negligible storage above 508 feet for flood control.

34.    Flood control operations are defined by the Corp's January 1979 Alabama-Coosa River Basin Reservoir Regulation Manual for the H. Neely Henry Reservoir (Neely Henry Manual),[29] as amended by a variance approved by the Commission in 2001. The operating curve is the maximum elevation at which Alabama Power may maintain the reservoir during normal (i.e., non-flood control) inflow conditions. As long as the Neely Henry reservoir surface elevation is below the operating curve, Alabama Power may operate the Neely Henry development to "satisfy normal system load requirements."[30]

35.    Once the reservoir level reaches the operating curve, Alabama Power must operate the development in accordance with the Corps' Neely Henry Manual for flood control. Chart No. 12 of the Neely Henry Manual summarizes a pre-flood evacuation schedule for flood control. Because the Neely Henry reservoir has little storage, flood control is implemented by decreasing the reservoir level as much as 5.5 feet (to 502.5 feet) when flood flows are identified upstream of the Neely Henry reservoir. The pre-flood evacuation schedule shows required operations and reservoir evacuation rates for various pool elevations and inflow rates. Pre-flood evacuation procedures are implemented based on the elevation of Neely Henry reservoir, the discharge from the upstream Weiss dam, and flows measured 20 miles upstream at the Gadsden flow gage.

---

operating curve for a 3-year trial period, but concluded the Corps must approve any revisions to the reservoir regulation schedule (*Alabama Power Company*, 94 FERC ¶ 62,171 (2001)). After the 3-year trial period concluded on March 18, 2004, the Commission authorized Alabama Power to continue operating under the revised operating curve until a decision on its application for a new license is issued (*Alabama Power Company*, 106 FERC ¶ 62,209 (2004)). Alabama Power proposes to continue to operate the project following the interim operating curve. Because the interim operating curve for Neely Henry has been implemented for over 12 years, the EA considered this curve as the existing condition for environmental analysis. *See also* letter from Colonel Stephen J. Roemhildt, District Commander, U.S. Army Corps of Engineers, filed with the Commission on October 25, 2010, stating no objection to the continued operation of the Neely Henry development with the interim operating curve.

[29] *See* H. Neely Henry Manual.

[30] *Id.*

Page 22 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

### 3.    Logan Martin Development

36.    The Logan Martin development is a peaking project operated to provide energy during peak demand periods.  The project typically generates power 1 to 6 hours per day Monday through Friday.  Flows from the Logan Martin reservoir, impounded by a 1.2-mile-long dam, pass through a powerhouse which is integral with the dam.  After exiting the Logan Martin powerhouse, flows pass directly into the Coosa River.

37.    Discharges from the powerhouse vary from leakage (during non-generation) to 33,000 cfs (maximum hydraulic capacity).  Flows in excess of the powerhouse capacity are spilled into the bypassed reach through one or more of its seven spillway gates, providing controlled releases.

38.    Alabama Power operates the Logan Martin development to maintain the reservoir level at or below an operating curve.[31]  The operating curve begins at a winter pool elevation of 460 feet on January 1 and remains at 460 feet until March 31.  On April 1 the elevation linearly rises to 465 feet on May 7, and remains at 465 feet until September 30 to provide recreation on the reservoir.  From October 1 through October 31 the curve linearly declines to 462 feet, and from November 1 through December 31 the curve linearly declines to 460 feet to make room for spring flood flows.

39.    The operating curve also delineates storage in the reservoir available for power generation and flood control.  Storage varies monthly, but generally elevations 460 to 465 feet provide 67,600 acre-feet of storage for power generation, and elevations 465 to 477 feet provide 245,300 acre-feet of storage for flood control.

40.    Flood control operations are defined by the Corp's June 2004 Alabama-Coosa River Basin Reservoir Regulation Manual for the Logan Martin Reservoir (Logan Martin Manual).[32]  Chart No. 11 in the Logan Martin Manual shows the operating curve currently implemented by Alabama Power, which is the maximum elevation at which Alabama Power may maintain the reservoir during normal inflow (i.e., non-flood control) conditions.  As long as the Logan Martin reservoir surface elevation is below the

---

[31] Since 1965 the reservoir elevation has averaged no more than 6 to 12 inches below the operating curve throughout the year.

[32] *See* Logan Martin Manual.

Filed: 06/17/2016          Page 23 of 327

USCA Case #16-1195          Document #1621558

operating curve, Alabama Power may operate the Logan Martin development to "satisfy normal system load requirements."[33]

41.    Once the reservoir levels reach the operating curve, Alabama Power must operate the development in accordance with the Corps' Logan Martin Manual for flood control. Chart No. 12 of the Logan Martin Manual defines the basic regulation schedule for flood control, showing required operations and reservoir outflows for various pool elevations and inflow rates.  In general, when the reservoir elevation is below the top of the operating curve, releases may be made through the powerhouse up to its hydraulic capacity.  When the reservoir elevation is at the operating curve, powerhouse and spillway releases are to be used to evacuate the reservoir up to a total of 50,000 cfs.  An alternate flow schedule is used to specify greater releases (up to 270,000 cfs) when the reservoir level is above the operating curve, and rising.  However, releases from the dam above 80,000 cfs rarely occur (i.e., since 1965 releases of 80,000 cfs were recorded in three years).

### 4.    Lay Development

42.    Alabama Power operates the Lay development in run-of-river mode, with a normal full pool elevation at 396 feet.  Daily fluctuations between 0.75 and 1 foot may occur due to operating constraints.  Flows from the powerhouse and spill gates are passed directly into the Coosa River.  Lay Lake has no flood storage, thereby limiting operations during floods to passing inflows through the powerhouse and/or 26 spill gates at the dam.

### 5.    Mitchell Development

43.    Alabama Power operates the Mitchell development in run-of-river mode, with a normal full pool elevation at 312 feet.  Daily fluctuations less than 1 foot may occur due to operating constraints.  Flows from the powerhouse and spill gates are passed directly into the Coosa River.  Mitchell Lake has no flood storage, thereby limiting operations during floods to passing inflows through the powerhouse and/or 23 spill gates at the dam.

### 6.    Jordan Development

44.    Alabama Power operates the Jordan development in run-of-river mode, with a normal full pool elevation at 252 feet.  Daily fluctuations less than 1 foot may occur due to operating constraints.  Flows from the powerhouse and spill gates are passed directly into the Coosa River.  Jordan Lake has no flood storage, thereby limiting operations

---

[33] *Id.*

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 24 of 327

Page 25 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

during floods to passing inflows through the Jordan powerhouse, 35 spill gates at the dam, or into a canal leading to the Bouldin development.

45.     Flow diverted from Jordan Lake to the Bouldin development bypasses Jordan dam and is returned to the Coosa River about 14.5 miles downstream from Jordan dam. Alabama Power currently provides minimum flow releases from the Jordan development for whitewater boating and aquatic enhancement in the Coosa River bypassed reach downstream from Jordan dam.  These releases are provided through the turbines, or one or more of the 35 release gates at the dam.  Alabama Power is required to release a continuous flow of at least 2,000 cfs from the Jordan dam from July 1 through March 31 to support the aquatic flora and fauna of the Coosa River, including the endangered tulotoma snail.[34] From April 1 through May 31, the minimum flow release is increased to 8,000 cfs between 9 a.m. and 3 p.m. (pulse flow) and 4,000 cfs the remainder of each day (base flow).  The base flow and pulse flows are gradually reduced between June 1 and June 30 to ultimately return to the 2,000-cfs continuous minimum flow requirement by July 1.

46.     In addition to the aquatic base flow and pulse flows released in the spring for fish, which also enhance whitewater boating conditions downstream from the Jordan dam, Alabama Power is also required to provide whitewater boating releases that vary between 4,000 and 8,000 cfs on weekends, and up to 10,000 cfs on holidays, during the summer months.  The recreation flows may temporarily cease during extreme drought periods when Alabama Power's reservoirs on the Coosa River are 1 foot or more below the normal operating range, such as occurred during the summers of 2006 and 2007.

47.     Specifically, the flow release requirements, as required by a 1997 Commission staff order and amended in 2001,[35] are:

---

[34] However, in November 2007, Commission staff issued a license amendment in response to drought conditions, authorizing Alabama Power to reduce (from 2,000 to 1,600 cfs) minimum flow releases from Jordan dam for a 90-day period beginning December 2.  *Alabama Power Company*, 121 FERC ¶ 62,156 (2007).

[35] *See Alabama Power Company*, 79 FERC ¶ 62,182 (1997), *order amending min. flow release schedule*, 96 FERC ¶ 62,050 (2001) (approving shift in daily fish flow and recreation releases for April 1 through May 31, from the hours of 6:00 a.m. to 12:00 p.m. to the hours of 9:00 a.m. to 3:00 p.m.).

Page 26 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

- From April 1 through May 31, Alabama Power releases continuous base flows of 4,000 cfs for 18 hours per day from 3 p.m. through 9 a.m. For the remaining 6 hours, Alabama Power should release an 8,000 cfs pulse flow from 9 a.m. through 3 p.m.

- Beginning June 1 through June 15, Alabama Power reduces the continuous 4,000 cfs base flow at a rate of 66.7 cfs per day, and the daily 8,000 cfs pulse flow at a rate of 133.3 cfs per day.

- From June 16 through June 30, Alabama Power ceases release of the daily pulse flow but continues to release the continuous base flow, reducing it 66.7 cfs per day.

- From July 1 through March 31, Alabama Power releases a continuous minimum base flow of 2,000 cfs, regardless of inflow.

- From June 16 through October 31, on weekends only, Alabama Power releases flows of 4,000 cfs, 6,000 cfs or 8,000 cfs continuously from 11 a.m. to 5 p.m. using the following schedule:

| Weekend No. | Saturday | Sunday |
|---|---|---|
| 1 | 4,000 | 6,000 |
| 2 | 6,000 | 8,000 |
| 3 | 8,000 | 4,000 |
| 4 | 4,000 | 6,000 |
| 5 | 6,000 | 8,000 |
| 6 | 8,000 | 4,000 |
| 7 | 4,000 | 6,000 |
| 8 | 6,000 | 8,000 |
| 9 | 8,000 | 4,000 |
| 10 | 4,000 | 6,000 |
| 11 | 6,000 | 8,000 |
| 12 | 8,000 | 4,000 |
| 13 | 4,000 | 6,000 |
| 14 | 6,000 | 8,000 |
| 15 | 8,000 | 4,000 |
| 16 | 4,000 | 6,000 |
| 17 | 6,000 | 8,000 |
| 18 | 8,000 | 4,000 |
| 19 | 4,000 | 6,000 |
| 20 | 6,000 | 8,000 |

Page 27 of 327     Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

- On one day during the Memorial Day and Labor Day weekend, Alabama Power releases up to 10,000 cfs continuously between 10 a.m. and 6 p.m.

- On July 4th Alabama Power releases up to 10,000 cfs continuously between 10 a.m. and 6 p.m. using the following schedule: if July 4th is on Tuesday, a Monday release would be required in addition to the required release on July 4th; if July 4th is on a Wednesday, the Monday release would be forfeited for the July 4th release; if July 4th is on a Thursday, the Monday release would be changed to Friday, July 5th to give a four day release; if July 4th is on a Saturday, Sunday or Monday, the normal recreational release schedule would be followed.

- A special release may be scheduled to accommodate a civic event during the period April 1 to June 15. The release would be from 6 a.m. to 5 p.m. at a release rate up to 10,000 cfs. The amount of release and number of days has been changed over the past few years. A 2004 civic event required a release for four days, one day each of 8,500 cfs from 9 a.m. to 3 p.m., 8,500 cfs from 9 a.m. to 5 p.m., 8,500 cfs from 7 a.m. to 5 p.m., and 8,500 cfs from 7 a.m. to 4 p.m.

- Flow releases shall be within a 5 percent flow-variation tolerance band of the release rate specified for each scheduled boating release day.

- All recreational releases are conditioned upon sufficient availability of inflow to support other project purposes. Recreational releases would be modified or terminated as follows:

  ○ For weekend releases, if insufficient water is available for a two day release but sufficient for a one day release then a one day release will be scheduled. Should it be required to reduce the number of days of release, first, Sunday will be deleted. If insufficient water is available for a one day scheduled release, the release will be canceled.

  ○ Recreational releases may be canceled when the Weiss, Neely Henry, and Logan Martin reservoirs are one foot below the normal operations guide curve.

  ○ Recreational releases may be modified (either lower flow or shorter duration) if dissolved oxygen (DO) in the releases during the event

Filed: 06/17/2016      Page 28 of 327

Document #1621558

USCA Case #16-1195

would cause the DO level in the Jordan dam tailrace to fall below 4.0 milligrams per Liter (mg/L) with aeration systems operations.

### 7. **Bouldin Development**

48.     Alabama Power operates the Bouldin development in run-of-river mode, with a normal full pool elevation at 252 feet.  Daily fluctuations less than 1 foot may occur due to operating constraints.  Flows from the upstream Jordan Lake are passed through a 3-mile-long power canal to the powerhouse, which is integral with the dam.  Since there are no spill gates at the Bouldin dam, flows in excess of Bouldin's turbine capacity (28,800 cfs) are spilled at the Jordan dam.  Discharge from the Bouldin powerhouse flows through a 5-mile long canal into the Coosa River.

### G.     **Navigation Flow Requirements**

49.     The existing licenses do not quantify a navigation flow, but require Alabama Power to provide flows to support navigation, as specified by the Corps.[36]  In accordance with an April 18, 1972 agreement with the Corps, Alabama Power operates its Jordan and Bouldin developments on the Coosa River and the Thurlow development of its Yates and Thurlow Project No. 2407 on the Tallapoosa River to provide a total continuous minimum 7-day-average release of not less than 4,640 cfs in the Alabama River,[37] as measured at the Montgomery flow gage.[38]  The navigation release provides a 9-foot

---

[36] Standard Article 12 of the Mitchell and Jordan licenses and standard Article 18 of the Coosa Project license provide for navigation flows, as may be prescribed by the Corps in the interest of navigation.

[37] The 1972 agreement specifies a combined release of 4,640 cfs from the Coosa and Tallapoosa rivers.  However, it does not specify releases for each individual basin. Nonetheless, based on a ratio of drainage areas for each basin (10,059 square miles for the Coosa River Basin and 4,680 square miles for the Tallapoosa River Basin), the Coosa River's portion of the navigation requirement would be 3,166 cfs (68 percent) and Tallapoosa River's portion would be 1,475 cfs (32 percent).

[38] The minimum navigation flow is based on the estimated 7Q10 flow (lowest 7-day average flow that occurs, on average, once every ten years) for the Alabama River in the Montgomery area.  The Montgomery flow gage is about 10 miles downstream from the confluence of the Coosa and Tallapoosa rivers.  Because there is little intervening flow, this gage approximates the combined releases from both river basins.

Page 29 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

navigation channel and approximately 8,500-cfs flow downstream from the Claiborne Lock and Dam. In January 1980, Alabama Power agreed to provide at least 2,667 cfs during any consecutive 3-day period, eliminating periods of little or no flow and more evenly distributing the required 7-day total flow.

### H.   New Project Facilities and Project Boundary Changes

50.     Alabama Power proposes no major construction or capacity-related construction at the project. However, as described below, Alabama Power proposes to: (1) install aeration systems at Weiss and Neely Henry and upgrade existing aeration systems at Logan Martin, Lay, and Mitchelldevelopments, and continue to operate the aeration system at the Jordan development;[39] and (2) construct or improve various recreation amenities at the project's seven developments that include parking areas, fishing piers, docks, boat launches, campsites, and trails. Alabama Power also proposes to add 364 acres to the project boundary:[40] 235 acres for additional flood easements along Lay Lake to accommodate Alabama Power's proposed operational changes at the Logan Martin development and 129 acres (in two parcels) downstream from the Jordan development for recreation use. Alabama Power also proposes to remove 285.5 acres from the project boundary based on new survey information and to remove lands that are no longer needed for project purposes. This results in a net increase of 78.5 acres of land within the project boundary. Finally, as discussed above, although Alabama Power's relicense application proposed upgrading turbine units at its Lay, Bouldin, and Jordan developments,[41] these upgrades were subsequently authorized under its existing license.[42]

---

[39] The Bouldin development withdraws water from Jordan Lake.

[40] *See* EA at 193-94.

[41] The scope of work includes turbine replacement, stator coil replacement, wicket gate system rehabilitation or replacement, gate stem bushing replacement, turbine and generator bearing refurbishment, and related component changes.

[42] The turbine upgrades are expected to increase each turbine rating by 4 MW, as well as increase efficiency and annual generation. However, no change in the developments' installed capacity is expected, because the generator capacity in MW is smaller than the corresponding turbine capacity in MW. *See* EA at 35.

## I.  **Proposed Project Operation and Environmental Measures**

51.    Alabama Power proposes to operate the project as described below, and implement environmental measures to protect and enhance water quality, fish and wildlife, recreation, and cultural resources.

### 1.  **Project Operation**

52.    At the Weiss development, Alabama Power proposes to modify the operating curve to:  (1) raise the winter operating curve by 3 feet to elevation 561 feet from December 1through March 1; and (2) extend the summer operating curve from August 31 to September 30.  The purpose of these proposed changes is to:  (1) ensure that the Weiss reservoir reaches its normal pool elevation early in the year; (2) ensure that minimum flows can be provided to the Weiss bypassed reach year-round, including during drought conditions; and (3) enhance recreation access and use of the Weiss reservoir.

53.    Alabama Power proposes to continue operating the Neely Henry development according to the interim operating curve that has been in place since February 2001.  The operating curve provides for a normal summer pool elevation of 508 feet and normal winter pool of 507 feet.  Alabama Power also proposes to modify flood control procedures, to be consistent with the operating curve implemented in 2001.

54.    For the Logan Martin development, Alabama Power proposes to modify the operating curve to:  (1) raise the winter pool elevation by 2 feet, to 462 feet, from January 1 to April 14; (2) raise the pool level to attain a normal summer elevation of 465 feet by May 1 and maintain this elevation through September 30; and (3) begin lowering the reservoir level on October 1 to reach an elevation of 462 feet by December 1.  The purpose of these proposed changes is to:  (1) ensure that the Logan Martin reservoir reaches its normal pool elevation early in the year; and (2) enhance recreation access and use of the Logan Martin reservoir.

55.    Alabama Power proposes to continue to operate the Lay, Mitchell, Jordan, and Bouldin developments in a run-of-river mode, as previously described, and to continue providing navigation flow releases from the Jordan development as established in the 1972 agreement with the Corps.

Page 30 of 327      Filed: 06/17/2016      Document #1621558      USCA Case #16-1195

## 2.    **Environmental Measures**

56.    To protect and enhance aquatic habitat and water quality in the 20-mile-long Weiss bypassed reach, Alabama Power proposes to implement the Weiss Bypass Flow Adaptive Management Plan[43] to determine minimum flow requirements.  Initially, Alabama Power will release a variable continuous minimum flow ranging from 4 to 9 percent of the flows occurring at the upstream Mayo's Bar USGS gage no. 02397000 (i.e., approximately 135 to 1,053cfs), depending on the month of the year.  Alabama Power will monitor biotic responses to the minimum flows through 2020 and, in consultation with resource agencies, adjust the minimum flow requirements, as needed.

57.    To protect existing aquatic habitat, organisms, and recreational use in the Coosa River downstream of the project, Alabama Power proposes to maintain the existing aquatic enhancement flow releases and recreation flow releases from Jordan dam.  Following completion of the authorized turbine upgrade at the Jordan development, Alabama Power proposes to consult with interested entities and assess the feasibility of replacing the existing recreational flow release of 4,000 cfs with releases ranging from 4,000 to 5,000 cfs.

58.    To address minimum flow needs downstream from the Neely Henry, Logan Martin, Lay, and Mitchell developments, Alabama Power proposes to implement an adaptive management approach that includes:  (1) assessing water quality conditions in the tailraces following implementation of DO enhancements; (2) assessing the status of mussels, snails, and fish in the tailwaters before and after implementing the DO enhancements; and (3) consulting with FWS and Alabama DCNR to identify measures that may improve the growth and survival of target species.

59.    To enhance water quality in the Coosa River, Alabama Power proposes to meet state water quality standards of 4 mg/L of DO in the turbine discharges of each development.  To protect the state's river basins in accordance with the goals of the Clean Water Act (CWA), Alabama Power proposes to continue to voluntarily participate in the Alabama Clean Water Partnership Project (Clean Water Partnership).  Finally, as an education tool on toxins in the Coosa River Basin, Alabama Power proposes to make its final Toxins Issue Report available to the public.

---

[43] *See* Alabama Power July 28, 2005 license application at Volume 4, E10-Draft Adaptive Management Plan for the Coosa River-Weiss Bypass.

Page 32 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

60.     To minimize erosion and sedimentation, as well as improve water quality, at the project, Alabama Power proposes to update and implement its Erosion Repair and Monitoring Plan.

61.     To promote the recovery of listed mussels and fish, as well as enhance their habitat in the Coosa River and other river systems in Alabama, Alabama Power proposes to provide funds to help establish and maintain: (1) the Alabama Aquatic Biodiversity Center (Aquatic Center), an aquatic research and culture facility for the propagation of aquatic species of concern within the state; and (2) the Fisheries Habitat Enhancement and Restoration Program (Fish Program).

62.     To enhance crappie and blackbass spawning in the Logan Martin and Weiss reservoirs, Alabama Power proposes to continue restricting lake level fluctuations in the reservoirs in the spring by holding constant, or slightly increasing, the water levels in the Weiss and Logan Martin reservoirs for, at a minimum, a 14-day period in the spring.

63.     To enhance and protect the wetland and upland wildlife habitats in the project area, Alabama Power proposes to implement the Coosa Wildlife Management Plan, which includes provisions for: (1) managing the project's shorelines for native vegetative communities and enhancing wildlife habitat value; (2) managing timber resources to improve wildlife habitat, including creating additional forest openings on project lands to provide foraging areas for wildlife; (3) managing lands around the Mitchell development for the benefit of the federally listed red-cockaded woodpecker; (4) protecting and monitoring bald eagle nesting areas; (5) establishing barrier-free public hunting areas; (6) developing a waterfowl refuge and/or waterfowl management area at the Weiss development; and (7) establishing and funding a Wildlife Habitat Enhancement and Restoration Program.[44]

64.     To improve management of wetlands, as well as rare, threatened, and endangered species at the project, Alabama Power proposes to: (1) incorporate the wetland database developed during relicensing into Alabama Power's geographic information system database used to administer its Shoreline Management Plan; (2) develop and implement a public education program on the value of wetlands; and (3) make available to state and federal agencies the Alabama Power wetland database to improve the agencies' review of proposed activities on lands classified as Sensitive Resources Lands.

---

[44] Under this program, Alabama Power would contribute money to the fund and Alabama DCNR would administer the funds for measures within the Coosa River Project and the Warrior River Project No. 2165 boundaries.

Page 33 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

65.    To enhance recreational opportunities, Alabama Power proposes to implement its Recreation Plan that includes provisions for operating and maintaining, or providing for the operation and maintenance of, recreation sites and improving those sites by installing fishing piers, developing trails, repairing an existing or installing new boat launches, and improving parking areas and primitive campsites. To enhance public safety at the project, Alabama Power proposes to: (1) periodically monitor the amount, location, and origin of woody debris on the project reservoirs and lakes; and (2) fund the Alabama Marine Police and implement a 2003 agreement with the Alabama Marine Police.

66.    To protect sensitive habitats and the scenic quality at the project, Alabama Power proposes to implement its Shoreline Management Plan that includes: (1) shoreline management goals; (2) policies for activities that may affect shoreline management (e.g., dredging, bank stabilization); (3) a shoreline classification system; (4) public education and outreach measures to describe, promote, and recommend best management practices (BMP) to protect the shoreline; (5) shoreline permitting guidelines; and (6) a provision for periodically updating the Shoreline Management Plan. To protect native species and public health at the project, Alabama Power proposes, as part of its Shoreline Management Plan, to continue: (1) administering its Aquatic Plant Management and Mosquito Control Programs; and (2) cooperating with Alabama DCNR to control invasive species.

67.    To protect cultural resources, Alabama Power proposes to implement the final Historic Properties Management Plan (HPMP) filed October 27, 2006, in accordance with the Programmatic Agreement (PA).

**Summary Of License Requirements**

68.    As summarized below, the license, which authorizes a combined 960.9 MW of renewable energy, requires a number of measures to protect and enhance water quality, fish, wildlife, cultural, and recreation resources at the project.

69.    This license requires, with some modifications, most measures proposed by Alabama Power to provide downstream flood control at the Weiss, Neely Henry, and Logan Martin developments; control shoreline erosion and reservoir siltation; improve DO levels below each development and monitor DO levels and biological responses to improved DO levels; release continuous seasonal minimum flows in the Weiss bypassed reach and below Jordan to enhance aquatic habitat and populations of listed mussels and snails; add gravel, brush piles, and other structures in project reservoirs to provide cover for fish; maintain and improve project recreation sites; provide whitewater boating flows below the Jordan development; modify operations and minimum flow releases during drought conditions to protect listed species and navigation needs below Jordan; improve

Page 34 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

habitat for the federally listed red-cockaded woodpecker; establish barrier-free hunting areas; protect the shoreline and establish buffer zones to protect riparian habitats, wetlands, and listed species; and protect cultural resources. Modifications to some of these measures are included in the license to facilitate administration of the license, exclude requirements that generally would be outside of the license, and require specific measures as opposed to the establishment of funds (e.g., adding gravel and brush piles to project reservoir instead of providing funding to the state to implement habitat improvements).

70.     This license authorizes Alabama Power to continue to operate the Neely Henry reservoir according to a modified operating curve authorized under a variance approved by the Corps and the Commission in 2001 (i.e., a normal winter pool elevation of 507 feet). This license, however, does not authorize Alabama Power's proposal to raise the winter pool elevations for the Weiss and Logan Martin developments because such change will hinder the Corps' flood control responsibilities at the developments. This license also requires staff's recommended *Project Operation and Flow Monitoring Plan* (Article 406) to demonstrate compliance with project operations.

## Water Quality Certification

71.     Under section 401(a)(1) of the CWA,[45] the Commission may not issue a license authorizing the construction or operation of a hydroelectric project unless the state water quality certifying agency either has issued water quality certification for the project or has waived certification by failing to act on a request for certification within a reasonable period of time, not to exceed one year. Section 401(d) of the CWA provides that the certification shall become a condition of any federal license that authorizes construction or operation of the project.[46]

72.     On July 2, 2004, Alabama Power applied to Alabama Department of Environmental Management (Alabama DEM) for 401 water quality certification. On July 1, 2005, Alabama DEM issued a certification for the Coosa River Project that includes seven discrete conditions at each of the project's seven developments, which are set forth in Appendix A of this order and incorporated into the license (*see* Ordering Paragraph D).

---

[45] 33 U.S.C. § 1341(a)(1) (2006).

[46] 33 U.S.C. § 1341(d) (2006).

73. The certification requires the following measures:

(1) Operate each development, including turbine releases, to provide no less than 4 mg/L of DO at all times[47] at specified monitoring locations for each development.

(2) Develop and implement measures to increase the DO downstream of the powerhouse discharges through structural and/or operational changes at the project within 18 months of licensing.

(3) Install a tailrace monitor and collect DO and water temperature data at specific locations in the Weiss bypass reach and, during generation from May 1 through September 30, downstream from each powerhouse. Monitoring can be temporarily discontinued during flood events until tailrace elevations return to normal.

(4) Commence monitoring within 18 months of the effective date of a new license if the effective date is within the prescribed monitoring period, or by the following May 1 if the effective date of the license is not within the prescribed monitoring period; and monitor for a period of 3 years.

(5) Maintain and calibrate the monitoring equipment to assure proper operation.

(6) Develop and submit DO and water temperature monitoring reports to the Alabama DEM and the Commission.

(7) Assess the project's effects (by development) on Alabama's water quality standards and file the assessment with the Alabama DEM within 6 months following the end of the 3-year monitoring period; and develop and implement additional structural or operational measures if monitoring results do not show substantial compliance with state DO standards.

---

[47] Conservation Groups assert that the certification conditions require Alabama Power to maintain DO levels above 5.0 mg/L except when generating, and then the applicable standard that must be met in the discharge is 4.0 mg/L. *See* Conservation Groups July 8, 2010 Comments at 23, citing to Alabama Adm. Code §§ 335-6-10.09(2)(e)(4), (3)(c)(4), and (5)(e)(4). Conservation Groups are mistaken. The certification conditions are clear that Alabama Power must maintain no less than 4.0 mg/L of DO *at all times*, including during periods of non-generation.

Page 36 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

The certification conditions also require Alabama Power to: (1) file, with Alabama DEM and the Commission by some unspecified date following the final year of monitoring, a final water quality report; and (2) implement structural and operational modifications at the project to ensure compliance with DO standards without prior Commission approval. To provide the Commission a means to administer compliance with license requirements, Article 408, *Water Quality Monitoring Plan*, requires Alabama Power to include in the monitoring plan a schedule for filing any reports and plans for continued monitoring and/or measures to improve DO with the Commission for review and approval. In addition, Article 407, *Dissolved Oxygen Enhancement Plan*, requires Alabama Power to provide additional details of its plan to enhance DO.

## Coastal Zone Management Act

74.     Under section 307(c)(3)(A) of the Coastal Zone Management Act (CZMA),[48] the Commission cannot issue a license for a project within or affecting a state's coastal zone unless the state CZMA agency concurs with the license applicant's certification of consistency with the state's coastal zone management program, or the agency's concurrence is conclusively presumed by its failure to act within six months of its receipt of the applicant's certification.

75.     By letter of May 10, 2006, Alabama DEM notified Alabama Power that the project is neither within the Alabama coastal zone nor within a geographic area in which Alabama DEM would review licenses for consistency with the coastal zone management program. Therefore, no consistency certification is required.

## Section 18 Fishway Prescription

76.     Section 18 of the FPA[49] provides that the Commission shall require the construction, maintenance, and operation by a licensee of such fishways as may be prescribed by the Secretary of the Interior or the Secretary of Commerce, as appropriate.

77.     By letter filed July 30, 2008, the Secretary of the Interior requested that the Commission reserve authority to prescribe fishways. Consistent with Commission policy, Article 409, *Reservation of Authority to Provide Fishways*, reserves the Commission's authority to require fishways that may be prescribed by Interior for the Coosa River Project.

---

    [48] 16 U.S.C. § 1456(c)(3)(A) (2006).

    [49] 16 U.S.C. § 811 (2006).

Filed: 06/17/2016    Page 37 of 327

Document #1621558

USCA Case #16-1195

**ThreatenedAnd Endangered Species**

78.     Section 7(a)(2) of the Endangered Species Act (ESA) of 1973[50] requires federal agencies to ensure that their actions are not likely to jeopardize the continued existence of federally listed threatened and endangered species, or result in the destruction or adverse modification of their designated critical habitat.

79.     There are existing populations of 14 federally listed species within the Coosa River Project area.  These species include five plants:  (1) the endangered Alabama leather flower, (2) endangered harperella, (3) endangered green pitcher plant, (4) threatened Mohr's Barbaras buttons, and (5) threatened Kral'swaterplantain.  There is one listed bird, the endangered red-cockaded woodpecker, and one listed fish, the threatened blue shiner.  There are two listed mussels:  (1) endangered southern clubshell, and (2) threatened finelined pocketbook.  There are five listed snails:  (1) endangered interrupted rocksnail, (2) endangered rough hornsnail, (3) endangered tulotoma snail, (4) endangered cylindrical lioplax, and (5) threatened painted rocksnail.

80.     In addition, there are 12 designated critical habitat units in the project area.  Two units (IR1 and IR3 on the mainstem of the Coosa in the Weiss bypass and Jordan tailrace, respectively) are critical habitat for the interrupted rocksnail, 2 units (RH1 and RH2 in the Jordan tailrace andYellowleaf Creek – Lay Lake, respectively) are critical habitat for the rough hornsnail, 2 units (GP2 and GP3 in the Weiss bypass and Hatchet Creek-Mitchell Lake, respectively) are critical habitat for the Georgia pigtoe mussel, and 6 units (Units 18, 19, 21, 23, 24, and 26) are for 10 listed mussel species.[51]

81.     FWS also plans to reintroduce 20 threatened and endangered species to habitats in the project area in the foreseeable future, in accordance with the reintroduction plan of the Mobile River Basin Mollusk Restoration Committee.[52]

---

[50] 16 U.S.C. § 1536(a) (2006).

[51] In addition to critical habitat for the finelined pocketbook and southern clubshell mussels, which are found in the project area, the six units are designated critical habitat for the following listed mussels, which are not present in the project area:  southern acornshell, upland combshell, Alabama moccasinshell, Coosa moccasinshell, southern pigtoe, ovate clubshell, and triangular kidneyshell.

[52] The species are the blue shiner, amber darter, goldline darter, painted rocksnail, interrupted rocksnail, rough hornsnail, cylindrical lioplax, lacy elimia, flat pebblesnail,

Continued…

Page 38 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

82.     On January 15, 2010, Commission staff sent its Biological Assessment (BA)[53] to FWS and requested formal consultation on certain listed species.  On January 24, 2011, Alabama Power filed additional information regarding some listed mussel species.[54]  On November 4, 2011, staff issued a revised BA.  The revised BA found that relicensing the proposed project, with staff's recommended measures, would not likely adversely affect the five listed plants (Alabama leatherflower, Mohr's Barbaras buttons, harperella, Kral'swaterplantain, and green pitcher plant) and mussel critical habitat units 19, 21, 23, and 24.  Staff asked for FWS concurrence with these findings.

83.     The revised BA also found that relicensing the proposed project, with staff's recommended measures would likely adversely affect the following listed species and designated critical habitat, and initiated formal consultation regarding these species: (1) the red-cockaded woodpecker; (2) the two listed mussel species (finelined pocketbook and southern clubshell); (3) four of the five listed snail species (interrupted rocksnail, rough hornsnail,tulotoma snail, and painted rocksnail); (4) mussel critical habitat Units 18 and 26, interrupted rocksnail units IR1 and IR3, rough hornsnail units RH1 and RH2, and Georgia pigtoe units GP2 and GP3; and (5) the 20 listed species to be reintroduced in the project area.[55]

84.     FWS, in a letter filed December 8, 2011, acknowledged the initiation of formal consultation with respect to the species and designated critical habitat listed in the paragraph above, as well as for the blue shiner fish and the cylindrical lioplax snail.[56]  FWS also concurred with staff's determination that the Alabama leatherflower, Mohr's

---

finelined pocketbook, Alabama moccasinshell, Coosa moccasinshell, southern clubshell, southern pigtoe, ovate clubshell, southern combshell, Georgia pigtoe, heavy pigtoe, Triangular kidneyshell, and inflated heelsplitter.  *See* Attachment 6 of Alabama Power's addendum to its draft BA, filed January 24, 2011.

[53] The EA served as staff's BA.

[54] *See* Alabama Power's January 24, 2011 addendum to the draft BA it had submitted with its relicense application.

[55] *Seesupra* note 52.

[56] The revised BA by mistake had omitted findings for these two species that relicensing the project would not likely adversely affect the existing population of the species.

Page 39 of 327

Filed: 06/17/2016    Document #1621558

USCA Case #16-1195

Barbaras buttons, harperella, Kral'swaterplantain, green pitcher plant, and mussel critical habitat units 19, 21, 23, and 24 are not likely to be adversely affected.

85.     On June 10, 2012, FWS filed its biological opinion (BO), which concluded that relicensing the project is not likely to jeopardize the continued existence of any species, nor is it likely to destroy or adversely modify any critical habitat.

86.     The BO includes an incidental take statement with 11 reasonable and prudent measures (RPM) in five action areas to minimize take of mussels, snails, blue shiner fish, and the red-cockaded woodpecker, along with 16 terms and conditions to implement the measures. The reasonable and prudent measures are meant to minimize incidental take of the species covered by the BO that would result from: (1) poor water quality and habitat fragmentation; (2) shoreline management practices; (3) land management practices and timber harvesting activities; (4) flow releases downstream from the Bouldin and Jordan developments and lake level management during drought conditions; and (5) stranding associated with the biannual drawdown of Lay Lake.

87.     The terms and conditions require Alabama Power to: (1) implement the water quality monitoring plan included in the Weiss Bypass Flow Adaptive Management Plan; (2) implement the DO measures required by the certification for the Logan Martin development and revise the Logan Martin adaptive management plan[57] to ensure adequate DO is maintained during non-generation periods; (3) participate in species survival, habitat, and water quality studies associated with reintroduction efforts; (4) designate shoreline areas that are adjacent to, or could affect, listed species or critical habitat as Sensitive Resource Lands under the Shoreline Management Plan's classification system; (5) promote the use of BMPsand proper use of herbicides; (6) conduct baseline mussel, snail, and fish surveys in the lower Big Canoe Creek (Neely Henry development), lower Choccolocco Creek (Logan Martin development), and lower Hatchet and Weogufka creeks (Mitchell development); (7) implement the red-cockaded woodpecker management plan proposed by the licensee;[58] (8) apply appropriate BMPs and streamside management zones in lower Hatchett and Weogufka creeks during timber management activities; and (9) implement the Coosa River Project portion of Alabama-ACT Drought Response Operations Proposal (ADROP), including (i) flow reductions

[57]*See* Attachment 5 to Alabama Power's January 24, 2011 Addendum to the Coosa River Project Biological Assessment.

[58]*See* Alabama Power's July 28, 2005 license application, Volume 4, E6, Section 6-Wildlife Management Plan.

Filed: 06/17/2016    Page 40 of 327

USCA Case #16-1195    Document #1621558

(from spring to summer flow requirements) of no greater than 67 cfs per day and water quality monitoring, (ii) use of excess water in the Jordan Lake to maintain wetted width of the Coosa River downstream, (iii) studies of exposed habitat and population data for rough hornsnail in Yellowleaf Creek, (iv) maintenance of a drawdown rate of less than 12 inches per day, (v) salvage and translocation of exposed mussels and snails during lake draw down events; and (vi) surveying of shoreline areas for the tulotoma snail and rough hornsnail prior to and after drawdowns, and estimate the amount of exposed habitat.

88.    The RPMs and their implementing incidental take terms and conditions are included in Appendix B and the terms and conditions are made part of the license by Ordering Paragraph E. In addition, in order to monitor compliance with, and facilitate administration of, the terms and conditions, Article 417 requires the licensee to file a *Threatened and Endangered Species Protection Plan*, for Commission approval, detailing how it will implement the terms and conditions of the BO.

89.    In addition to the incidental take conditions, FWS recommends four conservation measures to help protect, and promote the recovery of, listed species and the bald eagle.[59] These measures would require Alabama Power to: (1) coordinate with the resource agencies to conduct surveys of rough hornsnail in the Coosa River downstream from the Jordan dam within 36 months of license issuance; (2) classify shoreline habitats in the areas surrounding the Mohr's Barbaras buttons and green pitcher plant locations as Sensitive Resource Lands; (3) coordinate with the resource agencies to identify a modified schedule for conducting bald eagle surveys;[60] and (4) include with the Shoreline

---

[59] Conservation measures are discretionary recommendations. The regulations implementing the ESA define conservation recommendations as "suggestions regarding discretionary measures to minimize or avoid adverse effects of a proposed action on listed species or critical habitat or regarding the development of information." *See* 50 C.F.R. § 402.02 (2010).

[60] The Coosa Wildlife Management Plan was developed prior to the delisting of the bald eagle, and includes annual surveys over a two-week period to identify and protect bald eagle nests. Although the bald eagle is no longer a listed species, it is still protected under the Bald and Golden Eagle Protection Act. FWS states that two weeks is likely not sufficient to complete surveys over all of the developments and recommends Alabama Power work with FWS and Alabama DCNR to develop a suitable survey schedule.

Management Plan an evaluation matrix [61] to expedite Alabama Power's shoreline permit application process.

90.     Because the proposed measures would further support the protection and recovery of listed and protected species at the project at little cost, this license includes FWS' recommended measures, except for the rough hornsnail surveys downstream from the Jordan Dam. Article 414 requires Alabama Power to reclassify shoreline habitats surrounding the Mohr's Barbaras buttons and green pitcher plant locations as Sensitive Resources Lands and modify the Shoreline Management Plan to include permit restrictions. Article 412 requires Alabama Power to work with FWS and Alabama DCNR to establish a bald eagle survey schedule to allow Alabama Power sufficient time to complete the required surveys, and thus protect the bald eagle and its habitat on project lands from activities associated with shoreline development, including Alabama Power's proposed recreational improvements.

91.     However, this license does not require Alabama Power to conduct a survey of rough hornsnail distribution in the Coosa River downstream from the Jordan dam. While such surveys would provide quantified information about the distribution of rough hornsnail in the downstream Coosa River, this information is not needed because there is critical habitat for the species in the Jordan tailrace, and the species is known to occur in the Coosa River downstream from the Jordan dam. Moreover, this license includes no measures that would adversely affect the existing environment in the Coosa River downstream from the Jordan Dam. Alabama Power, however, is free to work with FWS and Alabama DCNR to conduct the requested survey outside of the license.

92.     On November 9, 2012, Alabama Rivers filed comments with the Commission on FWS' BO, reiterating many of the concerns it raised on the draft BO, including its assertions that the BO's baseline is flawed,[62] its conclusions are not supported by the

---

[61] The evaluation matrix would assist Alabama Power in determining (1) whether certain shoreline activities (e.g., dredging, construction of boat docks and boat ramps, and bank stabilization) within the Sensitive Resources Lands classification might affect a federally listed species, and (2) if so, appropriate restrictions to place on a permit authorizing a non-project use.

[62] Alabama Rivers also asserts that FWS inappropriately postponed determination of a baseline until after the license is issued, thus calling into question the BO's incidental take estimates. Alabama Rivers cites, as an example, the BO's determination that the fish, mussel, and snail surveys to be conducted in various project area waters "will

Continued…

Filed: 06/17/2016          Page 41 of 327

Document #1621558

USCA Case #16-1195

record, and it includes insufficient quantitative analyses of existing and alternative minimum flows.[63]

93.     To support its claims, Alabama Rivers filed what it deems new information from experts in the form of two declarations and three studies, which it claims challenges the BO's conclusion that post-action monitoring will provide an accurate understanding of baseline populations.[64]  Alabama Rivers asks that the Commission not issue a license for the project before considering its newly submitted evidence.[65]

94.     As relevant here, the ESA requires that federal agencies consult, formally or informally, with FWS and obtain a BO on whether the proposed action is likely to result in a violation of the ESA when the agency determines that a proposed action may affect a threatened and endangered species.[66]  As discussed above, staff consulted with FWS and obtained a BO finding that the proposed relicensing of the Coosa River Project would not likely jeopardize the continued existence of any listed species, nor adversely affect or destroy their critical habitat.  FWS determined that incidental take of several species may

---

establish a baseline and be used to insure no further decline" in mussels, fish, snails, or habitat.  Alabama Rivers' November 9, 2012 Comments at 5.

[63] On April 18, 2012, Alabama Rivers also filed comments with FWS, asserting that the draft BO's conclusions were not supported by the record and alleging that it included insufficient quantitative analyses of existing and alternative minimum flows, as well as an improper definition of baseline.

[64] Alabama Rivers' November 9, 2012 Comments at 2 (citing attached "expert declaration" from Dr. Robert Bringolf and Dr. James Stoeckel; three studies by Johnson, *et al.* (2001), Rypel, *et al.* (2009), and Peterson, *et al.* (2011); and "discussion of updated [Environmental Protection Agency] recommendations regarding appropriate dissolved oxygen" levels).

[65] On December 19, 2012, Alabama Power filed a response to Alabama Rivers' comments, stating that the BO and its accompanying Incidental Take Statement adequately address Alabama Rivers' concerns.  Alabama Power added that Alabama Rivers has not pointed to new information not already considered by FWS or demonstrated any reason why the Commission's reliance on the BO could be considered arbitrary and capricious.  Alabama Power's December 19, 2012 Comments at 2-3.

[66] *See* 50 C.F.R. § 402.01(b) (2012).

occur as a result of project relicensing, and pursuant to ESA section 7(b),[67] provided an incidental take statement as part of its BO. The statement includes terms and conditions to implement measures to avoid or minimize incidental take.

95.    In arguing that staff relied unreasonably on FWS' BO, Alabama Rivers fails to recognize the substantive and procedural responsibilities that ESA section 7(a)(2)[68] imposes and the interdependence of federal agencies acting under that section. Although a federal agency is required to ensure that its action will not jeopardize the continued existence of listed species or destroy or modify their designated critical habitat, it must do so in consultation with the appropriate agency, in this case,FWS. Because FWS is charged with implementing the ESA, it is the recognized expert with regard to matters of listed species and their habitat.[69]

96.    In reviewing whether the Commission may appropriately rely on a BO, the relevant inquiry is not whether the BO is flawed, but rather whether the Commission's reliance was arbitrary and capricious.[70] Therefore, an action agency may rely on a BO if a challenging party can point to no new information that the consulting agency did not take into account that challenges the BO's conclusions.

97.    We find no basis for Alabama Rivers' challenge. As discussed in more detail below, the informationit cites is not sufficiently relevant to the Coosa River Project relicensing to warrant questioning the BO's conclusions. Specifically, the three articles consider different species that are not only located in different riverine systems, but are also located in a different state (Georgia). With respect to the two declarations, while they may disagree with some of FWS' conclusions in the BO, an agency must have discretion to rely on the reasonable opinions of its own qualified experts.[71]

---

[67] 16 U.S.C. § 1536(a)(4) (2006).

[68] *Id.* § 1536(a)(2).

[69] *See City of Tacoma, Washington v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006) (finding that expert agencies such as FWS have greater knowledge about the conditions that may threaten listed species and are best able to make factual determinations about appropriate measures to protect the species).

[70] *Id.*

[71] *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).

Filed: 06/17/2016    Page 43 of 327

USCA Case #16-1195    Document #1621558

Page 44 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

98.     Moreover, the studies Alabama Rivers provides are not new; the three studies are dated 2001, 2009, and 2011.  Although the final BO was issued in June 2012, Alabama Rivers does not explain why it waited five months—until November 2012—to submit the three studies and expert declarations for FWS to consider in developing its final BO.

99.     Accordingly, this proceeding is not the appropriate venue to address Alabama Rivers' assertion that the BO violates ESA.[72]  Alabama Rivers filed extensive comments with the FWS on the draft BO, and is essentially rearguing factual issues that FWS had before it in preparing the final BO.  The Commission will not substitute its judgment for that of FWS, the agency that Congress has determined in the ESA should be responsible for providing its expert opinion regarding whether relicensing the Coosa River Project is likely to jeopardize the continued existence of the listed species, or to destroy or adversely modify their critical habitat.

100.     Here, the BO reviewed:  (1) the existing status of 23 species and 12 critical habitat units; (2) the environmental baseline for the action area; (3) the effects of the proposed relicensing of the Coosa River Project; and (4) the cumulative effects.  Based on the analysis, FWS concluded that the relicensing of the project, as proposed and with staff's additional environmental measures, is not likely to jeopardize the continued existence of any species, nor is it likely to destroy or adversely modify any critical habitat.[73] Accordingly, there is nothing in the record to suggest that our reliance on the BO is arbitrary and capricious.[74]

101.     Alabama Rivers' contention that the Commission should not rely on the BO because the BO in turn relies on post-license studies and monitoring, is similarly misplaced.  As noted earlier, the FPA does not require that the Commission have perfect

---

[72] Moreover, the Commission does not have the authority to render a decision on the validity of the BO.  When a BO is prepared in the course of a Commission licensing proceeding, the only means of challenging its substantive validity is on judicial review of the Commission's decision in the court of appeals.  *See City of Tacoma, Washington v. FERC*. 460 F.3d 53, 75 (D.C. Cir. 2006).

[73] *See* BO at 89-90.

[74] Moreover, it is appropriate for the Commission to show reasoned deference to FWS with regard to the interpretation of its rules and regulations.  *See Pacific Gas and Electric Company*, 107 FERC ¶ 61,232, at P21 (2004).

Page 45 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

information before taking a licensing action or that all environmental concerns be definitively resolved before issuing a license. This license includes extensive monitoring conditions, and the opportunity to modify the license as needed to address any new resource issues that may arise. Therefore, if the post-licensing studies and plans indicate that the take estimates in the incidental take statement are not sufficient, the Commission may reinitiate consultation and adjust the license terms to address these issues.

**National Historic Preservation Act**

102.   Under section 106 of the National Historic Preservation Act (NHPA)[75] and its implementing regulations,[76] federal agencies must take into account the effect of any proposed undertaking on properties listed or eligible for listing in the National Register of Historic Places (defined as historic properties) and afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking. This generally requires the Commission to consult with the State Historic Preservation Officer (SHPO) to determine whether and how a proposed action may affect historic properties, and to seek ways to avoid or minimize any adverse effects.

103.   To satisfy these responsibilities, the Commission executed a Programmatic Agreement (PA) with the Alabama SHPO and the Georgia SHPO and invited Alabama Power, the Chickasaw Nation, the Mississippi Band of Choctaw Indians, the Muscogee (Creek) Nation of Oklahoma, the Poarch Band of Creek Indians, and the Bureau of Indian Affairs (BIA) to concur with the stipulations of the PA. Alabama Power and the BIA concurred. The PA requires the licensee to implement an HPMP, filed on October 27, 2006, for the term of any new license issued for this project. Execution of the PA demonstrates the Commission's compliance with section 106 of the NHPA. Article 418 requires the licensee to implement the PA and an Historic Properties Management Plan.

**RecommendationsOf Federal And State Fish And Wildlife Agencies Pursuant To Section 10(j) Of The FPA**

104.   Section 10(j)(1) of the FPA[77] requires the Commission, when issuing a license, to include conditions based on recommendations submitted by federal and state fish and

---

[75] 16 U.S.C. § 470 *et seq.* (2006).

[76] 36 C.F.R. Part 800 (2012).

[77] 16 U.S.C. § 803(j)(1) (2006).

wildlife agencies pursuant to the Fish and Wildlife Coordination Act,[78] to "adequately and equitably protect, mitigate damages to, and enhance fish and wildlife (including related spawning grounds and habitat)" affected by the project.

105.    In response to the June 6, 2008 public notice that solicited comments, final recommendations, terms and conditions, and prescriptions, FWS filed a total of six recommendations under section 10(j).[79]  Four recommendations were determined to be outside the scope of section 10(j) and are discussed in the next section.  The license includes conditions consistent with the two remaining recommendations that are within the scope of section 10(j):  (1) implement the Weiss Bypass Flow Adaptive Management Plan, including the plan's flow regime (Article 404); and (2) require that all waters in each development's tailrace comply with Alabama's standard of no less than 4.0 mg/L at all times (Article 407).

106.    Alabama DCNR did not submit any recommendations under FPA section 10(j).[80]

**Section 10(a)(1) Of The FPA**

107.    Section 10(a)(1) of the FPA[81] requires that any project for which the Commission issues a license be best adapted to a comprehensive plan for improving or developing a waterway or waterways for the use or benefit of interstate or foreign commerce; for the improvement and utilization of waterpower development; for the adequate protection, mitigation, and enhancement of fish and wildlife; and for other beneficial public uses, including irrigation, flood control, water supply, recreation, and other purposes.

---

[78] 16 U.S.C. §§ 661 *et seq*. (2006).

[79] *See* FWS' filing of July 30, 2008.  FWS included an additional recommendation under section 10(j) in which it encouraged the Commission to consider the cumulative downstream and upstream effects of the Coosa River Project operation on aquatic habitats and listed species.  However, this is not a proper section 10(j) recommendation because it is not a request for measures to be included in the license.  In any event, the EA includes a cumulative effects analysis which addresses this issue, and which was considered in developing the license conditions.  *See* EA at 104, 135-36.

[80] *See* Alabama DCNR's filing of July 31, 2008.

[81] 16 U.S.C. § 803(a)(1) (2006).

Filed: 06/17/2016          Page 46 of 327

USCA Case #16-1195          Document #1621558

Page 47 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

### A.   FWS Recommendations

108.   FWS made four recommendations under section 10(j) that are not specific measures to protect, mitigate damages to, or enhance fish and wildlife, or have no relationship to project effects.  Consequently, these recommendations are not considered under section 10(j) of the FPA.  Instead, these recommendations are considered under the broad public-interest standard of section 10(a)(1).[82]

109.   FWS recommends that Alabama Power re-evaluate the flow needs downstream from the Neely Henry, Logan Martin, Lay, and Mitchell developments (through adaptive management plans) following the installation of aeration enhancements.  This recommendation is accommodated by the water quality certification requirements, and in Article 408, *Water Quality Monitoring Plan*.  The plan requires Alabama Power to maintain DO levels of no less than 4.0 mg/L through additional structural and operational requirements (e.g., flow releases), if needed.[83]

110.   FWS recommends, and Alabama Power proposes, to provide funding, through a Culture Facility Fund managed by Alabama Power towards the establishment of the Aquatic Center.[84]  The purpose of the Aquatic Center would be to propagate threatened and endangered species and other aquatic species of concern throughout Alabama.

111.   As discussed in the EA,[85] the Aquatic Center may potentially produce valuable information, through research, that could aid in the enhancement and restoration of threatened and endangered mussels and snails in the Coosa River and elsewhere in Alabama.  However, we find that the recommended measure is too general to effectively implement at the Coosa River Project.  As the Commission has previously explained, we

---

[82] 16 U.S.C. § 803 (a)(1) (2006).

[83] Flow releases from the developments may be one of the operational measures considered if the aeration systems do not prove sufficient for attaining state standards for DO.

[84] Alabama Power would contribute $2.8 million to the Culture Facility Fund over a 16-year period, beginning after licenses are issued for the Coosa River and Warrior River projects.  The funds would be used to reimburse the costs associated with material, labor, equipment, office supplies, matching funds for grants, and subcontracting services for planning, constructing, managing, operating, and maintaining the Aquatic Center.

[85] *See* EA at 103.

Page 48 of 327

Filed: 06/17/2016       Document #1621558

USCA Case #16-1195

prefer to require a licensee to undertake specific measures to resolve project effects, especially in cases where it is not clear to what extent the funds will be used for activities related to the project, as is the case here.[86]  Because there is no assurance that the resources affected by the project would benefit from the Culture Facility Fund and Aquatic Center, staff did not recommend, and we do not adopt, the measure.[87]  However, Alabama Power may support the Aquatic Center through funding outside of its license.

112.    The FWS recommends that Alabama Power consult with it regarding any proposed permitting under the Shoreline Management Plan, particularly with respect to lands designated as Sensitive Resources Lands, and that the plan be revised periodically to reflect new information on listed species.  As discussed later in this order, Article 414, *Shoreline Management Plan*, requires such consultation and periodic revisions.

113.    The FWS recommends that the Commission include the relevant portions of the ADROP in the license.  As discussed elsewhere in this order, the ADROP, as it relates to the Coosa River Project, is included as a condition of this license (Article 403, *Drought Management*).

## B.    <u>Project Operation and Reservoir Elevations</u>

114.    Alabama Power proposes to modify the operating curves for the Weiss and Logan Martin reservoirs by increasing the winter pool levels and extending the summer pool season up to 30 days.  Although the modifications would enhance recreation access, extend the summer recreation season, and help ensure refilling of the reservoirs to summer levels, it would also reduce the dedicated flood storage for the reservoirs.[88]  TheCorps has flood control responsibilities on the Coosa River within the Alabama-Coosa-Tallapoosa (ACT) River Basin and has established the maximum elevations of the reservoirs through operating curves.  Thus, before the Commission may authorize changing the operating curves and raising these elevations, Alabama Power must first

---

[86] *See Policy Statement on Hydropower Licensing Settlements*, 116 FERC ¶ 61,270 (2006) and *Portland General Electric Company and Confederated Tribes of the Warm Springs Reservation of Oregon*, 111 FERC ¶ 61,450 (2005).

[87] *See* EA at 249.

[88] *See* EA at 236.

Page 49 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

obtain approval from the Corps.[89]  Accordingly, staff recommended, and this license requires, that Alabama Power continue to operate the Weiss and Logan Martin developments under the existing operating curves and pool elevations, as defined in the Corps' 2004 Reservoir Regulation Manuals for the two developments.[90]  Articles 401a, *Weiss Reservoir Water Level Management*, and 401c, *Logan Martin Reservoir Water Level Management*, require the operating curves established in the Corps' 2004 operating manuals.Should the Corps revise its operating manuals in the future to permit a change in winter pool levels, Alabama Power may, at that time, file a request to amend its license.

115.    Alabama Power proposes to continue to operate the Neely Henry reservoir according to a modified operating curve under a variance approved by the Corps and the Commissionin 2001 (i.e., a normal summer pool elevation of 508 feet and normal winter pool elevation of 507 feet).  In the EA,[91] staff concluded the modification to the operating curve would have a mostly beneficial effect on aquatic, wetland, and recreation resources.  Nonetheless, staff did not recommend such changes because changes to the operating curve would require Corps approval.

116.    In comments on the final EA, the Corps stated that it did not object to continued operation of the Neely Henry reservoir with the revised higher winter pool, deferring to the Commission whether to include the curve modifications in the new license, or to continue the operation under a variance.[92]  The Atlanta Commission, on the other hand, recommended that Alabama Power operate the Neely Henry development under the pre-

---

[89]33 C.F.R. § 208.11 (Engineering Regulation 1110-2-241) (2012); and Pub.L. No. 83-436.

[90]*See* EA at 235-36.

[91]*Id.*

[92]*See* U.S. Army Corps of Engineers' filing of November 3, 2010 responding to staff's recommendation in the EA that the Neely Henry development operate under the pre-variance operating curve.  Other comments on the draft EA also expressed support for continuing the higher reservoir elevations in the new license:  Neely Henry Lake Association; Logan Martin Association; William J. Copeland; Rainbow City, Alabama; the City of Gadsden, Alabama; Alabama Power; the Honorable Blaine Galliher, State of Alabama House of Representatives; Congressman Robert B. Aderholt; and Senator Richard Shelby.

variance operating curve (i.e., winter pool elevation 505 feet) until the Corps updates its operating manual.[93]

117.    Given the Corps' approval of the operating curve modifications and the benefits to environmental resources, we are including in the license Article 401b, *Neely Henry Reservoir Water Level Management*, which requires Alabama Power to continue operating under the operating curve as modified and approved in 2001.

118.    Alabama Power proposes to modify the regulation schedules for flood control for the Weiss, Neely Henry, and Logan Martin reservoirs to reflect its proposed changes in the operating curves for these developments.  As discussed above, the Corps has flood control responsibilities on the Coosa River within the ACT River Basin.  Thus, for these reservoirs the Corps, not the Commission, has authority to specify the flood regulation schedules and approve any changes in the flood regulation schedules.  Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments*, directs the licensee to operate the Weiss, Neely Henry, and Logan Martin developments for flood control as specified in the Corps Reservoir Regulation Manual for each development.  Since the Neely Henry Reservoir Regulation Manual has not been updated since 1979, Article 402 of the license also requires Alabama Power to consult with the Corps and file a plan with the Commission to update the flood control procedures for the Neely Henry development consistent with the operating curve required in Article 401(b), *Neely Henry Reservoir Water Level Management*.

119.    Alabama Power proposes to continue to operate the Lay, Mitchell, Jordan, and Bouldin developments in a run-of-river mode.  Water level fluctuations of less than 1 foot below the normal full pool for each lake would continue as they have under the prior licenses.  We agree, and include Articles 401d-401g, *Lay, Mitchell, Jordan, and Bouldin Reservoirs Water Level Management*, in the license.  These articles require Alabama Power to:  (1) operate the Lay, Mitchell, Jordan, and Bouldin developments in run-of-river mode; and (2) maintain the water surface elevations within 1 foot below the normal full pool elevation for each reservoir, except during droughts or emergency situations.  These operating requirements would continue to provide adequate protection (1) for water quality, aquatic biota, and aquatic habitat by minimizing fluctuations of water surface levels both upstream and downstream of the developments; and (2) for fish and other aquatic organisms that rely on near-shore habitat for feeding, spawning, and cover, as well as for aquatic vegetation near the shoreline.

---

[93] *See* Lewis B. Jones, King & Spalding LLP, on behalf of the Atlanta Regional Commission, filing of November 22, 2010.

Filed: 06/17/2016          Page 50 of 327

Document #1621558

USCA Case #16-1195

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 51 of 327

C.   **Flow Releases from Project Developments**

   1.   **Weiss Development**

      a.   **Bypass Flow Adaptive Management Plan**

120.   The Weiss bypassed reach:  (1) has no minimum flow requirement under the existing license; (2) is the only stretch of river in the project area upstream of the Jordan dam that has a significant reach not subject to a backwater effect;[94] (3) is federally designated as critical habitat for eight species of mussels; and (4) serves as habitat for 46 species of fish and 19 species of mussels, including one federally endangered and one threatened mussel species.  Alabama Power proposes to implement an adaptive management plan for establishing a minimum flow regime to maintain aquatic habitat in the bypassed reach.

121.   Alabama Power filed a *Draft Adaptive Management Plan for the Coosa River-Weiss Bypass* with the license application that defines goals and objectives, initial minimum flows for the bypassed reach, water quality and biological monitoring methods and collection sites, monitoring timelines, and an implementation schedule.  Under the proposed adaptive management approach, which state and federal fish and wildlife agencies agreed to as part of a Weiss Bypass Working Group (Weiss Bypass Group), Alabama Power would release specific minimum flows then monitor the response of the aquatic biota, including reintroduced snails and mussels, to the minimum flows.  The general goal, as established by the Weiss Bypass Group, is to meet Alabama water quality standards and provide flows to support the aquatic biota through all life stages.  The goal for fish is to mimic an unregulated flow regime, as well as to improve habitat to support, including the recruitment, augmentation, and reintroduction of, native fauna.  The goal for invertebrate fauna, including mussels, is the same, with the addition of protecting and enhancing federally protected species.  Flows would be modified if the biotic response does not achieve resource goals.

---

   [94] The Weiss bypassed reach is 20 miles long.  The upper 5.5 miles receives only leakage from the dam; the lower 14.5 miles receives flow from Terrapin Creek.  Between 9 (in winter months) and 12 (in summer months) miles of the lower bypassed reach is subject to backwater effects from the downstream Neely Henry reservoir and from the operational discharges from the Weiss powerhouse, depending on operating conditions and season.

Page 52 of 327      Filed: 06/17/2016      Document #1621558      USCA Case #16-1195

122.    Alabama Power proposes initially to release a continuous minimum flow, as identified by the Weiss Bypass Group, that ranges from 4 to 9 percent of the flows (135 to 1,053 cfs based on average monthly flows) occurring at the upstream Mayo's Bar USGS gage no. 02397000, depending on the month of the year.  There would be an adjustment of the flow twice per week based on the actual flow occurring at the Mayo's Bar gage.  Alabama Power would evaluate the water quality and biotic responses to the initial flow releases for 13 years, after which time it would, in consultation with the Weiss Bypass steering committee,[95] recommend any changes to the flows that may be needed to achieve resource goals.  The draft plan, however, did not define the decision process for adjusting the flow releases, but rather only indicated that it would be developed in consultation with the Weiss Bypass steering committee.

123.    Staff found that the proposed minimum flows would improve invertebrate and fish communities, and the aquatic habitats on which they rely, relative to existing conditions.[96]  Staff also found that the goals and objectives, sampling methods, and collaborative approach to be a reasonable means to evaluate the effectiveness of the flows.  However, before the plan can be approved, the decision process, as well as the criteria for determining whether the flows should be adjusted, still needs to be defined.  Article 404 requires Alabama Power to file a final plan that contains these elements, as well as an updated implementation schedule.

124.    Alabama Rivers asserts that it "repeatedly requested" the Commission require Alabama Power to provide additional information on flows, including water balance modeling and a flow study using the Instream Flow Incremental Methodology (IFIM).  Alabama Rivers stated that without such data, there would be an inadequate basis for the environmental analysis and licensing decision.[97]

---

[95] The steering committee would be comprised of representative from Alabama Power, Alabama DCNR, FWS, Alabama Rivers Alliance, and the Weiss Lake Improvement Association.

[96]*See* EA at 93-96.

[97] Alabama Rivers asserts (July 8, 2010 Comments at 10) that the statement in the EA that Alabama Power and the stakeholders generally agree to Alabama Power's adaptive management approach to establishing minimum flows in the Weiss bypassed reach is incorrect.  The EA does not say that the stakeholders agreed to Alabama Power's plan, but rather that stakeholders generally agreed to "an" adaptive management approach. *See* EA at 93 and 225.

Filed: 06/17/2016     Page 53 of 327

Document #1621558

USCA Case #16-1195

125.   With regard to the methods used by Alabama Power to assess instream flow needs at the Coosa River Project, the EA addresses Alabama Rivers' concern.[98] The EA acknowledges that Alabama Power did not use quantitative habitat data, but explains that Alabama Power and resource agencies agreed, instead, to take an adaptive management approach to determine flows for the Weiss bypassed reach. The EA also discusses the fact that the flow in the Weiss bypassed reach can reverse direction at times.[99] Consequently, a conventional IFIM approach would be difficult to apply to the reach, because the models that are used to develop data for IFIM are not well suited for assessing habitat in river reaches with occasional reversal of flow. Regardless of the methodology used to assess flows in the Weiss bypassed reach, the EA analyzed the benefits of Alabama Power's proposed flows, as well as those recommended by the Conservation Groups[100] and found that the minimum flows proposed by Alabama Power, along with a monitoring provision, would adequately protect and enhance existing resources at a lower cost.[101]

126.   Alabama Rivers disagrees with staff's recommendation that Alabama Power file an updated Weiss Bypass Flow Adaptive Management Plan for Commission approval, because this information should have been gathered and considered prior to finalizing the EA. As noted earlier, the FPA does not require that the Commission have perfect information before taking a licensing action. In this instance, staff reviewed Alabama Power's license application and required additional information where necessary to fill information gaps and clarify aspects of Alabama Power's proposal. Staff reviewed the information in the record and determined it to be of sufficient detail for purposes of preparing the EA.

---

[98] *See* EA at B-11.

[99] Flow reverses in the Weiss bypassed reach due to a backwatering effect from the operation of the Weiss powerhouse and the flow fluctuations associated with the operation of the Neely Henry development.

[100] The Conservation Groups recommended higher percentage target flows be provided: 30 percent of mean annual flow from July through November; 60 percent of mean annual flow from January through April; and 40 percent of the mean annual flow in May, June, and December.

[101] *See* EA at 93-96, 206, and 225-28.

Filed: 06/17/2016    Page 54 of 327

USCA Case #16-1195    Document #1621558

### b. **Fish Spawning**

127.    Since 1989, Alabama Power voluntarily has held lake levels constant or only slightly increased them at the Weiss development for a 14-day period during the spring to support favorable conditions for spawning for crappie as well as for other spring-spawning, warm water fish species, including largemouth bass.  Alabama Power has implemented a similar strategy at Logan Martin reservoir.

128.    In the EA,[102] staff found that the success of the fishery at the Weiss and Logan Martin reservoirs is likely due to many factors, but the stabilization of lake levels during the crappie and largemouth bass spawning season contributes to successful year class production.  Therefore, the EA recommended, and Article 410, *Crappie and Black Bass Spawning Enhancement at Weiss and Logan Martin Reservoirs*, requires that Alabama Power continue to hold lake levels constant for a 14-day period during the spring.[103] Article 410 gives Alabama Power the flexibility to, after consultations with Alabama DCNR and the Corps, forego the stabilization of the lake levels in a particular year, or halt the stabilization at any point during the 14-day period, due to adverse hydrological conditions (e.g., drought), maintenance activities, or other operational conditions.

### 2.    **Flow releases below Neely Henry, Logan Martin, Lay, and Mitchell developments**

129.    Conservation Groups assert that minimum flow schedules are needed downstream from each development to protect non-developmental uses of the river.[104] We disagree.

130.    The tailwaters downstream of the Neely Henry, Logan Martin, Lay, and Mitchell developments each flow into the backwater of the reservoir or lake located immediately downstream from that development.[105]  Releasing minimum flows, as recommended by Alabama Rivers, could result in higher velocities and provide short reaches of riverine type habitat, similar to what now occurs when the developments are generating, although

---

[102] *See* EA at 67-68.

[103] *See* EA at 236 and 237.

[104] Conservation Groups July 8, 2010 Comments at 31.

[105] *See* EA at 225.

Page 55 of 327

Filed: 06/17/2016    Document #1621558

USCA Case #16-1195

on a continuous basis. However, these reaches currently experience little dewatering of habitat and support excellent tailwater fisheries. Therefore, the need for minimum flows in these reaches has not been established at this time. Alabama Power proposes to implement, and the resource agencies concur, an adaptive management approach to assess the need for, and extent of, minimum flows in the Neely Henry, Logan Martin, Lay, and Mitchell development's tailraces. Alabama Power would consult with Alabama DCNR and FWS to develop final plans and schedules for studies following the implementation of aeration systems to improve DO levels at the project. Staff recommended Alabama Power file the final plans and schedules for Commission approval.[106]

131.    FWS' BO includes, as a condition, a requirement to revise and implement Alabama Power's Logan Martin adaptive management plan. Article 417, *Threatened and Endangered Species Protection Plan*, requires Alabama Power to develop a plan for implementing the terms and conditions of FWS' BO, including: (1) measures associated with the Logan Martin adaptive management plan; and (2) habitat and water quality monitoring in the Coosa River. The actions taken as part of the Threatened and Endangered Species Protection Plan are expected to identify factors affecting aquatic habitat for federally listed species, and any measures taken for such species are likely to benefit other aquatic species as well.

132.    As for minimum flows for the remaining developments, staff found no basis for requiring continuous minimum flows downstream from the developments at this time,[107] and this order does not require such flows. Standard Article 15 provides the Commission the ability to reconsider the need for minimum flows downstream from these developments if conditions change or as new information becomes available.

### 3.    Flow Release Plan below Jordan Development

133.    Alabama Power operates the Jordan development in a run-of-river mode, with flow releases that protect the federally listed tulotoma snail, enhance aquatic resources, and provide whitewater boating. Alabama Power proposes to continue these flow releases, which it has been implementing, with minor modification, since 1997.

---

[106]*See* EA at 217.

[107]*See* EA at 228-29.

Page 56 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

134.    As discussed in the EA,[108] since implementing the flows downstream from the Jordan dam, there has been a beneficial effect on the aquatic resources and recreational opportunities.  The reach now supports a trophy fishery for spotted bass and a population of the federally listed tulotoma snail.  In addition, the weekend releases, from June 16 through October 31, continue to provide for Class I through Class III whitewater boating[109] in a 7.5-mile-long reach between the Jordan dam and a takeout point downstream from the dam.  Accordingly, Article 405, *Minimum Flow Releases at the Jordan Development*, requires Alabama Power to continue providing the existing minimum flow releases and scheduled recreational flow releases.

135.    Upon completing the refurbishment of unit 4 at the Jordan development, Alabama Power proposes to evaluate whether such refurbishment alleviates a hydraulic constraint of the turbine unit so that Alabama Power would be able to provide recreational flows in the 4,000 cfs to 5,000 cfs range instead of the 4,000 cfs that it currently releases.  If sustained flows in this range are feasible, Alabama Power proposes to negotiate an alternative release schedule with interested stakeholders.

136.    The EA concludes[110] that flows of about 4,475 cfs would provide safer boating opportunities than the existing 4,000-cfs release, and a more satisfying whitewater experience.  In the event that flows in the requested range are feasible after the refurbishment of unit 4, the EA recommends that Alabama Power conduct a study to evaluate and determine the flows that would provide a better boating experience. We agree.  Accordingly, Article 405, *Minimum Flow Releases at the Jordan Development*, requires the licensee, upon completion of the turbine unit upgrade, to evaluate whether refurbishment of unit 4 alleviates a hydraulic constraint so that the licensee shall be able to provide recreation flows in the range of 4,000 cfs to 5,000 cfs, instead of the current 4,000 cfs flow, and determine the appropriate recreation flow releases, including a schedule for such releases into the Coosa River downstream  of the Jordan dam.

---

[108]*See* EA at 228.

[109] The International Scale of River Difficulty defines six classes of whitewater: Class I – easy; Class II – novice; Class III – intermediate; Class IV – advanced; Class V – expert; and Class VI – extreme.

[110]*See* EA at 180-81.

Filed: 06/17/2016      Page 57 of 327

USCA Case #16-1195      Document #1621558

### 4.    **Navigation Flows**

137.    The Corps has congressionally mandated authority to determine flows for navigation, and standard Articles 12 or 18 of the current licenses for the Coosa, Mitchell, and Jordan projects require Alabama Power to release water from the project developments, as the Corps may prescribe in the interest of navigation.  The Corps' current navigation requirement for the Coosa River Project, per the 1972 agreement, specifies a minimum 7-day average target flow of 4,640 cfs be provided by the combined releases from developments on the Coosa and Tallapoosa rivers.  The Corps has not specified a specific target flow requirement for the Coosa River Project.  Therefore, the license does not require a specific navigation release for the Coosa River Project.  Rather, standard Article 12 is used to ensure that flows for navigation, specific to the Coosa River Project, are implemented at such time the Corps identifies a target flow specifically for the Coosa River Project.

138.    Alabama Power proposes to continue navigation flow releases from the Coosa River Project in accordance with the 1972 agreement with the Corps.  In the EA,[111] staff concluded that, during wet and normal water years, adequate flows are available in the Coosa and Tallapoosa River basins to meet navigation needs.  However, during moderate and extreme drought years, inflows to the project are inadequate to maintain navigation.  As required in the BO and discussed below, Article 403 requires Alabama Power to implement the Coosa River Portion of the ADROP as a drought management plan for the Coosa River.  The plan provides a means to manage water use in the Coosa River during severe droughts.

139.    ADROP replaces staff's recommendation in the EA to require a drought management plan, which had provisions for releases up to 4,640 cfs during drought conditions.  Therefore, Alabama Power's concern that staff's recommended interim measures during droughts would require it to release 4,640 cfs from the project during undefined "drought conditions," is moot.

140.    With regard to a specific flow target of 4,640 cfs for navigation, Alabama Power asserts that the EA mischaracterizes the 4,640-cfs flow as a "requirement" for navigation.[112]  Alabama Power adds that "the 4,640 cfs flow is not an enforceable requirement under our FERC licenses or any Corps-issued directive.  Rather, it is a

---

[111] *See* EA at 230.

[112] *Id*. at 4.

Filed: 06/17/2016    Page 58 of 327

Document #1621558

USCA Case #16-1195

qualified commitment to support downstream navigation, which Alabama Power has honored since 1972."

141.    We disagree.  While Alabama Power entered into the 1972 agreement with the Corps to provide navigation flows on the Alabama River, as a requirement of the original license for the Martin Project, the agreement covers both the Tallapoosa (where the Martin Project is located) and Coosa rivers.  Therefore, in conformance with standard Article 12 of the current license, the 4,640-cfs is a requirement of the Coosa River Project as well.

142.    Alabama Power asserts that the EA's recommendation to provide a flow of 4,640 cfs eliminates the qualification in the 1972 agreement that the 4,640-cfs flow will be provided so long as the upstream storage dams are above minimum operating curve elevations.[113]  Staff's review of the 1972 agreement suggests that Alabama Power is required to release 4,640 cfs at all times, unless otherwise directed by the Corps.  In any event, Alabama Power's assertion here is moot, because standard Articles 12 or 18 of the current licenses for the Coosa, Mitchell, and Jordan projects, and standard Article 12 of this license, gives the Corps the authority to specify reasonable measures for navigation.

### 5.    **Drought Management**

143.    During wet and normal water years, inflows are generally adequate to meet existing downstream flow needs and maintain reservoir levels near the operating curves for the developments.  During periods of low inflows at the Weiss, Neely Henry, and Logan Martin developments, water is released from the storage pools to help maintain downstream water quality, aquatic habitat, power generation, navigation, and recreational opportunities.  However, during extreme drought years, as experienced in 2006 and 2007, inflows to the developments are inadequate to maintain downstream minimum flows and reservoir levels near the operating curves.[114]

144.    In its January 24, 2011 filing, Alabama Power proposes to implement the ADROP, which was submitted as an attachment to its revised Coosa River Biological Assessment. ADROP includes a plan to manage Alabama Power reservoirs within the Alabama, Coosa, and Tallapoosa River Basin during drought conditions.  ADROP requires monitoring rainfall and stream flow within the ACT River Basin.  When drought

---

[113] *Id.* at 4-5.

[114] *See* EA at 230.

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 59 of 327

indicators reach specified levels, operations responses are triggered, resulting in pre-determined incremental reductions or increases in flow released from Alabama Power reservoirs.

145.    ADROP is a basin-wide comprehensive plan for drought management which includes the Coosa River, Tallapoosa River, and part of the Alabama River. FWS' BO (see RPM Action (4)) specifies that Alabama Power is to implement the Coosa River Project portion of ADROP. The BO's terms and conditions include specific measures to implement this RPM. The BO requires Alabama Power to maintain flow reductions at 67cfs per day[115] and monitor water surface temperatures at multiple locations between the Jordan dam and Corn Creek Shoals during drought conditions. In addition, the BO requires that all excess water in Jordan Lake be used to maintain the wetted perimeter of the Coosa River downstream from the Jordan dam. Article 417, *Threatened and Endangered Species Protection Plan*, requires that Alabama Power develop a plan to implement the provisions of the BO. Upon license issuance, Article 403, *Drought Management*, requires Alabama Power to implement the Coosa River portion of ADROP.

146.    Conservation Groups raised concerns about the EA's recommendations for flow releases from the project during drought conditions,[116] and the Atlanta Commission argues that no license should be issued for the Coosa River Project until a drought management plan has been finalized and analyzed.[117] Atlanta Commission further argues that any license issued should contain conditions that are consistent with the Corps plan.[118] This license requires the implementation of the Coosa River portion of ADROP, which defines the flow releases from the Coosa River Project to protect navigation and other non-developmental resources during drought conditions. The flow releases outlined in the Coosa River portion were developed based on experiences in operating the

---

[115] This is the rate at which Alabama Power would reduce flows in the Coosa River downstream from the Jordan dam when transitioning from one flow to another as provided by ADROP.

[116] Conservation Groups July 8, 2010 Comments at 31.

[117] Atlanta Commission November 22, 2010 Comments at 2.

[118] *Id.*

Filed: 06/17/2016     Page 60 of 327     Document #1621558     USCA Case #16-1195

project during drought conditions,[119] and FWS's BO found these flow provisions to be protective of listed species.

### 6. Project Operation and Flow Monitoring Plan

147.   Alabama Power proposes complex operations,[120] including flow releases in the Weiss bypassed reach and downstream of the Jordan dam, to meet a variety of needs (e.g., protecting environmental resources, recreation, navigation, and flood control).  The EA recommended many of Alabama Power's operation proposals, as well as a means to monitor compliance with such operations.[121]  To enable the Commission to monitor compliance with the operational provisions of this license, as well as provide important data needed by Alabama Power and the resource agencies to evaluate what effects, if any, the required water levels and flow releases have on the environmental resources, Article 406, *Project Operation and Flow Monitoring Plan*, requires Alabama Power to develop and implement an operation and flow monitoring plan.

---

[119] The Commission addressed the issue of flow releases during droughts at the Jordan development when it authorized a temporary reduction in the minimum flows from 2,000 cfs to 1,600 cfs in response to drought conditions.  *See Alabama Power* Co., 121 FERC ¶ 62,011 (2007) and *Alabama Power Co.,* 121 FERC ¶ 62,156.

[120] Conservation Groups assert that the EA did not address previously filed comments that rapid fluctuations in water levels due to peaking operations may impact fish during critical times (e.g., spawning).  *See* Conservation Groups July 8, 2010 Comments at 28-29.  Conservation Groups are incorrect.  The EA assessed the impacts of flow fluctuations on aquatic organisms.  *See* EA at 98-99 and 232-33.  The EA explained that Alabama Power provides daily ramping of flows downstream from the Jordan development when flows are reduced from 4,000 to 2,000 cfs.  The EA also explained that the remaining peaking developments (Weiss, Neely Henry, and Logan Martin) each discharge to the upper end of the downstream development's reservoir, and not to riverine habitats that typically benefit from ramping.  Water velocities would range from 0 to around 6 feet per second during generation, but little habitat would be dewatered.  Regardless of these operational conditions, each of the developments has excellent tailwater fisheries and there is a healthy population of tulotoma snails downstream from the Jordan development (*see* EA at 233 and B-12).  This suggests that existing project operation is not affecting fish and other aquatic organisms.

[121] *See* EA at 225-32, and 235-37.

Filed: 06/17/2016          Page 61 of 327

USCA Case #16-1195          Document #1621558

### D.     DO and Water Temperatures

148.    The project's intakes draw water from the deeper portions of their respective impoundments.  As a consequence, the state standard of no less than 4.0 mg/L is not met all the time in the project's tailraces (i.e., it's not met between about 1 and 20 percent of the time, depending on development).[122]  Also, leakage from the Logan Martin dam results in low DO levels downstream from the dam.  To improve DO in the project discharges, Alabama Power proposes to install or upgrade aeration systems at each development to meet the state standard of no less than 4.0 mg/L.  As discussed previously in this order, we are requiring Alabama Power to install or upgrade aeration systems, monitor DO levels, and modify operations to enhance DO at each of the project's developments.

149.    The Conservation Groups and Alabama Rivers recommend Alabama Power operate the project to maintain DO of no less than 5.0 mg/L.  These entities filed comments on the final EA and on FWS' BO that they claim further support the need for a DO of 5.0 mg/L to protect aquatic life in the Coosa River.[123]  Specifically, the Conservation Groups and Alabama Rivers cite to studies in other basins in the southeastern United States and depositions from biologists familiar with the Coosa River that they contend support the need for higher DO concentrations.  In addition, Conservation Groups contend that the EA does not address Wildlife Fund's comments on the draft EA[124] that DO concentrations less than 5.0 mg/L may negatively affect balance in the aquatic community.

150.    While not all of the studies cited by Alabama Rivers were considered by staff in the preparation of the EA, the cited studies are not new and provide information similar to what staff analyzed in preparing the EA.  Commission staff considered Wildlife Fund's comments in the EA, noting that higher DO levels are generally more beneficial for aquatic biota.[125]  In addition, staff recognizes that Alabama DEM considers its DO standard of no less than 4.0 mg/L in the discharge of an existing hydropower project to be

---

[122] *See* EA at 85 and 86.

[123] Conservation Groups July 8, 2010 Comments at 24-26 and Alabama Rivers November 9, 2012 Comments at 6-7.

[124] Wildlife Fund's May 6, 2009 Comments at 8.

[125] *See* EA at B-13 and B-17.

Filed: 06/17/2016     Page 62 of 327

Document #1621558

USCA Case #16-1195

sufficiently protective of aquatic biota, including threatened and endangered species.[126]   Giving due weight to the state's water quality certification, staff concluded that maintaining the state standard of no less than 4.0 mg/L would provide adequate DO for downstream aquatic communities.

151.    Notwithstanding the issue of what DO concentration should be required at the Coosa River Project, as staff noted in the EA, the measures proposed by Alabama Power may result in DO levels greater than 5.0 mg/L in the developments' discharges.[127] Turbine aeration devices are commonly employed at other hydropower projects licensed by the Commission, and have been shown to improve DO levels in the receiving waters. For example, Alabama Power maintains DO levels in the Jordan tailwater above the minimum state standard of 4.0 mg/L using turbine aeration measures.[128]  In addition, as previously discussed, this license requires Alabama Power to monitor DO levels downstream from each development.  If the monitoring shows that the turbine aeration systems do not bring DO levels up to the state standard, then the licensee will be required to develop structural or operational modifications to the project, which would have to be filed with the Commission for approval.

152.    Conservation Groups assert that staff should have required Alabama Power to file detailed plans for the aeration systems and water quality monitoring in order to have reasonable assurance that Alabama Power's proposal would protect water quality. We find that sufficient information exists to determine that measures to improve DO levels should be implemented[129] and that the aeration systems and monitoring programs are reasonable steps to achieve the state's standard for DO.  Regardless, the certification

---

[126] As noted by Alabama DEM in a letter to Wildlife Fund, EPA Region 4 has approved Alabama's water quality standards numerous times pursuant to consultations with FWS under section 7 of the ESA.  *See* Conservation Groups July 8, 2010 Comments at P. 31 of Exhibit 2, which includes a June 22, 2010 letter from Lynn Sisk, Alabama DEM, to Judy Takats, Wildlife Fund.

[127] *See* EA at B-13.

[128] Alabama Power filed reports on February 4, 2008 and December 12, 2008 documenting the effects on DO of reducing flow downstream from the Jordan development.  With the development's aeration system operating, Alabama Power maintained DO in the low-flow months at or above 5.0 mg/L.

[129] *See* EA at 222-24.

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 63 of 327

requires maintenance of state standards for DO at all times, via structural or operational measures at each development, if additional measures prove necessary.

153.    Alabama Rivers recommends that DO and water temperature monitoring locations in the Weiss bypassed reach and each development's tailraces include locations in interstitial waters.[130]  Monitoring DO and water temperature in interstitial waters is unnecessary to maintain consistency with state water quality standards.  Nonetheless, these areas are particularly important to freshwater mussels, some of which are federally listed under ESA.  Therefore, Article 408, *Water Quality Monitoring Plan*, requires Alabama Power to consult with FWS, Alabama DEM, and Alabama DCNR to establish monitoring locations that account for interstitial waters.

154.    Conservation Groups assert that the EA omits specific discussion of the project's impacts on any water quality criteria other than DO.[131]  Conservation Groups argue that it is not clear whether the proposed new license will have significant impacts on attainment of such criteria.  For example, Conservation Groups assert that staff does not recommend specific conditions to assure that temperature exceedances will be addressed.

155.    The EA describes potential project-related effects on DO and water temperature,[132] but does not include any discussion of potential project impacts on other water quality criteria (e.g., pH, chlorophyll A, phosphorus, nitrogen, and coliform bacteria).  However, no entity, including Alabama DEM, expressed a concern regarding such other water quality criteria, nor did any entity recommend measures to address any water quality parameters other than DO and water temperature.  Moreover, these other parameters are generally unaffected by hydropower project operation.  Therefore, staff's decision to not analyze them in the EA was reasonable.

156.    With respect to temperature exceedances, the certification requires Alabama Power to monitor and report DO and water temperature annually for the first 3 years of its license.  Article 408, *Water Quality Monitoring Plan*, requires Alabama Power to develop a plan to implement the provisions of the certification, including filing requisite plans and reports with the Commission for review.  Should the reports show water

---

[130] Interstitial refers to that portion of the surface water that infiltrates a streambed and moves through the gravel substrate.

[131] Conservation Groups July 8, 2010 Comments at 19.

[132] *See* EA at 86-88.

Filed: 06/17/2016      Page 64 of 327

USCA Case #16-1195      Document #1621558

temperature exceedances that are detrimental to fish and other aquatic organisms at the project, the Commission may require Alabama Power to implement measures at the project to address an identified effect.

157.    Conservation Groups assert that the EA does not consider alternative flow regimes as a means of increasing DO concentrations downstream from the project's developments.[133]  Conservation Groups are mistaken.  The EA recognizes that providing continuous instream flows to reaches of the Coosa River that currently receive little flow or to reaches that receive intermittent powerhouse releases, would improve aquatic habitat conditions.[134]  However, staff found little basis for recommending continuous minimum flows at each of the developments at this time,[135] except in the Weiss bypassed reach and downstream from the Jordan development.  However, this license provides several mechanisms to establish minimum flows at individual developments after license issuance, should flows be found necessary through the monitoring required by this license.[136]  These requirements should address the concerns of the Conservation Groups.

###    E.    Clean Water Partnership

158.    Alabama Power proposes to continue participating with the Clean Water Partnership and to share technical data from the project's relicensing effort with the partnership.  The partnership is a coordinated effort of public and private stakeholders to restore and protect the state's river basins, in accordance with the goals of the CWA.  In the EA,[137] staff found that the specific goals and measures that would be implemented under the program are too general to determine the public benefit or serve a project

---

[133]*Id.* at 21.

[134]*See* EA at 92.  Aquatic habitat is defined as a specific area with environmental (i.e., biological, chemical, or physical) characteristics needed and used by an aquatic organism, population, or community.  Water quality, then, is part of what makes up aquatic habitat.

[135] There is little dewatering of habitat downstream from each development and the tailwater fisheries are considered excellent.  *See* EA at 97.

[136]*See* Article 408, *Water Quality Monitoring Plan*; and Article 417, *Threatened and Endangered Species Protection Plan*.

[137]*See* EA at 247.

Filed: 06/17/2016      Page 65 of 327

Document #1621558

USCA Case #16-1195

purpose. Therefore, although Alabama Power may continue its participation in the partnership, the license does not require this measure.

### F.   Funding to Alabama DCNR

159.   Alabama Power proposes to provide $4.23 million to Alabama DCNR to help the agency establish and maintain a Fish Habitat Enhancement Program for project waters. Alabama DCNR would use the funds to introduce natural woody debris and brush piles, add spawning gravels, and stabilize stream banks. In the EA,[138] staff found that such measures would enhance fish and invertebrate habitat, increase angling opportunities, and improve water quality and cover for organisms using near shore waters.

160.   Staff determined that the estimated funding levels would likely be adequate to implement the measures. However, the Commission looks to its licensees to implement specific measures.[139] Therefore, Article 411 requires Alabama Power to file a *Fish Habitat Enhancement Plan* for project waters that includes: (1) the elements of the Fish Habitat Enhancement Program; (2) a schedule for implementing the habitat enhancements; (3) consultation with Alabama DCNR and FWS; and (4) a reporting provision to document the yearly efforts, as well as proposals, subject to Commission approval, for the next year.

### G.   Fish Passage

161.   Three Corps locks and dams downstream on the Alabama River prevent the migration of anadromous or catadromous fish species in the Coosa River. Alabama Power does not propose fish passage at any of the Coosa River Project developments.

162.   Conservation Groups state that, according to Alabama DCNR, the restriction of passage has ongoing effects on fish and the invertebrates that depend on them. Conservation Groups assert that the EA wrongly declines to study alternatives for fish passage.[140] Alabama Rivers provided similar comments on the draft EA, which staff addressed in the EA.[141] Staff concluded that there are no diadromous fish thatcurrently

---

[138] *See* EA at 235.

[139] *See* *Policy Statement on Hydropower Licensing Settlements*, 116 FERC ¶ 61,270.

[140] Conservation Groups July 8, 2010 Comments at 37.

[141] *See* EA at B-10 and 11.

Page 66 of 327

Filed: 06/17/2016    Document #1621558

USCA Case #16-1195

have access to or use the Coosa River. Staff also concluded that there is some benefit to downstream movement of resident fish through the Coosa River Project area, and that the lack of upstream passage did not seem to hinder resident fish populations. Conservation Groups provide no new information that challenges staff's conclusion regarding the need for fish passage at the project at this time.[142] Moreover, as requested by Interior and discussed previously, this license reserves the Commission's authority to require fishways for the Coosa River Project that may be prescribed by the Secretary of the iInterior in the future.

### H.    Wildlife Management Plan

163.   Alabama Power proposes to implement its Coosa Wildlife Management Plan[143] to protect and enhance wetland and upland wildlife habitat within the Coosa River Project. The EA found that (with the exception ofSection 11, discussed in the next paragraph) thespecific objectives of the plan, which are described in the EA,[144] would protect and enhance wildlife and wildlife habitat on project lands.[145]

164.   Section 11 of the proposed plan includes a provision to fund a Wildlife Habitat Enhancement and Restoration Program. The purpose of the program is to provide a framework for Alabama Power and Alabama DCNR to work cooperatively to enhance and restore wildlife and their habitats in the Coosa and Warrior Project areas. Alabama Power identified three projects which "among others, will be considered" for funding,

---

[142] Conservation Groups argue that "dams, in most cases, block the movement of catadromous, anadromous, and riverine fish species," resulting in, among other things, fragmentation of native fish ranges and long-term river fragmentation. *See* Conservation Groups July 8, 2010 Comments at 37. However, Conservation Groups do not explain why this general statement applies specifically to the Coosa River Project, given the findings set forth in the EA that diadromous fish do not have access to the Coosa River and the resident, riverine fisheries are excellent, or why the Commission's reserved authority does not ensure appropriate protections.

[143] The plan is included in Volume 4 of the license application filed on July 28, 2005. Although it was filed as a draft, Alabama Power did not file a final plan with the Commission.

[144] *See* EA at 112.

[145] *See* EA at 238.

Page 67 of 327        Filed: 06/17/2016        Document #1621558        USCA Case #16-1195

including: development and management of a waterfowl area on the Weiss development; wildlife habitat enhancement on Coosa Wildlife Management Area lands within the Mitchell Project Boundary; and applications for matching grants for wildlife restoration and enhancement projects to be conducted on Warrior River and/or Coosa River Projects.[146] In the EA,[147] staff concluded that, whilethe program would benefit wildlife resources within theCoosa and Warrior basins, it could notanalyze the specific benefits of the fund to the Coosa River Project because Alabama Power did not providethe dollar allocations for the Coosa River Project, or identify specific measures or locations which would be funded. Accordingly, staff recommended this funding measure not be included in the license.

165. We agree. The Commission's role in overseeing license compliance makes it important that license conditions be clear and enforceable.[148] Proposed conditions that do not clearly outline the licensee's responsibilities and establish the parameters governing required actions may be difficult or impossible to enforce.[149] Proposed measures should be as narrow as possible, with specific measures preferred over general measures.[150] Accordingly, because the Commission cannot analyze the specific benefits of the proposed fund on Coosa River Project lands, we will not include it as an Article 412, *Wildlife Management Plan*requirement. Alabama Power is free to work with Alabama DCNR outside of the license.

166. Article 412, *Wildlife Management Plan*, requires Alabama Power to implement Sections 1 through 10 of its Wildlife Management Plan. The article further requires Alabama Power, in consultation with FWS and Alabama DCNR, to develop and implement a schedule for conducting annual bald eagle surveys.

---

[146]*See* Appendix B to Alabama Power's proposed Coosa River Wildlife Management Plan, Volume 4 of July 28, 2011 license application.

[147]*See* EA at 238.

[148]*See Policy Statement on Hydropower Licensing Settlements*, 116 FERC ¶ 61,270 at P 2-3 (2006).

[149]*Id.* at P 4.

[150]*Id.* at P 6.

Filed: 06/17/2016          Page 68 of 327

Document #1621558

USCA Case #16-1195

167.    Conservation Groups state that the EA shows that continued project operation will have significant impacts that are not entirely beneficial, in that operation of the project may benefit some fish and wildlife resources, but may adversely affect others.[151]    Conservation Groups assert that further study and analysis of the effects must be conducted in the form of an environmental impact statement (EIS), and that the Commission must gather "specific" data on project impacts to wildlife habitat under existing, proposed, and alternative operations.[152]    Conservation Groups provide no substantive evidence to support their assertions.

168.    As relevant here, an EIS is not necessary to assess how a project may affect wildlife and their habitats at a project.  Moreover, staff need only assess those measures recommended by other entities or that it identifies as reasonable.[153]    The EA for the Coosa River Project describes Alabama Power's proposed action, as well as measures recommended by other entities to address potential effects on wildlife and wildlife habitat.  Staff assessed the effects of the measures in the EA, concluding that the consequences could be either positive or negative.  To address such potential effects, staff recommended Alabama Power develop and implement a Wildlife Management Plan, finding that such a measure would benefit wildlife and its habitats at the Coosa River Project,[154] which Conservation Groups do not challenge.

### I.    **Toxins Report**

169.    Fish consumption advisories have been issued for portions of the Coosa River within the Weiss, Neely Henry, Logan Martin, and Lay developments, due to polychlorinated biphenyl (PCB) contamination.[155]    Alabama Power proposes to make the

---

[151]Conservation Groups July 8, 2010 Comments at 39 (citing EA at 108-13).

[152]*Id.*

[153]  Conservation Groups and American Rivers did not provide any recommendations pertaining to wildlife and wildlife habitats in response to the Commission's June 6, 2008 public notice that the application was ready for environmental analysis.

[154]*See* EA at 238

[155]*See* EA at 66.

Toxins Issue Report,[156] which it prepared and filed with its relicense application, available for public education purposes. In addition, the Logan Martin Association recommends that any activity in areas with contaminated sediments at the Logan Martin development receive heightened scrutiny by Alabama Power and the Corps before such activity is permitted.

170.    As noted by staff in the EA,[157] while staff does not object to Alabama Power providing this information to the public, a specific license requirement to do so is not warranted. Any PCB contamination in the Coosa River is unrelated to the Alabama Power developments and not the result of project construction or operation. The report is in any event available to the public through the public record of this proceeding. As to Logan Martin Association's recommendation, any proposed activity that would require dredging (and thus could disturb contaminated sediments) will require a CWA section 404 permit from the Corps before an entity would be authorized to undertake such activity.

### J.    Recreation Plan

#### 1.    Recreation Sites

171.    To enhance recreation resources at the project, Alabama Power proposes to improve recreation facilities as described in its Coosa River Project Recreation Plan.[158] The plan includes measures at a total of 65 developed and undeveloped recreation sites, which are owned and operated by various entities, including Alabama Power; all are located within, or adjacent to, the project boundary. Alabama Power owns and operates 42 of the 65 recreation sites, which provide boat launches, parking areas, campsites, fishing piers, docks, bank fishing access, and trails.[159] The plan also includes funds to the Alabama Marine Police to perform public safety at the project reservoirs and lakes.

---

[156]*See* Volume 4, E5 – Toxins Issue Report, of Alabama Power's license application, filed July 28, 2005.

[157]*See* EA at 88.

[158]*See* Volume 5 of Alabama Power's license application, filed July 28, 2005.

[159]*See* EA at 158-59.

Filed: 06/17/2016      Page 69 of 327

Document #1621558

USCA Case #16-1195

Page 70 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

172.    In the EA,[160] staff recommended measures for 40 of the recreation sites owned and operated by Alabama Power that would result in a significant improvement to recreational opportunities.  The most significant measures include provisions for: (1) installing a fishing pier at the Weiss, Neely Henry, Lay, and Jordan developments; (2) developing a trail at Lay, Mitchell, Jordan and Bouldin developments; (3) repairing an existing, or installing a new, boat launch at Weiss, Mitchell, and Jordan and Bouldin developments; (4) improving five primitive campsites with toilets, defined fire rings, and stabilizing the shoreline at Mitchell development; (5) reconfiguring the parking areas to define vehicles and vehicles with trailer-boat parking at each development; and(6) reserving five sites for future recreation development.[161]

173.    Overall, the recreation measures would enhance recreational opportunities at the project and contribute to a cumulative beneficial effect on recreation resources within the Coosa River Basin.[162]  However, the Recreation Plan filed with the license application encompasses both project and non-project recreation sites, includes a schedule with dates that have passed and dates for improving non-project recreation sites, and does not take into account the Commission-approved tailrace fishing access facilities at the Mitchell development and the Jordan development.[163]  Therefore, Article 413, *Recreation Plan*, requires Alabama Power to revise and file a Recreation Plan.

174.    In the EA,[164] staff did not recommend, and this license does not require, that Alabama Power implement its proposed improvements at non-project recreation sites

---

[160]*See* EA at 174-75.

[161] The five sites are:  at Neely Henry development, Future Land Site (Site 45); at Lay development, Kelly Creek Boat Launch (Site 14) and Glover's Point Landing (Site 15); and at Jordan and Bouldin developments, Future Land Site (Site 47) and Potential Swimming Access between Site No. 19 and Site No. 20.

[162]*See* EA at 182.

[163] As discussed earlier, the Mitchell Project Comprehensive Recreation Master Plan was amended in 1985 to add a tailrace fishing access facility, and the Jordan Dam Project Recreation Use Plan was amended in 2001 to add a tailrace fishing access facility. *See supra* notes 19 & 20.  Staff did not count these two tailrace fishing assess facilities in its 40 recommended measures for recreation sites.  This order requires all 42 sites for project recreation.

[164]*See* EA at 249-50.

Page 71 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

(i.e., at a state or county recreation site) because: (1) the proposed measures at project recreation sites are sufficient to meet recreation needs at the project; and (2) the proposed measures at non-project recreation sites are not needed to satisfy project purposes. Staff also did not recommend, and this license does not require, Alabama Power's proposed funding of the Alabama Marine Police. Such funding is not the responsibility of a licensee in the context of a Commission license and is not required to fulfill the project's purposes.[165] In general, the Commission is concerned with protecting resources and having specific enforceable provisions towards that end rather than requiring a licensee to provide funding for agency personnel.[166]

175.    Conservation Groups assert that staff's recommended modifications, now authorized here, to Alabama Power's Recreation Plan, do not demonstrate that the recreational enhancements "will adequately mitigate the project's impacts on recreation if Staff does not even know what specific enhancements APC [Alabama Power] is proposing or whether the enhancements are within or outside the project boundary." The Conservation Groups argue further that "Staff does not even know when APC would implement the enhancement measures," and that "the final EA does not cite to any specific data or analysis which show that the proposed license would not cause or continue any significant impacts on recreational resources."[167]

176.    We disagree. Staff identified the recreation enhancements and whether the enhancements were located within, or adjacent to, the project boundary, and considered the existing and projected recreational use and capacity at the recreation sites and whether Alabama Power's proposed enhancements would meet existing and future needs.[168] As to an implementation schedule, we are requiring Alabama Power to file a revised implementation schedule for Commission approval. Further, under the staff

---

[165] *See* *Policy Statement on Hydropower Licensing Settlements*, 116 FERC ¶ 61,270 (2006).

[166] *See* *Portland General Electric Company and Confederated Tribes of the Warm Springs Reservation of Oregon*, 117 FERC ¶ 61,112, at P 83 (2006).

[167] Conservation Groups July 8, 2010 Comments at 40.

[168] *See* EA at 137-55.

Filed: 06/17/2016      Page 72 of 327

USCA Case #16-1195      Document #1621558

alternative, staff found the proposed recreation measures would contribute to a cumulative beneficial effect on recreation resources within the Coosa River Basin.[169]

## 2.    **Monitoring Recreational Use**

177.    Alabama Power proposes to continue monitoring recreational use levels at the project recreation sites and report recreation use levels on the project's Licensed Hydropower Development Recreation Report (Form 80) every six years, as required by Part 8 of the Commission's regulations.[170]    Alabama Power proposes to hold a recreation group meeting prior to filing Form 80 data with the Commission to discuss recreational use and demand, and project-related resource effects, etc., based on Form 80 data.    In the EA,[171] staff found that monitoring of recreational use and demand at the project would assist Alabama Power to identify when recreation needs are no longer being met. Therefore, Article 413, *Recreation Plan,* requires Alabama Power to file a Recreation Monitoring Report with the Form 80 every six years.

## K.    **Project Boundary**

### 1.    **Recreation Sites**

178.    Alabama Power proposes, and staff recommended, the project boundary be modified to include a total of 13 developed and undeveloped recreation sites that are located partially within, or adjacent to, the project boundary and are needed to support water-based, project-related recreation and public access to project lands and waters.[172] We agree.    Because these facilities are necessary for project purposes, they must be brought into the project boundary, and Article 203, *Exhibit G Drawings*, so requires.

179.    Nine of the 13 recreation sites are located entirely on Alabama Power-owned land: (1) at the Lay development, Beeswax Creek Boat Launch and Park (Site 13A & Site 13B), Lay Dam Boat Launch (Site 3), Shelby County 400 Boat Lauch (Site 7), Kelly Creek Boat Launch (Site 14), and Glover's Point Landing (Site 15); (2) at the Mitchell

---

[169]*See* EA at 182.

[170]18 C.F.R. § 8.11 (2012).

[171]*See* EA at 157.

[172]*See* EA at 242.

Development, Big Foot Boat Launch (Site 8) and Double Bridges Company (Site 12); and (3) at the Jordan and Bouldin developments, Future Land Site (Site 47).

180.    At the remaining four sites, only the shorelines are owned by Alabama Power and within the project boundary: (1) State Route 9 Informal Fishing Area (Site 58), at the Weiss development; (2) Route 145 Bridge Bank Fishing (Site 33), at the Lay development; (3) Bouldin Canal Bank Fishing (Site 25C), at the Jordan development; and (4) Croft's Ferry boat launch (Site 40), at the Neely Henry development.  Adjacent lands, which are informal recreation sites on state or county rights of way, are outside of the project boundary.  We assume that the state or county will continue to operate and maintain these recreation lands, and we thus will not require that they be brought into the project boundary.[173]  Article 413, *Recreation Plan*, requires Alabama Power to continue to operate and maintain only those portions of Site 58, Site 33, Site 25C, and Site 40 located on Alabama Power lands and within the project boundary.

## 2.    Land Parcels

181.    Alabama Power proposes to add 364 acres to the project boundary.  These lands consist of:  (1) 235 acres downstream from the Logan Martin dam (Lay Lake) that may be inundated during high flow events; (2) 120 acres about 0.5 mile downstream from the Jordan dam for two barrier-free hunting facilities (Section 10.0, Wildlife Management Plan); and (3) 9 acres downstream from the Jordan dam for recreational use.  Alabama Power also proposes to remove 285.5 acres from the project boundary to either correct a mapping error or to remove lands that originally were used during project construction and are no longer needed for project purposes.  These lands consist of:  (1) 216 acres near the Weiss development power canal (the lands have been leased to a landscape nursery); (2) 61 acres downstream from the Jordan dam; (3) 3.5 acres at the Weiss development; (4) 3 acres at the Mitchell development; and (5) 2 acres at the Bouldin development.[174]

182.    In the EA,[175] staff recommended approving Alabama Power's proposed project boundary modifications.  Article 203, *Exhibit G Drawings,* therefore, requires Alabama Power to file revised Exhibit G drawings that clearly identify the project boundary and project facilities within the project boundary.

---

[173] *See Consumers Energy Company*, 130 FERC ¶ 62,052, at P 51 (2010).

[174] *See* Alabama Power Company's filing of May 6, 2009.

[175] *See* EA at 243-44.

Filed: 06/17/2016      Page 73 of 327

Document #1621558

USCA Case #16-1195

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 74 of 327

L.     **Shoreline Management Plan**

183.    Alabama Power proposes to implement its Shoreline Management Plan.[176]  The plan would guide shoreline management and permitting activities at each of the developments and consists of the following components, which are explained below: (1) shoreline classification system maps; (2) shoreline compliance; (3) public education and outreach; and (4) exotic species and aquatic plant management.

184.    Interior recommends that the Shoreline Management Plan include a provision that allows Interior to evaluate any proposed permitting that may affect lands classified by Alabama Power as Sensitive Resources Lands,[177] particularly lands that support federally listed species.  Interior also recommends the Shoreline Management Plan be revised periodically to take into account the listing of new federal species and/or designation of critical habitat.

185.    In the EA,[178] staff recommended modifying the Shoreline Management Plan to allow Interior to review permitting activities on lands supporting federally listed species to ensure that the species are protected.  Interior's review of permitting activities on the Sensitive Resources Lands Classification would ensure that current federal listing of species and/or critical habitat is considered.  Article 414, *Shoreline Management Plan*, modifies the Shoreline Management Plan accordingly.

186.    Upon review of the FWS' final BO, the Shoreline Management Plan should be revised to:  (1) incorporate the FWS' Term and Condition (Action 2), which requires Alabama Power to implement its Shoreline Management Plan with certain modifications; (2) include the FWS' Conservation Recommendation, which provides for an evaluation matrix for Sensitive Resources Lands Classification; and (3) include individual maps that identify the modified Coosa River Project boundary, as discussed *infra*.  Accordingly, Article 414, *Shoreline Management Plan*, requires Alabama Power to revise and file a Shoreline Management Plan to include the requisite measures of FWS' BO.

---

[176] *See* Volume 6 of Alabama Power's license application, filed July 28, 2005.

[177] In the Shoreline Management Plan, Sensitive Resources Lands are identified as project lands managed for the protection and enhancement of threatened and endangered species, historic properties, wetlands, and significant scenic areas.

[178] *See* EA at 245 and 253.

187.    Furthermore, in the EA,[179] staff determined, and we agree, that a review and update of the Shoreline Management Plan every six years would be reasonable.  The review is intended to examine whether or not implementation of the approved Shoreline Management Plan is effectively meeting the goals and objectives of the plan and whether or not any changes are needed.  Article 414, *Shoreline Management Plan*, requires this measure.

### 1.    Shoreline Classification System Maps

188.    Alabama Power's Shoreline Management Plan includes shoreline classification system maps for each of the seven developments at the project.  However, the maps are outdated (2005) and do not account for changes in the project boundary.Therefore, Article 414, *Shoreline Management Plan*, requires Alabama Power to file updated shoreline classification system maps as part of its Shoreline Management Plan.

### 2.    Shoreline Compliance Program

189.    Alabama Power proposes to continue implementing its Shoreline Compliance Program to manage development of non-project use of project lands, and thereby protect the scenic, recreational, and environmental resources at the project.  Under this program, it will continue to monitor project property to ensure that no unauthorized uses occur within the project boundary and to resolve any issues that may arise with respect to unauthorized structures.Article 414, *Shoreline Management Plan*, accordingly requires Alabama Power to develop a permitting program for allowable facilities and/or uses of the project shorelines and measures to address unpermitted structures.

### 3.    Public Education and Outreach Program

190.    Alabama Power proposes to continue implementing its public education and outreach program.[180]  In the EA,[181] staff concluded such a program would inform the public about the project, and the purposes and requirements of the Shoreline Management Plan, as well as BMPs for protecting the shoreline.  However, some elements of the program lack specificity.  Article 414, *Shoreline Management Plan,* requires Alabama

---

[179] *See* EA at 245.

[180] *See* Section 5.1 of the Shoreline Management Plan included in Alabama Power's July 28, 2005 license application.

[181] *See* EA at 190-92.

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 75 of 327

Page 76 of 327

Filed: 06/17/2016      Document #1621558      USCA Case #16-1195

Power to describe in detail its public education and outreach program, as part of the revised Shoreline Management Plan.

### M.   Invasive Species Management Plan

191.   Alabama Power proposes to implement its Exotic Species and Aquatic Plant Management Program.[182]   In the EA,[183] staff found such a program would be beneficial. However, the program includes measures that would be implemented at both the Coosa River Project and the Warrior River Project No. 2165,[184] and is based on outdated data (from 1998 to 2002).  To facilitate the Commission's administration of the license, Article 416, *Invasive Species Management Plan*, requires Alabama Power to develop and implement an Invasive Species Management Plan that uses updated information and specifically pertains to the Coosa River Project.

### N.   Erosion Repair and Monitoring Plan

192.   Alabama Power proposes to implement its Coosa-Warrior Projects Erosion Repair and Monitoring Plan.[185]   The plan includes:  (1) the repair and monitoring of 12 active erosion sites at the Neely Henry, Logan Martin, Lay, and Bouldin developments; and (2) a report that summarizes the results of the first 3-year monitoring period.  Alabama Rivers recommends that Alabama Power file a plan that includes provisions for: (1) identifying erosion sites; (2) monitoring and repairing erosion sites, including outlining the monitoring cycle and decision-making process for determining appropriate remedial measures; and (3) reporting on the success of any implemented remedial measures.  Alabama Rivers' recommendations also include the specific criteria for determining success of the measures implemented and an implementation schedule.

193.   As discussed in the EA,[186] shoreline erosion occurs at various sites at the project developments.  In the EA,[187] staff found that Alabama Power's proposed plan would

---

[182]*See* Appendix E to the Shoreline Management Plan filed by Alabama Power with it license application on July 28, 2005.

[183]*See* EA at 238-39.

[184]*Alabama Power* Co., 130 FERC ¶ 62,271 (2010).

[185]*See* Volume 4 of Alabama Power's license application, filed July 28, 2005.

[186]*See* EA at 88-90.

Page 77 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

ensure that erosion resulting from project operation would be adequately monitored and remediated, and, therefore, recommended adopting the plan. The plan isenforceable because it includes specific measures.However, the plan includesmeasures that would be implemented at both the Coosa River Project and the Warrior River Project No. 2165. To facilitate the Commission's administration of the license, Article 415, *Erosion Repair and Monitoring Plan*, requires Alabama Power to file, with updates, an erosion plan that includes only measures to be implemented at the Coosa River Project.

194.  With regard to Alabama Rivers' recommendations, many of the measures are already incorporated in Alabama Power's plan. However, Alabama Power's plan does not clearly explain how it will decide what measures will be implemented, or where or how it will determine if the measures are successful. Including these elements would improve the effectiveness of the plan and help ensure successful implementation. Therefore, Article 415, *Erosion Repair and Monitoring Plan*, requires Alabama Power to file an erosion plan with these additions.

195.  Conservation Groups assert that the EA does not provide specific analysis of how existing project operation is contributing to erosion at project sites.[188] Accordingly, Conservation Groups argue that there is no basis for finding that the proposed Erosion Repair and Monitoring Plan will mitigate project impacts on erosion. We disagree. The recommended monitoring program for the existing erosion sites would provide a mechanism for identifying which sites should be repaired now versus those that can be remediated at a later date.[189] As part of the effort, Alabama Power would identify the type of erosion occurring and design measures accordingly. Moreover, Article 415, *Erosion Repair and Monitoring Plan*, requires Alabama Power to develop and implement an erosion plan that includes provisions to: (1) identify, remediate, and monitor erosion sites; (2) develop a decision-making process; and (3) outline criteria for determining the success of implemented measures.

---

[187]*See* EA at 224 and 225.

[188]Conservation Groups July 8, 2010 Comments at 27. Conservation Groups also assert that the EA does not address recommendations that the plan be prepared in consultation with resource agencies. Article 415, *Erosion Repair and Monitoring Plan*, requires Alabama Power to consult with Alabama DEM, Alabama DCNR, and FWS, among others.

[189]*See* EA at B-7.

Filed: 06/17/2016        Page 78 of 327

Document #1621558

USCA Case #16-1195

## Compliance With The National Environmental Policy Act (NEPA)

196.    The draft and final EAs for the proposed Coosa River Project analyzed the potential impacts to aquatic resources, terrestrial resources, threatened and endangered species, recreation, land use and aesthetics, cultural resources, and cumulative impacts. In addition to Alabama Power's proposal, staff considered two alternatives: (1) Alabama Power's proposal with staff modifications; and (2) the no-action alternative, meaning the project would continue to operate under the terms and conditions of the current license, and no new environmental measures would be implemented.[190]   The EA considered other alternatives, including issuing a non-power license, federal government takeover of the project, and retiring the project, but eliminated them from further analysis because they did not meet the purpose and need of the proposed action.[191]

197.    As described in the EA, continued operation of the Coosa River Project, with its recommended measures, would involve no land-disturbing or land clearing activities other than minor disturbances associated with recreational enhancements.  As relevant here, the EA found that the recommended measures would:  (1) ensure adequate water quality; (2) increase riverine habitat in the Weiss bypassed reach; (3) improve recreational opportunities at the project; and (4) maintain riparian conditions and recreational opportunities downstream of the project.

198.    Staff also found that project operation and the associated fish entrained through the project's turbines would result in some minor, long-term effects on resident fish in the Coosa River.  Staff determined that, although project operation would also result in some occasional times of low DO in various parts of the Coosa River, implementation of DO enhancement measures would minimize this impact.[192]   Based on these findings, staff found that issuance of a license for the Coosa River Project, with staff's recommended environmental measures, would not constitute a major federal action significantly affecting the quality of the human environment.[193]

199.    On July 8, 2010, Conservation Groups filed comments challenging the adequacy of the EA, and asserting that an EIS should have been prepared.  On November 5, 2012,

---

[190] *See* EA at 15-49.

[191] *See* EA at 49-50.

[192] *See* EA at 256.

[193] *Id.*

Alabama Rivers filed comments on the EA, based on what it deems deficiencies in FWS' June 10, 2012 final Biological Opinion.

### A. Adequacy of the EA

200.   Conservation Groups claim that the EA failed "to provide a convincing reason why an EIS was not prepared," and that its finding of no significant impacts (FONSI) is based on a "conclusory statement" that "the issuance of a license would not constitute a major federal action significantly affecting the quality of the human environment."[194]

201.   The statement to which Conservation Groups cites sets forth a finding based on the extensive analysis set forth in the EA. As the Commission recently noted, an EA's FONSI "need not repeat any of the discussion in the assessment, but may incorporate it by reference."[195]

202.   Conservation Groups also assert that the FONSI is not supported by substantial evidence. They first assert that the EA's findings are based on what they deem an inappropriate reliance on documents submitted by the licensee and others. As an example, Conservation Groups cite to Table 4-1 in the EA, which summarizes the assumptions and economic information Alabama Power submitted in its license application for considering the economic parameters of the project. Conservation Groups argue that the EA does not explain why such economic "evidence cited is reliable or probative."[196]

203.   Although it is unclear precisely what Conservation Groups concerns are, to the extent they suggest that staff did not sufficiently vet or review the reliability of the licensee's information, this is not correct. As it does for all components of a license

---

[194]Conservation Groups July 8, 2010 Comments at 5(citing to EA at 256).

[195]*Alabama Power Company*, 141 FERC ¶ 61,127, at n.106 (2012)(citing Council on Environmental Quality's regulations at 40 C.F.R. § 1508.13 (2012)).

[196]Conservation Groups July 8, 2010 Comments at 8. They also appear to use Table 4-1 as an example of what they deem staff's reliance on "whole documents in support of its findings" without providing "specific citations." Conservation Groups argue that this "obliges an objecting party to infer which part was relied on…." However, Table 4-1 contains footnotes, which set forth the precise page number in the licensee's July 5, 2005 license application where the cited information can be found.

Filed: 06/17/2016          Page 80 of 327

Document #1621558

USCA Case #16-1195

application, staff independently reviewed the information provided. As explained in detail in the EA,[197] pursuant to an April 21, 2006 staff request for additional information, Alabama Power provided an explanation of how it evaluated the power value of its proposal, the no action alternative, and costs of flow release alternatives submitted by Conservation Groups. The EA notes that staff reviewed Alabama Power's explanation, accepted it as reasonable, and applied a comparable value to the power values associated with the Conservation Groups' minimum flow/ramping proposal.

204.     Moreover, section 4-1 of the EA clearly explains that the information in Table 4-1 provides the parameters for the economic analysis of the Coosa River Project, and why such information is important.[198]

205.     Conservation Groups next claim that the EA cites to "disputed evidence without explanation." As an example, they assert that the EA disregarded Conservation Groups' expert evidence that shows that existing minimum flows downstream from the Jordan dam are very low and not adequately protective of the aquatic community, and that higher flows would better mitigate project impacts in that area.[199]

206.     Staff explained in the EA that, although it is unclear in Conservation Groups' alternative minimum flow recommendations at what point in the basin the percent of annual flow would be measured, assuming it is at the Mayo's Bar gage, Conservation Groups' approximate recommended flows would be in the same range as shown in Table 3-9 of the EA, that is, from 1,969 to 3,922 cfs, which is a similar range of flows to the current and proposed releases from the Jordan dam.[200] Thus, the higher minimum flows recommended by Conservation Groups appear to be in the same range as, and not

---

[197] *See* EA at B-8.

[198] *See* EA at 200-01. Conservation Groups also argue that the EA "repeatedly cites to the [license application] exhibits without acknowledging that, as applicant, Alabama Power has the burden of proof on disputed factual issues." Conservation Groups do not explain to which "disputed factual issues" it refers, or why the burden of proof would fall on Alabama Power. Conservation Groups only cite for support, with no explanation, 5 U.S.C. § 556(d), which is the provision in the Administrative Procedure Act pertaining to the burden of proof for the proponent of a rule or order.

[199] Conservation Groups July 8, 2010 Comments at 9.

[200] *See* EA at 96-97.

Page 81 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

significantly different from, the flows proposed by Alabama Power and required by the license.

207.    Conservation Groups allege there are information gaps in the record which cannot be filled with staff assumptions.  They cite, as an example, the EA's references to the lack of habitat data as a basis for not evaluating alternative minimum flow schedules, and relying instead on a recommendation that Alabama Power implement an adaptive management approach for variable continuous minimum flows.  Conservation Groups state that it submitted expert opinion that obtaining qualitative analyses of alternative flow regimes would not pose an unreasonable burden for Alabama Power or staff, and questions why the EA fails to explain why there was no recommendation that the licensee gather this data.[201]

208.    As staff explained in the EA,[202] Alabama Power and the state and federal resource agencies agreed, during pre-application consultations, that an adaptive management approach was appropriate in determining flows to be released from the Weiss dam.  Under this approach, Alabama Power will provide an initial minimum flow in the Weiss bypassed reach and then study the effects of that flow, with the potential for adjustment of that flow, depending on the study results.  This method would use actual empirical data to determine an appropriate minimum flow, while instream flow methods that generate quantitative habitat data, such as the IFIM requested by Alabama Rivers, use modeling to generate predictions of potential habitat under a range of flows.  Both approaches are acceptable, so use of an adaptive management approach that generates empirical data is reasonable .

209.    In a similar vein, Conservation Groups challenge the EA's reliance on post-licensing studies and plans to resolve issues such as instream flow for aquatic life under the new license.  Citing *Confederated Tribes and Bands of Yakima Indian Nations v. FERC*[203] in support of its position, it contends that the Commission must consider all issues relevant to the public interest prior to relicensing.

---

[201] Conservation Groups July 8, 2010 Comments at 10.

[202] *See* EA at B-11.

[203] 746 F.2d 466 (9th Cir. 1984) (*Yakima).*

Page 82 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

210.    The Commission addressed the identical argument recently in *Alabama Power Company*.[204] There, it explained that *Yakima* does not require the Commission to have perfect information before it acts.[205] The test is whether, given uncertainty, the Commission's action meets the standard for judicial review, which requires that the Commission's decision be supported by substantial evidence.[206] As the court found in *United States Department of the Interior v. FERC*:[207]

> *Yakima* at most imposes on the Commission the duty to consider and study the environmental issue before granting a license. *Yakima* does not require any heightened degree of certainty for environmental facts, nor does it imply that all environmental concerns must be definitively resolved before a license is issued. Read this way, *Yakima* simply endorses the unstartling principles that an agency must establish a record to support its decisions and that a reviewing court, without substituting its own judgment, must be certain that the agency has considered all factors required by the statute.

211.    It is not possible, as Conservation Groups contend staff must do, to precisely identify and quantify how the new license will impact specific project resources over the next several decades. Nevertheless, the consultation procedures included in the management plans required by this license allow for adjustments to adapt to unforeseen conditions or new technology. Moreover, the Commission reserves in this license, as it does for all licenses, the authority to reopen the license to address resource issues that may arise through the term of the license.[208]

212.    Finally, Conservation Groups assert that the EA did not consider a reasonable range of "alternatives" that they and other entities proposed, such as: alternative minimum flow schedules for the project developments; alternatives to the proposed water quality monitoring protocols; and alternatives for biological monitoring, fish passage,

---

[204]*Alabama Power Company*, 141 FERC ¶ 61,127 at P 23.

[205]*See, e.g., Idaho Power Co.*, 108 FERC ¶ 61,129, at P 41 (2004), *reh'g denied,* 110 FERC ¶ 61,242 (2005), *aff'd Idaho Rivers United v. FERC*, 189 Fed. Appx.629, 2006 U.S. App. Lexis 17566 (9th Cir. 2006).

[206]*Id.*

[207]952 F.2d 538, 546 (D.C. Cir. 1992).

[208]*See California v. FPC*, 345 F.2d 917, 925 (9th Cir. 1965).

erosion and sedimentation monitoring and erosion repair, and recreation management. Conservation Groups contend that, in declining to consider these alternatives, staff erroneously concluded that the obligation to consider a reasonable range of alternatives is limited to alternatives that correspond to all elements of the license applicant's proposal.[209]

213.    As the Commission recently explained in *Alabama Power Company*, section 102(2)(E) of NEPA requires agencies to take a "hard look" at the potential environmental consequences of their proposed actions.[210]   However, in carrying out their NEPA responsibilities, agencies are governed by a rule of reason.[211]   The range of alternatives that must be considered is a matter within an agency's discretion.[212]   The discussion of alternatives need not be exhaustive and need only provide sufficient information to permit a reasoned choice of alternatives, i.e., "reasonable" alternatives.[213] There is no requirement to examine each proposed mitigation or enhancement measure (or groups of such measures submitted by an entity) as a separate alternative or alternatives.[214]

214.    The EA discussed Conservation Groups' recommendations, comments, and proposed alternative measures as they applied to the particular resources at issue. To the extent the EA did not specifically include in the staff alternative certain measures that Conservation Groups and others recommended, it discussed the reasons for not adopting

---

[209]Conservation Groups July 8, 2010 Comments at 70.

[210]*Alabama Power Company*, 141 FERC ¶ 61,127 at P 80 (citing *Committee      for Auto Responsibility v. Solomon*, 603 F.2d 992, 1002 (D.C. Cir. 1979), *cert. denied*, 445 U.S.915 (1980)).

[211]*Natural Resources Defense Council v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972).

[212]*Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551-52 (1976).

[213]*See* section 102(2)(C)(iii) of NEPA, 42 U.S.C. § 4332(2)(C)(iii) (2006); and *North Carolina v. FPC*, 533 F.2d 702, 707 (D.C. Cir. 1976) (citing *NRDC v. Morton*, 485 F.2d 827 (D.C. Cir. 1972)).

[214]*Idaho Power Co.*, 110 FERC ¶ 61,242 at PP 80-85.

Filed: 06/17/2016          Page 83 of 327

USCA Case #16-1195          Document #1621558

those recommendations.[215]  Accordingly, the analytical approach taken in the EA, which is the same approach that the Commission has employed for decades, considered a reasonable range of alternatives and enabled staff to make informed recommendations concerning the relicensing of the Coosa River Project.[216]

## B.  Need for an EIS

215.   Conservation Groups assert that relicensing the Coosa River Project will significantly affect the quality of the human environmentand that, therefore, under NEPA's[217] requirements, an EIS rather than an EA was required.[218]  Conservation Groups contend that pursuant to the Council on Environmental Quality's (CEQ) regulations

---

[215]*See, e.g.,* discussion of why EA did not recommend adopting Conservation Groups' proposed plans for:  monitoring erosion and sedimentation within the project boundary for the term of the license (*see* EA at 89-90); fish passage feasibility (*see* EA at 102); monitoring water quality beyond three years required by water quality certificate (*see* EA at 87); and monitoring measures associated with their recommended recreation management plan, including performance standards for the conditions of the facilities, and monitoring use over the term of the new license (*See* EA at 156-57).

[216] As noted above, on November 5, 2012, Alabama Rivers filed comments on the final BO, which included additional comments on the EA. They assert that an EIS is required based on what they argue are deficiencies in the BO. Specifically, they assert that the BO "shows that the proposed action will likely result in take and adverse habitat modification."  As discussed above, reliance on FWS' BO is appropriate, and Conservation Groups did not provide new information to warrant reconsideration of the validity of the BO's conclusions.  Moreover, a number of issues Alabama Rivers raises in its November 5, 2012 comments were also raised in Conservation Groups July 8, 2010 comments, and are addressed elsewhere in this order.

[217]42 U.S.C. §§ 4321-4370(f) (2006).

[218] Conservation Groups assert that they have twice moved that the Commission prepare an EIS and provide other specific relief:  first, as part of their May 6, 2009 comments on the draft EA; and second, in their July 8, 2010 comments.  Alabama Rivers' November 9, 2012 comments assert that the "Commission has not ruled on our motion or otherwise responded to our request to date."  The EA at B-5 explains why an EIS was not prepared; this order addresses Conservation Groups' July 8, 2010 comments.

Filed: 06/17/2016          Page 84 of 327

USCA Case #16-1195          Document #1621558

implementing NEPA, staff failed to consider the intensity of the proposed relicensing when deciding to prepare an EA.

216.   The test for determining the need for an EIS is whether an action will have a significant impact on the quality of the human environment.[219]  To that end, staff prepared an EA to assist in determining whether to prepare an EIS.[220]  In relicensing proceedings, the Commission uses existing environmental conditions (i.e., continued project operation under the existing license) as a baseline against which to evaluate the potential environmental impacts of an applicant's proposal and other reasonable alternatives.[221]

217.   As explained in more detail above, in the EA, staff thoroughly considered the potential impacts of relicensing the project on all of the resources cited by Conservation Groups, including impacts to water quality, erosion and sedimentation, aquatic species, threatened and endangered species, wildlife, and recreation.  Although staff identified potential ongoing impacts to some resources, it identified no impacts as significant.

218.   The Conservation Groups are mistaken that, under the CEQ regulations, an EIS was required.  The CEQ regulations state that determinations of whether a project will have significant impacts on the environment depend on both "context" and "intensity of the impacts."[222]  With respect to intensity, the regulations set forth 10 factors agencies should consider, including nine cited by Conservation Groups:  (1) impacts that may be both beneficial and adverse; (2) unique characteristics of the geographic area; (3) the degree to which the proposed action's effects on the environment are highly controversial; (4) the degree to which the potential effects are highly uncertain or involve unique or unknown risks; (5) the degree to which the action may establish a precedent for future actions with significant effects; (6) whether the action is related to other actions with individually insignificant but cumulatively significant impacts on the environment, such as other activities in the Alabama-Coosa-Tallapoosa Basin; (7) impacts to significant scientific, cultural or historical resources; (8) impacts to listed species and their critical habitats; and (9) whether the proposed action threatens a violation of federal and state law

---

[219] 42 U.S.C. § 4332(2)(c) (2006).

[220] 40 C.F.R. § 1501.4(c) (2012).

[221] *See Alabama Power Company*, 141 FERC ¶ 61,127.

[222] 40 C.F.R. § 1508.27(b) (2011).

Page 85 of 327
Filed: 06/17/2016
Document #1621558
USCA Case #16-1195

requirements for protection of the environment.[223]  As discussed in more detail
below, we have reviewed these factors and find that, contrary to Conservation Groups
assertions, none of these factors require preparation of an EIS in this case.

### a.  Minor Impacts both beneficial and adverse

219.   Conservation Groups argue that impacts to water quality, soils, aquatic species,
wildlife, and recreation may have a number of adverse impacts, however "the true
extent…is difficult to determine due to the incomplete information provided in the final
EA."[224]  As explained above, staff sufficiently examined the potential impacts of
relicensing the project on each of the targeted resources in the EA.  Although staff
identified potential ongoing impacts to some resources, it identified no impacts as
significant.[225]  Moreover, to the extent Conservation Groups assert that there is
incomplete information, as also explained above, the Commission is not required to have
perfect information before it acts, nor is it required or expected to resolve all
inconsistencies between information that is submitted.

### b.  Geographic Area

220.   Conservation Groups state that the extraordinary biodiversity of the Coosa River
Basin demonstrates that the project is located in a unique geographic area that warrants
preparation of an EIS.  We disagree.  The EA appropriately considered the geographic
area, stating that the

---

[223]*Id.* at 40 C.F.R. §§ 1508.27(b)(1) and (b)(3)-(9).

[224]Conservation Groups July 8, 2010 Comments at 19-41.

[225] For example, Conservation Groups argue that the EA does not explain why
project-specific entrainment studies were not performed, given that the EA states that
Alabama Power estimated the annual mortality to be about 1.3 million fish at the
project's developments.  However, the EA explains that this loss is consistent with
published literature where field studies have been conducted showing that most of the
fish entrained were juvenile life stages and smaller species such as minnows.  These life
stages and species often experience high natural mortality in populations unaffected by
hydropower operation.  As relevant here, the Coosa River Project supports sport and/or
commercial fisheries, and do not appear substantially affected by turbine mortality under
its current license or as proposed for relicensing.  *See* EA at 67-70 and 101-02.

Filed: 06/17/2016      Page 86 of 327

Document #1621558

USCA Case #16-1195

Coosa River Basin supports rich and diverse assemblages of aquatic species, with 147 species of fish. Additionally, it supports the most diverse collection of freshwater mollusks in the world.[226]

As explained in the EA and this order, however, relicensing the Coosa River Project will not have significant impacts to the biodiversity of the Coosa River Basin. Indeed, the relevant CEQ regulation provides that, in the context of determining whether an EIS is required, "intensity…refers to the *severity*" of the impact.[227] Thus, the regulation requires an agency to consider whether adverse effects are sufficiently severe to require preparation of an EIS. Staff appropriately considered the geographic area, and rightly concluded that there would be no significant impacts to the Coosa River Basin from relicensing the project.

c.    **Potential Effects on the Environment are Not Highly Controversial**

221.    Conservation Groups assert that the Coosa River Project is highly controversial, in part because of issues related to interstate water allocation and inter-basin allocation of flows between the Tallapoosa and Coosa river system. Conservation Groups cite to Georgia DNR's objection to Alabama Power's operation of the project during drought conditions.[228]

222.    For an action to qualify as "highly controversial" for NEPA purposes, there must be a "dispute over the size, nature, or effect of the action, rather than the existence of opposition to it."[229] Accordingly, a "controversy" does not exist merely because individuals or groups oppose, or have raised questions about, an action. While legitimate concerns have been raised in this proceeding, they have been addressed and resolved through pre-filing consultation, scoping meetings, and extensive comments and other filings from all parties.

---

[226] *See* EA at 51.

[227] *See* 40 C.F.R. § 1508.27(b) ('Significantly" as used in NEPA requires considerations of both context and intensity: (b) *Intensity*. This refers to the severity of impact…).

[228] *See* EA at 43.

[229] *See, e.g., Central New York Oil and Gas Company, LLC,* 137 FERC ¶ 61,121, at P 115 (2011).

Filed: 06/17/2016      Page 87 of 327

USCA Case #16-1195      Document #1621558

Page 88 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

### d.     Project Establishes No Precedent for Future Actions

223.    Conservation Groups state that this relicensing proceeding may establish a precedent for future actions, including future proposed relicensing proceedings involving Alabama Power.  However, an EA is a non-binding document and creates no precedent to which the Commission is bound.  Moreover, every relicensing proceeding is unique and has different impacts on different resources.  In determining whether to prepare an EIS or an EA, staff relies upon the Commission's regulations and makes an individual determination for each proposal.

### e.     Project is Not Related to Other Actions with Cumulatively Significant Impacts

224.    Conservation Groups assert that the EA's cumulative impact analysis is deficient primarily because it does not forecast potential changes in operations at other facilities or provide findings regarding the conditions of flow and biological resources 30 to 50 years after issuance of a new license.[230]  Conservation Groups also disagree with the cumulative impact analysis for failing to consider the effects of climate change on project operations.

225.    As the Commission recently explained, NEPA does not require the precision Conservation Groups seek in our NEPA analyses.  The adequacy of an EA (or an EIS) is determined by a "rule of reason," which requires only a "reasonably thorough discussion of the significant aspects of the probable environmental consequences."[231]  Attempting to predict future flow scenarios that may occur due to climate change or other conditions would be too speculative given the state of the science at this time.

226.    Moreover, the Commission's obligation under FPA section 10(a)(1) continues throughout the term of the license.[232]  To this end, we include in licenses a number of conditions that reserve the Commission's authority to order changes to project facilities or operations in the future, as circumstances may warrant.

---

[230]Conservation Groups July 8, 2010 Comments at 44.

[231]*Alabama Power Company*, 141 FERC ¶ 61,127 at P 84.

[232]*See, e.g., S.D. Warren Co.*, 68 FERC ¶ 61,213, at 62,022 (1994).

Page 89 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

### f.  Insignificant Impact to Scientific, Cultural, or Historical Resources

227.    The EA acknowledges that the project may affect cultural resources, but finds that implementation of Alabama Power's HPMP would sufficiently protect historic properties, as well as undiscovered archaeological sites should any be identified during the new license term.[233]  Conservation Groups argue that the EA does not explain how the HPMP will be adequate to mitigate any such potential impacts to the point of insignificance.

228.    As discussed in this order, staff executed a PA with the Alabama SHPO and the Georgia SHPO to facilitate compliance with section 106 of the NHPA.  The PA requires Alabama Power to implement the HPMP for the term of the new license.  As explained in the EA,[234] in the event that a project-related activity cannot be modified to avoid an adverse effect on an historic property within the project's area of potential effects, Alabama Power will consult with the Alabama SHPO, the Georgia SHPO, and other interested parties, as provided for under the HPMP, to define appropriate mitigation measures.[235]

### g.  Listed Species and Their Critical Habitat are Adquately Protected

229.    Conservation Groups take issue with the EA's conclusion that formal consultation is not necessary for some species.  They add that the EA's use of the existing conditions for establishing baseline conditions is improper for purposes of the analysis on threatened and endangered species.  Rather, Conservation Groups assert that the EA should have analyzed impacts to threatened and endangered species using the baseline as set forth in the ESA and its implementing regulations, and that the BA's use of a "marginal benefit analysis," is inconsistent with the ESA's recovery standard.[236]

---

[233]Conservation Groups July 8, 2010 Comments at 52 (citing to EA at 199).

[234]*See*EA at 246.

[235]*Id.*

[236]Conservation Groups July 8, 2010 Comments at 64-67.  They cite in part to the ESA regulations which define baseline for ESA purposes as "the past and present impacts of all Federal, State or private actions, and other human activities in the action area, the

Continued...

Filed: 06/17/2016        Page 90 of 327

USCA Case #16-1195        Document #1621558

230.    The revised BA was issued more than a year after Conservation Groups filed their July 8, 2010 comments on the EA.  Accordingly, the BA, which provided additional information and resulted in a request for formal consultation for additional species, may resolve or address many of Conservation Groups' concerns with respect to the EA's consideration of threatened and endangered species issues.[237]  Nonetheless, the Conservation Groups are mistaken.  Contrary to their assertions, the EA properly relied on a baseline that includes existing environmental conditions.

231.    In relicensing proceedings, the Commission uses existing environmental conditions (i.e., continued project operation under the existing license) as a baseline against which to evaluate the environmental impacts of an applicant's proposal and other reasonable alternatives.  This longstanding practice has been upheld by the courts, and Conservation Groups provide no persuasive arguments for changing this practice.[238]

---

anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process."  50 C.F.R. § 402.02.

[237] Alabama Rivers November 9, 2012 Comments at 22-23 assert that because staff's BA, which was issued after the final EA, changed the EA's "not likely to adversely affect" findings for several species to "likely to adversely affect," the EA should be supplemented "to evaluate the adverse effects it now considers to be likely or consider alternatives to mitigate those impacts."  However, the BA was a comprehensive analysis considered as part of formal consultation under ESA.  Because the BO's conclusions do not alter a finding of no significant impact, supplementing the EA would result in a meaningless exercise of form over substance.

[238] *See American Rivers v. FERC*, 201 F.3d 1186, 1195-96 (9th Cir. 2000) (affirmed Commission's existing environmental conditions baseline as consistent with "the substantive and procedural requirements of both the FPA and NEPA"); *see also Conservation Law Foundation v. FERC*, 216 F.3d 41, 46-47 (D.C. Cir. 2000) (court denied petitioners' argument that including existing conditions in the baseline caused the Commission to ignore continuing impacts directly attributable to the new license, and held that use of an existing condition baseline was a reasonable construction of the FPA's 10(j) requirements for protection of fish and wildlife).

Filed: 06/17/2016      Page 91 of 327

Document #1621558

USCA Case #16-1195

### h.   Project Does Not Threaten Violation of Federal and State Law

232.   Conservation Groups assert that the EA does not demonstrate that the relicensing of the Coosa River Project will comply with all of the state of Alabama's water quality standards, and that Alabama Power did not provide sufficient water quality data and analysis to Alabama DEM.  We disagree.  As discussed above, Alabama DEM requires that Alabama Power implement measures to assure compliance with Alabama's DO standards.  There is no evidence to suggest that other water quality parameters are not being met.  More to the point, Alabama DEM, the agency responsible for administering the state's water quality program and issuing the water quality certification, found no reason to require compliance with other water quality parameters.

## Administrative Provisions

### A.   Annual Charges

233.   The Commission collects annual charges from licensees for administration of the FPA.  Article 201, *Administrative Annual Charges*, provides for the collection of funds for administration of the FPA and use and occupancy of United States lands.

### B.   Exhibit F and G Drawings

234.   The Commission requires licensees to file sets of approved project drawings on microfilm and in electronic file format.  Article 202, *Exhibit F Drawings*, requires the filing of these drawings.

235.   The Exhibit G drawings filed with the license application do not enclose and show all the project recreation facilities required in the license within the project boundary.  The Exhibit G drawings must show all approved project features; therefore, the project boundary drawings are not approved.  Article 203, *Exhibit G Drawings*, requires Alabama Power to file revised Exhibit G drawings pursuant to §§ 4.39 and 4.41 of the Commission's regulations.

### C.   Amortization Reserve

236.   The Commission requires licensees for new major licenses to set up and maintain an amortization reserve account upon license issuance.  Article 204, *Amortization Reserve*, requires the establishment of the account.

Filed: 06/17/2016          Page 92 of 327

Document #1621558

USCA Case #16-1195

### D.    Headwater Benefits

237.    Some projects directly benefit from headwater improvements that were constructed by other licensees, the United States, or permittees.  Article 205, *Headwater Benefits*, requires the licensee to reimburse such entities for these benefits if they were not previously assessed and reimbursed.

### E.    Review of Final Plans and Specifications

238.    Article 301 requires the licensee to provide the Commission's Division of Dam Safety and Inspections (D2SI) Atlanta Regional Office with final contract drawings and specifications, together with a supporting design report, consistent with the Commission's engineering guidelines.  The submittal shall include a temporary construction emergency action plan, a quality control and inspection program, and a soil erosion and sediment control plan.

239.    Where new construction or modifications to the project are involved, the Commission requires the licensee to file revised drawings of project features as built. Article 302 provides for the filing of these drawings.

240.    Where project modifications are proposed, as a result of environmental requirements, the Commission requires licensees to file a plan and schedule of any proposed modification to project operation or to the water retaining and/or conveyance features of the project.  Article 303 provides for the filing of this plan and schedule.

### F.    Use and Occupancy of Project Lands and Waters

241.    Requiring a licensee to obtain prior Commission approval for every use or occupancy of project land would be unduly burdensome.  Therefore, Article 419, *Use and Occupancy*, allows the licensee to grant permission, without prior Commission approval, for the use and occupancy of project lands for such minor activities as landscape planting. Such uses must be consistent with the purposes of protecting and enhancing the scenic, recreational, and environmental values of the project.

### Stateand Federal Comprehensive Plans

242.    Section 10(a)(2)(A) of the FPA[239] requires the Commission to consider the extent to which a project is consistent with federal or state comprehensive plans for improving,

---

[239] 16 U.S.C. § 803(a)(2)(A) (2006).

developing, or conserving a waterway or waterways affected by the project.[240] Under section 10(a)(2)(A), federal and state agencies filed 42 comprehensive plans that address various resources in Alabama and Georgia. Of these, the staff identified and reviewed 14 comprehensive plans that are relevant to this project.[241] No conflicts were found.

**Applicant's Plans and Capabilities**

243. In accordance with sections 10(a)(2)(C) and 15(a) of the FPA,[242] Commission staff evaluated Alabama Power's record as a licensee for these areas: (A) conservation efforts; (B) compliance history and ability to comply with the new license; (C) safe management, operation, and maintenance of the project; (D) ability to provide efficient and reliable electric service; (E) need for power; (F) transmission services; (G) cost effectiveness of plans; and (H) actions affecting the public. We accept the staff's findings in each of the following areas.

### A. Conservation Efforts

244. Section 10(a)(2)(C) of the FPA requires the Commission to consider the extent of any electricity consumption efficiency improvement programs for license applicants primarily engaged in the generation or sale of electric power, like Alabama Power.

---

[240] Comprehensive plans for this purpose are defined at 18 C.F.R. § 2.19 (2012).

[241] The list of applicable plans can be found in section 5.4 of the EA for the project. In its July 8, 2010 comments, Conservation Groups assert that the Commission did not respond to requests to include: (1) *Recovery Plan for Six Mobile River Basin Aquatic Snails*; (2) *Alabama Statewide Comprehensive Outdoor Recreation Plan* (SCORP); (3) *Conserving Alabama's Wildlife: A comprehensive Strategy*; and (4) *State of Alabama Water Improvement Advisory commission, Studies of Pollution in Streams of Alabama*. Staff responded to these requests in footnote 58, in section 5.4 of the EA, as well as staff letters issued June 15, 2009 and November 17, 2010. In the letters, staff stated that the Alabama SCORP was listed as a Commission-approved comprehensive plan and the other three documents were not accepted as comprehensive plans because they were not filed by a qualifying agency, as required by section 10(a)(2)(A) of the FPA. *See*http://elibrary.ferc.gov/idmws/common/opennat.asp?fileID=12488731 and http://elibrary.ferc.gov/idmws/common/opennat.asp?fileID=12488780.

[242] 16 U.S.C. §§ 803(a)(2)(C) and 808(a) (2006).

Page 94 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

245.   Alabama Power has provided conservation services for its electricity customers since 1979.  Alabama Power has several programs to promote conservation and energy efficiency for residential, commercial, industrial, and agricultural customers. Alabama Power:  (a) provides the public with seasonal energy saving tips through multi-news media including print, television, and radio; (b) sponsors conservation oriented events including conservation/recreation-themed programs, workshops and conferences; and (c) maintains the Energy Tips website, which is a comprehensive online resource designed to provide customers with home energy information using easy to understand terms and illustrations.  These programs show that Alabama Power is making an effort to conserve electricity and has made a satisfactory good faith effort to comply with section 10(a)(2)(C) of the FPA.

### B.   Compliance History and Ability to Comply with the New License

246.   Based on a review of Alabama Power's compliance with the terms and conditions of the current license, staff finds that Alabama Power's overall record of making timely filings and compliance with its license is satisfactory.  Therefore, staff believes that Alabama Power can satisfy the conditions of a new license.

### C.   Safe Management, Operation, and Maintenance of the Project

247.   Staff has reviewed Alabama Power's management, operation, and maintenance of the Coosa River Project pursuant to the requirements of 18 C.F.R. Part 12 and the Commission's Engineering Guidelines.  Staff concludes that the dams and other project works meet the Commission's Engineering Guidelines and criteria, and that there is no reason to believe that Alabama Power cannot continue to safely manage, operate, and maintain these facilities under a new license.

### D.   Ability to Provide Efficient and Reliable Electric Service

248.   Staff has reviewed Alabama Power's plans and its ability to operate and maintain the project in a manner most likely to provide efficient and reliable electric service. Alabama Power regularly inspects the project's turbine generator units to ensure they continue to perform in an optimal manner, schedules maintenance to minimize effects on energy production, and since the project has been in operation, has undertaken several initiatives to ensure the project is able to operate reliably into the future.  Staff concludes that Alabama Power is capable of operating the project to provide efficient and reliable electric service in the future.

Page 95 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

### E.    Need for Power

249.    To assess the need for power, staff looked at the needs in the operating region in which the project is located.  The seven developments of the Coosa River Project have a combined installed capacity of 960.9 MW that generates about 3,050,000MWh per year, and is located in the southern sub-region of Southeastern Electric Reliability Council (SERC), which is one of eight regional reliability councils of the North American Electric Reliability Council.  SERC is a summer peaking region, and the peak summer energy demand for the SERC region is projected to grow at an average annual rate of 1.7 percent over the planning period from 2007 through 2016.  About 39 percent of the energy utilized in the SERC region is generated from coal, 26 percent generated from nuclear power, and 5 percent generated from hydropower.

250.    The southern sub-region is serviced by Southern Company, the largest generator of electricity in the United States.  Alabama Power is the second largest subsidiary of Southern Company, providing 30 percent of the power needs for the Southern Company's residential, commercial, and industrial customers.  Of this 30 percent, 7.2 percent of the power is derived from Alabama Power's 14 hydroelectric facilities.  These facilities provide a significant source of reliable, dependable, and reasonably priced electricity for Alabama Power's customers.

251.    Power from the Coosa River Project will continue to meet Alabama Power customers' growing needs as well as meeting part of the regional need for power.

### F.    Transmission Services

252.    Each of the seven Coosa River developments delivers power to a substation located at the base of, or near, the respective project dam.  The substations are connected to Alabama Power's transmission system through high voltage lines, which are not part of this license.  Alabama Power proposes no changes that would affect its own or other transmission services in the region.

### G.    Cost Effectiveness of Plans

253.    Alabama Power proposes to make a number of facility and operational modifications to both improve project generating capacity and enhance environmental resources affected by the project.  Based on Alabama Power's record as an existing licensee, staff concludes that these proposals are likely to be carried out in a cost-effective manner.

Filed: 06/17/2016          Page 96 of 327

USCA Case #16-1195     Document #1621558

## H.     Actions Affecting the Public

254.    During the current license term, Alabama Power provided facilities to enhance the public use of project lands and waters, and operated the project with consideration to protecting public use of the project reservoirs and lakes, as well as protecting downstream communities by providing flood control storage.  During this relicensing process, the public was invited to participate in meetings and provide comments at each phase of the process.  In addition to being responsive to public input that benefits the community, Alabama Power uses the project to help meet the power needs of the region.

## Project Economics

255.    In determining whether to issue a new license for an existing hydroelectric project, the Commission considers a number of public interest factors, including the economic benefits of project power.  Under the Commission's approach to evaluating the economics of hydropower projects, as articulated in *Mead Corp.*,[243] the Commission uses current costs to compare the costs of the project and likely alternative power with no forecasts concerning potential future inflation, escalation, or deflation beyond the license issuance date.  The basic purpose of the Commission's economic analysis is to provide a general estimate of the potential power benefits and the costs of a project, and of reasonable alternatives to project power.  The estimate helps to support an informed decision concerning what is in the public interest with respect to a proposed license.

256.    In applying this analysis to the Coosa River Project, staff considered three options: No Action alternative, Alabama Power's proposal, and the project as licensed herein.  Under the no action alternative, the project would continue to operate as it does now.  The project has an installed capacity of 960.9 MW, and generates an average of 3,050,000 MWh of electricity annually.  The average annual project cost is about $65.9 million, or $21.6/MWh.  When we multiply our estimate of average generation by the alternative power cost of $98.07/MWh, staff gets a total value of the project's power of $299.1 million in 2013 dollars.[244]  To determine whether the proposed project is currently

---

[243] 72 FERC ¶ 61,027 (1995).

[244] For the Coosa River Project, staff used Alabama Power's estimate for the cost of alternative power ($95.08/MWh in 2009 dollars) adjusted to 2013 dollars.  This includes a power value, as well as value for dependable capacity.  Alabama Power's estimate for alternative power is higher than the average retail cost of power in the Southeastern Region.  However the Coosa River Project is unique in that it provides a high level of dependable capacity which justifies a higher replacement cost for energy.

Page 97 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

economically beneficial, staff subtracts the project's cost from the value of the project's power.[245]  Therefore, the project would produce power at a cost of$233.2 million, or $76.4/MWh, lessthan the likely alternative cost of power.

257.    As proposed by Alabama Power, the levelized annual cost of operating the Coosa River Project is $80.1 million, or $26.2/MWh.  Based on generation of 3,058,697 MWh of electricity annually and an alternative power cost of $97.99/MWh, staff gets a total value of the project's power of $299.7 million in 2013 dollars.  Therefore, in the first year of operation, the project would produce power at a cost of $219.6 million, or $71.8/MWh, less than the likely alternative cost of power.

258.    As licensed herein with the mandatory conditions and staff measures, the levelized annual cost of operating the project would be about $79.8 million, or $26.2/MWh.  Based on generation of 3,050,000 MWh of electricity annually as licensed, the project would produce power valued at $299.1 million in 2013 dollars when multiplied by the $98.07/MWh value of the project's power.  Therefore, in the first year of operation, the project would produce power at a cost of $219.3 million, or $71.9/MWh, less than the likely alternative cost of power.

259.    In considering public interest factors, the Commission takes into account that hydroelectric projects offer unique operational benefits to the electric utility system (ancillary service benefits).  These benefits include the ability to help maintain the stability of a power system, such as by quickly adjusting power output to respond to rapid changes in system load; and to respond rapidly to a major utility system or regional blackout by providing a source of power to help restart fossil-fuel based generating stations and put them back on line.

**Comprehensive Development**

260.    Sections 4(e) and 10(a)(1) of the FPA[246] require the Commission to give equal consideration to the power development purposes and to the purposes of energy

---

[245] Details of staff's economic analysis for the project as licensed herein and for various alternatives are included in the EA issued on December 31, 2009, at 200-02.  The project costs and value for energy described in this order were adjusted from 2009 to 2013 dollars.  The project costs were adjusted based on the CPI-U index for years 2009-2012.  The value of alternative power, which is a combined energy and capacity value, was increased by 3.14 percent to reflect a similar increase in costs as reported in the Energy Information Administration Annual Outlook for 2012.

conservation; the protection, mitigation of damage to, and enhancement of fish and wildlife; the protection of recreational opportunities; and the preservation of other aspects of environmental quality. Any license issued shall be such as in the Commission's judgment will be best adapted to a comprehensive plan for improving or developing a waterway or waterways for all beneficial public uses. The decision to relicense this project, and the terms and conditions included herein, reflect such consideration.

261. The EA for the project contains background information, analysis of effects, and support for related license articles. Based on the record of this proceeding, including the EA and the comments thereon, licensing the Coosa River Project as described in this order would not constitute a major federal action significantly affecting the quality of the human environment. The project will be safe if operated and maintained in accordance with the requirements of the license.

262. Based on staff's independent review and evaluation of the Coosa River Project, recommendations from the resource agencies and other stakeholders, and the no-action alternative, as documented in the EA, we have selected the proposed Coosa River Project, with the staff-recommended measures and agency mandatory conditions, and find that it is best adapted to a comprehensive plan for improving or developing the Coosa River.

263. We selected this alternative because: (1) issuance of a new license will serve to maintain a beneficial, dependable, and an inexpensive source of electric energy; (2) the required environmental measures will protect and enhance fish and wildlife resources, water quality, recreational resources, and historic properties; and (3) the combined 960.9 MW of electric capacity comes from a renewable resource that does not contribute to atmospheric pollution.

### License Term

264. Section 15(e) of the FPA[247] provides that any new license issued shall be for a term that the Commission determines to be in the public interest, but not less than 30 years or more than 50 years. The Commission's general policy is to establish 30-year terms for projects with little or no redevelopment, new construction, new capacity, or environmental mitigation and enhancement measures; 40-year terms for projects with a moderate amount of such activities; and 50-year terms for projects with extensive

---

[246] 16 U.S.C. §§ 797(e) and 803(a)(1) (2006).

[247] 16 U.S.C. § 808(e) (2006).

Page 98 of 327     Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

Filed: 06/17/2016        Page 99 of 327

Document #1621558

USCA Case #16-1195

measures.[248]  The license authorizes a minor amount of construction, no new capacity, and only a minor amount of new environmental mitigation and enhancement measures.  Consequently, a 30-year license term for the Coosa River Project is appropriate.

The Commission orders:

(A)     This license is issued to Alabama Power Company (licensee), for a period of 30 years, effective the first day of the month in which this order is issued, to operate and maintain the Coosa River Project.  This license is subject to the terms and conditions of the Federal Power Act (FPA), which is incorporated by reference as part of this license, and subject to the regulations the Commission issues under the provisions of the FPA.

(B)     The project consists of:

(1)    All lands, to the extent of the licensee's interests in these lands, described in the project description and the project boundary discussion of this order.

(2)    Project works which include:

The Weiss Development consisting of:  (1) a diversion dam with (a) a 1.35-mile-long earthen east embankment, (b) an approximately 280-foot-long concrete spillway equipped with five 40-foot-wide by 38-foot-high Tainter gates and one 16-foot-wide by 22-foot-high Taintor trash gate, (c) an approximately 100-foot-long concrete non-overflow section, and (d) a 1.0-mile-long earthen west embankment; (2) a secondary dam with (a) a 1.7-mile-long east embankment, (b) a 120-foot-long east concrete non-overflow section, (c) a 256-foot-wide powerhouse intake with trashracks with a 6-inch clear spacing, and an adjacent 16-foot-wide by 22-foot-high trash gate, (d) a 140-foot-long concrete west non-overflow section, and (e) a 1.8-mile-long earthen west embankment; (3) earthen saddle dikes designated as saddle dikes "A", "B", and "C", 3,692 feet, 2,473 feet, and 3,692 feet long, respectively; (4) a 52-mile-long reservoir with a surface area of 30,200 acres and storage of 306,651 acre-feet at a normal pool elevation of 564 feet mean sea level (msl), gross storage of 704,404 acre-feet at elevation 574 feet msl, and generation storage of 148,400 acre-feet at elevations 558-564 feet msl; (5) a 7,000-foot-long power canal from the main reservoir to a forebay lake; (6) a 256-foot-long by 67-foot-wide concrete powerhouse containing three generating units, each unit

---

[248] *See Consumers Power Co.,* 68 FERC ¶ 61,077, at 61,383-84 (1994).

Filed: 06/17/2016    Page 100 of 327    Document #1621558    USCA Case #16-1195

with (a) a vertical fixed-blade turbine with a 39,100 horsepower rating (29,325 kilowatts [kW]) and a maximum discharge of 8,400 cubic feet per second (cfs), and (b) a generator rated at 29,250 kW. The total rated capacity is 87.75 megawatts (MW); (7) a 1,300-foot-long, 50-foot-wide earthen tailrace channel; (8) a substation; and (9) appurtenant equipment.

The Neely Henry Development consisting of: (1) a dam with (a) an 850-foot-long earthen east embankment, (b) a 120-foot-long east concrete non-overflow section, (c) a 300-foot-long powerhouse intake section that includes trashracks with a 6-inch clear spacing, (d) a 305-foot-long concrete spillway with six 40-foot-wide by 29-foot-high Tainter gates, (e) a 133-foot-long west concrete non-overflow section, and (f) a 3,200-foot-long earthen west embankment; (2) a 78-mile-long reservoir with a surface area of 11,235 acres and storage of 121,235 acres at normal pool elevation 508 feet msl, and generation storage of 30,640 acre-feet at elevations 505-508 feet msl; (3) a 300-foot-long by 170-foot-wide concrete powerhouse containing three generating units, each unit with (a) a vertical propeller turbine with a 33,500 horsepower rating (25,125 kW) and a maximum discharge of 8,900 cfs, and (b) a generator rated at 24,300 kW. The total rated capacity is 72.9 MW; (4) a substation; and (5) appurtenant equipment.

The Logan Martin Development consisting of: (1) a dam with (a) a 4,650-foot-long earthen east dike, (b) a 327-foot-long concrete spillway with six 40-foot-wide by 38-foot-high Tainter gates and one 17.5-foot-wide by 21-foot-high vertical trash gate, (c) a 295-foot-long powerhouse intake section that includes trashracks with a 6-inch clear spacing, (d) an 850-foot-long earthen dike with a concrete non-overflow section next to the powerhouse; (2) a 48.5-mile long reservoir with a surface area of 15,263 acres and storage of 273,500 acre-feet at normal pool elevation 465 feet msl, flood storage of 518,600 acre-feet at elevation 477 feet msl, flood storage of 245,300 acre-feet at elevations 465-477 feet msl, and generation storage of 67,700 acre-feet at elevations 460-465 feet msl; (3) a 295-foot-long by 168.5-foot-wide concrete powerhouse containing three generating units, each unit with (a) a vertical propeller turbine with a 59,000 horsepower rating (44,250 kW) and a maximum discharge of 11,000 cfs, and (b) a generator rated at 42,750 kW. The total rated capacity of the generating units is 128.25 MW; (4) a substation; and (5) appurtenant equipment.

The Lay Development consisting of: (1) a dam with (a) a 512-foot-long earthen east embankment, (b) a 180-foot-long east concrete bulkhead section, (c) a 930-foot-long concrete spillway with twenty-six 30-foot-wide by 17-foot-high radial lift gates, (d) a 304-foot-long powerhouse intake section that includes trashracks with a 6-inch clear spacing, and (e) a 194-foot-long west concrete bulkhead section; (2) a 48.2-mile-long lake with a surface area of 12,000 acres at normal pool elevation 396 feet msl; (3) a 376-foot-long by 74-foot-wide concrete powerhouse containing six generating units, four units with (a) a

vertical propeller turbine with a 40,000 horsepower rating (30,000 kW) and a maximum discharge of 5,700 cfs, and (b) a generator rated at 29,500 kW; and two units with (a) a vertical, fixed-blade, "diagonal flow" turbine with a 45,500 horsepower rating (34,000 kW) and a maximum discharge of 5,700 cfs, and (b) a generator rated at 29,500 kW. The total rated capacity is 177 MW; (4) a substation; and (5) appurtenant equipment.

The Mitchell Development consisting of: (1) a dam with (a) a 964-foot-long concrete spillway with twenty-three 30-foot-wide by 15-foot-high timber-faced radial gates and three 30-foot-wide by 25-foot-high steel-faced radial gates, (b) a 449-foot-long original powerhouse intake section that includes trashracks with a 6-inch clear spacing, and (c) a 300-foot-long newer powerhouse intake section that includes trashracks with a 6-inch clear spacing; (2) a 14-mile-long lake with a surface area of 5,850 acres at normal pool elevation 312 feet msl; (3) a 449-foot-long by 83-foot-wide original concrete powerhouse at the center of the dam containing one operating generating unit with (a) a vertical propeller turbine with a 29,000 horsepower rating (21,750 kW) and a maximum discharge of 4,788 cfs, and a generator rated at 20,000 kW; (4) a 295-foot-long by 90-foot-wide newer concrete powerhouse at the west abutment of the dam wide containing three generating units, each with (a) a vertical propeller turbine with a 69,000 horsepower rating (51,750 kW) and a maximum discharge of 10,454 cfs, and (b) a generator rated at 42,750 kW. The total rated capacity is 170 MW; (5) a substation; and (6) appurtenant equipment.

The Jordan Development consisting of: (1) a dam with (a) a 177-foot-long concrete east non-overflow section, (b) a 246-foot-long powerhouse intake section that includes trashracks with a 4-1/8-inch clear spacing, (c) a 1,330-foot-long concrete spillway with eighteen 34-foot-wide by 8-foot-high radial lift gates and seventeen 30-foot-wide by 18-foot-high vertical lift gates, and (d) a 75-foot-long concrete west non-overflow section; (2) an 18-mile-long lake with a surface area of 5,880 acres at normal pool elevation 252 feet msl; (3) a 300-foot-long by 62-foot-wide concrete powerhouse containing four generating units, three units with (a) a vertical propeller turbine with a 36,000 horsepower rating (27,000 kW) and a maximum discharge of 4,960cfs, and (b) a generator rated at 25,000 kW; and one unit with (a) a vertical propeller turbine with a 40,000 horsepower rating (30,000 kW) and maximum discharge of 5,200 cfs, and (b) a generator rated at 25,000 kW. The total rated capacity is 100 MW; (4) a substation; and (5) appurtenant equipment.

The Bouldin Development consisting of: (1) a 3-mile long, 210-foot-wide power canal leading from Jordan Lake to the Bouldin powerhouse and forebay lake. The power canal and forebay lake have a surface area of 920 acres at a normal pool elevation of 252 feet msl; (2) a forebay dam with (a) a 7,000-foot-long earthen east embankment, (b) a

Page 102 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

228-foot-long powerhouse intake section that includes trashracks with a 6-inch clear spacing, and (c) a 2,200-foot-long earthen west embankment; (3) a 228-foot-long by112-foot-wide concrete powerhouse containing three generating units, two units with (a) a vertical propeller turbine with a 103,600-horsepower rating (77,700kW) and a maximum discharge of 9,600 cfs, and (b) a generator rated at 75,000 kW; and a third generating unit with (a) a vertical fixed-blade, "diagonal flow" turbine with a 109,500-horsepower rating (81,700 kW) and a maximum discharge of 9,600 cfs, and (b) a generator rated at 75,000 kW. The total rated capacity is 225 MW; (4) a 5-mile-long, 250-foot-wide tailrace channel originating at the base of the powerhouse and terminating at the Coosa River; (5) a substation; and (6) appurtenant equipment.

The project works generally described above are more specifically shown and described by those approved portions of exhibits A and F shown below:

Exhibit A:  The following sections of exhibit A filed on July 28, 2005:

Pages A-1 through A-42 of Exhibit A, entitled "Project Description," describing the structural, mechanical, electrical, and transmission equipment for each of the seven developments.

Exhibit F:  The following exhibit F drawings filed on July 28, 2005:

| Exhibit F Drawing | FERC No. 2146- | Description |
| --- | --- | --- |
| *Weiss Development* | | |
| F-1 | 1001 | Weiss Dam – General Layout |
| F-2 | 1002 | Weiss Dam – Spillway Plan and Sections |
| F-3 | 1003 | Weiss Dam – Powerhouse Location Plan |
| F-4 | 1004 | Weiss Dam – Powerhouse Transverse Sections |
| F-5 | 1005 | Weiss Dam – Powerhouse Longitudinal Section |
| F-6 | 1006 | Weiss Dam – Powerhouse Generator Floor Plan |
| | | |
| *Neely Henry Development* | | |
| F-7 | 1007 | H. Neely Henry Dam – Plan and Sections |
| F-8 | 1008 | H. Neely Henry Dam – Powerhouse Transverse Section thru Units |
| F-9 | 1009 | H. Neely Henry Dam – Powerhouse Transverse Section thru Service Bay |
| F-10 | 1010 | H. Neely Henry Dam – Powerhouse Longitudinal Section |

Page 103 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

| F-11 | 1011 | H. Neely Henry Dam – Powerhouse Floor Plans |
|------|------|---------------------------------------------|

*Logan Martin Development*

| F-12 | 1012 | Logan Martin Dam – Plan, Dike, and Spillway Section |
|------|------|-----------------------------------------------------|
| F-13 | 1013 | Logan Martin Dam – Powerhouse Transverse Section thru Units |
| F-14 | 1014 | Logan Martin Dam – Powerhouse Transverse Section thru Service Bay |
| F-15 | 1015 | Logan Martin Dam – Longitudinal Section |
| F-16 | 1016 | Logan Martin Dam – Floor Plans |

*Lay Development*

| F-17 | 1017 | Lay Dam Reconstruction – Powerhouse Plan, Elevations and Sections |
|------|------|-------------------------------------------------------------------|
| F-18 | 1018 | Lay Dam Reconstruction – Powerhouse Elevation and Sections |
| F-19 | 1019 | Lay Dam – Powerhouse Addition Plan |

*Mitchell Development*

| F-20 | 1020 | Mitchell Dam – Project Additions Plan |
|------|------|---------------------------------------|
| F-21 | 1021 | Mitchell Dam – Elevations of Project Additions |
| F-22 | 1022 | Mitchell Dam – New Powerhouse Transverse Section |
| F-23 | 1023 | Mitchell Dam – Spillway Sections |
| F-24 | 1024 | Mitchell Dam – Powerhouse Floor Plan |
| F-25 | 1025 | Mitchell Dam – Original Powerhouse Plans |
| F-26 | 1026 | Mitchell Dam – Transverse Section thru Units No. 1 and 2 |
| F-27 | 1027 | Mitchell Dam – Transverse Section thru Unit No. 3 |
| F-28 | 1028 | Mitchell Dam – Transverse Section thru Unit No. 4 |
| F-29 | 1029 | Mitchell Dam – Original Spillway Cross Sections |
| F-30 | 1030 | Mitchell Dam – New Powerhouse Longitudinal Section |

*Jordan Development*

| F-31 | 1031 | Jordan Dam – Plan |
|------|------|-------------------|
| F-32 | 1032 | Jordan Dam – Spillway Sections |
| F-33 | 1033 | Jordan Dam – Headworks and Powerhouse Section |
| F-34 | 1034 | Jordan Dam – Powerhouse Plan |

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 104 of 327

*Bouldin Development*

| | | |
|---|---|---|
| F-35 | 1035 | Walter Bouldin Dam – Plan of Dike, Sta. 23+00 ~ Sta. 37+00 |
| F-36 | 1036 | Walter Bouldin Dam – Plan of Dike, Sta. 23+00 – Sta. 37+00 |
| F-37 | 1037 | Walter Bouldin Dam – Plan of Dike, Sta. 37+00 – Sta. 55+00 |
| F-38 | 1038 | Walter Bouldin Dam – Plan of Dike, Sta. 55+00 – Sta. 68+00 |
| F-39 | 1039 | Walter Bouldin Dam – Plan of Dike, Sta. 68+00 – Sta. 82+00 |
| F-40 | 1040 | Walter Bouldin Dam – Plan of Dike, Sta. 82+00 – Sta. 98+00 |
| F-41 | 1041 | Walter Bouldin Dam – Plan of Dike, Sta. 98+00 – Sta. 114+00 |
| F-42 | 1042 | Walter Bouldin Dam – Plan of Dike, Sta. 114+00 – Sta. 131+27 |
| F-43 | 1043 | Walter Bouldin Dam – Typical Sections at Key Locations |
| F-44 | 1044 | Walter Bouldin Dam – Cross-section at Intake -Headworks Wingwalls |
| F-45 | 1045 | Walter Bouldin Dam – Powerhouse Longitudinal Section along Centerline of Units |
| F-46 | 1046 | Walter Bouldin Dam – Powerhouse Plan |

(3)    All of the structures, fixtures, equipment or facilities used to operate or maintain the project, all portable property that may be employed in connection with the project, and all riparian or other rights that are necessary or appropriate in the operation or maintenance of the project.

(C)    The exhibits A and F described above are approved and made part of this license.  The exhibit G drawings filed on July 28, 2005, as part of the application for license, do not conform to Commission regulations and are not approved.

(D)    This license is subject to the conditions submitted by the Alabama Department of Environmental Management under section 401(a)(1) of the Clean Water Act, 33 U.S.C. § 1341(a)(1) (2006), as those conditions are set forth in Appendix A to this order.

(E)    This license is subject to the incidental take terms and conditions of the biological opinion submitted by the U.S. Fish and Wildlife Service under section 7 of the

Page 105 of 327

Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

Endangered Species Act, as those conditions are set forth in Appendix B to this order.

(F)     This license is also subject to the articles set forth in Form L-5 (Oct. 1975), entitled "Terms and Conditions of License for Constructed Major Project Affecting Navigable Waters and Lands of the United States," (*see* 54 F.P.C. 1799 et seq.), as reproduced at the end of this order, and the following additional articles:

Article 201.*Administrative Annual Charges*.  The licensee shall pay the United States annual charges, effective the first day of the month in which the license is issued, and as determined in accordance with the provisions of the Commission's regulations in effect from time to time, for the purposes of:

(a)  reimbursing the United States for the cost of administration of Part I of the Federal Power Act.  The authorized installed capacity for that purpose is 960.9 megawatts; and

(b)  recompensing the United States for the use, occupancy, and enjoyment of 271.9 acres of its lands.

Article 202.*Exhibit F Drawings*.  Within 45 days of the date of issuance of the license, the licensee shall file the approved Exhibit F drawings in aperture card and electronic file formats.

(a)     Three sets of the approved exhibit drawings shall be reproduced on silver or gelatin 35mm microfilm.  All microfilm shall be mounted on type D (3-1/4" X 7-3/8") aperture cards.  Prior to microfilming, the FERC Project-Drawing Number (i.e., P-2146-1001 through P-2146-1046) shall be shown in the margin below the title block of the approved drawing.  After mounting, the FERC Drawing Number shall be typed on the upper right corner of each aperture card.  Additionally, the Project Number, FERC Exhibit (i.e., F-1, etc.), Drawing Title, and date of this license shall be typed on the upper left corner of each aperture card.

Two of the sets of aperture cards shall be filed with the Secretary of the Commission, ATTN:  OEP/DHAC.  The third set shall be filed with the Commission's Division of Dam Safety and Inspections Atlanta Regional Office.

(b)     The licensee shall file two separate sets of exhibit drawings in electronic raster format with the Secretary of the Commission, ATTN:  OEP/DHAC.  A third set shall be filed with the Commission's Division of Dam Safety and Inspections Atlanta Regional Office.  Exhibit F drawings must be identified as Critical Energy Infrastructure

Information (CEII) material under 18 C.F.R. § 388.113(c) (2012). Each drawing must be a separate electronic file, and the file name shall include: FERC Project-Drawing Number, FERC Exhibit, Drawing Title, date of this license, and file extension in the following format [P-2146-1001, F-1, Description, MM-DD-YYYY.TIF]. Electronic drawings shall meet the following format specification:

> IMAGERY – black & white raster file
> FILE TYPE – Tagged Image File Format (TIFF), CCITT Group 4
> RESOLUTION – 300 dpi desired (200 dpi min)
> DRAWING SIZE FORMAT – 24" X 36" (min), 28" X 40" (max)
> FILE SIZE – less than 1 MB desired

Article 203. *Exhibit G Drawings*. Within 90 days of the issuance of the license, the licensee shall file, for Commission approval, revised Exhibit G drawings enclosing within the project boundary all principal project works necessary for operation and maintenance of the project, including the 42 project recreation sites identified in Article 413, *Recreation Plan*. The Exhibit G drawings must comply with §§ 4.39 and 4.41 of the Commission's regulations.

Article 204. *Amortization Reserve*. Pursuant to section 10(d) of the Federal Power Act, a specified reasonable rate of return upon the net investment in the project shall be used for determining surplus earnings of the project for the establishment and maintenance of amortization reserves. The licensee shall set aside in a project amortization reserve account at the end of each fiscal year one half of the project surplus earnings, if any, in excess of the specified rate of return per annum on the net investment. To the extent that there is a deficiency of project earnings below the specified rate of return per annum for any fiscal year, the licensee shall deduct the amount of that deficiency from the amount of any surplus earnings subsequently accumulated, until absorbed. The licensee shall set aside one-half of the remaining surplus earnings, if any, cumulatively computed, in the project amortization reserve account. The licensee shall maintain the amounts established in the project amortization reserve account until further order of the Commission.

The specified reasonable rate of return used in computing amortization reserves shall be calculated annually based on current capital ratios developed from an average of 13 monthly balances of amounts properly included in the licensee's long-term debt and proprietary capital accounts as listed in the Commission's Uniform System of Accounts. The cost rate for such ratios shall be the weighted average cost of long-term debt and preferred stock for the year, and the cost of common equity shall be the interest rate on 10-year government bonds (reported as the Treasury Department's 10-year constant

Page 106 of 327

Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

maturity series) computed on the monthly average for the year in question plus four percentage points (400 basis points).

Article 205.*Headwater Benefits*.  If the licensee's project was directly benefited by the construction work of another licensee, a permittee, or the United States on a storage reservoir or other headwater improvement during the term of the original license (including extensions of that term by annual licenses), and if those headwater benefits were not previously assessed and reimbursed to the owner of the headwater improvement, the licensee shall reimburse the owner of the headwater improvement for those benefits, at such time as they are assessed, in the same manner as for benefits received during the term of this new license.  The benefits shall be assessed in accordance with Part 11, Subpart B, of the Commission's regulations.

Article 301.*Contract Plans and Specifications*.  At least 60 days prior to the start of any construction, the licensee shall submit one copy of its plans and specifications and supporting design document to the Commission's Division of Dam Safety and Inspections (D2SI)-Atlanta Regional Engineer, and two copies to the Commission (one of these shall be a courtesy copy to the Director, D2SI).  The submittal to the D2SI-Atlanta Regional Engineer must also include as part of preconstruction requirements: a Quality Control and Inspection Program; a Temporary Construction Emergency Action Plan; and a Soil Erosion and Sediment Control Plan.  The licensee may not begin construction until the D2SI-Atlanta Regional Engineer has reviewed and commented on the plans and specifications, determined that all preconstruction requirements have been satisfied, and authorized start of construction.

Article 302.*As-built Drawings*.  Within 90 days of completion of construction of the facilities authorized by this license, the licensee shall file for Commission approval revised exhibits A, F, and G, as applicable, to describe and show those project facilities as built.  A courtesy copy shall be filed with the Commission's Division of Dam Safety and Inspections (D2SI)-Atlanta Regional Engineer, the Director, D2SI, and the Director, Division of Hydropower Administration and Compliance.

Article 303.*Project Modification Resulting From Environmental Requirements*. Any permanent or temporary modification which may affect the project works or operations shall be coordinated with the Commission's Division of Dam Safety and Inspections Atlanta Regional Engineer at the beginning of the planning and design phase. This includes those modifications resulting from environmental requirements set forth in the license.  This schedule is to allow sufficient review time for the Commission to insure that the proposed work does not adversely affect the project works, dam safety or project operation.

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 107 of 327

USCA Case #16-1195     Document #1621558     Filed: 06/17/2016     Page 108 of 327

Article 304.*Generating Unit Upgrades at the Lay and Bouldin Developments*.  In reference to the turbine unit upgrades approved by the Commission on March 16, 2012, the licensee shall:

    (1)    Start construction of the turbine upgrades at the Lay and Bouldin developments no later than March 15, 2014, and complete construction no later than March 15, 2016;

    (2)    Within 90 days of the completion of the turbine upgrades at the Lay and Bouldin developments, file with the Commission and the Division of Dam Safety and Inspections-Atlanta Regional Engineer (a) the date of commencement of construction; (b) photo documentation of the nameplates of the new turbine units; and (c) a description of all of the turbines installed and hydraulic capacities before and after the upgrades; and

    (3)    Within 90 days of completion of the turbine upgrades at the Lay and Bouldin developments, file, for Commission approval, revised Exhibit K, L (now Exhibit F), and M drawings,  to describe those project facilities as built.  A courtesy copy shall be filed with the Commission's Division of Dam Safety and Inspections–Atlanta Regional Engineer and the Director Division of Hydropower Administration and Compliance.

Article 305.*Generating Unit Upgrades at the Jordan Development*.  In reference to the turbine unit upgrades approved by the Commission on May 7, 2013, the licensee shall:

(1) Start construction of the turbine upgrades at the Jordan development no later than May 5, 2015, and complete construction no later than May 5, 2017;

(2)  Within 90 days of the completion of the turbine upgrades at the Jordan development, file with the Commission and Division of Dam Safety and Inspections-Atlanta Regional Engineer (a) the date of commencement of construction; (b) photo documentation of the nameplates of the new turbine units; and (c) a description of the turbines installed and hydraulic capacity before and after the upgrades; and

(3)  Within 90 days of completion of the turbine upgrade at the Jordan development, file for Commission approval revised Exhibits K, L (now Exhibit F), and M, to describe those project facilities as built.  A courtesy copy shall be filed with the Commission's Division of Dam Safety and Inspections-Atlanta Regional Engineer and the Director, Division of Hydropower Administration and Compliance.

Page 109 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

<u>Article 401(a-g)</u>. *Project Operation and Water Level Management.*

<u>Article 401a</u>. *Weiss Reservoir Water Level Management.* Upon issuance of the license, the licensee shall implement the reservoir level management provisions of this article. The licensee shall operate the Weiss development in accordance with the operating curves and elevations as shown in the figure below and described herein, unless otherwise directed by the U.S. Army Corps of Engineers (Corps) for navigation or flood control:



<u>Operating Curve</u>. The operating curve reflects the maximum elevation at which the reservoir may be maintained before implementing the Corps' flood control measures. Flood control measures, as identified in Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments*, are to be implemented when the reservoir level is at or above the operating curve. On January 1, the curve is at elevation 558 feet mean sea level (msl) and linearly rises to elevation 564 feet msl on the last day of April. From May 1 through August 31 the curve remains at elevation 564 feet msl. From September 1 through December 31 the curve linearly declines to elevation 558 feet msl.

<u>Drought Curve</u>. The drought curve indicates when the reservoir is in drought condition and is used to calculate the composite storage (the sum of the amount of storage available for each reservoir in the Coosa River Basin). Composite storage is a component of the ADROP drought management plan required by Article 403, *Drought Management*. On January 1, the curve is at elevation 556 feet msl and remains at this elevation until January 31. On February 1 the curve rises linearly to elevation 562.75 feet

Page 110 of 327

Filed: 06/17/2016     Document #1621558

USCA Case #16-1195

msl on May 31.  On June 1 the curve decreases linearly to elevation 556 feet msl on November 30, and remains at elevation 556 feet msl December 1 through December 31.

The area between the operating curve and the drought curve represents the range in which the reservoir may be maintained under normal conditions, except as provided in Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments,* for flood control and Article 403, *Drought Management,* for drought management.  The licensee shall continually review hydrologic conditions and adhere to the requirements of Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments,* during flood conditions, and Article 403, *Drought Management,* during drought conditions.

The reservoir level requirements may be temporarily modified if required by operating emergencies beyond the control of the licensee, and for short periods upon mutual agreement among the licensee, the Corps, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources.  If the reservoir level is so modified, the licensee shall notify the aforementioned agencies and the Commission as soon as possible, but not later than 48 hours after each such incident, and shall provide the reason for the change in reservoir levels.

Article 401b.*Neely Henry Reservoir Water Level Management*.  Upon issuance of the license, the licensee shall implement the reservoir level management provisions of this article.  The licensee shall operate the Neely Henry development in accordance with the operating curves and elevations as shown in the figure below and described herein, unless otherwise directed by the U.S. Army Corps of Engineers (Corps) for navigation or flood control:

Filed: 06/17/2016     Page 111 of 327

Document #1621558

USCA Case #16-1195



**Operating Curve.** The operating curve reflects the maximum elevation at which the reservoir may be maintained before implementing the Corps' flood control measures. Flood control measures, as identified in Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments*, are to be implemented when the reservoir level is at or above the operating curve. On January 1, the curve is at elevation 507 feet mean sea level (msl) and remains at 507 feet msl until March 31. From April 1 to April 30 the elevation linearly rises to 508 feet msl. From May 1 through September 30 the curve remains at elevation 508 feet msl. From October 1 to November 31 the curve linearly declines to elevation 507 feet msl, and remains at 507 feet msl until December 31.

**Drought Curve.** The drought curve indicates when the reservoir is in drought condition and is used to calculate the composite storage (the sum of the amount of storage available for each reservoir in the Coosa River Basin). Composite storage is a component of the ADROP drought management plan required by Article 403, *Drought Management*. On January 1, the curve is at elevation 505 feet msl and remains at this elevation until March 31. On April 1 the curve rises linearly to elevation 507 feet mslon May 31. On June 1 the curve decreases linearly to elevation 505 feet msl on November 30, and remains at elevation 505 feet msl December 1 through December 31.

The area between the operating curve and the drought curve represents the range in which the reservoir may be maintained under normal conditions, except as provided in Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments,* for flood control and Article 403, *Drought Management,* for drought

Filed: 06/17/2016      Page 112 of 327

USCA Case #16-1195      Document #1621558

management. The licensee shall continually review hydrologic conditions and
adhere to the requirements of Article 402, *Flood Control Operations at Weiss, Neely
Henry, and Logan Martin Developments,* during flood conditions, and Article 403,
*Drought Management,* during drought conditions.

The reservoir level requirements may be temporarily modified if required by
operating emergencies beyond the control of the licensee, and for short periods upon
mutual agreement among the licensee, the Corps, Alabama Department of Environmental
Management, and Alabama Department of Conservation and Natural Resources. If the
reservoir level is so modified, the licensee shall notify the aforementioned agencies and
the Commission as soon as possible, but not later than 48 hours after each such incident,
and shall provide the reason for the change in reservoir levels.

Article 401c.*Logan Martin Reservoir Water Level Management*. Upon issuance of
the license, the licensee shall implement the reservoir level management provisions of
this article. The licensee shall operate the Logan Martin development in accordance with
the operating curves and elevations as shown in the figure below and described herein,
unless otherwise directed by the U.S. Army Corps of Engineers (Corps) for navigation
and flood control:



Operating Curve. The operating curve reflects the maximum elevation at which
the reservoir may be maintained before implementing the Corps' flood control measures.
Flood control measures, as identified in Article 402, *Flood Control Operations at Weiss,
Neely Henry, and Logan Martin Developments*, are to be implemented when the reservoir

level is at or above the operating curve. On January 1, the curve is at elevation 460 feet mean sea level (msl) and remains at 460 feet msl until March 31. On April 1 the elevation linearly rises to 465 feet msl on May 7, and remains at 465 feet msl until September 30. From October 1 through October 31 the curve linearly declines to 462 feet msl, and from November 1 through December 31 the curve linearly declines to elevation 460 feet msl.

Drought Curve. The drought curve indicates when the reservoir is in drought condition, and is used to calculate the composite storage (the sum of the amount of storage available for each reservoir in the Coosa River Basin). Composite storage is a component of the ADROP drought management plan required by Article 403, *Drought Management*. On January 1, the curve is at elevation 458 feet msl and remains at this elevation until March 31. On April 1 the curve rises linearly to elevation 462 feet msl on May 31. On June 1 the curve decreases linearly to elevation 458 feet msl on November 30, and remains at elevation 458 feet msl December 1 through December 31.

The area between the operating curve and the drought curve represents the range in which the reservoir may be maintained under normal conditions, except as provided in Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments,* for flood control and Article 403, *Drought Management,* for drought management. The licensee shall continually review hydrologic conditions and adhere to the requirements of Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments,* during flood conditions, and Article 403, *Drought Management,* during drought conditions.

The reservoir level requirements may be temporarily modified if required by operating emergencies beyond the control of the licensee, and for short periods upon mutual agreement among the licensee, the Corps, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources. If the reservoir level is so modified, the licensee shall notify the Commission as soon as possible, but not later than 48 hours after each such incident, and shall provide the reason for the change in reservoir levels.

Article 401d. *Lay Lake Water Level Management*. The licensee shall operate the Lay development in run-of-river mode, where outflows approximate inflows to the project. The licensee shall, to the extent possible, maintain the lake level within 1 foot of normal full pool elevation 396 feet mean sea level, except as provided in Article 403, *Drought Management*. The licensee shall continually review hydrologic conditions and adhere to the requirements of Article 403, *Drought Management,* during drought conditions.

Run-of-river operation and the lake water surface elevation may be temporarily modified if required by conditions beyond the control of the licensee, or for short periods upon mutual agreement with the U.S. Army Corps of Engineers, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources. If project operations are so modified, the licensee shall notify the aforementioned agencies and the Commission as soon as possible, but not later than 48 hours after each such incident, and shall provide a reason for the change in project operations.

Article 401e.*Mitchell Lake Water Level Management*. The licensee shall operate the Mitchell development in run-of-river mode, where outflows approximate inflows to the project. The licensee shall, to the extent possible, maintain the lake level within 1 foot of normal full pool elevation 312 feet mean sea level, except as provided in Article 403, *Drought Management*. The licensee shall continually review hydrologic conditions and adhere to the requirements of Article 403, *Drought Management,* during drought conditions.

Run-of-river operation and the lake water surface elevation may be temporarily modified if required by conditions beyond the control of the licensee, or for short periods upon mutual agreement with the U.S. Army Corps of Engineers, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources. If project operations are so modified, the licensee shall notify the aforementioned agencies and the Commission as soon as possible, but not later than 48 hours after each such incident, and shall provide a reason for the change in project operations.

Article 401f.*Jordan Lake Water Level Management*. The licensee shall operate the Jordan development in run-of-river mode, where outflows approximate inflows to the project. The licensee shall, to the extent possible, maintain the lake level within 1 foot of normal full pool elevation 252 feet mean sea level, except as provided in Article 403, *Drought Management*. The licensee shall continually review hydrologic conditions and adhere to the requirements of Article 403, *Drought Management,* during drought conditions.

Run-of-river operation and the lake water surface elevation may be temporarily modified if required by conditions beyond the control of the licensee, or for short periods upon mutual agreement with the U.S. Army Corps of Engineers, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources. If project operations are so modified, the licensee shall notify the aforementioned agencies and the Commission as soon as possible, but not later than 48 hours after each such incident, and shall provide a reason for the change in project operations.

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 114 of 327

Filed: 06/17/2016      Page 115 of 327

USCA Case #16-1195      Document #1621558

<u>Article 401g</u>. *Bouldin Lake Water Level Management*.  The licensee shall operate the Bouldin development in run-of-river mode, where outflows approximate inflows to the project.  The licensee shall, to the extent possible, maintain the lake level within 1 foot of normal full pool elevation 252 feet mean sea level, except as provided in Article 403, *Drought Management*.  The licensee shall continually review hydrologic conditions and adhere to the requirements of Article 403, *Drought Management,* during drought conditions.

Run-of-river operation and the lake water surface elevation may be temporarily modified if required by conditions beyond the control of the licensee, or for short periods upon mutual agreement with the U.S. Army Corps of Engineers, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources.  If project operations are so modified, the licensee shall notify the aforementioned agencies and the Commission as soon as possible, but not later than 48 hours after each such incident, and shall provide a reason for the change in project operations.

<u>Article 402</u>.*Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments*.  The purpose of this article is to provide for flood control in accordance with rules and regulations prescribed by the Secretary of the Army pursuant toPublic Law 83-436.

    a.      *Weiss Reservoir Flood Control Operations.*

Unless otherwise directed by the U.S. Army Corps of Engineers (Corps), the licensee shall implement measures for flood control at the Weiss development as described in the Corps' June 2004 Alabama-Coosa River Basin Reservoir Regulation Manual,  Weiss Reservoir (Weiss Manual):paragraphs 24 through 28 of the Weiss Manual, which describe the flood control operations; Chart No. 20, which summarizes the flood control regulation schedule and operating measures for flood control; and Chart No. 21, which describes an induced surcharge schedule.

    b.      *Neely Henry Reservoir Flood Control Operations.*

The licensee shall implement measures for flood control at the Neely Henry development as directed by the Corps.  In addition, the licensee shall consult with the Corps, and file within 180 days of license issuance an update to the flood control measures specified in the Corps' January 1979 Alabama-Coosa River Basin Reservoir Regulation Manual, H. Neely Henry Reservoir (Neely Henry Manual) to be consistent with the flood control curve for the Neely Henry development specified in Article 401b. These revisions shall include: updates to paragraphs 28 through 35 of the Neely Henry

Filed: 06/17/2016      Page 116 of 327

Document #1621558

USCA Case #16-1195

Manual, which describe the flood operations and a reservoir pre-flood evacuation procedure; and updates to Chart No. 12, which summarizes the pre-flood evacuation schedule and reservoir evacuation rates. The filing shall contain documentation of consultation with the Corps.

<p style="text-align:center;">c.      *Logan Martin Reservoir Flood Control Operations*</p>

Unless otherwise directed by the Corps, the licensee shall implement measures for flood control at the Logan Martin development as described in the Corps' June 2004 Alabama-Coosa River Basin Reservoir Regulation Manual, Logan Martin (Logan Martin Manual): paragraphs 25 through 28 of the Logan Martin Manual, which describe the flood control operations; Chart No. 12, which summarizes the flood control regulation schedule and operating measures for flood control; and Chart No. 13, which describes an induced surcharge schedule.

The flood control requirements at the Weiss, Neely Henry, and Logan Martin developments may be temporarily modified if required by operating emergencies beyond the control of the licensee, and for short periods upon mutual agreement among the licensee, the Corps, U.S Fish and Wildlife Service, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources. If the flood control provisions are so modified, the licensee shall notify the Commission as soon as possible, but not later than 48 hours after such incident, and shall provide the reason for the change in project operation.

Article 403.*Drought Management*. Upon issuance of this license the licensee shall implement the Coosa River portion of Alabama-ACT Drought Response Operations Proposal (ADROP), Version 3.3.1, dated December 13, 2010, as described in Attachment 3 to Alabama Power's Addendum to the Coosa River Biological Assessment, filed by Alabama Power on January 24, 2011. The Coosa River portion of ADROP provides a plan for managing the Coosa River operations during drought conditions of varying intensity. When drought indicators (rainfall and stream flow indicators) reach specified intensity levels, the Coosa River Project shall be operated to provide the specified monthly minimum flow releases from the Jordan dam. The licensee shall notify the Commission as soon as possible, but no later than 48 hours after modifying operations in response to drought conditions.

Article 404.*Weiss Bypass Flow Adaptive Management Plan*. Within one year of license issuance, the licensee shall file, with the Commission for approval a final Weiss Bypass Flow Adaptive Management Planthat is based on the draft plan dated July 2005 and filed with the Commission with the license application on July 28, 2005. The final plan shall include the following additional measures: (1) a detailed decision process,

Page 117 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

including specific habitat and biological criteria for determining whether, and to what degree, to adjust flows in the future; (2) a protocol for adjusting the identified criteria; and (3) an updated implementation schedule.

The Weiss Bypass Flow Adaptive Management Plan shall be developed after consultation with U.S. Fish and Wildlife Service and Alabama Department of Conservation and Natural Resources. The licensee shall include with the plan documentation of consultation, copies of recommendations on the plan after it has been updated and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan. The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the updated plan with the Commission. If the licensee does not adopt a recommendation or otherwise makes changes to the draft plan, the filing shall include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the updated plan. The plan shall not be implemented until the licensee is notified by the Commission that the plan is approved. Upon Commission approval the licensee shall implement the plan, including any changes required by the Commission.

Article 405. *Minimum Flow Releases at the Jordan Development.* Upon issuance of the license, the licensee shall provide the following minimum flow releases from Jordan dam to protect the federally listed tulotoma snail (*Tulotoma magnifica*) and to maintain adequate flows for recreation downstream of the Jordan development.

- From April 1 through May 31, the licensee shall release a continuous base flow of 4,000 cubic feet per second (cfs) for 18 hours per day from 3 p.m. through 9 a.m. For the remaining 6 hours, the licensee shall release an 8,000-cfs pulse flow from 9 a.m. through 3 p.m.

- Beginning June 1 through June 15, the licensee shall reduce the continuous 4,000-cfs base flow at a rate of 66.7 cfs per day, and the daily 8,000-cfs pulse flow at a rate of 133.3 cfs per day.

- From June 16 through June 30, the licensee may cease release of the daily pulse flow but shall continue to release the continuous base flow, reducing it at a rate of 66.7 cfs per day.

- From July 1 through March 31, the licensee shall release a continuous minimum base flow of 2,000 cfs, regardless of inflow.

Page 118 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

- From June 16 through October 31, on weekends only, the licensee shall release flows of 4,000 cfs, 6,000 cfs or 8,000 cfs continuously from 11 a.m. to 5 p.m. using the following schedule:

| Weekend No. | Saturday | Sunday |
|---|---|---|
| 1 | 4,000 | 6,000 |
| 2 | 6,000 | 8,000 |
| 3 | 8,000 | 4,000 |
| 4 | 4,000 | 6,000 |
| 5 | 6,000 | 8,000 |
| 6 | 8,000 | 4,000 |
| 7 | 4,000 | 6,000 |
| 8 | 6,000 | 8,000 |
| 9 | 8,000 | 4,000 |
| 10 | 4,000 | 6,000 |
| 11 | 6,000 | 8,000 |
| 12 | 8,000 | 4,000 |
| 13 | 4,000 | 6,000 |
| 14 | 6,000 | 8,000 |
| 15 | 8,000 | 4,000 |
| 16 | 4,000 | 6,000 |
| 17 | 6,000 | 8,000 |
| 18 | 8,000 | 4,000 |
| 19 | 4,000 | 6,000 |
| 20 | 6,000 | 8,000 |

- On one day during the Memorial Day and Labor Day weekend, the licensee shall release up to 10,000 cfs continuously between 10 a.m. and 6 p.m.

- On July 4th the licensee shall release up to 10,000 cfs continuously between 10 a.m. and 6 p.m. using the following schedule: if July 4th is on Tuesday, a Monday release would be required in addition to the required release on July 4th; if July 4th is on a Wednesday, the Monday release would be forfeited for the July 4th release; if July 4th is on a Thursday, the Monday release would be changed to Friday, July 5th to give a four day release; if July 4th is on a Saturday, Sunday or Monday, the normal recreational release schedule would be followed.

- A special release, up to 10,000 cfs may be scheduled to accommodate a civic event during the period April 1 to June 15. The amount of release, number of

Page 119 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

days, and hours of release may be determined based on the schedule for the civic event, and sufficient availability of inflows.

- Flow releases shall be within a 5 percent flow-variation tolerance band of the release rate specified for each scheduled boating release day.

- All recreational releases are conditioned upon sufficient availability of inflow to support other project purposes.  Recreational releases may be modified or terminated as follows:

  ○ For weekend releases, if insufficient water is available for a two day release but sufficient for a one day release then a one day release may be scheduled.  Should it be required to reduce the number of days of release, first, Sunday may be deleted.  If insufficient water is available for a one day scheduled release, the release may be canceled.

  ○ Recreational releases may be canceled when the Weiss, Neely Henry, and Logan Martin reservoirs are one foot below the normal operations guide curve.

  ○ Recreational releases may be modified (either lower flow or shorter duration) if dissolved oxygen in the releases during the event would cause the dissolved oxygen level in the Jordan dam tailrace to fall below 5.0 mg/l with aeration systems operations.

The flows may be temporarily modified if required by operating emergencies beyond the control of the licensee, for short periods upon mutual agreement among the licensee, the Corps, U.S. Fish and Wildlife Service, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources, as necessary for flood control as provided in Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments*, or drought management as provided in Article 403, *Drought Management*.  If the flows are so modified, the licensee shall notify the Commission as soon as possible, but not later than 48 hours after each such incident, and shall provide the reason for the change in project operation.

<u>Recreation Flow Release Evaluation</u>

Within 60 days of completing the turbine upgrade at the Jordan development, as authorized by the Commission on May 7, 2013, the licensee shall file for Commission approval, a plan to evaluate flow releases higher than the current 4,000 cfs recreation

Filed: 06/17/2016    Page 120 of 327    Document #1621558    USCA Case #16-1195

release. The plan shall include, at a minimum, provisions to: (1) evaluate whether refurbishment of unit 4 alleviates a hydraulic constraint so that the licensee shall be able to provide recreation flows in the 4,000 cfs to 5,000 cfs range; and (2) if flows in the range shall be feasible the licensee shall determine, after consultation with the Alabama Department of Conservation and Natural Resources, the U.S. Fish and Wildlife Service, and the Coosa River Paddling Club, the recreation flows that provide for safe and optimal boating opportunities, and a schedule for such releases.

The licensee shall include with the plan an implementation schedule, documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan. The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission. If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 406. *Project Operation and Flow Monitoring Plan*. Within 180 days of license issuance, the licensee shall file, with the Commission for approval, a Project Operation and Flow Monitoring Plan to monitor compliance with: (1) the water levels for each development required in Article 401(a-g) *Project Operation andWater Level Management*; (2) operations for flood control required in Article 402, *Flood Control Operations*; and (3) the drought management provisions in Article 403, *Drought Management*; and (4) flow releases from the Weiss and Jordan dams required in Article 404, *Weiss Bypass Flow Adaptive Management Plan* and Article 405,*Minimum Flow Releases at the Jordan Development*.

The Project Operation and Flow Monitoring Plan shall be developed after consultation with the Alabama Department of Conservation and Natural Resources, Alabama Department of Environmental Management, U.S. Fish and Wildlife Service, and the U.S. Army Corps of Engineers. The licensee shall include with the plan an implementation schedule, documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan. The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission. If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

Page 121 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

The Commission reserves the right to require changes to the plan.  Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 407.*Dissolved Oxygen Enhancement Plan*.Within 6 months of license issuance, the licensee shall file for Commission approval, a Dissolved Oxygen Enhancement Plan for the Coosa River Project.  The purpose of the plan is to maintain dissolved oxygen (DO) concentrations in the Weiss bypassed reach (measured at a point 1,200 feet downstream from the Weiss dam spillway), the Weiss tailrace, and the Neely Henry, Logan Martin, Lay, Mitchell, Jordan, and Bouldintailwaters of no less than 4.0 mg/L at all times.

The plan shall include, but not be limited to, the following provisions:

(1)      a description of the measures (e.g., turbine aeration systems, flow release mechanism for the Weiss bypassed reach, etc.) to be implemented at each project development, including protocols for their operation and maintenance;

(2)      design drawings of the aeration systems, flow release mechanism(s), etc.;

(3)      a description of the guidelines under which the aeration systems will be operated; and

(4)      a schedule for completing the installation of the DO enhancement measures at each project development no later than18 months from license issuance.

The Dissolved Oxygen Enhancement Plan shall be developed after consultation with the Alabama Department of Environmental Management, the Alabama Department of Conservation and Natural Resources, and the U.S. Fish and Wildlife Service.  The licensee shall include with the plan documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan.  The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission.  If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan.  Implementation of the plan shall not begin until the licensee is notified by the Commission that the plan is

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 122 of 327

approved.  Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 408.*Water Quality Monitoring Plan.*  Within 3 months of license issuance, the licensee shall file, for Commission approval, a Water Quality Monitoring Plan to implement the water quality monitoring, reporting, and remedial measures requirements outlined in conditions 3 through 7 of the project's water quality certification, attached as Appendix A to this license.  In addition to the stipulations of the certification, the Water Quality Monitoring Plan shall:  (1) provide for dissolved oxygen (DO) and water temperature monitoring at all times (except during flood events as stipulated in the water quality certification); (2) include monitoring locations for interstitial waters; and (3) include provisions for filing any reports and plans required by the certification for continued monitoring and/or DO enhancement measures with the Commission for review and approval.

The Water Quality Monitoring Plan shall be developed after consultation with the Alabama Department of Environmental Management, Alabama Department of Conservation and Natural Resources, and the U.S. Fish and Wildlife Service.  The licensee shall include with the plan an implementation schedule, documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities, and specific descriptions of how the entities' comments are accommodated by the plan.  The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission.  If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan.  Implementation of the plan shall not begin until the licensee is notified by the Commission that the plan is approved.  Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 409.*Reservation of Authority to Prescribe Fishways.*  Authority is reserved to the Commission to require the licensee to construct, operate, and maintain, or to provide for the construction, operation, and maintenance of such fishways as may be prescribed by the Secretary of the Interior pursuant to section 18 of the Federal Power Act.

Article 410.*Crappie and Black Bass Spawning Enhancement at Weiss and Logan Martin Reservoirs.* The licensee shall hold constant or slightly increase the water levels in Weiss and Logan Martin reservoirs for a 14-day period in the spring, with no 24-hour increase in reservoir levels greater than 2 inches.  The purpose of the program is to provide stable, shallow-water spawning conditions for crappie and black bass in the

reservoirs. The exact dates and duration of stable water levels shall be determined annually in consultation with the Alabama Department of Conservation and Natural Resources (Alabama DCNR) and the U.S. Army Corps of Engineers (Corps).

The licensee shall file a report with the Commission annually, by December 31, starting the first full year of operation under this license, that provides the dates for the 14-day period that lake levels were stabilized to enhance fish spawning in the Weiss and Logan Martin reservoirs the preceding year. If, after consultation with the Alabama DCNR and the Corps, lake levels were not stabilized in the preceding year, or were halted at any point during the 14-day period, the licensee shall explain in the report the reasons for not stabilizing the lake levels (e.g., adverse hydrological conditions such as drought, maintenance activities, or operational conditions), along with supporting documentation, including comments from the Alabama DCNR and the Corps, if applicable. The Commission reserves the right to require changes to the enhancement measures.

Article 411. *Fish Habitat Enhancement Plan.* Within 120 days of license issuance, the licensee shall develop and file for Commission approval, a Fish Habitat Enhancement Plan to enhance aquatic habitat at the Coosa River Project. The plan shall include, but not be limited to: (1) a provision for introducing pea gravel or other appropriate substrates to the lakes to enhance spawning and cover for fish and to provide substrate for invertebrates; (2) measures to stabilize the Coosa River Project shorelines and the Weiss bypassed reach to improve water quality, control sedimentation, and provide cover for fish; and (3) a provision for providing brush piles and other woody debris in the lakes to provide cover for fish and to enhance angling opportunities at the project.

In order to evaluate the effectiveness of the implemented measures and the need for additional measures, the plan shall also include a provision to file an annual report with the Commission by December 31 that includes, but is not limited to: (1) a map showing the location of the measures installed under the plan; (2) a detailed description of the types and composition of materials used to construct the physical habitat enhancements; (3) a detailed description of the method(s) to be used to evaluate individual enhancement measures, as well as the follow-up observations documenting the effectiveness of the implemented measures; (4) a description of any measures, devices, or techniques proposed to replace measures deemed ineffective, and a schedule for installing the replacement structures; and (5) the maintenance protocol to keep the enhancement structures in functional condition.

The Fish Habitat Enhancement Plan shall be developed after consultation with the Alabama Department of Conservation and Natural Resources and the U.S. Fish and Wildlife Service. The licensee shall include with the plan an implementation schedule,

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 123 of 327

documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan. The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission. If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.The Commission reserves the right to require changes to the plan. Implementation of the plan shall not begin until the licensee is notified by the Commission that the plan is approved. Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 412.*Wildlife Management Plan*. The licensee shall implement Sections 1 through 10 of its draft Wildlife Management Plan for the Coosa River Hydroelectric Project, filed July 28, 2005, in Volume 4 of its relicense application. The purpose of the plan is to protect and enhance wildlife and wildlife habitat (aquatic and upland) on project lands.

In addition, within 120 days of license issuance, the licensee shall develop and file for Commission approval a bald eagle plan and schedule for conducting annual bald eagle surveys. The plan shall be developed in consultation with the U.S. Fish and Wildlife Service and the Alabama Department of Conservation and Natural Resources. The licensee shall include with the plan documentation of consultation, copies of recommendations on the plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan. The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission. If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the bald eagle plan. Implementation of the plan shall not begin until the licensee is notified by the Commission that the plan is approved. Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 413.*Recreation Plan*.Within 1 year of license issuance, the licensee shall file, with the Commission for approval, a revised Recreation Plan for the Coosa River Hydroelectric Project to improve recreation opportunities at the project. The plan shall include, but not be limited to, the following project-wide and development-specific provisions:

Project-Wide

Page 125 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

(1) An identification of the acreage for each of the 42 project recreation sites required by this article, including the sites designated for future recreational use; (2) an evaluation of the existing signage at the recreation sites for accuracy of information and a description of any proposed revisions to the existing signage or any proposed new signage; (3) a description of soil erosion and sediment control measures to be used where ground-disturbing activities are proposed, including bio-engineering techniques (e.g., willow and wetland seeding) to stabilize the shoreline; (4) provisions to post a "carry-in/carry-out" informational sign for the public to carry out their trash from the project recreation sites, identification and removal of certain existing trash receptacles, and installation of containers with appropriately-sized bags at identified recreation sites; (5) a provision to clean-up, and remove trash from, the project recreation sites;(6) a discussion of how the needs of the disabled were considered in the planning and design of the recreation facilities; (7) a definition of woody debris and a provision to monitor the amount, location, and origin of woody debris collected at the Coosa River Project reservoirs and lakes to determine if a public safety concern exists; and (8) a provision to review and update, every six years, the Recreation Plan.  The plan shall include appropriate site drawings, specifications,  and a map or maps showing the type of recreation facilities and their location in relation to the revised project boundary.  The licensee shall operate and maintain, or provide for the operation and maintenance of, the project recreation sites.

<u>Weiss Development</u>

At State Launch Highway 9 (Site 30):  continue to provide a boat launch, a parking area, and a fishing pier.

At State Launch at Cobia Bridge (Site 27):  continue to provide a barrier-free walkway from the parking area to the dock, and a dock.

At Cedar Bluff Fishing Pier (Site 75):  continue to provide a fishing pier.

At State Route 9 Informal Fishing Area (Site 58):  provide details for improving the site located on licensee-owned lands.

At Bypass Bank Fishing Area (Site 85):  (1) discuss how the site shall be managed to minimize or prevent unauthorized activities, such as illegal dumping; and (2) improve the site, such as designated parking for vehicles and vehicles with trailer-boat.

At Slackland Beach (Site 2):  (1) improve the existing access road to allow maintenance and emergency vehicles, as well as, pedestrian access; (2) install a gate on the access road; and (3) provide a single vehicle parking area.

At Bay Springs Boat Launch (Site 51):  (1) discuss how the site shall be managed to minimize or prevent vandalism; (2) improve the site by repairing and extending the existing boat launch to provide access at the winter pool elevation of 561 feet mean sea level (from January 1 to March 1), and designate parking for vehicles and vehicles with trailer-boat including a traffic flow pattern; and (3) install a fishing pier.

<u>Neely Henry Development</u>

At Croft's Ferry (Site 40):  continue to provide a boat launch on licensee-owned land.

At Ten Islands Historic Park (Site 2):  (1) continue to provide a boat launch; (2) re-stripe the parking area and designate parking for vehicles and vehicles with trailer-boat; (3) install a fishing pier; and (4) install a parking area for vehicles with trailered boats and a pedestrian sidewalk to the boat launch.

At Possible Future Recreation Use Lands (Site 45) located approximately 0.5 mile north of Neely Henry dam and within the Coosa River Project boundary:  reserve the site for future recreational development.

<u>Logan Martin Development</u>

At Lock 3 Bank Fishing Site (Site 42):  improve the site by repairing the parking area with grading and applying compacted gravel, repairing the shoreline erosion identified on the bank fishing trail, and developing a parking area.

<u>Lay Development</u>

At Beeswax Creek Boat Launch and Park, Site 13 A:  (1) continue to provide a boat launch; (2) install a barrier-free fishing pier; and (3) designate an accessible parking space to serve the new fishing pier.

At Beeswax Creek Boat Launch and Park, Site 13 B:  (1) install a fishing pier; and (2) construct a barrier-free trail from the existing parking area to the fishing pier.

Page 126 of 327     Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

At Lay Dam Boat Launch (Site 3):  (1) continue to provide a boat launch;
(2) provide additional parking for single vehicles and designate accessible parking; and
(3) provide a discussion of whether a portable toilet at the parking area is needed.

At Cedar Creek Bridge Informal Camping Site (Site 29):  provide details for improving the site located on licensee-owned lands.

At Shelby County 400 Boat Launch (Site 7):  (1) continue to provide a boat launch; (2) expand the parking area to accommodate vehicles with trailer-boat and designate parking for single vehicles; (3) improve the dock; and (4) provide a discussion of whether an additional boat launch is needed.

At Route 145 Bridge Bank Fishing (Site 33):  stabilize the shoreline on licensee-owned land.

At Kelly Creek Boat Launch (Site 14):  (1) continue to provide a boat launch; and (2) reserve the site for future recreational development.

At Glover's Point Landing (Site 15):  (1) continue to provide a boat launch; and (2) reserve the site for future recreational development.

<u>Mitchell Development</u>

At Big Foot Boat Launch (Site 8):  provide details for repairing the boat launch and developing a parking area.

At Barrett's Fish Camp (Site 14):  continue to provide a boat launch and parking area.

At Higgins Ferry Park and Boat Launch (Site 6):  (1) continue to provide a boat launch; (2) construct a trail for pedestrian access to the existing boat launch; and (3) discuss how conflicts between current campsites and day-use will be resolved.

At Double Bridges Camping (Site 12):  provide details for constructing a boat launch and a fishing pier on licensee-owned lands.

At Informal Primitive Camping Site Nos. 16, 17, 27, 33, and 34, located within the project boundary at the Coosa Wildlife Management Area:  provide details for improving each informal primitive campsite.

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 127 of 327

At Boy Scout Camp (Arrowhead Preserve) (Site 5): provide details for a carry-in boat access area, a trail to the new carry-in boat access area, and a parking area for approximately 15 vehicles.

Continue to provide for the Tailrace Fishing Access Facility.

To protect the federally listed red-cockaded woodpecker, the licensee shall improve the project recreation sites at the Mitchell development in coordination with the Red-cockaded Woodpecker (*Picoides borealis*) Management Plan required under Article 412, *Wildlife Management Plan*.

<u>Jordan Development and Bouldin Development</u>

At the Jordan development: continue to provide for the Tailrace Fishing Access Facility.

At East Side Tailrace Recreation Site (Site 33): continue to provide a boat launch, restroom facilities, a parking area, and an access road.

At Rotary Point Boat Launch (Site 20): (1) continue to provide a boat launch; (2) install an electrical distribution service line at the boat launch and parking area; (3) install lights; (4) reconfigure the parking area to improve traffic flow; and (5) install a fishing pier.

At Bonner's Landing (Site 4): (1) continue to provide a boat launch; (2) improve the boat launch to allow access by a vehicle with trailer-boat; (3) provide details for improving the access/egress road to the boat launch; (3) develop a shoreline fishing trail or a fishing pier with a trail; (4) develop a single vehicle parking area at the new trail; (5) provide details for improving the trail from the parking area to the swimming area; and (6) provide details for improving the parking area to provide for additional parking.

At the East Side Tailrace Fishing Access (Site 34): (1) construct an approximate 150-foot-long path from the upper parking area to an identified site or sites along the shoreline to improve bank fishing; and (2) provide details for improving the parking area.

At Rotary Point Bank Fishing Access (Site 20B): (1) continue to provide a boat launch; (2) develop a parking area at the existing trail; (3) provide details for improving the trail to the site; and (4) determine the need for a fishing pier.

At Sheila's Wharf (Site 2): (1) develop a parking area; (2) install a fishing pier; and (3) construct a barrier-free trail from the parking area to the fishing pier.

Page 128 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

Filed: 06/17/2016      Document #1621558      USCA Case #16-1195      Page 129 of 327

At Jordan Dam Picnic Area (Site 22):  (1) continue to provide a picnic area; and (2) install signage to inform the public of the hours of operation and acceptable uses.

At Swayback Bridge Bank Fishing (Site 30):  (1) designate parking for vehicles; (2) provide details for improving the trail to the site; and (3) construct a carry-in boat access area.

At Bouldin Canal Bank Fishing Site (Site 25C):  provide details for improving the site located on licensee-owned lands.

At Future Use Land Site (Site 47) located downstream from the Jordan dam: reserve the site for future whitewater boating access to the Coosa River.

At Potential Swimming Access, located between Site No. 19 and Site No. 20: reserve the site for future recreational development.

The Recreation Plan shall be developed after consultation with the Alabama Department of Conservation and Natural Resources, the U.S. Fish and Wildlife Service, the U.S. Bureau of Land Management, and the Coosa River Paddling Club.  The licensee shall include with the plan an implementation schedule, documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan.  The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission.  If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

Concurrent with the filing of the Licensed Hydropower Development Recreation Report (Form 80) with the Commission, the licensee shall file a Recreation Monitoring Report that shall include:  (1) a summary of any meeting with the entities above that discusses recreational use and demand, and associated project-related resource effects; and (2) any additional measures or modifications to the project recreation sites that shall be needed and a schedule for implementing such changes.

The licensee shall develop the plan to be consistent with Article 411, *Fish Habitat Enhancement Plan*, and Article 412, *Wildlife Management Plan*, so that provisions for stabilizing the shoreline, as well as provisions for protecting and enhancing wildlife and associated habitat, are consistent.

The Commission reserves the right to require changes to the plan.  Upon Commission approval the licensee shall implement the plan, including any changes required by the Commission.

Article 414. *Shoreline Management Plan*.  Within 1 year of license issuance, the licensee shall file with the Commission, for approval, a revised Shoreline Management Plan for the Coosa River Project to protect the environmental resources and scenic quality at the project.  The plan shall include, but not be limited to, the following:  (1) a list of land use management objectives and goals; (2) a description of the shoreline classification system, including at a minimum (a) project operation lands, (b) recreation lands, (c) multiple use lands; (d) sensitive resources lands, particularly project lands that will be adjacent to, or might affect, federally listed species (e.g., Mohr's Barbaras buttons (*Marshalliamohrii*) or green pitcher plant (*Sarraceniaoreophila*)), and (e) natural or undeveloped lands; (3) individual maps that clearly identify the Coosa River Project boundary for each of the developments and the above shoreline classification system; (4) a description of the basis for designating the various lands; (5) a provision to update the Sensitive Resources Lands classification at least annually to account for new federally listed species and/or critical habitat; (6) an evaluation matrix for the Sensitive Resources Lands classification to assist in defining permit restrictions; (7) a description of allowable and prohibited uses for each of the above shoreline classification system; and (8) a provision to review and update, if necessary, the Shoreline Management Plan every six years.

Shoreline Compliance Program

The Shoreline Management Plan shall include a Shoreline Compliance Program to inform shoreline landowners and the public about the licensee's procedures for issuing a permit and/or lease to occupy project lands and waters.  The program shall include, at a minimum, the following:  (1) a discussion of the Shoreline Compliance Program; (2) an application process for a permit and/or lease to occupy project lands and waters; and (3) a provision, with a schedule, to address unpermitted structures at each of the Coosa River Project's developments.

Public Education and Outreach

The Shoreline Management Plan shall include a Public Education and Outreach Program to inform shoreline landowners and the public about the project and the provisions contained in the Shoreline Management Plan.  The program shall include, at a minimum, the following:  (1) a detailed description of public education and outreach activities at the project; (2) identification of the licensee's web site address to provide the public with information regarding the licensee's shoreline permitting program; (3) a

USCA Case #16-1195        Document #1621558        Filed: 06/17/2016        Page 130 of 327

Filed: 06/17/2016     Page 131 of 327

Document #1621558

USCA Case #16-1195

provision to promote, through the licensee's Shorelines newsletter, the benefits of using best management practices, including bio-engineering techniques (willow and wetland seeding) to control soil erosion; and (4) a provision for informing the public of the proper use of federal-regulated herbicides and associated effects on aquatic resources.

The Shoreline Management Plan shall be developed after consultation with the U.S. Fish and Wildlife Service, the U.S. Bureau of Land Management, the Alabama State Historic Preservation Office, the Georgia State Historic Preservation Office, and the Alabama Department of Conservation and Natural Resources. The licensee shall include an implementation schedule, documentation of consultation, copies of recommendations on the completed program after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the program. The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations prior to filing the program with the Commission. If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Upon Commission approval the licensee shall implement the plan, including any changes required by the Commission.

Article 415. *Erosion Repair and Monitoring Plan*. Within 90 days of license issuance, the licensee shall file with the Commission for approval, an Erosion Repair and Monitoring Plan for the Coosa River Project. The purpose of the plan is to address erosion and sedimentation, as well as identify remediation measures, at the project.

The plan shall incorporate the provisions of the Erosion Repair and Monitoring Plan, filed with the Coosa River Project license application, as Volume 4, on July 28, 2005 that pertains specifically to the Coosa River Project. The plan shall also include, at a minimum, the following modifications:

(1)     updates, based on the additional consultation required below, to the provisions included in the draft plan, filed on July 28, 2005;

(2)     a decision-making process for determining remedial measures to be implemented at individual erosion sites on the project developments; and

(3)     specific criteria for determining the success of implemented measures to control erosion.

The Erosion Repair and Monitoring Plan shall be developed after consultation with the Alabama Department of Environmental Management, the Alabama Department of Conservation and Natural Resources, the U.S. Fish and Wildlife Service, the U.S. Bureau of Land Management, the Alabama State Historic Preservation Office, and the Georgia State Historic Preservation Office. The licensee shall include with the plan an implementation schedule, documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan. The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission. If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 416. *Invasive Species Management Plan.* Within 1 year of license issuance, the licensee shall file with the Commission for approval, an Invasive Species Management Plan that specifically pertains to the Coosa River Project. The plan shall include, but not be limited to, the following: (1) an identification of invasive species that occur within the Coosa River Project boundary; (2) a discussion of the specific measures that will be used to control invasive species at the project, including identifying any herbicides and pesticides that are safe for aquatic resources that inhabit lands classified as Sensitive Resources Lands; (3) a provision to avoid the use of any herbicides and pesticides at the Jordan development that may harm the federally listed tulotoma snail (*Tulotomamagnifica*); (4) a provision to annually monitor the invasive species to evaluate the effectiveness of the implemented control measures; (5) a description of the mosquito control program; and (6) a description of the zebra mussel awareness program.

The Invasive Species Management Plan shall be developed after consultation with the U.S. Fish and Wildlife Service, the U.S. Bureau of Land Management, and the Alabama Department of Conservation and Natural Resources. The licensee shall include with the plan an implementation schedule, documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan. The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations prior to filing the plan with the Commission. If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

Filed: 06/17/2016        Document #1621558        USCA Case #16-1195        Page 133 of 327

The Commission reserves the right to require changes to the plan.   Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 417. *Threatened and Endangered Species Protection Plan*.  Within 180 days of license issuance, the licensee shall file for Commission approval, a Threatened and Endangered Species Protection Plan detailing how it will implement the incidental take terms and conditions of the U.S. Fish and Wildlife's (FWS) Biological Opinion, filed on June 10, 2012, to minimize take of listed species.  The terms and conditions are included in Appendix B of this license.

The plan shall include, at a minimum, the licensee's strategy for implementing the provisions outlined in the terms and conditions of the incidental take statement.  In addition, the plan shall include a provision for filing any report required by the conditions of the incidental take statement with the Commission for review.

The Threatened and Endangered Species Protection Plan shall be developed after consultation with FWS and the Alabama Department of Conservation and Natural Resources.  The licensee shall include with the plan an implementation schedule, documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan.  The licensee shall allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission.  If the licensee does not adopt a recommendation, the filing shall include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan.  Implementation of the plan shall not begin until the licensee is notified by the Commission that the plan is approved.  Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

Article 418. *Programmatic Agreement*.  The licensee shall implement the "Programmatic Agreement Among the Federal Energy Regulatory Commission, the Alabama State Historic Preservation Officer, and the Georgia State Historic Preservation Officer for Managing Historic Properties That May Be Affected by a License Issuing to Alabama Power Company for the Continued Operation of the Coosa River Hydroelectric Project in Alabama and Georgia (FERC No. 2146-111)," executed on October 20, 2006 by the Alabama State Historic Preservation Officer and on October 26, 2006 by the Georgia State Historic Preservation Officer, including but not limited to the approved Historic Properties Management Plan (HPMP), filed October 27, 2006.  In the event that the Programmatic Agreement is terminated, the licensee shall continue to implement the

Filed: 06/17/2016    Page 134 of 327    Document #1621558    USCA Case #16-1195

provisions of its approved HPMP. The Commission reserves the authority to require changes to the HPMP at any time during the term of the license.

Article 419. *Use and Occupancy.* (a) In accordance with the provisions of this article, the licensee shall have the authority to grant permission for certain types of use and occupancy of project lands and waters and to convey certain interests in project lands and waters for certain types of use and occupancy, without prior Commission approval. The licensee may exercise the authority only if the proposed use and occupancy is consistent with the purposes of protecting and enhancing the scenic, recreational, and other environmental values of the project. For those purposes, the licensee shall also have continuing responsibility to supervise and control the use and occupancies for which it grants permission, and to monitor the use of, and ensure compliance with the covenants of the instrument of conveyance for, any interests that it has conveyed, under this article. If a permitted use and occupancy violates any condition of this article or any other condition imposed by the licensee for protection and enhancement of the project's scenic, recreational, or other environmental values, or if a covenant of a conveyance made under the authority of this article is violated, the licensee shall take any lawful action necessary to correct the violation. For a permitted use or occupancy, that action includes, if necessary, canceling the permission to use and occupy the project lands and waters and requiring the removal of any non-complying structures and facilities.

(b) The type of use and occupancy of project lands and waters for which the licensee may grant permission without prior Commission approval are: (1) landscape plantings; (2) non-commercial piers, landings, boat docks, or similar structures and facilities that can accommodate no more than 10 water craft at a time and where said facility is intended to serve single-family type dwellings; (3) embankments, bulkheads, retaining walls, or similar structures for erosion control to protect the existing shoreline; and (4) food plots and other wildlife enhancement. To the extent feasible and desirable to protect and enhance the project's scenic, recreational, and other environmental values, the licensee shall require multiple use and occupancy of facilities for access to project lands or waters. The licensee shall also ensure, to the satisfaction of the Commission's authorized representative, that the use and occupancies for which it grants permission are maintained in good repair and comply with applicable state and local health and safety requirements. Before granting permission for construction of bulkheads or retaining walls, the licensee shall: (1) inspect the site of the proposed construction, (2) consider whether the planting of vegetation or the use of riprap would be adequate to control erosion at the site, and (3) determine that the proposed construction is needed and would not change the basic contour of the impoundment shoreline. To implement this paragraph (b), the licensee may, among other things, establish a program for issuing permits for the specified types of use and occupancy of project lands and waters, which may be subject to the payment of a reasonable fee to cover the licensee's costs of administering the permit program. The Commission reserves the right to require the

Page 135 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

licensee to file a description of its standards, guidelines, and procedures for implementing this paragraph (b) and to require modification of those standards, guidelines, or procedures.

(c)  The licensee may convey easements or rights-of-way across, or leases of project lands for:  (1) replacement, expansion, realignment, or maintenance of bridges or roads where all necessary state and federal approvals have been obtained; (2) storm drains and water mains; (3) sewers that do not discharge into project waters; (4) minor access roads; (5) telephone, gas, and electric utility distribution lines; (6) non-project overhead electric transmission lines that do not require erection of support structures within the project boundary; (7) submarine, overhead, or underground major telephone distribution cables or major electric distribution lines (69-kV or less); and (8) water intake or pumping facilities that do not extract more than one million gallons per day from a project impoundment.  No later than January 31 of each year, the licensee shall file three copies of a report briefly describing for each conveyance made under this paragraph (c) during the prior calendar year, the type of interest conveyed, the location of the lands subject to the conveyance, and the nature of the use for which the interest was conveyed.

(d)  The licensee may convey fee title to, easements or rights-of-way across, or leases of project lands for:  (1) construction of new bridges or roads for which all necessary state and federal approvals have been obtained; (2) sewer or effluent lines that discharge into project waters, for which all necessary federal and state water quality certification or permits have been obtained; (3) other pipelines that cross project lands or waters but do not discharge into project waters; (4) non-project overhead electric transmission lines that require erection of support structures within the project boundary, for which all necessary federal and state approvals have been obtained; (5) private or public marinas that can accommodate no more than 10 water craft at a time and are located at least one-half mile (measured over project waters) from any other private or public marina; (6) recreational development consistent with an approved report on recreational resources of an Exhibit E; and (7) other uses, if:  (i) the amount of land conveyed for a particular use is 5 acres or less; (ii) all of the land conveyed is located at least 75 feet, measured horizontally, from project waters at normal surface elevation; and (iii) no more than 50 total acres of project lands for each project development are conveyed under this clause (d)(7) in any calendar year.  At least 60 days before conveying any interest in project lands under this paragraph (d), the licensee must file a letter with the Commission, stating its intent to convey the interest and briefly describing the type of interest and location of the lands to be conveyed (a marked Exhibit G map may be used), the nature of the proposed use, the identity of any federal or state agency official consulted, and any federal or state approvals required for the proposed use. Unless the Commission's authorized representative, within 45 days from the filing date,

Page 136 of 327      Filed: 06/17/2016      Document #1621558      USCA Case #16-1195

requires the licensee to file an application for prior approval, the licensee may convey the intended interest at the end of that period.

(e)  The following additional conditions apply to any intended conveyance under paragraph (c) or (d) of this article:

(1)  Before conveying the interest, the licensee shall consult with federal and state fish and wildlife or recreation agencies, as appropriate, and the State Historic Preservation Officer;

(2)  Before conveying the interest, the shall determine that the proposed use of the lands to be conveyed is not inconsistent with any approved report on recreational resources of an Exhibit E; or, if the project does not have an approved report on recreational resources, that the lands to be conveyed do not have recreational value;

(3)  The instrument of conveyance must include the following covenants running with the land:  (i) the use of the lands conveyed shall not endanger health, create a nuisance, or otherwise be incompatible with overall project recreational use; (ii) the grantee shall take all reasonable precautions to ensure that the construction, operation, and maintenance of structures or facilities on the conveyed lands will occur in a manner that will protect the scenic, recreational, and environmental values of the project; and (iii) the grantee shall not unduly restrict public access to project waters;

(4)  The Commission reserves the right to require the licensee to take reasonable remedial action to correct any violation of the terms and conditions of this article, for the protection and enhancement of the project's scenic, recreational, and other environmental values.

(f)  The conveyance of an interest in project lands under this article does not in itself change the project boundaries.  The project boundaries may be changed to exclude land conveyed under this article only upon approval of revised Exhibit G drawings (project boundary maps) reflecting exclusion of that land.  Lands conveyed under this article will be excluded from the project only upon a determination that the lands are not necessary for project purposes, such as operation and maintenance, flowage, recreation, public access, protection of environmental resources, and shoreline control, including shoreline aesthetic values.  Absent extraordinary circumstances, proposals to exclude lands conveyed under this article from the project shall be consolidated for consideration when revised Exhibit G drawings would be filed for approval for other purposes.

(g)  The authority granted to the licensee under this article shall not apply to any part of the public lands and reservations of the United States included within the project boundary.

Filed: 06/17/2016          Page 137 of 327

Document #1621558

USCA Case #16-1195

(G)     The licensee shall serve copies of any Commission filing required by this order on any entity specified in the order to be consulted on matters relating to that filing.  Proof of service on these entities must accompany the filing with the Commission.

(H)     This order constitutes final agency action.  Any party may file a request for rehearing of this order within 30 days from the date of its issuance, as provided in section 313(a) of the FPA, 16 U.S.C. § 825*l* (2006), and section 385.713 of the Commission's regulations, 18 C.F.R. § 385.713 (2012).  The filing of a request for rehearing does not operate as a stay of the effective date of this license or of any other date specified in this order.  The licensee's failure to file a request for rehearing shall constitute acceptance of this order.

By the Commission.

Kimberly D. Bose,
Secretary

**Form L-5**
(October, 1975)

## FEDERAL ENERGY REGULATORY COMMISSION

### TERMS AND CONDITIONS OF LICENSE FOR CONSTRUCTED MAJOR PROJECT AFFECTING NAVIGABLE WATERS AND LANDS OF THE UNITED STATES

Filed: 06/17/2016          Page 138 of 327

USCA Case #16-1195          Document #1621558

**Article 1.** The entire project, as described in this order of the Commission, shall be subject to all of the provisions, terms, and conditions of the license.

**Article 2.** No substantial change shall be made in the maps, plans, specifications, and statements described and designated as exhibits and approved by the Commission in its order as a part of the license until such change shall have been approved by the Commission: Provided, however, That if the Licensee or the Commission deems it necessary or desirable that said approved exhibits, or any of them, be changed, there shall be submitted to the Commission for approval a revised, or additional exhibit or exhibits covering the proposed changes which, upon approval by the Commission, shall become a part of the license and shall supersede, in whole or in part, such exhibit or exhibits theretofore made a part of the license as may be specified by the Commission.

**Article 3.** The project area and project works shall be in substantial conformity with the approved exhibits referred to in Article 2 herein or as changed in accordance with the provisions of said article. Except when emergency shall require for the protection of navigation, life, health, or property, there shall not be made without prior approval of the Commission any substantial alteration or addition not in conformity with the approved plans to any dam or other project works under the license or any substantial use of project lands and waters not authorized herein; and any emergency alteration, addition, or use so made shall thereafter be subject to such modification and change as the Commission may direct. Minor changes in project works, or in uses of project lands and waters, or divergence from such approved exhibits may be made if such changes will not result in a decrease in efficiency, in a material increase in cost, in an adverse environmental impact, or in impairment of the general scheme of development; but any of such minor changes made without the prior approval of the Commission, which in its judgment have produced or will produce any of such results, shall be subject to such alteration as the Commission may direct.

**Article 4.** The project, including its operation and maintenance and any work incidental to additions or alterations authorized by the Commission, whether or not conducted upon lands of the United States, shall be subject to the inspection and

Page 139 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

supervision of the Regional Engineer, Federal Energy Regulatory Commission, in the region wherein the project is located, or of such other officer or agent as the Commission may designate, who shall be the authorized representative of the Commission for such purposes. The Licensee shall cooperate fully with said representative and shall furnish him such information as he may require concerning the operation and maintenance of the project, and any such alterations thereto, and shall notify him of the date upon which work with respect to any alteration will begin, as far in advance thereof as said representative may reasonably specify, and shall notify him promptly in writing of any suspension of work for a period of more than one week, and of its resumption and completion. The Licensee shall submit to said representative a detailed program of inspection by the Licensee that will provide for an adequate and qualified inspection force for construction of any such alterations to the project. Construction of said alterations or any feature thereof shall not be initiated until the program of inspection for the alterations or any feature thereof has been approved by said representative. The Licensee shall allow said representative and other officers or employees of the United States, showing proper credentials, free and unrestricted access to, through, and across the project lands and project works in the performance of their official duties. The Licensee shall comply with such rules and regulations of general or special applicability as the Commission may prescribe from time to time for the protection of life, health, or property.

    **Article 5.** The Licensee, within five years from the date of issuance of the license, shall acquire title in fee or the right to use in perpetuity all lands, other than lands of the United States, necessary or appropriate for the construction maintenance, and operation of the project. The Licensee or its successors and assigns shall, during the period of the license, retain the possession of all project property covered by the license as issued or as later amended, including the project area, the project works, and all franchises, easements, water rights, and rights or occupancy and use; and none of such properties shall be voluntarily sold, leased, transferred, abandoned, or otherwise disposed of without the prior written approval of the Commission, except that the Licensee may lease or otherwise dispose of interests in project lands or property without specific written approval of the Commission pursuant to the then current regulations of the Commission. The provisions of this article are not intended to prevent the abandonment or the retirement from service of structures, equipment, or other project works in connection with replacements thereof when they become obsolete, inadequate, or inefficient for further service due to wear and tear; and mortgage or trust deeds or judicial sales made thereunder, or tax sales, shall not be deemed voluntary transfers within the meaning of this article.

    **Article 6.** In the event the project is taken over by the United States upon the termination of the license as provided in Section 14 of the Federal Power Act, or is transferred to a new licensee or to a nonpower licensee under the provisions of Section 15

Page 140 of 327    Filed: 06/17/2016    Document #1621558    USCA Case #16-1195

of said Act, the Licensee, its successors and assigns shall be responsible for, and shall make good any defect of title to, or of right of occupancy and use in, any of such project property that is necessary or appropriate or valuable and serviceable in the maintenance and operation of the project, and shall pay and discharge, or shall assume responsibility for payment and discharge of, all liens or encumbrances upon the project or project property created by the Licensee or created or incurred after the issuance of the license: Provided, That the provisions of this article are not intended to require the Licensee, for the purpose of transferring the project to the United States or to a new licensee, to acquire any different title to, or right of occupancy and use in, any of such project property than was necessary to acquire for its own purposes as the Licensee.

**Article 7.** The actual legitimate original cost of the project, and of any addition thereto or betterment thereof, shall be determined by the Commission in accordance with the Federal Power Act and the Commission's Rules and Regulations thereunder.

**Article 8.** The Licensee shall install and thereafter maintain gages and stream-gaging stations for the purpose of determining the stage and flow of the stream or streams on which the project is located, the amount of water held in and withdrawn from storage, and the effective head on the turbines; shall provide for the required reading of such gages and for the adequate rating of such stations; and shall install and maintain standard meters adequate for the determination of the amount of electric energy generated by the project works. The number, character, and location of gages, meters, or other measuring devices, and the method of operation thereof, shall at all times be satisfactory to the Commission or its authorized representative. The Commission reserves the right, after notice and opportunity for hearing, to require such alterations in the number, character, and location of gages, meters, or other measuring devices, and the method of operation thereof, as are necessary to secure adequate determinations. The installation of gages, the rating of said stream or streams, and the determination of the flow thereof, shall be under the supervision of, or in cooperation with, the District Engineer of the United States Geological Survey having charge of stream-gaging operations in the region of the project, and the Licensee shall advance to the United States Geological Survey the amount of funds estimated to be necessary for such supervision, or cooperation for such periods as may mutually agreed upon. The Licensee shall keep accurate and sufficient records of the foregoing determinations to the satisfaction of the Commission, and shall make return of such records annually at such time and in such form as the Commission may prescribe.

**Article 9.** The Licensee shall, after notice and opportunity for hearing, install additional capacity or make other changes in the project as directed by the Commission, to the extent that it is economically sound and in the public interest to do so.

**Article 10.** The Licensee shall, after notice and opportunity for hearing, coordinate the operation of the project, electrically and hydraulically, with such other projects or

power systems and in such manner as the Commission may direct in the interest of power and other beneficial public uses of water resources, and on such conditions concerning the equitable sharing of benefits by the Licensee as the Commission may order.

**Article 11.** Whenever the Licensee is directly benefited by the construction work of another licensee, a permittee, or the United States on a storage reservoir or other headwater improvement, the Licensee shall reimburse the owner of the headwater improvement for such part of the annual charges for interest, maintenance, and depreciation thereof as the Commission shall determine to be equitable, and shall pay to the United States the cost of making such determination as fixed by the Commission. For benefits provided by a storage reservoir or other headwater improvement of the United states, the Licensee shall pay to the Commission the amounts for which it is billed from time to time for such headwater benefits and for the cost of making the determinations pursuant to the then current regulations of the Commission under the Federal Power Act.

**Article 12.** The United States specifically retains and safeguards the right to use water in such amount, to be determined by the Secretary of the Army, as may be necessary for the purposes of navigation on the navigable waterway affected; and the operations of the Licensee, so far as they affect the use, storage and discharge from storage of waters affected by the license, shall at all times be controlled by such reasonable rules and regulations as the Secretary of the Army may prescribe in the interest of navigation, and as the Commission my prescribe for the protection of life, health, and property, and in the interest of the fullest practicable conservation and utilization of such waters for power purposes and for other beneficial public uses, including recreational purposes, and the Licensee shall release water from the project reservoir at such rate in cubic feet per second, or such volume in acre-feet per specified period of time, as the Secretary of the Army may prescribe in the interest of navigation, or as the Commission may prescribe for the other purposes hereinbefore mentioned.

**Article 13.** On the application of any person, association, corporation, Federal agency, State or municipality, the Licensee shall permit such reasonable use of its reservoir or other project properties, including works, lands and water rights, or parts thereof, as may be ordered by the Commission, after notice and opportunity for hearing, in the interests of comprehensive development of the waterway or waterways involved and the conservation and utilization of the water resources of the region for water supply or for the purposes of steam-electric, irrigation, industrial, municipal or similar uses. The Licensee shall receive reasonable compensation for use of its reservoir or other project properties or parts thereof for such purposes, to include at least full reimbursement for any damages or expenses which the joint use causes the Licensee to incur. Any such compensation shall be fixed by the Commission either by approval of an agreement between the Licensee and the party or parties benefiting or after notice and opportunity

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 141 of 327

for hearing. Applications shall contain information in sufficient detail to afford a full understanding of the proposed use, including satisfactory evidence that the applicant possesses necessary water rights pursuant to applicable State law, or a showing of cause why such evidence cannot concurrently be submitted, and a statement as to the relationship of the proposed use to any State or municipal plans or orders which may have been adopted with respect to the use of such waters.

**Article 14.** In the construction or maintenance of the project works, the Licensee shall place and maintain suitable structures and devices to reduce to a reasonable degree the liability of contact between its transmission lines and telegraph, telephone and other signal wires or power transmission lines constructed prior to its transmission lines and not owned by the Licensee, and shall also place and maintain suitable structures and devices to reduce to a reasonable degree the liability of any structures or wires falling or obstructing traffic or endangering life. None of the provisions of this article are intended to relieve the Licensee from any responsibility or requirement which may be imposed by any other lawful authority for avoiding or eliminating inductive interference.

**Article 15.** The Licensee shall, for the conservation and development of fish and wildlife resources, construct, maintain, and operate, or arrange for the construction, maintenance, and operation of such reasonable facilities, and comply with such reasonable modifications of the project structures and operation, as may be ordered by the Commission upon its own motion or upon the recommendation of the Secretary of the Interior or the fish and wildlife agency or agencies of any State in which the project or a part thereof is located, after notice and opportunity for hearing.

**Article 16.** Whenever the United States shall desire, in connection with the project, to construct fish and wildlife facilities or to improve the existing fish and wildlife facilities at its own expense, the Licensee shall permit the United States or its designated agency to use, free of cost, such of the Licensee's lands and interests in lands, reservoirs, waterways and project works as may be reasonably required to complete such facilities or such improvements thereof. In addition, after notice and opportunity for hearing, the Licensee shall modify the project operation as may be reasonably prescribed by the Commission in order to permit the maintenance and operation of the fish and wildlife facilities constructed or improved by the United States under the provisions of this article. This article shall not be interpreted to place any obligation on the United States to construct or improve fish and wildlife facilities or to relieve the Licensee of any obligation under this license.

**Article 17.** The Licensee shall construct, maintain, and operate, or shall arrange for the construction, maintenance, and operation of such reasonable recreational facilities, including modifications thereto, such as access roads, wharves, launching ramps, beaches, picnic and camping areas, sanitary facilities, and utilities, giving consideration

Filed: 06/17/2016      Page 142 of 327

Document #1621558

USCA Case #16-1195

Filed: 06/17/2016          Page 143 of 327

USCA Case #16-1195          Document #1621558

to the needs of the physically handicapped, and shall comply with such reasonable modifications of the project, as may be prescribed hereafter by the Commission during the term of this license upon its own motion or upon the recommendation of the Secretary of the Interior or other interested Federal or State agencies, after notice and opportunity for hearing.

**Article 18.** So far as is consistent with proper operation of the project, the Licensee shall allow the public free access, to a reasonable extent, to project waters and adjacent project lands owned by the Licensee for the purpose of full public utilization of such lands and waters for navigation and for outdoor recreational purposes, including fishing and hunting: Provided, That the Licensee may reserve from public access such portions of the project waters, adjacent lands, and project facilities as may be necessary for the protection of life, health, and property.

**Article 19.** In the construction, maintenance, or operation of the project, the Licensee shall be responsible for, and shall take reasonable measures to prevent, soil erosion on lands adjacent to streams or other waters, stream sedimentation, and any form of water or air pollution. The Commission, upon request or upon its own motion, may order the Licensee to take such measures as the Commission finds to be necessary for these purposes, after notice and opportunity for hearing.

**Article 20.** The Licensee shall clear and keep clear to an adequate width lands along open conduits and shall dispose of all temporary structures, unused timber, brush, refuse, or other material unnecessary for the purposes of the project which results from the clearing of lands or from the maintenance or alteration of the project works. In addition, all trees along the periphery of project reservoirs which may die during operations of the project shall be removed. All clearing of the lands and disposal of the unnecessary material shall be done with due diligence and to the satisfaction of the authorized representative of the Commission and in accordance with appropriate Federal, State, and local statutes and regulations.

**Article 21.** Material may be dredged or excavated from, or placed as fill in, project lands and/or waters only in the prosecution of work specifically authorized under the license; in the maintenance of the project; or after obtaining Commission approval, as appropriate. Any such material shall be removed and/or deposited in such manner as to reasonably preserve the environmental values of the project and so as not to interfere with traffic on land or water. Dredging and filling in a navigable water of the United States shall also be done to the satisfaction of the District Engineer, Department of the Army, in charge of the locality.

**Article 22.** Whenever the United States shall desire to construct, complete, or improve navigation facilities in connection with the project, the Licensee shall convey to

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 144 of 327

the United States, free of cost, such of its lands and rights-of-way and such rights of passage through its dams or other structures, and shall permit such control of its pools, as may be required to complete and maintain such navigation facilities.

**Article 23.** The operation of any navigation facilities which may be constructed as a part of, or in connection with, any dam or diversion structure constituting a part of the project works shall at all times be controlled by such reasonable rules and regulations in the interest of navigation, including control of the level of the pool caused by such dam or diversion structure, as may be made from time to time by the Secretary of the Army.

**Article 24.** The Licensee shall furnish power free of cost to the United States for the operation and maintenance of navigation facilities in the vicinity of the project at the voltage and frequency required by such facilities and at a point adjacent thereto, whether said facilities are constructed by the Licensee or by the United States.

**Article 25.** The Licensee shall construct, maintain, and operate at its own expense such lights and other signals for the protection of navigation as may be directed by the Secretary of the Department in which the Coast Guard is operating.

**Article 26.** Timber on lands of the United States cut, used, or destroyed in the construction and maintenance of the project works, or in the clearing of said lands, shall be paid for, and the resulting slash and debris disposed of, in accordance with the requirements of the agency of the United States having jurisdiction over said lands. Payment for merchantable timber shall be at current stumpage rates, and payment for young growth timber below merchantable size shall be at current damage appraisal values. However, the agency of the United States having jurisdiction may sell or dispose of the merchantable timber to others than the Licensee: Provided, That timber so sold or disposed of shall be cut and removed from the area prior to, or without undue interference with, clearing operations of the Licensee and in coordination with the Licensee's project construction schedules. Such sale or disposal to others shall not relieve the Licensee of responsibility for the clearing and disposal of all slash and debris from project lands.

**Article 27.** The Licensee shall do everything reasonably within its power, and shall require its employees, contractors, and employees of contractors to do everything reasonably within their power, both independently and upon the request of officers of the agency concerned, to prevent, to make advance preparations for suppression of, and to suppress fires on the lands to be occupied or used under the license. The Licensee shall be liable for and shall pay the costs incurred by the United States in suppressing fires caused from the construction, operation, or maintenance of the project works or of the works appurtenant or accessory thereto under the license.

**Article 28.** The Licensee shall interpose no objection to, and shall in no way prevent, the use by the agency of the United States having jurisdiction over the lands of

Filed: 06/17/2016        Page 145 of 327

Document #1621558

USCA Case #16-1195

the United States affected, or by persons or corporations occupying lands of the United States under permit, of water for fire suppression from any stream, conduit, or body of water, natural or artificial, used by the Licensee in the operation of the project works covered by the license, or the use by said parties of water for sanitary and domestic purposes from any stream, conduit, or body of water, natural or artificial, used by the Licensee in the operation of the project works covered by the license.

**Article 29.** The Licensee shall be liable for injury to, or destruction of, any buildings, bridges, roads, trails, lands, or other property of the United States, occasioned by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto under the license. Arrangements to meet such liability, either by compensation for such injury or destruction, or by reconstruction or repair of damaged property, or otherwise, shall be made with the appropriate department or agency of the United States.

**Article 30.** The Licensee shall allow any agency of the United States, without charge, to construct or permit to be constructed on, through, and across those project lands which are lands of the United States such conduits, chutes, ditches, railroads, roads, trails, telephone and power lines, and other routes or means of transportation and communication as are not inconsistent with the enjoyment of said lands by the Licensee for the purposes of the license. This license shall not be construed as conferring upon the Licensee any right of use, occupancy, or enjoyment of the lands of the United States other than for the construction, operation, and maintenance of the project as stated in the license.

**Article 31.** In the construction and maintenance of the project, the location and standards of roads and trails on lands of the United States and other uses of lands of the United States, including the location and condition of quarries, borrow pits, and spoil disposal areas, shall be subject to the approval of the department or agency of the United States having supervision over the lands involved.

**Article 32.** The Licensee shall make provision, or shall bear the reasonable cost, as determined by the agency of the United States affected, of making provision for avoiding inductive interference between any project transmission line or other project facility constructed, operated, or maintained under the license, and any radio installation, telephone line, or other communication facility installed or constructed before or after construction of such project transmission line or other project facility and owned, operated, or used by such agency of the United States in administering the lands under its jurisdiction.

**Article 33.** The Licensee shall make use of the Commission's guidelines and other recognized guidelines for treatment of transmission line rights-of-way, and shall clear

such portions of transmission line rights-of-way across lands of the United States as are designated by the officer of the United States in charge of the lands; shall keep the areas so designated clear of new growth, all refuse, and inflammable material to the satisfaction of such officer; shall trim all branches of trees in contact with or liable to contact the transmission lines; shall cut and remove all dead or leaning trees which might fall in contact with the transmission lines; and shall take such other precautions against fire as may be required by such officer. No fires for the burning of waste material shall be set except with the prior written consent of the officer of the United States in charge of the lands as to time and place.

**Article 34.** The Licensee shall cooperate with the United States in the disposal by the United States, under the Act of July 31, 1947, 61 Stat. 681, as amended (30 U.S.C. sec. 601, et seq.), of mineral and vegetative materials from lands of the United States occupied by the project or any part thereof: Provided, That such disposal has been authorized by the Commission and that it does not unreasonably interfere with the occupancy of such lands by the Licensee for the purposes of the license: Provided further, That in the event of disagreement, any question of unreasonable interference shall be determined by the Commission after notice and opportunity for hearing.

**Article 35.** If the Licensee shall cause or suffer essential project property to be removed or destroyed or to become unfit for use, without adequate replacement, or shall abandon or discontinue good faith operation of the project or refuse or neglect to comply with the terms of the license and the lawful orders of the Commission mailed to the record address of the Licensee or its agent, the Commission will deem it to be the intent of the Licensee to surrender the license. The Commission, after notice and opportunity for hearing, may require the Licensee to remove any or all structures, equipment and power lines within the project boundary and to take any such other action necessary to restore the project waters, lands, and facilities remaining within the project boundary to a condition satisfactory to the United States agency having jurisdiction over its lands or the Commission's authorized representative, as appropriate, or to provide for the continued operation and maintenance of nonpower facilities and fulfill such other obligations under the license as the Commission may prescribe. In addition, the Commission in its discretion, after notice and opportunity for hearing, may also agree to the surrender of the license when the Commission, for the reasons recited herein, deems it to be the intent of the Licensee to surrender the license.

**Article 36.** The right of the Licensee and of its successors and assigns to use or occupy waters over which the United States has jurisdiction, or lands of the United States under the license, for the purpose of maintaining the project works or otherwise, shall absolutely cease at the end of the license period, unless the Licensee has obtained a new license pursuant to the then existing laws and regulations, or an annual license under the terms and conditions of this license.

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 146 of 327

Page 147 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

**Article 37.** The terms and conditions expressly set forth in the license shall not be construed as impairing any terms and conditions of the Federal Power Act which are not expressly set forth herein.

Filed: 06/17/2016 Page 148 of 327

Document #1621558

USCA Case #16-1195

# APPENDIX A

**Water Quality Certificate Conditions for the Coosa River Project Issued By the Alabama Department of Environmental Management on July 1, 2005**

## Weiss Dam Development and Weiss By-Pass Spillway

### LIMITATIONS

1. The operation of the Weiss Dam development, including the operation of the turbines, shall be managed such that no less than 4.0 mg/l of dissolved oxygen (D.O.) shall be maintained at all times at the monitoring locations prescribed herein. Management required to maintain the 4.0 mg/l dissolved oxygen criterion shall be implemented.

### COMPLIANCE SCHEDULE

2. Alabama Power Company shall develop and implement measures to increase the D.O. downstream of project discharges to comply with the limitations herein through structural and/or operational modifications at the project within 18 months of a new license for the Coosa Project by the Federal Energy Regulatory Commission (FERC).

### MONITORING AND REPORTING

3. The tailrace monitor used to determine compliance with paragraph 1. above shall be placed in the tailrace of Weiss dam powerhouse on the west bank at latitude 34° 07' 49"N and longitude 85° 47' 40"W approximately 500 feet downstream from the powerhouse. The monitor downstream of the Weiss By-Pass spillway shall be located at approximately latitude 34° 10' 11"N and longitude 85° 45' 04"W approximately 1200 feet downstream of the spillway. The monitor in the Weiss Dam tailrace shall record dissolved oxygen and temperature at 60-minute intervals during periods of generation following one continuous hour of generation beginning of May 1 and extending through September 30. The monitor in the Weiss Dam By-Pass shall record dissolved oxygen and temperature continuously at 60-minute intervals from May 1 through September

Page 149 of 327

Filed: 06/17/2016     Document #1621558

USCA Case #16-1195

30.  During flood events, the monitoring may be temporarily discontinued until tailrace elevations return to normal.

4.  The monitoring program shall begin within 18 months following the effective date of issuance of a new license for the Coosa Project if the effective date is within the prescribed monitoring period.  If the effective date of the license is not within the prescribed monitoring period, monitoring shall begin the following May 1.  The monitoring program shall continue for a period of three years.

5.  The monitoring equipment shall receive adequate and frequent maintenance and calibration to assure proper operation.  The dissolved oxygen monitoring equipment will be calibrated at an acceptable frequency using the manufacture's recommendations, the Winkler Method, Method 360.2 of EPA's Method for Chemical Analysis of Water and Wastes, latest edition, or other equivalent methods.

6.  Dissolved oxygen and temperature monitoring reports shall be submitted with appropriate certifications to the ADEM within 90 days following the end of the annual monitoring period.  Following the final year of monitoring, the complete set of data shall be submitted to ADEM for review and comment prior to submittal to the FERC.  In addition to dissolved oxygen and temperature data, the monitoring reports shall specify whether turbines were in operation at the time of the Weiss tailrace dissolved oxygen and temperature measurements and the discharge rate of water flow passing through each turbine at the time of the measurements.  For the Weiss By-Pass spillway, the flow passing over the spillway shall be reported with each dissolved oxygen and temperature measurement.  Monitoring reports shall be submitted in an electronic form compatible with the Microsoft$^{TM}$ Excel and Word software.

7.  An assessment of the effects of the operation of the Weiss Dam development on the State of Alabama's water quality standards shall be conducted using the results of the monitoring as described in the previous paragraphs.  If the monitoring results do not indicate substantial compliance with the State of Alabama water quality standards (maintenance of a D.O. concentration of 4.0 mg/l or greater), Alabama Power Company shall develop and implement measures to ensure compliance with the D.O. criterion through

Page 150 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

structural and/or operational modifications at the project as prescribed in paragraph 2. The assessment shall be filed with ADEM within 6 months following the end of the three year monitoring period. As a part of the assessment Alabama Power Company shall furnish, at the Department's request, other data and information that may be available but not expressly required in this monitoring plan.

## Neely Henry Development

## LIMITATIONS

1. The operation of the Neely Henry development, including the operation of the turbines, shall be managed such that no less than 4.0 mg/l of dissolved oxygen (D.O.) shall be maintained at all times at the monitoring location prescribed herein. Management required to maintain the 4.0 mg/l dissolved oxygen criterion shall be implemented.

## COMPLIANCE SCHEDULE

2. Alabama Power Company shall develop and implement measures to increase the D.O. downstream of project discharges to comply with the limitations herein through structural and/or operational modifications at the project within 18 months of a new license for the Coosa Project by the Federal Energy Regulatory Commission (FERC).

## MONITORING AND REPORTING

3. The tailrace monitor used to determine compliance with paragraph 1. above shall be placed in the tailrace of Neely Henry dam powerhouse on the east bank at latitude 33° 46' 52"N and longitude 86° 02' 59"W approximately 1600 feet downstream from the powerhouse. The monitor in the Neely Henry tailrace shall record dissolved oxygen and temperature at 60-minute intervals during periods of generation following one continuous hour of generation from May 1 through September 30. During flood events, the monitoring may be temporarily discontinued until tailrace elevations return to normal.

4.  The monitoring program shall begin within 18 months following the effective date of issuance of a new license for the Coosa Project if the effective date is within the prescribed monitoring period. If the effective date of the license is not within the prescribed monitoring period, monitoring shall begin the following May 1. The monitoring program shall continue for a period of three years.

5.  The monitoring equipment shall receive adequate and frequent maintenance and calibration to assure proper operation. The dissolved oxygen monitoring equipment will be calibrated at an acceptable frequency using the manufacture's recommendations, the Winkler Method, Method 360.2 of EPA's Method for Chemical Analysis of Water and Wastes, latest edition, or other equivalent methods.

8.  Dissolved oxygen and temperature monitoring reports shall be submitted with appropriate certifications to the ADEM within 90 days following the end of the annual monitoring period. Following the final year of monitoring, the complete set of data shall be submitted to ADEM for review and comment prior to submittal to the FERC. In addition to dissolved oxygen and temperature data, the monitoring reports shall specify whether turbines were in operation at the time of the Neely Henry tailrace dissolved oxygen and temperature measurements and the discharge rate of water flow passing through each turbine at the time of the measurements. Monitoring reports shall be submitted in an electronic form compatible with the Microsoft™ Excel and Word software.

9.  An assessment of the effects of the operation of the Neely Henry development on the State of Alabama's water quality standards shall be conducted using the results of the monitoring as described in the previous paragraphs. If the monitoring results do not indicate substantial compliance with the State of Alabama water quality standards (maintenance of a D.O. concentration of 4.0 mg/l or greater), Alabama Power Company shall develop and implement measures to ensure compliance with the D.O. criterion through structural and/or operational modifications at the project as prescribed in paragraph 2. The assessment shall be filed with ADEM within 6 months following the end of the three year monitoring period. As a part of the assessment Alabama Power

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 151 of 327

Page 152 of 327

Filed: 06/17/2016     Document #1621558

USCA Case #16-1195

Company shall furnish, at the Department's request, other
data and information that may be available but not expressly
required in this monitoring plan.

## Logan Martin Development

## LIMITATIONS

1. The operation of the Logan Martin development, including the
   operation of the turbines, shall be managed such that no less than 4.0
   mg/l of dissolved oxygen (D.O.) shall be maintained at all times at
   the monitoring location prescribed herein.  Management required to
   maintain the 4.0 mg/l dissolved oxygen criterion shall be
   implemented.

## COMPLIANCE SCHEDULE

2. Alabama Power Company shall develop and implement measures to
   increase the D.O. downstream of project discharges to comply with
   the limitations herein through structural and/or operational
   modifications at the project within 18 months of a new license for
   the Coosa Project by the Federal Energy Regulatory Commission
   (FERC).

## MONITORING AND REPORTING

3. The tailrace monitor used to determine compliance with paragraph 1.
   above shall be placed in the tailrace of Logan Martin dam on the east
   bank at latitude 33° 24' 38"N and longitude 86° 20' 44"W
   approximately 5800 feet downstream from Logan Martin dam.  The
   monitor shall record dissolved oxygen and temperature at 60-minute
   intervals during periods of generation following one continuous hour
   of generation from May 1 through November 30.  During flood
   events, the monitoring may be temporarily discontinued until tailrace
   elevations return to normal.

4. The monitoring program shall begin within 18 months following the
   effective date of issuance of a new license for the Coosa Project if
   the effective date is within the prescribed monitoring period.  If the
   effective date of the license is not within the prescribed monitoring

Page 153 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

period, monitoring shall begin the following May 1. The monitoring program shall continue for a period of three years.

5. The monitoring equipment shall receive adequate and frequent maintenance and calibration to assure proper operation. The dissolved oxygen monitoring equipment will be calibrated at an acceptable frequency using the manufacture's recommendations, the Winkler Method, Method 360.2 of EPA's Method for Chemical Analysis of Water and Wastes, latest edition, or other equivalent methods.

6. Dissolved oxygen and temperature monitoring reports shall be submitted with appropriate certifications to the ADEM within 90 days following the end of the annual monitoring period. Following the final year of monitoring, the complete set of data shall be submitted to ADEM for review and comment prior to submittal to the FERC. In addition to dissolved oxygen and temperature data, the monitoring reports shall specify whether turbines were in operation at the time of the Logan Martin tailrace dissolved oxygen and temperature measurements and the discharge rate of water flow passing through each turbine at the time of the measurements. Monitoring reports shall be submitted in an electronic form compatible with the Microsoft$^{TM}$ Excel and Word software.

7. An assessment of the effects of the operation of the Logan Martin development on the State of Alabama's water quality standards shall be conducted using the results of the monitoring as described in the previous paragraphs. If the monitoring results do not indicate substantial compliance with the State of Alabama water quality standards (maintenance of a D.O. concentration of 4.0 mg/l or greater), Alabama Power Company shall develop and implement measures to ensure compliance with the D.O. criterion through structural and/or operational modifications at the project as prescribed in paragraph 2. The assessment shall be filed with ADEM within 6 months following the end of the three year monitoring period. As a part of the assessment Alabama Power Company shall furnish, at the Department's request, other data and information that may be available but not expressly required in this monitoring plan.

Page 154 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

**Lay Development**

## LIMITATIONS

1. The operation of the Lay development, including the operation of the turbines, shall be managed such that no less than 4.0 mg/l of dissolved oxygen (D.O.) shall be maintained at all times at the monitoring location prescribed herein. Management required to maintain the 4.0 mg/l dissolved oxygen criterion shall be implemented.

## COMPLIANCE SCHEDULE

2. Alabama Power Company shall develop and implement measures to increase the D.O. downstream of project discharges to comply with the limitations herein through structural and/or operational modifications at the project within 18 months of a new license for the Coosa Project by the Federal Energy Regulatory Commission (FERC).

## MONITORING AND REPORTING

3. The tailrace monitor used to determine compliance with paragraph 1. above shall be placed in the tailrace of Lay dam powerhouse on the west bank at latitude 32° 57' 44"N and longitude 86° 31' 10"W approximately 300 feet downstream from Lay dam. The monitor shall record dissolved oxygen and temperature at 60-minute intervals during periods of generation following one continuous hour of generation from May 1 through September 30. During flood events, the monitoring may be temporarily discontinued until tailrace elevations return to normal.

4. The monitoring program shall begin within 18 months following the effective date of issuance of a new license for the Coosa Project if the effective date is within the prescribed monitoring period. If the effective date of the license is not within the prescribed monitoring period, monitoring shall begin the following May 1. The monitoring program shall continue for a period of three years.

5. The monitoring equipment shall receive adequate and frequent maintenance and calibration to assure proper operation. The

Filed: 06/17/2016      Page 155 of 327

USCA Case #16-1195      Document #1621558

dissolved oxygen monitoring equipment will be calibrated at an acceptable frequency using the manufacture's recommendations, the Winkler Method, Method 360.2 of EPA's Method for Chemical Analysis of Water and Wastes, latest edition, or other equivalent methods.

6. Dissolved oxygen and temperature monitoring reports shall be submitted with appropriate certifications to the ADEM within 90 days following the end of the annual monitoring period. Following the final year of monitoring, the complete set of data shall be submitted to ADEM for review and comment prior to submittal to the FERC. In addition to dissolved oxygen and temperature data, the monitoring reports shall specify whether turbines were in operation at the time of the Lay development tailrace dissolved oxygen and temperature measurements and the discharge rate of water flow passing through each turbine at the time of the measurements. Monitoring reports shall be submitted in an electronic form compatible with the Microsoft™ Excel and Word software.

7. An assessment of the effects of the operation of the Lay development on the State of Alabama's water quality standards shall be conducted using the results of the monitoring as described in the previous paragraphs. If the monitoring results do not indicate substantial compliance with the State of Alabama water quality standards (maintenance of a D.O. concentration of 4.0 mg/l or greater), Alabama Power Company shall develop and implement measures to ensure compliance with the D.O. criterion through structural and/or operational modifications at the project as prescribed in paragraph 2. The assessment shall be filed with ADEM within 6 months following the end of the three year monitoring period. As a part of the assessment Alabama Power Company shall furnish, at the Department's request, other data and information that may be available but not expressly required in this monitoring plan.

**Mitchell Project**

LIMITATIONS

1. The operation of the Mitchell project, including the operation of the turbines, shall be managed such that no less than 4.0 mg/l of

dissolved oxygen (D.O.) shall be maintained at all times at the monitoring location prescribed herein. Management required to maintain the 4.0 mg/l dissolved oxygen criterion shall be implemented.

## COMPLIANCE SCHEDULE

2. Alabama Power Company shall develop and implement measures to increase the D.O. downstream of project discharges to comply with the limitations herein through structural and/or operational modifications at the project within 18 months of a new license for the Coosa Project by the Federal Energy Regulatory Commission (FERC).

## MONITORING AND REPORTING

3. The tailrace monitor used to determine compliance with paragraph 1. above shall be placed in the tailrace of Mitchell dam powerhouse on the west bank at latitude 32° 48' 18"N and longitude 86° 26' 46"W approximately 100 feet downstream from Mitchell dam. The monitor shall record dissolved oxygen and temperature at 60-minute intervals during periods of generation following one continuous hour of generation from May 1 through September 30. During flood events, the monitoring may be temporarily discontinued until tailrace elevations return to normal.

4. The monitoring program shall begin within 18 months following the effective date of issuance of a new license for the Coosa Project if the effective date is within the prescribed monitoring period. If the effective date of the license is not within the prescribed monitoring period, monitoring shall begin the following May 1. The monitoring program shall continue for a period of three years.

5. The monitoring equipment shall receive adequate and frequent maintenance and calibration to assure proper operation. The dissolved oxygen monitoring equipment will be calibrated at an acceptable frequency using the manufacture's recommendations, the Winkler Method, Method 360.2 of EPA's Method for Chemical Analysis of Water and Wastes, latest edition, or other equivalent methods.

Filed: 06/17/2016     Page 156 of 327

Document #1621558

USCA Case #16-1195

6. Dissolved oxygen and temperature monitoring reports shall be submitted with appropriate certifications to the ADEM within 90 days following the end of the annual monitoring period. Following the final year of monitoring, the complete set of data shall be submitted to ADEM for review and comment prior to submittal to the FERC. In addition to dissolved oxygen and temperature data, the monitoring reports shall specify whether turbines were in operation at the time of the Mitchell project tailrace dissolved oxygen and temperature measurements and the discharge rate of water flow passing through each turbine at the time of the measurements. Monitoring reports shall be submitted in an electronic form compatible with the Microsoft™ Excel and Word software.

7. An assessment of the effects of the operation of the Mitchell project on the State of Alabama's water quality standards shall be conducted using the results of the monitoring as described in the previous paragraphs. If the monitoring results do not indicate substantial compliance with the State of Alabama water quality standards (maintenance of a D.O. concentration of 4.0 mg/l or greater), Alabama Power Company shall develop and implement measures to ensure compliance with the D.O. criterion through structural and/or operational modifications at the project as prescribed in paragraph 2. The assessment shall be filed with ADEM within 6 months following the end of the three year monitoring period. As a part of the assessment Alabama Power Company shall furnish, at the Department's request, other data and information that may be available but not expressly required in this monitoring plan.

## Jordan Project

## LIMITATIONS

1. The operation of the Jordan project, including the operation of the turbines, shall be managed such that no less than 4.0 mg/l of dissolved oxygen (D.O.) shall be maintained at all times at the monitoring location prescribed herein. Management required to maintain the 4.0 mg/l dissolved oxygen criterion shall be implemented.

Page 158 of 327

Filed: 06/17/2016      Document #1621558      USCA Case #16-1195

COMPLIANCE SCHEDULE

2. Alabama Power Company shall develop and implement measures to increase the D.O. downstream of project discharges to comply with the limitations herein through structural and/or operational modifications at the project within 18 months of a new license for the Coosa Project by the Federal Energy Regulatory Commission (FERC).

MONITORING AND REPORTING

3. The tailrace monitor used to determine compliance with paragraph 1. above shall be placed in the tailrace of Jordan dam on the west bank at latitude 32° 36' 58"N and longitude 86° 15' 27"W approximately 800 feet downstream from Jordan dam.  The monitor shall record dissolved oxygen and temperature at 60-minute intervals during periods of generation following one continuous hour of generation from May 1 through November 30.  During flood events, the monitoring may be temporarily discontinued until tailrace elevations return to normal.

4. The monitoring program shall begin within 18 months following the effective date of issuance of a new license for the Coosa Project if the effective date is within the prescribed monitoring period.  If the effective date of the license is not within the prescribed monitoring period, monitoring shall begin the following May 1.  The monitoring program shall continue for a period of three years.

5. The monitoring equipment shall receive adequate and frequent maintenance and calibration to assure proper operation.  The dissolved oxygen monitoring equipment will be calibrated at an acceptable frequency using the manufacture's recommendations, the Winkler Method, Method 360.2 of EPA's Method for Chemical Analysis of Water and Wastes, latest edition, or other equivalent methods.

6. Dissolved oxygen and temperature monitoring reports shall be submitted with appropriate certifications to the ADEM within 90 days following the end of the annual monitoring period.  Following the final year of monitoring, the complete set of data shall be submitted to ADEM for review and comment prior to submittal to

the FERC. In addition to dissolved oxygen and temperature data, the monitoring reports shall specify whether turbines were in operation at the time of the Jordan project tailrace dissolved oxygen and temperature measurements and the discharge rate of water flow passing through each turbine at the time of the measurements. Monitoring reports shall be submitted in an electronic form compatible with the Microsoft™ Excel and Word software.

7. An assessment of the effects of the operation of the Jordan project on the State of Alabama's water quality standards shall be conducted using the results of the monitoring as described in the previous paragraphs. If the monitoring results do not indicate substantial compliance with the State of Alabama water quality standards (maintenance of a D.O. concentration of 4.0 mg/l or greater), Alabama Power Company shall develop and implement measures to ensure compliance with the D.O. criterion through structural and/or operational modifications at the project as prescribed in paragraph 2. The assessment shall be filed with ADEM within 6 months following the end of the three year monitoring period. As a part of the assessment Alabama Power Company shall furnish, at the Department's request, other data and information that may be available but not expressly required in this monitoring plan.

## Bouldin Development

## LIMITATIONS

1. The operation of the Bouldin Development, including the operation of the turbines, shall be managed such that no less than 4.0 mg/l of dissolved oxygen (D.O.) shall be maintained at all times at the monitoring location prescribed herein. Management required to maintain the 4.0 mg/l dissolved oxygen criterion shall be implemented.

## COMPLIANCE SCHEDULE

2. Alabama Power Company shall develop and implement measures to increase the D.O. downstream of project discharges to comply with the limitations herein through structural and/or operational modifications at the project within 18 months of a new license for

USCA Case #16-1195        Document #1621558        Filed: 06/17/2016        Page 159 of 327

the Coosa Project by the Federal Energy Regulatory
Commission (FERC).

## MONITORING AND REPORTING

3. The tailrace monitor used to determine compliance with paragraph 1.
   above shall be placed in the tailrace of Bouldin dam on the west
   bank at latitude 32° 34' 58"N and longitude 86° 16' 57"W
   approximately 100 feet downstream from Bouldin dam. The
   monitor shall record dissolved oxygen and temperature at 60-minute
   intervals during periods of generation following one continuous hour
   of generation from May 1 through September 30. During flood
   events, the monitoring may be temporarily discontinued until tailrace
   elevations return to normal.

4. The monitoring program shall begin within 18 months following the
   effective date of issuance of a new license for the Coosa Project if
   the effective date is within the prescribed monitoring period. If the
   effective date of the license is not within the prescribed monitoring
   period, monitoring shall begin the following May 1. The monitoring
   program shall continue for a period of three years.

5. The monitoring equipment shall receive adequate and frequent
   maintenance and calibration to assure proper operation. The
   dissolved oxygen monitoring equipment will be calibrated at an
   acceptable frequency using the manufacture's recommendations, the
   Winkler Method, Method 360.2 of EPA's Method for Chemical
   Analysis of Water and Wastes, latest edition, or other equivalent
   methods.

6. Dissolved oxygen and temperature monitoring reports shall be
   submitted with appropriate certifications to the ADEM within 90
   days following the end of the annual monitoring period. Following
   the final year of monitoring, the complete set of data shall be
   submitted to ADEM for review and comment prior to submittal to
   the FERC. In addition to dissolved oxygen and temperature data, the
   monitoring reports shall specify whether turbines were in operation
   at the time of the Bouldin development tailrace dissolved oxygen
   and temperature measurements and the discharge rate of water flow
   passing through each turbine at the time of the measurements.

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 160 of 327

Filed: 06/17/2016    Page 161 of 327

Document #1621558

USCA Case #16-1195

Monitoring reports shall be submitted in an electronic form compatible with the Microsoft™ Excel and Word software.

7. An assessment of the effects of the operation of the Bouldin development on the State of Alabama's water quality standards shall be conducted using the results of the monitoring as described in the previous paragraphs. If the monitoring results do not indicate substantial compliance with the State of Alabama water quality standards (maintenance of a D.O. concentration of 4.0 mg/l or greater), Alabama Power Company shall develop and implement measures to ensure compliance with the D.O. criterion through structural and/or operational modifications at the project as prescribed in paragraph 2. The assessment shall be filed with ADEM within 6 months following the end of the three year monitoring period. As a part of the assessment Alabama Power Company shall furnish, at the Department's request, other data and information that may be available but not expressly required in this monitoring plan.

The Department also certifies that there are no applicable effluent limitations nor other limitations imposed under Sections 301(b) or 302 or other standards imposed under Sections 306 or 307 of the Clean Water Act. This certification does not, however, exempt Alabama Power Company from requirements imposed under the National Pollutant Discharge Elimination System for other discharges at these facilities regulated by the Department.

Page 162 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

# APPENDIX B

**Reasonable and Prudent Measures and Terms and Conditions included in the U.S. Fish and Wildlife Service's Biological Opinion for the Relicensing of the Coosa River Hydroelectric Project (No. 2146), June 10, 2012**

## REASONABLE AND PRUDENT MEASURES

*Action (1) Alabama Power's Proposal for Operations*

    a. Weiss: Reduce the probability of releasing water of poor quality down the Bypass;

    b. Logan Martin: Maintain (if adequate) and enhance (if not) water quality conditions in the tailrace to ensure listed mussels and snails are able to carry out basic life cycle requirements;

    c. Jordan: Adhere to RPMs [Reasonable and Prudent Measures] and T&Cs [Terms and Conditions] outlined in the 1995 BO [Biological Opinion];

    d. Project-wide: Reduce the effects of habitat fragmentation and Project operations by participating in the reintroductions and monitoring of listed aquatic species throughout the Coosa River system.

Action (2) Implementation of a Shoreline Management Plan (SMP)

    a. Reduce the impacts from activities permitted under the SMP by minimizing excessive shoreline erosion and preventing herbicides from entering the water;

Action (3) Implementation of a Wildlife Management Plan

    a. Ensure that RCW [Red-Cockaded Woodpecker] cavity trees are protected to the maximum extent possible during land management activities;

    b. Ensure that blue shiner and tulotoma habitat in Weogufka and Hatchet Creeks is protected from Alabama Power timber harvesting activities.

Page 163 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

Action (4) Implementation of the Coosa River Project portion of the
Alabama Drought Response Operations Proposal – ADROP

    a. Reduce the stranding/mortality rate of tulotoma in the Coosa
River downstream of Jordan dam and follow the RMPs and
T&C's from 2008 Biological Opinions;

    b. Minimize releases of water through Bouldin Dam during drought
conditions;

    c. Identify how reservoir pool levels will be managed upstream of
Jordan, primarily Lay Lake.

Action (5) Drawdown of Lay Lake

    a. Re-evaluate, in consultation with the Service and ADCNR
[Alabama Department of Conservation and Natural Resources],
the need to continue the biannual drawdown on a predetermined
schedule. Whether a drawdown occurs biannually or during
drought conditions, the following RPMs should be observed:

        i.   Increase the time which tulotoma and the rough horn
snail will have to follow the waterline as water levels
recede;

       ii.   Reduce the stranding/mortality rate of tulotoma and
rough horn snail.

## TERMS AND CONDITIONS

Action (1) Alabama Power's Proposal for Operations

    a. Weiss AMP [Adaptive Management Plan]: Minimize the
temporary releases of warm or low DO [dissolved oxygen] waters
in the initial flow releases by implementing the water quality
monitoring plan as described in the AMP;

    b. Logan Martin AMP: Following the issuance of the FERC license,
Alabama Power will develop and implement the DO
improvement directives as listed in the 401 WQC issued by
ADEM [Alabama Department of Environmental Management].

Filed: 06/17/2016      Page 164 of 327

Document #1621558

USCA Case #16-1195

Alabama Power will also revise within 18 months the Logan Martin AMP to ensure that non-generation conditions are protective of listed species and begin developing plans and an implementation schedule, that is agreeable with the Service, to enhance DO during non-generation periods with the goal of ensuring the survival of listed mussels (and their hosts), snails, and fishes, and ensuring that they are able to carry out basic life cycle requirements.

c. Project-wide: In cooperation with the agencies, Alabama Power will participate in studies, included, but not limited to, in situ (e.g., "cage experiments") and laboratory experiments, species reintroductions, and studies to evaluate habitat and water quality conditions in the Coosa River.

Action (2) Implementation of a Shoreline Management Plan (SMP)

a. Project-wide:

   i.   All shorelines that are adjacent to, or could affect, listed species or CH [critical habitat] are to be designated as Sensitive Resource Lands under Alabama Power's Shoreline Classification System. The Sensitive Resource layer is to be addressed or updated at least annually, to account for new T&E [threatened and endangered] survey data or any new listing and/or CH designations;

   ii.  Actively promote, through homeowner publications and/or articles in Alabama Power's newsletter (Shorelines), the benefits of using BMPs [Best Management Practices] and the proper use of EPA [Environmental Protection Agency] regulated herbicides and their effects on aquatic organisms;

b. Project-specific monitoring plans:

   i.   Neely Henry: To ensure that listed species and CH are being protected in lower Big Canoe Creek, a baseline mussel and fish survey shall be conducted, within 36 months of the issuance of the license. This survey is to

Page 165 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

include the location(s) and extent of extant mussel populations, general population estimates, and fishery IBIs [Index of Biotic Integrity]. In addition to biological information, shorelines should be mapped to document existing conditions (e.g., riparian zones distance and condition and areas with high erosion potential). The survey will establish a baseline and will used to insure no further decline in the population of southern clubshell and habitat in lower Big Canoe Creek occurs.

ii.     Logan Martin: To ensure that listed species are being protected in lower Choccolocco Creek, a baseline mussel, snail, and fish survey shall be conducted within 36 months of the issuance of the license - similar to that in Big Canoe Creek. The survey will establish a baseline and will be used to insure no further decline in tulotoma, cylindricallioplax, or painted rocksnail populations and habitat in lower Choccolocco Creek occurs.

iii.    Mitchell: To ensure the protection of the blue shiner and tulotoma snail in lower Hatchet and Weogufka Creeks, baseline surveys shall be conducted and completed, within the Project boundary, within 36 months following the issuance of the license.  The surveys will determine the range and extent of tulotoma and blue shiner in lower Hatchet and Weogufka Creeks (within the Project boundary) and will be used to ensure that logging activities conducted on Project lands do not adversely affect CH or listed species.

Action (3) Implementation of a Wildlife Management Plan

a.  Implement procedures in the RCW Management Plan;

b.  In lower Hatchet and Weogufka Creeks, where tulotoma and blue shiners occur, all activities conducted under the Timber Management section of the WMP [Wildlife Management Plan] shall use the appropriate BMPs and SMZs [Streamside

Management Zones] for the environment and conditions being

managed

**Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal – ADROP**

a. Maintain flow reductions at 67 cfs per day, and monitor water temperatures at multiple locations, agreed to by the Service, between Jordan dam and Corn Creek Shoals during drought conditions. Monitoring sites shall be located in areas where tulotoma occurs;

b. All excess water in Jordan Bouldin Reservoir shall be used to maintain the wetted perimeter of the channel in the Coosa River below Jordan dam and not passed through Bouldin Dam, unless system reliability is jeopardized;

c. Although Action (4) (ADROP) and Action (5) (Drawdown of Lay Lake) are completely different actions, the same level of incidental take is expected for both actions. Therefore, the T&Cs listed below are applicable to both Actions (4) and (5).

   i. Studies shall be conducted to determine the extent of the margins that will be exposed in Yellow leaf Creek from the drawdown and rough horn snail population data shall be collected that can be used to estimate the population size within this area. Results of these studies must be suitable for use to develop methods for evaluating the effects on the rough hornsnail during future drawdown's and droughts;

   ii. Each drawdown time shall be increased to three days. This will provide an approximate drawdown rate of less than 12 inches per day, which should provide tulotoma and rough hornsnail a better chance at following the waterline as reservoir levels decline;

   iii. Efforts shall be made daily, during the initial drawdown and one day following the lowest point, to salvage all exposed individuals. All salvaged individuals shall be translocated to an area safe from drawdown levels and the number of individuals shall be recorded and reported

Filed: 06/17/2016      Page 167 of 327

Document #1621558

USCA Case #16-1195

to the Service within 30 days following the
completion of the action;

iv.   Shoreline surveys shall be conducted at all areas
occupied by tulotoma and the rough hornsnail prior to
and at the lowest point of the drawdown to determine
the amount (e.g., acres) of exposed habitat.

Action (5) Drawdown of Lay Lake

(a) Refer to the T&Cs listed under Action (4)(c).




RECEIVED
Mail Room

JUN 1 7 2016

United States Court of Appeals
District of Columbia Circuit

# Attachment 2

UNITED STATES OF AMERICA
FEDERAL ENERGY REGULATORY COMMISSION

Before Commissioners: Norman C. Bay, Chairman;
Cheryl A. LaFleur, Tony Clark,
and Colette D. Honorable.

Alabama Power Company

Project No. 2146-141

ORDER ON REHEARING AND CLARIFICATION AND
DISMISSING REQUEST FOR STAY

(Issued April 21, 2016)

1.     On June 20, 2013, the Commission issued a single new license to Alabama Power Company (Alabama Power) [1] under sections 4(e) and 15 of the Federal Power Act (FPA) [2] for the continued operation and maintenance of three projects that were previously licensed separately:  the Coosa Project No. 2146, which includes the Weiss, H. Neely Henry, Logan Martin, Lay, and Bouldin developments; the Mitchell Dam Project No. 82; and the Jordan Dam Project No. 618.  The newly-licensed Coosa River Project No. 2146 (Coosa River Project) is located on the Coosa River in Cherokee, Etowah, Calhoun, St. Clair, Talladega, Shelby, Coosa, Chilton, and Elmore Counties, Alabama, and Floyd County, Georgia.  Timely requests for rehearing were filed by Alabama Power; Alabama Rivers Alliance and American Rivers, jointly (Conservation Groups); Georgia Environmental Protection Division (Georgia EPD); and the Atlanta Regional Commission. [3]  Alabama Power also requested a stay of certain license articles.  For the reasons discussed below, we grant rehearing in part, dismiss as moot Alabama Power's stay request, and provide clarification.

---

[1] *Alabama Power Co.*, 143 FERC ¶ 61,249 (2013) (June 20 Order).

[2] 16 U.S.C §§ 797(e) and 808 (2012).

[3] The Atlanta Regional Commission adopts and incorporates by reference Georgia EPD's request for rehearing.  References in this order to Georgia EPD's request for rehearing include the Atlanta Regional Commission's rehearing request.

Page 170 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 171 of 327

## Background

2.     The Coosa River Basin drainage encompasses about 10,161 square miles in Alabama, Georgia, and Tennessee.  The Coosa River begins at the confluence of the Oostanaula and Etowah rivers near Rome, Georgia, and flows 267 miles in a southerly direction to its confluence with the Tallapoosa River.  The confluence of the Tallapoosa and Coosa Rivers is located about 18 miles downstream of the Jordan Dam, where they meet to form the Alabama River.[4]

3.     The Coosa River is highly regulated, with flows controlled by nine hydropower and storage developments operated by Alabama Power and the U.S. Army Corps of Engineers (Corps).  The Corps has congressionally mandated authority to determine flows for navigation on the Coosa River.[5]

4.     Farthest upstream on the Coosa River are two Corps developments, Carters and Allatoona.  The Coosa River Project, located downstream of the Corps projects, includes seven developments along a 200-mile-long segment of the Coosa River.[6]  From upstream to downstream the developments are:  Weiss, Neely Henry, Logan Martin, Lay, Mitchell, Bouldin and Jordan.

5.     A project canal carries water from the 52-mile-long Weiss reservoir to Weiss powerhouse, located about 19 miles downstream of Weiss dam.  Discharges from the Weiss powerhouse flow through a 1,300-foot-long tailrace canal and re-enter the Coosa River about 20 river miles downstream from the dam, creating the project's only bypassed reach.  Flows from the Weiss tailrace and bypassed reach enter the upper reaches of the 78-mile-long Neely Henry reservoir.  Flows from the Neely Henry tailrace enter the upper reaches of the 48.5-mile-long Logan Martin reservoir, and then pass through the 48-mile-long Lay reservoir and the 14-mile-long Mitchell reservoir.  Flows from the Mitchell tailrace enter the upper reaches of the 18-mile-long Jordan reservoir.

---

[4] In addition to the seven developments in this license, Alabama Power operates four more hydropower developments in the Alabama-Coosa-Tallapoosa River Basin, all located on the Tallapoosa River.  The projects are the R.L. Harris Hydroelectric Project No. 2628, the Martin Dam Project No. 349, and the Yates and Thurlow Project No. 2407.

[5] Public Law 83-436 states that any license issued by the Commission must include provisions for flood control and navigation, and the project must be operated for flood control and navigation in accordance with reasonable rules and regulations of the Secretary of the Army.  *See* June 20 Order, 143 FERC ¶ 61,249 at P 12.

[6] A detailed description and history of the Coosa River Project is set forth in the June 20 Order, 143 FERC ¶ 61,249 at PP 2-49.

Page 172 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

6.     The Bouldin development dam, reservoir, and powerhouse are at the end of a 3-mile-long man-made canal whose intake is located along the shore of Jordan reservoir about 1 mile upstream of Jordan dam. Flows from Bouldin powerhouse enter a 5-mile-long tailrace canal that discharges into the Coosa River downstream of Jordan dam near the confluence of the Tallapoosa and Coosa Rivers.

7.     The Weiss, Neely Henry, and Logan Martin developments provide seasonal storage for flood control and power during peak load periods. They typically generate power 1 to 6 hours per day Monday through Friday, with daily pool level changes within certain ranges. The Lay, Mitchell, Jordan, and Bouldin developments are operated run-of-river, with daily pool level changes of one foot or less.[7]

8.     In the 1960s, Alabama Power and the Corps developed Memoranda of Understanding to clarify the responsibilities of each entity with regard to operating their developments for flood control and other purposes. The Corps subsequently developed Reservoir Regulation Manuals (Reservoir Manuals) for the Weiss, Neely Henry, and Logan Martin developments in June 2004, January 1979, and June 2004, respectively.

9.     Although the licenses for the projects did not quantify a navigation flow, they required Alabama Power to provide flows to support navigation, as specified by the Corps.[8] Alabama Power has operated its Jordan and Bouldin developments on the Coosa River and the Thurlow development of its Yates and Thurlow Project No. 2407 on the Tallapoosa River to meet a continuous minimum 7-day average flow of 4,640 cubic feet per second (cfs) as measured at Montgomery, Alabama (downstream of Thurlow Lake and Jordan/Bouldin Lake). This navigation flow was based on a 1972 agreement (1972 agreement) between Alabama Power and the Corps.[9]

---

[7] Weiss, Neely Henry, Logan, Martin, Lay and Bouldin were originally licensed in 1957. *See* 18 FPC 257 (1957). Mitchell and Jordan were originally licensed in the 1920s and relicensed in 1975 and 1980, respectively. *See Alabama Power Company,* 54 FPC 2452 (1975) and *Alabama Power Company*, 13 FERC ¶ 62,082 (1980).

[8] Standard Article 12 of the Mitchell and Jordan licenses and standard Article 18 of the Coosa Project license provided for navigation flows, as might be prescribed by the Corps in the interest of navigation.

[9] Although the 1972 agreement specified that this target flow be provided by the combined releases from the developments on the Coosa and Tallapoosa rivers, it did not identify a specific navigation release for the Coosa Project, and, correspondingly, the license for the Coosa Project did not specify a navigation release. In January 1980, Alabama Power agreed to provide at least 2,667 cfs during any consecutive 3-day period

(continued ...)

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 173 of 327

10.     In July 2005, Alabama Power filed its relicense application, proposing to consolidate the three projects under one license. In its application, Alabama Power proposed raising the winter pool levels at the Weiss, Neely Henry, and Logan Martin developments; continuing to operate the Lay, Mitchell, Jordan, and Bouldin developments in a run-of-river mode; and providing navigation flow releases from the Jordan development as established in its 1972 agreement with the Corps. Alabama Power also proposed environmental measures to protect and enhance water quality, fish and wildlife, recreation, and cultural resources.

11.     On July 1, 2005, Alabama Department of Environmental Management (Alabama DEM) issued water quality certification for the seven developments of the Coosa River Project, pursuant to section 401 of the Clean Water Act (CWA).[10] The certification contains conditions for each development.

12.     On April 6, 2009, staff issued a draft environmental assessment (draft EA) for the Coosa River Project pursuant to the National Environmental Policy Act (NEPA).[11] The draft EA analyzed potential environmental impacts to aquatic resources, terrestrial resources, threatened and endangered species, recreation, land use and aesthetics, cultural resources, and cumulative impacts. On December 31, 2009, staff issued a final environmental assessment (EA). The EA addressed comments received on the draft EA from, among others, Georgia EPD, Alabama Rivers Alliance, and American Rivers. The EA concluded that continued operation of the Coosa River Project, with the mandatory conditions and licensee- and staff-recommended enhancement measures, would not constitute a major federal action significantly affecting the environment, and that therefore no environmental impact statement (EIS) was required.

13.     As pertinent here, there are existing populations of eight aquatic species within the Coosa River Project area that are listed as threatened or endangered under the Endangered Species Act (ESA):[12] one fish, the threatened blue shiner; two mussels: the endangered southern clubshell and the threatened finelined pocketbook; and five snails: the endangered interrupted rocksnail, rough hornsnail, tulotoma snail,[13] and cylindrical lioplax, and the threatened painted rocksnail. There are also 12 designated

---

to eliminate time periods of little or no flow and more evenly distribute the required 7-day flow.

[10] 33 U.S.C. § 1341(a)(1) (2012).

[11] 42 U.S.C. §§ 4332 *et seq.* (2012).

[12] 16 U.S.C. § 1536 (2012).

[13] On June 2, 2011, FWS published a final rule reclassifying the tulotoma snail as threatened under ESA. *See* 76 *Fed. Reg.* 31,866-874.

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 174 of 327

critical habitat units in the project area, some of which are in the Weiss bypassed reach and the Jordan tailrace.[14]

14.    On January 15, 2010, Commission staff sent to the U.S. Fish and Wildlife Service (FWS) a Biological Assessment[15] that it prepared pursuant to section 7 of the ESA.  On January 24, 2011, Alabama Power filed additional information regarding some listed mussel species,[16] and on November 4, 2011, staff issued a revised Biological Assessment, which it sent to FWS the same day, and requested formal consultation on certain of the listed species.

15.    On June 10, 2012, FWS filed its Biological Opinion, which concluded that relicensing the project as proposed with staff's additional recommended environmental measures, is not likely to jeopardize the continued existence of any of the species, nor is it likely to destroy or adversely modify any critical habitat.[17]  The document included an incidental take statement with 11 reasonable and prudent measures to minimize take of mussels, snails, blue shiner fish, and the red-cockaded woodpecker, along with 16 incidental take terms and conditions to implement the measures.

16.    On June 20, 2013, the Commission issued Alabama Power a new 30-year license for the continued operation and maintenance of the Coosa River Project No. 2146 (June 20 Order or license order).  The order included, among other things, the mandatory conditions of the water quality certification and the FWS' incidental take terms and conditions.

17.    As pertinent here, the license requires Alabama Power to:  (1) implement aeration measures to achieve a minimum dissolved oxygen (DO) level of 4.0 milligrams/liter (mg/L) at each development; (2) implement the Coosa River portion of the *Alabama-ACT Drought Response Operations Proposal* (ADROP) to manage the project reservoirs during drought conditions; (3) develop and implement an adaptive management plan for the Weiss bypassed reach, with the goal of providing flows that mimic a natural riverine flow regime in order to restore and enhance the abundance and diversity of riverine

---

    [14] In addition to critical habitat for the finelined pocketbook and southern clubshell mussels, which are found in the project area, there is designated critical habitat for listed mussels, which are not present in the project area.  *See* June 20 Order for more detail, 143 FERC ¶ 61,249 at PP 79-81.

    [15] The EA served as staff's Biological Assessment.

    [16] *See* Alabama Power's January 24, 2011 addendum to the draft Biological Assessment it had submitted with its relicense application.

    [17] *See* FWS June 10, 2012 filing at 89-90.

USCA Case #16-1195     Document #1621558     Filed: 06/17/2016     Page 175 of 327

aquatic biota (e.g., fish, mussels, snails); (4) develop and implement an adaptive management plan for the Logan Martin tailrace to enhance DO during non-generation periods, with the goal of ensuring the survival of listed mussels (and their hosts), snails, and fishes; and (5) conduct mussel, snail, and fish surveys to ensure no further decline in threatened and endangered mussels and snails.

18.     On July 18, 2013, Conservation Groups timely filed a request for rehearing of the June 20 Order, alleging that the DO standard required by the license is inadequate and the EA and license order violate the FPA, NEPA, and the Administrative Procedure Act (APA). On July 22, 2013, Alabama Power timely filed a request for rehearing, arguing that the Commission erred in its interpretation of the water quality certification's DO requirement, and objecting to a number of license requirements.[18] On July 22, 2013, Georgia EPD timely filed a request for rehearing, alleging errors in Commission staff's NEPA analysis.

## Discussion

### A.     Dissolved Oxygen

19.     Dissolved oxygen is a basic requirement of all aquatic animals, and many of the aquatic species found in the project area and listed as threatened or endangered under ESA require well-oxygenated, flowing water.[19] During the summer, water in the reservoirs tends to stratify, or separate into two layers: a warm surface layer that is relatively rich in DO and a colder bottom layer where DO levels are low because DO is gradually consumed by decomposing organic material. Within the tailraces, DO is primarily influenced by the depth at which water is withdrawn from the reservoir for generation.

20.     Normally, DO levels are not an issue in winter and spring months. During these months, when streamflows are typically at their highest point, DO levels tend to stay at acceptable levels in the reservoirs and the mainstem of the Coosa River. It is only during the warmer summer and early fall months when low DO in the project tailraces can be a

---

[18] Alabama Power also asked for a stay of license Articles 407, 408, and 417. On November 27, 2013, Commission staff extended the deadlines for filing the plans required by these articles, until further order of the Commission. *Alabama Power Company*, 145 FERC ¶ 62,154 (2013). The company's request for stay is therefore moot and is dismissed.

[19] DO levels are dependent on nutrient levels, temperature, and the amount of aeration that takes place in the system. Temperature in the reservoirs is dictated by season and retention time, while temperature in the tailraces is dictated by depth at which water is withdrawn from the reservoir for hydropower generation.

Page 176 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

problem.  That is when streamflows begin to decline, and large portions of tributary flows are captured and held in the reservoirs to maintain desired elevations.  Stratification also occurs at the Coosa River Project reservoirs on an annual basis in the warmer months, with DO levels often dropping to less than 4.0 mg/L at deeper depths.  The release of these low DO waters through the project powerhouses (and through seepage from Logan Martin dam) can affect aquatic resources downstream of the dams by reducing DO in the tailwaters.  Because the project's intakes draw water from the deeper portions of their respective impoundments, the state water quality standard of no less than 4.0 mg/L is not met in the project's tailraces from 20 percent to less than 1 percent of the time during these warmer months, depending on the development.[20]

21.     Natural aeration (mixing with surface releases) or artificial or mechanical aeration (e.g., turbine vents) can be used to raise DO levels in project discharges.  To enhance water quality in the Coosa River and ensure compliance with state water quality standards, Alabama Power proposed on relicensing to implement DO enhancement measures (aeration systems) for the turbine discharges at the Weiss and Neely Henry developments, and to continue operating, or improving where necessary, the existing aeration systems at the Logan Martin, Lay, Mitchell, and Jordan developments.  Specifically, Alabama Power proposed to maintain a minimum DO level of 4.0 mg/L in the discharges from the project's powerhouses (i.e., when the project is generating).

22.     Conservation Groups argued that Alabama Power's proposal would not provide sufficient protection for aquatic species, especially those listed under ESA as threatened or endangered.  They asserted that Alabama Power should be required to maintain a minimum DO level of 5.0 mg/L, not 4.0 mg/L, and that the DO level should be maintained below each dam at all times, whether the project was generating or not.

      **1.**     **<u>DO Standard in License Order</u>**

23.     The June 20 Order included in the license the conditions in Alabama DEM's water quality certification.[21]  The certification states in relevant part that:

> [Each] development, including the operation of the turbines, shall be
> managed such that no less than 4.0 mg/L of dissolved oxygen (D.O.)
> *shall be maintained at all times at the monitoring locations*
> prescribed herein.  Management required to maintain the 4.0 mg/L
> dissolved oxygen criteria shall be implemented.  [Emphasis added.]

---

[20] *See* EA at 85 and 86.

[21] *See* June 20 Order, 143 FERC ¶ 61,249 at Appendix A.

When including this requirement as a condition of the license, the Commission explained that it read the condition to mean "that Alabama Power must maintain no less than 4.0 mg/L of DO *at all times*, including during periods of non-generation."[22]

24.    The June 20 Order did not adopt Conservation Groups' recommendation that the minimum DO level should be 5.0 mg/L, noting that the groups did not provide definitive data showing that 5.0 mg/L would provide significantly greater protection than the state standard of 4.0 mg/L. The order explained that, while not all of the studies cited by Conservation Groups were considered by staff in preparing the EA, the studies were not new, and provided information similar to that which staff analyzed in preparing the EA.[23] While the Commission noted staff's concurrence that higher DO levels are generally more beneficial for aquatic biota, there was insufficient evidence to require a minimum DO level of 5.0 mg/L. The June 20 Order recognized that Alabama DEM considers its DO standard of 4.0 mg/L to be sufficiently protective of aquatic biota, including threatened and endangered species.[24]

25.    On rehearing, Conservation Groups reiterate their argument that the Commission erred in not requiring Alabama Power to maintain a minimum DO level of 5.0 mg/L at all times at all developments. They assert that the Commission ignored findings of Alabama DEM, FWS, and other peer-reviewed scientific literature in not requiring Alabama Power to maintain a minimum DO level of 5.0 mg/L. However, the groups provide no new arguments or information that was not previously considered by Commission staff in the final EA or by the Commission in the June 20 Order. We accordingly deny rehearing on this issue.[25]

---

[22] *See* June 20 Order, 143 FERC ¶ 61,249 at P 73, n.47.

[23] *Id.* PP 148-149.

[24] *Id.* P 150. The order also explained that the measures proposed by Alabama Power actually might result in DO levels greater than 5.0 mg/L in the developments' discharges. *Id.* P 151. Turbine aeration devices are commonly employed at other hydropower projects licensed by the Commission, and have been shown to improve DO levels in the receiving waters. For example, the existing turbine aeration measures used at the Jordan development result in DO levels in the Jordan tailwaters above the minimum state standard of 4.0 mg/L. Alabama Power reports filed February 4 and December 12, 2008, documenting the effects on DO of reducing flow downstream from the Jordan development, with the development's aeration system operating, show that Alabama Power maintained DO in the low-flow months at or above 5.0 mg/L. *Id.*

[25] Conservation Groups observe that Article 405 requires a 5.0-mg/L DO standard for recreational releases at Jordan dam, and question why a 5.0-mg/L DO standard is not also required for releases from the other project developments. Including a 5.0-mg/L DO

(continued ...)

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 177 of 327

26.     Alabama Power argues that the Commission erred in requiring maintenance of a 4.0-mg/L DO standard during periods of non-generation.  It asserts that the water quality certification for the Coosa River Project is clear on its face that Alabama Power is required to maintain the 4.0-mg/L DO standard only during periods of generation.[26]  Alabama Power adds that this issue was resolved with respect to the Coosa River Project in 2006 as a result of Conservation Groups' appeal of the water quality certification for the Coosa River Project.  It states that, as relevant here, one of the issues raised on appeal was whether Alabama's water quality standards required Alabama Power to operate the Coosa River Project to meet the state's DO standards during periods of generation as well as non-generation.[27]  Alabama DEM's Environmental Management Commission (Alabama Commission), which hears administrative appeals of Alabama DEM actions, issued findings of facts and conclusions of laws with respect to the appeal, and found that the water quality certification

> …requires 4.0 mg/L to be maintained in discharges from existing
> hydroelectric generation impoundments, like those at issue here,
> only when the operator is discharging water (either to generate

---

standard at Jordan dam was a mistake, as the correct standard is 4.0 mg/L.  *See* EA at 155.  We will modify Article 405 accordingly.

[26] Alabama Power also asserts that maintenance of  the 4.0-mg/L DO standard only during periods of generation is consistent with the state's water quality regulations, which provide:

> for a diversified warm water biota, including game fish, dissolved
> oxygen concentrations shall not be less than 5 mg/L at all times….
> In no event shall the dissolved oxygen level be less than 4 mg/L due
> to discharges from existing hydroelectric generation impoundments.

Alabama Power Request for Rehearing at 9 (citing to Ala. Admin. Code r. 335-6-11.02(6)).  On rehearing, Conservation Groups cite to this same regulation to suggest that Alabama Power should meet a 5.0-mg/L DO standard during periods of generation, arguing that the 4.0-mg/L DO standard for existing hydropower developments is a "variance"  that is "not based on protection of aquatic life, but rather accommodation of industry."  Conservation Groups Request for Rehearing at 34.  We decline to speculate why this regulation provides a separate DO standard for hydropower developments, but agree with Alabama Power that the regulation establishes a minimum DO level of 4.0 mg/L for existing hydroelectric facilities.

[27] Alabama Power Request for Rehearing at 10, and Attachment 1.

Filed: 06/17/2016      Page 179 of 327

Document #1621558

USCA Case #16-1195

electricity or through the spillway); *the limitation does not apply when water is not discharged.*[28] [Emphasis added].

27.     Alabama Power is correct.  The water quality certification for the Coosa River Project requires the company to meet a 4.0-mg/L DO standard only when the project is discharging, i.e., during periods of generation and in its minimum flow releases from the Weiss and Jordan developments.

28.     However, that the project's water quality certification requires a minimum DO level of 4.0 mg/L when the project is discharging (i.e., through the turbines or over the spillway) does not necessarily limit our authority to require something more (e.g., maintenance of DO downstream of each development during non-generation, maintenance of a higher DO level during generation or non-generation).  Therefore, we discuss below whether additional DO enhancement measures are warranted.

## 2.    **DO Data**

29.     In an effort to fully consider the issues raised on rehearing with respect to the appropriate minimum DO standard for the Coosa River Project, on November 27, 2013, staff issued an additional information request (AIR) to Alabama Power regarding DO levels downstream from each of the project's developments.[29]  The AIR comprised six items:  filing existing information on DO levels and DO enhancement measures at each development (Items 1 and 2); collecting DO data during generation and non-generation periods, if those data do not already exist (Item 3); and analyzing, with cost estimates, measures (physical and/or operational) that could be implemented at each development to maintain minimum DO levels of 4.0 mg/L or 5.0 mg/L at all times, i.e., whether generating or not (Items 4, 5 and 6).  The AIR explained that, if Alabama Power did not have sufficient information on DO levels during periods of non-generation, it would have to comply with Item 3 and develop a plan and schedule for collecting the data.

30.     Alabama Power filed DO data for the periods 1999 to 2001 and 2006 to 2013, and collected additional DO data during the low-flow, high-temperature period from July 1 through September 30, 2014.[30]

---

[28] February 24, 2006 Alabama Commission Order at 38-39 (included as Attachment 1 to Alabama Power's Request for Rehearing).

[29] Commission staff letter to Alabama Power dated November 27, 2013 (Accession no. 20131127-3039).

[30] Alabama Power filing of October 31, 2014.

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 180 of 327

31.    The data from 2006 to 2013 show little variability in DO levels from year to year at each development.  The 2014 generation data are consistent with the DO trends in prior years (2006-2013), suggesting that the 2014 non-generation data are likely consistent with the historical non-generation trends at each development.  When analyzed together, across all the Coosa River Project developments, the data from 2006 to 2014 show that during most years 75 percent or more of the hourly DO values are greater than 4.0 mg/L during generation.  Mean daily DO levels during non-generation periods in 2014, however, were consistently lower than DO levels during generation at all developments, except the Weiss Development, where the opposite was the case.

32.    Staff analyzed the 2014 DO data for each of the developments to determine how often DO levels dropped below 4.0 mg/L in the warmer months.  When the project was generating, the percent of hourly observations where DO dropped below 4.0 mg/L was: 13.6 percent at Neely Henry, 10.2 percent at Weiss, 5.8 percent at Logan Martin, 1.2 percent at Mitchell, and zero percent at Lay, Bouldin, and Jordan.

33.    During periods of non-generation, the percent of hourly observations where DO dropped below 4.0 mg/L was:  57.8 percent at Logan Martin, 50.4 percent at Lay, 37.1 percent at Neely Henry, 11.5 percent at Mitchell, less than 1 percent at Weiss, and zero percent at Bouldin and Jordan.

34.    With regard to even higher DO levels, the percent of hourly observations where DO dropped below 5.0 mg/L when the project was generating was between 24 and 40 percent for all developments, except Jordan and Bouldin where DO almost always remained above 5.0 mg/L.  During periods of non-generation, DO was below 5.0 mg/L over 70 percent of the time at all the developments, except Weiss (8.9 percent) and Bouldin (0.1 percent).[31]

35.    As to the extent and duration of extreme low-DO events when the project was not generating (i.e., DO below 3.0 and 2.0 mg/L), the percent of hourly observations where DO dropped to 3.0 mg/L or below was highest at Logan Martin (42.7 percent) and Neely Henry (10.7 percent), but less than 5 percent at the other developments.  DO dropped below 2.0 mg/L 24.7 percent of the time at Logan Martin, but less than 2 percent of the time at the other developments.

### 3.    Assessment of Appropriate DO Standard

36.    As discussed above, Commission staff's analysis of the data indicate that during the summer months DO levels below Neely Henry, Logan Martin, Mitchell, and Lay reservoirs fall below 4.0 mg/L on a daily basis.

---

[31] Jordan operates with a minimum flow requirement, so there are no times when water is not flowing downstream from the dam.

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 181 of 327

37.    These conditions could have negative implications for the aquatic organisms inhabiting the project's tailwaters (i.e., areas immediately downstream of the dams and powerhouses), especially less mobile species such as freshwater mussels and snails. Freshwater mussels, like fish, respond negatively to low DO levels, most notably with decreases in respiration and energy metabolism.  Moreover, low DO can adversely affect behavior, growth, feeding, and reproduction in freshwater fish, some of which serve has a host species for mussels.

38.    The U.S. Environmental Protection Agency (EPA) published recommendations for DO levels in its 1986 Quality Criteria for Water (also known as the "Gold Book").  This publication establishes DO criteria for warmwater systems that have become the benchmark for what is considered biologically necessary to protect freshwater aquatic life.  As relevant here, EPA recommends a minimum of 4.0 mg/L to avoid acute mortality, which is the standard Alabama DEM has adopted for the discharge of an existing hydropower project.[32]

39.    FWS, in its 2012 Biological Opinion for the Coosa River Project, recognizes the importance of the 4.0-mg/L DO standard as the minimum protection needed for freshwater mussels and snails.  The use of 4.0 mg/L as a minimum standard is also supported by Chen et al. (2001), who showed that mussels, including the Ohio pigtoe, exhibited a decrease in their ability to consume oxygen at DO levels less than 7.0 mg/L, with the sharpest decline at DO levels of 4.0 mg/L and below.

40.    While the standard of 4.0 mg/L may not provide optimal conditions for aquatic life, it is the accepted value for the minimum DO needed to sustain aquatic life, which was the purpose of requiring a minimum DO level of 4.0 mg/L as the standard in Article 407.

41.    On rehearing, to support a higher minimum DO level of 5.0 mg/L, Conservation Groups cite to two pieces of scientific literature:  Rypel et al., 2009 and Peterson et al., 2011.[33]  The Rypel paper addresses nine freshwater mussel species in the Sipsey River in Alabama, and the Peterson paper assesses impacts on mussels, without differentiating species of mussels, in the Apalachicola-Chattahoochee-Flint River Basin, the next watershed to the east of the Coosa River Basin in Georgia.  Conservation Groups contend that the Coosa River Basin is sufficiently similar to the Apalachicola-Chattahoochee-Flint River Basin, and both basins have similar threats to mussel survival.

---

[32] See U.S. Environmental Protection Agency 1986, *Quality Criteria for Water*, EPA 440/5-86-001, EPA, Office of Water Regulations and Standards, at pp. 253-63 (May 1, 1986).

[33] Conservation Groups Request for Rehearing at 102.

Filed: 06/17/2016     Page 182 of 327     Document #1621558     USCA Case #16-1195

42.     Neither the Rypel nor the Peterson paper specifically addresses the effects of DO on mussels.  These papers thus do not assist in a determination of the appropriate minimum DO level for mussels and other aquatic life in the Coosa River.

43.     Conservation Groups provide no new information that was not previously considered by Commission staff in the final EA or by the Commission in the June 20 Order.  Absent evidence contrary to the June 20 Order's decision that a minimum DO level of 4.0 mg/L would provide sufficient protection for aquatic resources at the project, we do not consider it reasonable to require Alabama Power to maintain a higher minimum DO level (e.g., 5.0 mg/L) at this time.

### 4.     Assessment of Need for Minimum DO Levels During Generating and Non-Generating Periods

44.     In the November 27, 2013 AIR, Commission staff requested additional information from Alabama Power to address the feasibility of improving DO conditions during generation and non-generation periods.  Among other things (i.e., information on existing DO enhancement measures installed at the project, existing DO data, and additional DO monitoring), staff requested that Alabama Power file a Dissolved Oxygen Enhancement and Operation Modeling report for the Coosa River Project (DO Enhancement Report).  The purpose of the report was, in part, for Alabama Power to identify and evaluate the effectiveness of potential enhancement measures to improve DO conditions in each of the Coosa River Project tailraces at all times.  The measures Alabama Power evaluated included:  (1) continuous unit generation; (2) continuous flow from a spillway gate; (3) unit pulsing; (4) tailrace oxygen injection; (5) spillway releases with tailrace oxygen injection; and (6) pulsing with tailrace oxygen injection.  The report was to provide the cost of implementing each of the measures.

45.     In the DO Enhancement Report, Alabama Power concludes that meeting a DO standard of 4.0 or 5.0 mg/L "at all times" is not achievable with any of the six measures evaluated.  The report found that measures 1 through 3, 5, and 6 could not be implemented because there is insufficient water in the system; measure 4 was deemed infeasible because the tailraces are too shallow for sufficient oxygen transfer.  However, in the report, Alabama Power identified a cost-effective approach for improving DO at the project during generation by using forebay oxygen diffuser systems.  Such systems use oxygen from a liquid oxygen storage facility, and pump it through diffuser lines placed at specific locations in a reservoir.

46.     We have no reason to challenge the report's conclusions on the six measures that Commission staff identified in its request, and therefore, we accept Alabama Power's findings as they pertain to those six measures and do not consider them here further.

47.     Reservoir/forebay oxygen diffuser systems have been proven effective in improving DO conditions while a hydropower project is generating.  For example, Duke Energy Progress, Inc. installed and operates a reservoir oxygen diffuser system at its

Page 183 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

Tillery development, which is part of the Yadkin-Pee Dee Project. This system, which was installed and tested in 2011, shows that, when Tillery is generating, DO is consistently at, or above, 5.0 mg/L downstream from Tillery dam, with DO periodically exceeding 6.0 mg/L.[34]

48.     During periods of non-generation, additional measures beyond the forebay diffuser system may be necessary to attain a minimum DO level of 4.0 mg/L. Such measures could include: (1) increasing the amount of oxygen piped through the forebay diffuser system while the project is generating to increase the amount of oxygen in the water at the end of the generation cycle; (2) releasing a small amount of well-oxygenated flow through a gate on the dam during the non-generation period; and (3) cycling individual generating units and operating the forebay diffuser system while doing so. In addition, Conservation Groups identified other options for improving DO at the Coosa River Project during non-generating periods, including: (1) SDOX Technology;[35] (2) physical spillway modifications to produce higher aeration rates; and (3) installing aerating weirs downstream from the dams.

49.     Alabama Power estimates that forebay oxygen diffuser systems can be designed, installed, and operated to provide a DO level of 4.0 mg/L during generation periods at each of the seven Coosa River developments for approximately $15 million. The annual operations and maintenance cost would be about $2.7 million, which includes the costs of annual supplies of liquid oxygen to operate the facility. These costs would be lower if the diffuser systems are not installed at the Lay, Jordan, and Bouldin developments, which currently provide a minimum DO level of 4.0 mg/L during generation periods.

50.     There could be additional costs for measures complimentary to the forebay oxygen diffuser systems if needed to maintain DO levels at or above 4.0 mg/L during non-generation, including capital costs which could range from $200,000 to $1 million per development, and operations and maintenance costs ranging from $100,000 to $750,000 per development.[36] These ranges are based on the potential use of some or all

---

[34] *See* Progress Energy Carolinas, Inc.'s January 20, 2012 filing, "Tillery and Blewett Falls Dissolved Oxygen Enhancement Reports – Yadkin-Pee Dee Hydroelectric Project No. 2206," at Accession No. 20120120-5013.

[35] SDOX Technology is a system that uses a pressurized process to rapidly and efficiently dissolve oxygen in water before it is introduced to a tailrace.

[36] We base these capital costs on comparable measures implemented at other hydropower projects in the South and information in a 1990 Electric Power Research Institute (EPRI) report, "*Assessment and Guide for Meeting Dissolved Oxygen Water Quality Standards for Hydroelectric Plant Discharges,*" EPRI GS-7001, Research Project 2694-B. These costs would primarily be incurred for Neely Henry, Logan Martin, Lay, and Mitchell developments for DO enhancement during non-generating periods. As

(continued ...)

of the following measures:  complementary minimum flows, modifications to the spillways (i.e., installing energy dissipation baffles), spillway modifications with spill flow, unit pulsing (Alabama Power currently uses this at its Logan Martin development, and could employ it at other developments, particularly Neely Henry), and utilizing SDOX Technology.

51.     The level of additional measures, if any, needed to achieve a minimum DO level of 4.0 mg/L during non-generation periods would largely depend upon how well Alabama Power would be able to improve DO levels during periods of generation.  As noted above, forebay oxygen diffuser systems have been shown to raise DO levels in project tailwaters to as high as 6.0 mg/L during generation.  Such a higher DO level at the start of the non-generation period could present enough of a buffer such that the DO level remains above 4.0 mg/L during the entire non-generating period without the need for implementing complimentary measures.

52.     Additional DO protection will be provided by a number of plans already required by the license.  Alabama Power has proposed, and the license requires, implementation of adaptive management plans for the Weiss bypassed reach and Logan Martin tailrace.  The plans were prepared in consultation with Alabama Department of Conservation and Natural Resources (Alabama DCNR) and FWS.  The general goals of these plans are to assess and improve chemical and physical habitat conditions and ensure that project operations are protective of listed threatened and endangered species.

53.     As part of the Logan Martin plan, Alabama Power will enhance DO levels, conduct biological monitoring of target species (fish, mollusk, and crayfish), evaluate the habitat suitability for possible reintroduction of target species, and identify measures that can improve the growth and survival of target species.

54.     As part of the Weiss bypassed reach plan, Alabama Power will release a variable continuous minimum flow into the bypassed reach.  The goals of this release are to provide a flow that more closely mimics the natural hydrograph, restore and enhance fish and mollusk diversity in the bypass through reintroductions and natural recruitment, and improve and rehydrate available habitat.

55.     In light of our above analysis, we find that the water quality certification's requirement for Alabama Power to maintain a minimum DO level of 4.0 mg/L when the project is discharging, along with the other DO and aquatic resource protections already provided in the license, will sufficiently protect aquatic resources, including federally

---

discussed above, low DO is not an issue at Jordan and Bouldin developments at any time, including non-generating periods.  In addition, a simple increase in the amount of DO added through the forebay oxygen diffuser system would likely address any low DO problems (i.e., levels below 4.0 mg/L) during periods of non-generation at Weiss.

Page 184 of 327     Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 185 of 327

listed species, and therefore, nothing further is needed at this time. The threatened and endangered species found in the project area are surviving under current conditions, and the record contains no evidence that they are under immediate threat.[37] The additional DO measures that we are requiring in the license will only serve to improve DO levels. Further, we note that neither FWS nor Alabama DEM found it necessary to impose measures beyond those we have now imposed. Thus, at this time, we do not have a basis for requiring that Alabama Power maintain DO levels of 4.0 mg/L at all times or raise that level.

56.     However, should the results of water quality and aquatic resource monitoring required by the license, including water quality monitoring required by the water quality certification and Article 408 of the license,[38] and the aquatic life monitoring included in the Biological Opinion, show that something more is needed, the Commission retains the authority under Standard Article 12 of the license to revisit this matter in the future. We are revising Article 407 to clarify that the purpose of the required DO Enhancement Plan is to ensure a 4.0-mg/L DO standard only in project discharges (i.e., when the project is generating or releasing minimum flows), consistent with the water quality certification conditions in Appendix A of the license.[39]

---

[37] The future monitoring required by the license will be sufficient to detect any long-term effects on the listed species.

[38] Article 408 requires water quality monitoring "at all times," meaning during both generating and non-generating periods. Although we are revising Article 407 to only require DO minimums be maintained during generating periods, we are nevertheless still requiring monitoring at all times to document the improvements in water quality resulting from Article 407. Along the same lines, our revision to Article 407 does not also revise Condition 1(b) of Appendix B of the license, which still requires Alabama Power to implement the Logan Martin Adaptive Management Plan with provisions to, among other things, enhance DO during non-generation periods with the goal of ensuring the survival of listed mussels (and their hosts), snails, and fishes.

[39] The June 20 Order requires Alabama Power to develop the plan in consultation with Alabama DEM, Alabama DCNR, and FWS and file it for Commission approval within 6 months of license issuance. The plan must also include a schedule for completing the installation of the DO enhancement measures no later than 18 months from license issuance. On rehearing, Alabama Power states that the consultation process would unnecessarily delay completion of the plan, and requiring Commission approval would further delay plan implementation. It alleges that it cannot complete installation of the DO enhancement measures within 18 months when development and implementation of the plan are outside of its control. Alabama Power requests that in lieu of this process it provide detailed information about the enhancement measures that are installed and how they are operated in the three annual reports and final assessment that are required in

(continued ...)

Filed: 06/17/2016      Page 186 of 327

Document #1621558

USCA Case #16-1195

### 5.  **Due Dates for Plans**

57.  On November 27, 2013, the Director of the Commission's Division of Hydropower Administration and Compliance, noting that the Commission at the time was reviewing all issues raised by parties requesting rehearing of the June 20, 2013 order, extended the due dates for filing the plans required by Articles 407, 408, and 417, until a deadline is established by further order of the Commission.  Those articles are revised to reflect new due dates.

### B.  **Article 402, Flood Control Operations**

58.  Article 402, *Flood Control Operations at Weiss, Neely Henry, and Logan Martin Developments,* states in relevant part

> The flood control requirements at the Weiss, Neely Henry, and Logan Martin developments may be temporarily modified if required by operating emergencies beyond the control of the licensee, and for short periods upon mutual agreement among the licensee, the Corps, U.S. Fish and Wildlife Service, Alabama Department of Environmental Management, and Alabama Department of Conservation and Natural Resources.  If the flood control provisions are so modified, the licensee shall notify the Commission as soon as possible, but not later than 48 hours after such incident….

59.  On rehearing, Alabama Power asserts that the requirement that the Corps, FWS, Alabama DEM, and Alabama DCNR must all agree prior to the licensee temporarily modifying the operating procedure during flood control operations is unduly burdensome and unnecessary and asks that Article 402 be amended to remove the requirement.[40]

60.  We agree.  The Corps establishes flood control procedures and is the only agency with the authority to do so.  Time is often of the essence when such short-term modifications of the flood control procedures are necessary, and no purpose would be

---

its water quality certification.  A 6-month consultation and approval process should provide ample time for Alabama Power to develop and file its DO enhancement plan. Moreover, the agencies to be consulted clearly have an interest in matters involving DO enhancement measures, and we see no reason to exclude them from the process. Accordingly, we deny rehearing on this issue.  However, we will revise Article 407 to require Alabama Power to file the plan no later than October 31, 2016, and complete installation of the measures within 18 months of issuance of this order.

[40] Alabama Power Request for Rehearing at 33.

Page 187 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

served in obtaining the agreement of agencies that have no regulatory authority over flood control. We therefore grant rehearing on this issue and modify Article 402 accordingly.

61. Alabama Power also challenges as "unworkable" the requirement that it notify the Commission within 48 hours after each incident and asks that Article 402 be amended to extend the time to notify the Commission to within 10 days of each incident. We agree that notifying the Commission within 10 days of each incident is reasonable, and we modify the article accordingly, and also require the same notification be provided to FWS, Alabama DEM, and Alabama DCNR.

## C.    Article 410, Crappie and Blackbass Spawning

62. To enhance crappie and blackbass spawning in project reservoirs, Article 410 of the license requires Alabama Power to continue restricting lake level fluctuations in Weiss and Logan Martin reservoirs in the spring by holding constant, or slightly increasing, the water levels in the two reservoirs for, at a minimum, a 14-day period in the spring, with no 24-hour increase in the reservoir levels greater than 2 inches.

63. On rehearing, Alabama Power asserts that the requirement of Article 410 with respect to Logan Martin reservoir is in error and should be deleted. Alabama Power explains that, although it has been stabilizing lake levels on Weiss and Logan Martin reservoirs during the spring spawning period on a voluntary basis, its license application proposed only that these efforts be a requirement of the new license as they pertain to Weiss reservoir.[41]

64. We deny rehearing on this issue. Pursuant to an agreement initiated in 1989 with the Cherokee Chamber of Commerce, the Corps, and Alabama DCNR, Alabama Power agreed to stabilize Weiss and Logan Martin reservoir levels during the spring crappie and blackbass spawning season.[42] As discussed in the EA, staff found that this measure enhances fish reproduction and supports recreational fishing in the lakes.[43] Accordingly, to ensure continuation of this measure through the term of the new license, we adopted staff's recommendation and included the requirement in the license for both Weiss and

---

[41] Appendix E in Alabama Power's license application noted that it operates voluntary fisheries enhancement programs, including "stabilization of lake levels on Weiss and Logan Martin reservoirs during the spring," but Appendix A to the license application did not propose including the stabilization of Logan Martin reservoir elevations as a requirement of the license.

[42] EA at 32.

[43] Id.

Logan Martin reservoirs.[44]  On rehearing, Alabama Power provides no convincing reason for removing this requirement with respect to Logan Martin.

65.    As a separate matter, Alabama Power states that fish stabilization typically occurs from late March to early May, and only at the request of Alabama DCNR based on scientific information that suggests that stabilization would be beneficial to the target species.[45]  During this time, Alabama Power notes that there are a number of factors on the reservoir and on the Coosa River system that may potentially cause the reservoir to fluctuate more than 2 inches within a 24-hour period.[46]  Alabama Power observes that Alabama DCNR has not suggested that water levels need to be maintained within 2 inches to ensure a successful stabilization period.  Accordingly, Alabama Power requests the removal of "with no 24-hour increase in reservoir levels greater than 2 inches" from Article 410.[47]

66.    We agree that a 2-inch restriction could easily be violated by wind and wave action, as well as during normal operations of the project (i.e., bringing units online or shutting units down, and gate operation during high flows).  However, our intent in imposing the 2-inch restriction was to ensure that lake levels are held stable during the 14-day period in the spring, consistent with the EA's findings.[48]  Accordingly, we will revise Article 410 to remove the 2-inch restriction and instead require that Alabama Power simply provide stable water levels in the Weiss and Logan Martin reservoirs for 14 days in the spring to enhance crappie and blackbass spawning.[49]

---

[44] We note that Alabama Power did not file comments challenging any recommendations set forth in the EA.

[45] Alabama Power Request for Rehearing at 34.

[46] *Id.*

[47] *Id.* at 35.

[48] *See* EA at 210 (identifying recommended enhancement/mitigation measure as providing "stable water levels in the Weiss and Logan Martin reservoirs…").

[49] Because we are replacing the specific 2-inch restriction in Article 410 with a general requirement to provide stable water levels, we are revising Article 406 to require that the Project Operation and Flow Monitoring Plan include a provision describing how the licensee will document compliance with the reservoir stabilization requirement in revised Article 410.

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 188 of 327

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 189 of 327

### D.     Navigation Flow

67.     On rehearing, Alabama Power argues that the June 20 Order wrongly interprets the 1972 agreement as a Corps prescription of navigation flow.  The company states that the 1972 agreement was a voluntary agreement, and the Corps has never exercised its authority with respect to the 4,640 cfs navigation flow.[50]  The company explains that, by requiring it to implement the drought management measures in ADROP while at the same time finding that the 1972 agreement is a license requirement, the license establishes two conflicting navigation flow requirements.

68.     We agree.  Standard Articles 12 or 18 of the prior licenses for the Coosa, Mitchell, and Jordan projects, and standard Article 12 of this license, give the Corps the authority to specify reasonable measures for navigation.  It appears the 1972 agreement was not an exercise of the Corps authority under these standard articles to prescribe certain flows for navigation.  Rather, as the company explains, the 1972 agreement was voluntary, and not itself a requirement of the prior licenses or this license.

### E.     License Term

69.     Section 15(e) of the FPA provides that any new license issued shall be for a term that the Commission determines to be in the public interest, but not less than 30 years or more than 50 years.[51]  The Commission's general policy is to relate the length of the new license term to the amount of redevelopment, new construction, new capacity, or new environmental mitigation and enhancement measures that are authorized or required under the license.  Accordingly, we grant 30-year terms for projects with little or no redevelopment, new construction, new capacity, or new environmental mitigation and enhancement measures; 40-year terms for projects with a moderate amount of such activities; and 50-year terms for projects with extensive measures.[52]

70.     The June 20 Order concluded that the relicensed Coosa River Project requires only a minor amount of new construction, no new capacity, and only a minor amount of new environmental mitigation and enhancement measures.  Accordingly, the Commission found that a 30-year term for the Coosa River Project is appropriate.[53]

---

[50] Alabama Power Request for Rehearing at 35-36.

[51] 16 U.S.C. § 808(e) (2012).

[52] *See Southern California Edison Co.,* 77 FERC ¶ 61,313, at 62,435 (1996).

[53] June 20 Order, 143 FERC ¶ 61,249 at P 264.

Filed: 06/17/2016      Page 190 of 327

Document #1621558

USCA Case #16-1195

71.    On rehearing, Alabama Power argues that a 40-year license is appropriate here. The company asserts that the cost of new environmental measures imposed by the license totals $277 million over 30 years, and requests that the Commission add an additional $32 million to that total for expenditures for turbine upgrades at Lay Units 1 and 2, Bouldin Unit 2, and Jordan Unit 4 that were authorized by the Commission prior to the issuance of the June 20 Order.[54]  Alabama Power argues that this total investment of $309 million[55] comes out to an investment of approximately $322,000 per MW, which it asserts is consistent with other licenses for which the Commission has issued 40-year terms.[56]

72.    We deny rehearing and affirm the license order's determination that a 30-year license term for the Coosa River Project is appropriate.  In issuing the license for a 30-year term, the Commission correctly determined that the license authorizes a minor amount of new construction, no new capacity, and only a minor amount of new environmental mitigation and enhancement measures.  As to the $32 million for turbine upgrades, that cost is not considered as an expenditure under the new license, and the additional capacity cannot be considered "new capacity" authorized by the June 20

---

[54] Alabama Power Rehearing at 28.

[55] Alabama Power cites to Table 4-3 of the EA and Table 6.3-1 in Volume 2 of its relicense application as the source of its numbers.  Those tables estimate the capital costs and annual operation and maintenance costs for each proposed environmental measure. Table 4-3 of the EA estimates an annual levelized cost for each measure, which is the sum of the annual cost for the measure in current dollars and the capital cost for the measure in current dollars but annualized over a 30-year period (to convert the capital cost to an annual cost).  Alabama Power does not explain the calculations and assumptions it used to arrive at the 30-year costs, but it appears that multiplying the annualized levelized costs by 30 years results in numbers that are close to the company's.

[56] *Id.*  Alabama Power cites to the relicense orders for the Wells Hydroelectric Project, which it claims required new measures totaling $58 million, or $75,686 per MW, *Public Utility District No. 1 of Douglas County, Wash.,* 141 FERC ¶ 62,104, at P 140 (2012); the Yards Creek Pumped Storage Project (Yards Creek), which it asserts required an investment in new measures of about $5 million, or $13,000 per MW, "well below" the investment required under the Coosa River Project license, *Jersey Central Power & Light Co.,* 143 FERC ¶ 62,102, at P 113 (2013); the Rhinelander Project, which it suggests demonstrates the Commission will extend a license term where it determines on rehearing that measures are moderate, rather than minor, *Rhinelander Paper Company,* 106 FERC ¶ 61,164 (2004).  Alabama Power also cites the 30-year license term for its Warrior River Project, noting that the measures there totaled approximately $30 million, or $142,000 per MW, *Alabama Power Co.,* 130 FERC ¶ 62,271 (2010), *reh'g denied,* 141 ¶ 61,127 (2012).

USCA Case #16-1195        Document #1621558        Filed: 06/17/2016        Page 191 of 327

Order. In determining an appropriate license term, we only consider measures required for the first time in the new license (and not measures authorized or required by the previous license).[57] Alabama Power's 2005 relicense application proposed turbine upgrades at the Lay, Bouldin, and Jordan developments. However, rather than waiting for its new license, Alabama Power instead chose to seek authorization for the upgrades under its prior license terms, and the upgrades, which increase the project's capacity by 14 MW, were authorized in 2012 and 2013.[58]

73.     In any event, a simple assessment of costs is not dispositive when determining a license term. Rather, as we did here, the Commission considers the extent and nature of redevelopment, new construction, new capacity, or new environmental mitigation and enhancement measures that are authorized under the new license. Here, the new environmental measures require Alabama Power to: (1) implement erosion measures and plans for protecting shoreline management, wildlife, and cultural resources; (2) evaluate minimum flow requirements and install additional aeration enhancements; (3) implement adaptive management plans for the Weiss bypassed reach and Logan Martin tailrace; and (4) provide upgrades to project recreation facilities.

74.     The only construction required under the new license is limited to improving recreation facilities, such as building parking areas, improving access roads, and installing fishing piers, and to developing accessible deer hunting areas. Accordingly, the new construction and environmental measures are minimal, particularly given the size and complexity of the Coosa River Project, and do not rise to the level of a 40-year license.

75.     Alabama Power's comparison of its annual dollar-per-installed megawatt cost to those spent by licensees that received 40-year license terms in various relicensing proceedings is unavailing. As the Commission has previously explained, each project is unique and the selection of an appropriate license term is a highly fact-sensitive exercise.[59] Rather than supporting Alabama Power's argument, the cited relicense orders

---

[57] *E.g., Georgia Power Company,* 111 FERC ¶ 61,183, at P 12 (2005); *Ford Motor Company,* 110 FERC ¶ 61,236, at PP 6-8.

[58] *See* June 20 Order, 143 FERC ¶ 61,249 at PP 18, 20, and 22. In any event, a 14-MW increase in capacity is relatively minor considering the project's installed capacity (960.9 MW).

[59] *See, e.g., Duke Energy Progress, Inc.,* 153 FERC ¶ 61,056, at P 42 (2015); *Northern Lights, Inc.,* 135 FERC ¶ 61,232, at P 6 (2011).

demonstrate the highly fact-sensitive nature of choosing an appropriate license term based on the record before the Commission.[60]

### F.    Need for an EIS

76.    The June 20 Order rejected Conservation Groups' contention that Commission staff should have prepared an EIS rather than an EA.[61]

77.    On rehearing, Conservation Groups reiterate their argument that the Commission has provided no convincing statement of reasons for issuing a finding of no significant impact.  They assert that the impacts of the Coosa River Project meet the Council on Environmental Quality's (CEQ) threshold test of "significance," thereby triggering the need for an EIS.  The Groups cite to CEQ's regulations, which provide criteria for determining significance, including consideration of the proposal's "intensity."

78.    The CEQ regulations identify ten criteria for considering a proposed action's "intensity," but do not prescribe the weight to be given to these criteria.[62]  As discussed below, Conservation Groups claim that eight of the ten criteria apply to the Coosa River Project:  (1) impacts, which may be beneficial and/or adverse; (2) the unique characteristics of the geographic area; (3) the degree to which the environmental impacts of the action are highly controversial; (4) the degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks; (5) whether the action is related to other actions with individually insignificant but

---

[60] For the Wells Project the 40-year term was chosen primarily to coordinate with other license terms in the Columbia River Basin.  *Public Utility District No. 1 of Douglas County, Wash.*, 141 FERC ¶ 62,104 at P 143 (2012).  The Yards Creek license, although it required environmental measures similar to those here, also required moderate new construction (building a 475-foot-long by 260-foot-wide emergency spillway, relocating an existing building, building ramps from an existing access road).  Moreover, Commission staff issued these orders under delegated authority, and they do not constitute precedent binding the Commission.  *See Midwest Generation, LLC*, 95 FERC ¶ 61,231, at 61,799 (2001) (citing *Phoenix Hydro Corp.*, 26 FERC ¶ 61,389, at 61,870 (1984), *aff'd*, *Phoenix Hydro Corp. v. FERC*, 775 F.2d 1187, 1191 (D.C. Cir. 1985)).  As to the Rhinelander Project, Alabama Power does not allege that the required measures are comparable to those here, nor did the Commission detail its reasons for the longer license term.  With respect to the Warrior River Project, as we noted above, cost of measures is not dispositive; it is the nature and extent of the measures that inform the Commission's determinations on license terms.

[61] June 20 Order, 143 FERC ¶ 61,249 at PP 215-232.

[62] *Friends of the Ompompanoosuc v. FERC*, 968 F.2d 1549, 1555 (2d Cir. 1992).

Filed: 06/17/2016      Page 192 of 327

USCA Case #16-1195      Document #1621558

cumulatively significant impacts; (6) the degree to which the action may adversely affect districts, sites, or structures listed or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources; (7) the degree to which the action may adversely affect an endangered or threatened species or its habitat; and (8) whether the action threatens a violation of federal, state or local law.[63]

### 1.    Minor Impacts, Both Beneficial and Adverse

79.    On rehearing, Conservation Groups reiterate their earlier argument that relicensing the Coosa River Project

> may have a number of adverse impacts on water quality, fisheries, listed species, recreation and socioeconomics. The true extent of adverse impacts is difficult to determine due to the incomplete information provided in the Final EA. Because of the extent of adverse impacts, to the degree that they are presently known, this project meets the definition of "significance" provided in 40 C.F.R. § 1508.27.

For example, Conservation Groups contend that the EA omits discussion of the project's impacts on any water quality other than DO, so it is unclear whether the new license will have significant impacts on water quality. They argue that the Commission has an "affirmative obligation" under NEPA to demonstrate that no environmental impacts are so significant as to warrant an EIS, "including all relevant water quality standards."[64]

80.    Conservation Groups are mistaken. The EA thoroughly considered the potential impacts of relicensing the project on environmental resources. Although staff identified potential ongoing impacts to some resources, it identified no impacts as significant.[65] Moreover, to the extent Conservation Groups assert that there is incomplete information, as also explained in the June 20 Order, the Commission is not required to have perfect information before it acts, nor is it required or expected to resolve all inconsistencies between information that is submitted.[66]

---

[63] 40 C.F.R. § 1508.27 (2015).

[64] *Id.*

[65] *See* June 20 Order, 143 FERC ¶ 61,249 at P 219.

[66] *Id.*

## 2.    Unique Geographic Area

81.    Conservation Groups asserts that the "extraordinary biodiversity" of the project area "shows that this is a unique geographic area, further highlighting the 'significance' of this project for purposes of NEPA."[67]  It claims the June 20 Order "sidesteps" this by noting that, while the geography is unique, the impacts are not sufficiently severe and therefore do not warrant an EIS.  Conservation Groups argue that even a limited impact may take on a severe nature if it occurs in a unique geographic area.[68]

82.    The relevant CEQ regulation states that in considering the significance of a proposed action, intensity "refers to the severity of impact."[69]  Conservation Groups do not dispute that the EA and June 20 Order recognize the unique biodiversity of the Coosa River Basin.  While Conservation Groups may be correct that context is important in determining the severity of an impact, the EA provides a comprehensive analysis of the potential impacts to each resource, and appropriately concludes that operation of the Coosa River Project, with the terms and conditions set forth in the license, will not have a significant impact on the environment.

83.    In any event, we do not find it reasonable to conclude that the mere fact that a proposed action occurs in a unique geographic area is dispositive of "significance" as contemplated by NEPA and the CEQ regulations, nor do we find that preparing an EIS here would have provided any additional meaningful information to assist in our decision-making process.

## 3.    Project's Potential Effects on Environment are Not Highly Controversial

84.    Conservation Groups disagree with the Commission's finding that the Coosa River Project is not "highly controversial," as contemplated by the CEQ regulation.  Rather, they assert that the project is highly controversial because "there is not enough water to meet competing demands," and the project is "contentious because it affects issues of interstate water allocation of the Alabama-Coosa-Tallapoosa river systems…."[70]

85.    As discussed in the June 20 Order, for an action to qualify as highly controversial for NEPA purposes, there must be a "dispute over the size, nature, or effect of the action,

---

[67] Conservation Groups Request for Rehearing at 56.

[68] Id. at 57.

[69] 40 C.F.R. § 1508.27(b) (2015).

[70] Conservation Groups Request for Rehearing at 57.

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 195 of 327

rather than the existence of opposition to it."[71]  Accordingly, a "controversy does not exist merely because individuals or groups oppose, or have raised questions about an action."[72]  While the June 20 Order acknowledges that legitimate concerns have been raised in this proceeding, they have been addressed through pre-filing consultations, scoping meetings, and extensive comments and other filings from all parties.  That Conservation Groups disagree with our staff's findings does not constitute a "controversy" as contemplated by the CEQ regulations.[73]

86.     Moreover, while we do not disagree there are longstanding disputes over water allocation in the Coosa River Basin, these concerns have been thoroughly vetted in separate processes, including the Corps' recent efforts to update its reservoir regulation manuals to provide a comprehensive management plan for the Alabama-Coosa-Tallapoosa River Basin, for which a comprehensive EIS was prepared.  Accordingly, we find no purpose would be served in preparing an EIS to address these issues.

### 4.     Project's Potential Effects on Environment are Not Highly Uncertain

87.     Conservation Groups contend that many of the potential environmental effects are unknown or incomplete.  For example, the Groups assert that there is insufficient information with respect to habitat availability under existing or proposed flow schedules at any of the developments; staff used "outdated data" as a basis for the Erosion Repair and Monitoring Plan; and recommended adoption of Alabama Power's DO proposal "despite having no details" regarding Alabama Power's plans.[74]  Conservation Groups allege that underscoring this is the "overreliance on post-license studies to ascertain information about project impacts" which, it avers, is inconsistent with the court's finding in *LaFlamme v. FERC*[75] and *Confederated Tribes & Bands of Yakima Indian Nation v. FERC*.[76]

---

[71] June 20 Order, 143 FERC ¶ 61,249 at P 222.

[72] *Id.*

[73] We note that when specialists express conflicting views, an agency must have the discretion to rely on the reasonable opinions of its own qualified experts.  *See Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).

[74] Conservation Groups Request for Rehearing at 59-68.

[75] 852 F.2d 389 (9th Cir. 1988) (*LaFlamme*).

[76] 746 F.2d 466 (9th Cir. 1984) (*Yakima*).

Page 196 of 327

Filed: 06/17/2016

Document #1621558

USCA Case #16-1195

88.     We disagree.  As discussed above, the EA and the June 20 Order addressed each potential environmental effect that Conservation Groups assert is "unknown or incomplete," and staff acknowledged where it did not have perfect or complete information regarding a potential environmental impact.  Moreover, Conservation Groups' reliance on *LaFlamme* and *Yakima* is misplaced.  In *LaFlamme*, the court suspended a hydroelectric project license and remanded the proceeding for compliance with NEPA after the Commission failed to prepare either an EIS or an EA for the project.  In *Yakima*, the Commission deferred all consideration of fisheries issues for one project in the Mid-Columbia River basin on the ground that the necessary analyses would take place in a separate proceeding involving fisheries issues for all of the Mid-Columbia projects.

89.     In this case, unlike in *LaFlamme* and *Yakima*, the existing information is substantial, and the EA provided a thorough analysis of all relevant potential environmental impacts and support for the conclusions reached in support of our decision to relicense the Coosa River Project.  The additional information gathering and refinement of mitigation plans that will occur during the post-licensing period is not essential to our licensing decision, but rather will enable Alabama Power to better develop and implement the required mitigation and monitoring plans.

90.     Moreover, as discussed at length in the June 20 Order, and unchallenged by Conservation Groups on rehearing, *Yakima* does not require the Commission to have perfect information before it acts.[77]  The question is whether, given uncertainty, the Commission's action meets the standard for judicial review, which requires that the Commission's decision be supported by substantial evidence, which we believe it is, as demonstrated by the EA and our orders.[78]

91.     As the June 20 Order explained,[79] the court found in *United States Department of the Interior v. FERC*:[80]

> *Yakima* at most imposes on the Commission the duty to consider and study the environmental issues before granting a license.  *Yakima* does not require any heightened degree of certainty for

---

[77] *See, e.g., Idaho Power Co.,* 108 FERC ¶ 61,129, at P 41 (2004), *reh'g denied,* 110 FERC ¶ 61,242 (2005), *aff'd Idaho Rivers United v. FERC*, 189 Fed. Appx. 629, 2006  U.S. App.  Lexis 17566 (9th Cir. 2006).

[78] *Id.*

[79] June 20 Order, 143 FERC ¶ 61,249 at P 75.

[80] 952 F.2d 538, 546 (D.C. Cir. 1992).

USCA Case #16-1195        Document #1621558          Filed: 06/17/2016          Page 197 of 327

environmental facts, nor does it imply that all environmental concerns must be definitively resolved before a license is issued. Read this way, *Yakima* simply endorses the unstartling principles that an agency must establish a record to support its decisions and that a reviewing court, without substituting its own judgment, must be certain that the agency has considered all factors required by the statute.

## 5.    Project is Not Related to Other Actions with Cumulatively Significant Impacts

92.    Conservation Groups argue that the EA's consideration of cumulative impacts was flawed because it failed to analyze the presence of other Alabama Power and Corps dams in the Alabama-Coosa-Tallapoosa River Basin.[81]  Conservation Groups further claim that the Commission erred in omitting consideration of the cumulative effects of climate change on the Coosa River Project, which it deems "inconsistent" with other federal agency initiatives, including CEQ's draft guidance on considering climate change and greenhouse gas emissions.[82]  We disagree on both counts.

93.    CEQ defines "cumulative impact" as the "impact on the environment which results from the incremental impact of the action [being studied] when added to other past, present, and reasonably foreseeable future actions…."[83]

94.    The U.S. Supreme Court has noted that the "determination of the extent and effect of [cumulative impacts], and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies."[84]  CEQ has explained that "it is not practical to analyze the cumulative effects of an action on the universe; the list of environmental effects must focus on those that are truly meaningful."[85]  Further, a cumulative impact analysis need only include "such

---

[81] Conservation Groups Request for Rehearing at 68-79.

[82] *Id.* at 76, citing CEQ's February 2010 *Draft NEPA Guidance on Consideration of the Effects of Climate Change and Greenhouse Gas Emissions.*

[83] 40 C.F.R. § 1508.7 (2015).

[84] *Kleppe v. Sierra Club,* 427 U.S. 390, 414 (1976).

[85] CEQ, *Considering Cumulative Effects Under the National Environmental Policy Act* at 8 (January 1997), http://energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-ConsidCumulEffects.pdf.

USCA Case #16-1195        Document #1621558        Filed: 06/17/2016        Page 198 of 327

information as appears to be reasonably necessary under the circumstances for evaluation of the project rather than to be so all-encompassing in scope that the task of preparing it would become either fruitless of well-nigh impossible."[86]

95.      The geographic scope of analysis for cumulatively affected resources was identified in the Coosa River Project EA by the physical limits of boundaries of the effects of the proposed action on a number of resources.[87]  Because the proposed action can affect resources differently, the geographic scope for each resource may vary.  For example, the EA notes that the construction and operation of dams in the Coosa and Alabama Rivers have cumulatively affected water quality, specifically DO concentrations, and fish and mollusk populations in the basins.[88]  Accordingly, in sections 3.3.1, *Aquatic Resources,* 3.3.4, *Recreation,* and 3.3.5, *Land Use and Aesthetics,* the EA considers the geographic scope for water quality and mollusks to be the Corps' Carters Dam upstream of the Coosa River Project on the Coosawattee River, downstream to the Corps' R.F. Henry lock and dam on the Alabama River.  Because a series of Corps dams downstream from the Coosa River Project (Clairborne, Milles Ferry, and R.F. Henry) block the access of anadromous fish to the Coosa River Project downstream of Jordan dam (the furthest downstream Coosa River Project development), the EA limited the analysis of cumulative fishery effects to the Coosa River Basin, downstream to the R.F. Henry lock and dam.  We find that this is a reasonable approach for considering cumulative impacts, and fully consistent with the CEQ regulations.

96.      We also disagree with Conservation Groups claim that the Commission was required to consider climate change impacts.

97.      As discussed in the June 20 Order, attempting to predict future flow scenarios that may occur due to climate change or other conditions would be too speculative given the state of the science at this time.[89]  We added that if there is a need to modify project operations or facilities to accommodate changes because of climate change, the Commission has retained the authority to reopen the license to determine whether additional environmental measures are necessary.[90]  On rehearing, Conservation Groups alleges no error with this finding.

---

[86] *Nat. Res. Def. Council, Inc. v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975).

[87] EA at 52.

[88] *Id.*

[89] June 20 Order, 143 FERC ¶ 61,249 at P 225.

[90] *Id.*

USCA Case #16-1195      Document #1621558      Filed: 06/17/2016      Page 199 of 327

98.    Moreover, as the Commission recently observed in *Eagle Crest Energy Company*,[91] climate change is a complex issue.  Inherent in NEPA and the CEQ regulations is a rule of reason that ensures agencies are afforded the discretion, based on their expertise and experience, to determine whether and to what extent to prepare an environmental analysis based on the availability of information, the usefulness of that information to the decision-making process, and the extent of the anticipated environmental consequences.  For hydroelectric projects, the Commission considers historical information on water sources and, as here, often includes monitoring and adaptive management provisions.

99.    The Commission's longstanding practice of including license reopener provisions that allow the Commission to alter license requirements in response to changed environmental conditions through the term of the license gives the Commission the ability to respond to the impacts of climate change, and provides appropriate environmental safeguards.  We have explained, however, that we are unaware of any current climate model that would allow the Commission to predict matters such as water supply or flows in a given basin during the 30- to 50-year term of a typical hydropower license in such a manner as to assist the Commission in analyzing alternatives and determining appropriate mitigation for environmental impacts.[92]

### 6.    Insignificant Impact to Scientific, Cultural, or Historic Resources

100.    Conservation Groups reiterate their argument that the Coosa River Project may impact scientific, historic, or cultural resources.  The Groups acknowledge that the license requires Alabama Power to implement an Historic Properties Management Plan (HPMP), but continue to allege that the EA "cites no specific evidence that demonstrates that the proposed HPMP will be adequate to mitigate any potential impacts to cultural and historical resources to the point of insignificance."[93]

101.    We disagree.  As we explained in the June 20 Order, staff executed a Programmatic Agreement (PA) with the Alabama State Historic Preservation Officer (SHPO) and the Georgia SHPO to facilitate compliance with section 106 of the National Historic Preservation Act.[94]  The PA requires Alabama Power to implement the HPMP

---

[91] *Eagle Crest Energy Company,* 153 FERC ¶ 61,058, at P 81 (2015).

[92] *Id.*

[93] Conservation Groups Request for Rehearing at 79-80.

[94] June 20 Order, 143 FERC ¶ 61,249 at P 228.

for the term of the new license. As discussed in the EA and the June 20 Order,[95] in the event that a project-related activity cannot be modified to avoid an adverse effect on an historic property within the project's area of potential effects, Alabama Power will consult with the Alabama SHPO, the Georgia SHPO, and other interested parties, as provided for under the HPMP, to define appropriate mitigation measures.

## 7.    Listed Species and Critical Habitat

102.    On rehearing, Conservation Groups renew their argument that the EA lacks qualitative evidence regarding threatened and endangered species and their critical habitat, and therefore inappropriately concludes that formal consultation was not necessary for some species, but was required for others.[96] They also reiterate their claim that the EA should have analyzed impacts to threatened and endangered species using the baseline as set forth in the ESA and its implementing regulations.[97]

103.    We answered these arguments in the June 20 Order, and Conservation Groups present no new information on rehearing. As discussed in the June 20 Order, and unchallenged by Conservation Groups on rehearing, although impacts to threatened and endangered species were thoroughly analyzed in the EA,[98] the subsequent revised Biological Assessment provided additional information that resulted in a request for formal consultation for additional species, and ultimately to FWS' Biological Opinion.[99] To the extent Conservation Groups argue that the EA's finding of no significant impact was not based on the additional findings of adverse effects as set forth in the revised Biological Assessment, and the Biological Opinion, we disagree. The assessment was a comprehensive analysis considered as part of formal consultation under ESA. The opinion's conclusions do not alter a finding of no significant impact.

104.    Conservation Groups' argument with respect to the appropriate baseline under NEPA for considering impacts to threatened and endangered species is equally without merit. As we explained in the June 20 Order, the Commission's longstanding use of exiting environmental conditions (i.e., continued project operation under the existing

---

[95] See EA at 246; June 20 Order, 143 FERC ¶ 61,249 at P 228.

[96] Conservation Groups Request for Rehearing at 82. The Groups do not identify the species for which they argue formal consultation was required.

[97] Id.

[98] See EA at 115-36.

[99] June 20 Order, 143 FERC ¶ 61,249 at P 81.

Filed: 06/17/2016      Page 200 of 327

USCA Case #16-1195      Document #1621558

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 201 of 327

license) as a baseline against which to evaluate the environmental impacts of a proposed action has been upheld by the courts.[100]

105.   While it is clear from the ESA regulations that the environmental baseline for ESA purposes includes past as well as present impacts of human activities, it is appropriate for the Commission to show reasoned deference to the ESA agencies with regard to their interpretation of the ESA regulations.[101]  Having said that, we note that Conservation Groups provide no source to suggest that ESA agencies must select a particular baseline condition from which to measure the effects of the proposed action; rather, it appears the ESA regulation requires the ESA agency to ensure that its environmental analysis identifies past activities that have contributed to current environmental conditions.

### 8.   Project Does Not Threaten Violation of Federal and State law

106.   On rehearing, Conservation Groups allege that the EA does not demonstrate that the Coosa River Project will comply with all federal and state environmental laws, primarily because the EA "contains inadequate information to demonstrate that the proposed project will comply with all Alabama water quality standards."[102]

107.   We disagree.  As discussed in the June 20 Order, Alabama DEM requires that Alabama Power implement measures to ensure compliance with the state's DO standards. There is no evidence to suggest that other water quality parameters are not being met. Indeed, Alabama DEM, the agency responsible for administering the state's water quality program and issuing the water quality certification, found no reason to require compliance with other water quality parameters.  We find no reason to believe that the

---

[100]  *See* June 20 Order, 143 FERC ¶ 61,249 at P 231 and n.238 (citing to *American Rivers v. FERC*, 201 F.3d 1186, 1195-96 (9th Cir. 2000) (affirming Commission's existing-environmental-conditions baseline as consistent with "the substantive and procedural requirements of both the FPA and NEPA"); and *Conservation Law Foundation v. FERC*, 216 F.3d 41, 46-47 (D.C. Cir. 2000) (denying argument that including existing conditions in the baseline caused the Commission to ignore continuing impacts directly attributable to the new license, and holding that use of an existing condition baseline was a reasonable construction of the FPA's 10(j) requirements for protection of fish and wildlife)).

[101]  *See* June 20 Order, 143 FERC ¶ 61,249 at P 213, n.239, citing the ESA regulation at 50 C.F.R. § 402.02 which states in relevant part that the "environmental baseline includes the past and present impacts of all Federal, State or private actions…in the action area…"

[102]  Conservation Groups Request for Rehearing at 82.

project will not be able to comply with applicable state and federal laws, nor has Conservation Groups provided evidence to the contrary.

### 9.    Conclusion:  Project Impacts Do Not Meet Threshold Test of Significance

108.    Based on our review, above, we conclude that the potential environmental impacts of the Coosa River Project do not rise to a level of significance that would require preparation of an EIS.  Accordingly, we affirm that preparation of a thorough, detailed EA was appropriate in this case and deny Conservation Groups' request for rehearing on this issue.[103]  Moreover, as discussed above, Conservation Groups do not make any showing of how an EIS would provide any additional information beyond that already provided by our thorough, over 240-page EA.

### G.    Adequacy of EA

109.    Conservation Groups argue that the EA violates NEPA by improperly limiting an analysis of alternatives, not adequately evaluating cumulative impacts, and improperly segmenting projects.  For the reasons discussed below, we deny rehearing on these issues.[104]

_____

[103] We reject Conservation Groups' argument that Commission staff's EIS for relicensing the Martin Dam Project No. 349, another project (consisting of one development) in the Alabama-Coosa-Tallapoosa River Basin, and the Corps' EIS for the Water Control Manual for the Alabama-Coosa-Tallapoosa River Basin (analyzing the impacts of a comprehensive management plan for the entire River Basin) make the decision to prepare an EA for the Coosa River Project arbitrary and capricious.  Every relicensing proceeding is unique and has different impacts on different resources.  In determining whether to prepare an EA or an EIS, staff relies upon the Commission's regulations, and makes an individual determination for each proposal on a case-by-case basis.  Here, staff prepared an EA to assist in determining whether the proposed relicensing of the Coosa River Project would have a significant impact on the environment.  For all of the reasons set forth here, as well as in the EA and the June 20 Order, we took the requisite "hard look" at the potential environmental impact of the Coosa River Project and appropriately found that it will not have significant impacts, and that therefore an EIS was not required.

[104] For the reasons articulated elsewhere in this order and in the June 20 Order, we reject Conservation Groups' argument that the EA lacks sufficient analyses of the project's impacts to water quality, fisheries, instream flows, recreation, and threatened and endangered species.

Page 202 of 327     Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 203 of 327

### 1.   Range of Alternatives

110.   Section 102(2)(E) of NEPA[105] requires action agencies to consider reasonable alternatives to proposed actions.  The range of alternatives that must be discussed is a matter within an agency's discretion.[106]  The discussion of alternatives need not be exhaustive and need only provide sufficient information to permit a reasoned choice of alternatives.[107]

111.   Conservation Groups reiterate their earlier argument that the EA did not consider a reasonable range of alternatives, including alternatives they and other entities proposed.[108]  The Groups claim that the EA rejected their (and other entities') proposed alternatives, including:  alternative minimum flow schedules for the Weiss bypass, Neely Henry, Logan Martin, and Jordan developments; an alternative to meet a 5.0-mg/L DO standard in project tailwaters; an alternative to the proposed water quality monitoring protocols; fish passage; and recreation management.

112.   We disagree.  Here, the EA analyzed Alabama Power's proposal, that proposal as modified by agency conditions and Commission staff recommendations, and the "no-action" alternative of continuing to operate the project under the then-current license.[109] This constituted a reasonable range of alternatives.[110]  To the extent the EA did not analyze as a separate alternative the project with certain measures that Conservation Groups and others recommended, the EA explained that the recommendations were not presented as complete and concise alternatives to Alabama Power's proposal, but instead

---

[105] 42 U.S.C. § 4332(2)(E).

[106] *Vermont Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 551-52 (1976).

[107] *North Carolina v. FPC*, 533 F.2d 702, 707 (D.C. Cir. 1976), citing *NRDC v. Morton*, 458 F.2d 827 (D.C. Cir. 1972).

[108] Conservation Groups Request for Rehearing at 87.

[109] The EA also considered, but eliminated from further consideration:  (1) issuing a non-power license; (2) federal government takeover of the project; and (3) retiring the project.

[110] *Eagle Crest Energy Company,* 153 FERC ¶ 61,058, at P 70 (2015) (citing *Richard Balagur,* 57 FERC ¶ 61,315, at 62,018 (1991), *aff'd sub nom. Friends of the Ompompanoosuc v. FERC*, 968 F.2d 1549, 1555-56 (2nd Cir. 1992); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d at 197-198 (affirming adequacy of EIS that examined in detail only the proposed action and the no-action alternative, and eliminated other alternatives from further study).

comprised a variety of loosely organized environmental protection and enhancement measures.[111]   There is no requirement to examine each proposed mitigation or enhancement measure, or groups of such measures submitted by an entity, as a separate alternative or alternatives.[112]   Moreover, on rehearing, Conservation Groups do not challenge the license order's conclusion that the EA discussed the Groups' recommendations, comments, and proposed alternative measures as they applied to particular resources at issue, and discussed the reasons, where relevant, for not adopting recommendations.   The Conservation Groups recommendations were given due consideration, regardless of whether they were considered to be an alternative.[113]

## 2.  **Cumulative Impacts**

113.   On rehearing, Conservation Groups acknowledge the June 20 Order's discussion of why "existing environmental conditions" is the appropriate "baseline" for NEPA analysis, and that the two court cases affirming the Commission's baseline policy "concluded that the 'no-action alternative' in a FERC licensing context is the existing dam operations, as opposed to conditions that pre-existed dam operations."[114]   They argue, however, that these two cases do not speak to cumulative impact analysis, which they assert "is unequivocally defined as the incremental impact of a given action combined with *past,* present, and reasonably foreseeable future actions."[115]   Conservation Groups assert that, by these terms, the Commission must include the past impacts of dam construction and operation on, for example, species abundance and distribution.

---

[111] EA at B-5.

[112] *Idaho Power Co.,* 108 FERC ¶ 61,129 (2004), *reh'g denied,* 110 FERC ¶ 61,242 (2005), *aff'd Idaho Rivers United v. FERC*, 189 Fed. Appx. 629, 2006 U.S. App. Lexis 17566 (9th Cir. 2006).

[113] June 20 Order, 143 FERC ¶ 61,249 at P 214. *See also* discussion in EA of why staff did not recommend adopting Conservation Groups' proposed plans for:  monitoring erosion and sedimentation within the project boundary for the term of the license (EA at 89-90); fish passage feasibility (EA at 102); monitoring water quality beyond the three-year period required by water quality certification (EA at 87); monitoring measures associated with recreation management plan (EA at 156-157); alternative minimum flows (EA at B-9).

[114] Conservation Groups Request for Rehearing at 91-92, citing June 20 Order, 143 FERC ¶ 61,249 at P 231 (citing *American Rivers v. FERC,* 210 F.3d 1186, 1195-96 (9th Cir. 2000);  *Conservation Law Foundation v. FERC,* 216 F.3d 41, 46-47 (D.C. Cir. 2000).

[115] Conservation Groups Request for Rehearing at 92.

Page 204 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

114.   We agree that the past environmental impacts are relevant in determining what measures are appropriate to protect, mitigate, and enhance natural resources.  Indeed, beyond our consideration of cumulative impacts during the licensing process, it is the Commission's policy to use authority reserved in hydropower licenses to ameliorate cumulative impacts,[116] and we will do so with respect to the project at issue if and when it becomes appropriate.  However, as the Commission noted in response to comments on the baseline issue when it promulgated regulations to implement the relicense provisions of the Electric Consumers Protection Act of 1986:

> Enhancement may in many cases constitute a reduction of negative impacts attributable to the project since its construction.  However, this evaluation and consideration of the appropriateness of requiring enhancement measures is done in the context of today's environment and not in the context of the world as it existed 50 years ago.[117]

115.   Moreover, CEQ recognizes that this concept applies in the context of cumulative impacts, in guidance noting that agencies can conduct an adequate cumulative impact analysis by focusing on the current aggregate effects of past actions without delving into the historic details of individual past actions.[118]  Based on the foregoing, we deny rehearing on this issue.

### 3.    Segmentation

116.   Conservation Groups argue that the EA inappropriately segments the Coosa River Project by limiting the scope of the environmental analysis to the area from the most upstream part of the project to the end of the Jordan development's tailrace.  The Groups assert that "the river system as a whole must be examined," otherwise the analysis is viewed in isolation and "therefore is improper segmentation."[119]

---

[116] *See Use of Residual Authority in Hydropower Licenses to Ameliorate Cumulative Impacts*, 18 C.F.R. § 2.23 (2016).

[117] *Hydroelectric Relicensing Regulations Under the Federal Power Act,* Order No. 513, FERC Stats. & Regs. ¶ 30,854 at 31,401 (1989).  *See Eugene Water & Electric Board,* 81 FERC ¶ 61,270, at 62,237 (1997).

[118] *See Council on Environmental Quality Guidance on Consideration of Past Actions in Cumulative Effects Analysis* at 2, June 25, 2005.

[119] Conservation Groups Request for Rehearing at 92-93.  The Groups cite to 40 C.F.R. § 1508.27 (2015), which states that "significance cannot be avoided by terming an action temporary or by breaking it down into small component parts."

Page 205 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 206 of 327

117.   We disagree.  Improper segmentation involves "an attempt by an agency to divide artificially a 'major federal action' into smaller components to escape the application of NEPA to some of its segments."[120]  An analysis of improper segmentation requires that "where proceeding with one project will, because of functional or economic dependence, foreclose or irretrievably commit resources to future projects, the environmental consequences of the projects should be evaluated together."[121]  "Projects," for the purposes of NEPA, are described as "proposed actions" or proposals in which an action is imminent.[122]

118.   Notwithstanding that Conservation Groups fail to identify which proposed actions they claim have been improperly segmented from the Coosa River Project, we observe that in 2009 when preparing the draft and final EAs for the Coosa River Project, there were no other project proposals in the river basin pending before the Commission.[123]  The Commission fully studied the direct, indirect, and cumulative impacts of the proposed action, and did not improperly exclude review of any other actions that were related and temporally-linked.  The scope of that analysis was feasible and sufficient.[124]

**H.    Comprehensive Development and Substantial Evidence**

119.   Conservation Groups argue that the Coosa River license is not best adapted to a comprehensive plan of development, as required by the FPA.  They allege that the comprehensive development findings in the license order are not supported by substantial evidence, as required by section 313(b) of the FPA.  Specifically, the Groups contend that the June 20 Order demonstrates that the Coosa River Project will have significant impacts on the environment, yet does not explain how the Commission determined that the project is the best-adapted alternative.

---

[120] *Save Barton Creek Ass'n. v. Fed. Highway Admin.,* 950 F.2d 1129, 1139 (5th Cir. 1992).

[121] *Fritiofson v. Alexander*, 772 F.2d 1225 (5th Cir. 1985).

[122] 40 C.F.R. § 1508.23 (2015).

[123] The relicense application for the Martin Dam Project No. 349, located on the Tallapoosa River upstream of the Yates and Thurlow Project 2407, was not filed until 2011, approximately 5 years after the Coosa River Project relicense application; and the Yates and Thurlow Project No. 2407 was relicensed in 1994 for a 40-year term, which expires in February 2034.

[124] *See, e.g., Alabama Power Company*, 153 FERC ¶ 61,298, at PP 183-185 (2015).

USCA Case #16-1195        Document #1621558        Filed: 06/17/2016        Page 207 of 327

120.   We find no merit to these arguments.  Section 10(a)(1) of the FPA[125] requires that projects licensed by the Commission be best adapted to "a comprehensive plan for improving or developing a waterway," taking into account all beneficial uses of the waterway (e.g., waterpower development; protection, mitigation, and enhancement of fish and wildlife; irrigation; flood control; water supply; and recreation). Section 10(a)(1) does not require the Commission to prepare a single comprehensive plan that sets goals for achieving desired future conditions against which an application is measured.  Nor does it require that the license order itself constitute such a comprehensive plan.[126]

121.   Conservation Groups argue that the EA considers only the economic benefits of power generation at the project, and omits consideration of the economic costs and benefits associated with all other beneficial uses affected by the project, including the value of biodiversity, wildlife preservation and enhancement, and recreation. Conservation Groups assert this approach is inconsistent with "…the duty of the [Commission] properly to weigh each factor" relevant to its section 10(a)(1) balancing.[127]

122.   We deny rehearing.  Section 10(a)(1) requires the Commission to develop a record in the proceeding on all aspects of the beneficial public uses relating to the comprehensive development of the waterway or waterways involved.  That is what the Commission staff did here.  An extensive record was developed, which contains information and analyses on relevant issues and resources, including:  archaeological and historic resources, erosion, sedimentation, recreation, socioeconomics, native and exotic species, aquatic vegetation, fishery resources, instream flows, drought and flood management, and water quality.  The draft and final EAs reflect a thorough evaluation of the record as to the potential environmental effects on these resources of relicensing the project under various alternatives.

123.   Moreover, the license establishes a comprehensive set of operational and environmental measures, together with reservations of the Commission's authority to require changes to the project if future circumstances warrant, that ensures that the project will be operated through the term of the license in a manner that appropriately balances developmental and non-developmental interests.[128]

---

[125] 16 U.S.C. § 803(a) (2012).

[126] *See, e.g., Alabama Power Company,* 141 FERC ¶ 61,127, at PP 19-20 (2012).

[127] Conservation Groups Request for Rehearing at 95, citing *Scenic Hudson Preservation Conf. v. FPC,* 354 F.2d 606, 614 (1965), *cert. denied,* 384 U.S. 941 (1966).

[128] Further, to the extent Conservation Groups ask that the Commission value the monetary worth of a resource, we recently explained that such an exercise can be difficult
(continued ...)

### I.     Project Will Not Jeopardize Threatened and Endangered Species

124.    Conservation Groups renew their claim that the June 20 Order inappropriately relies on FWS' Biological Opinion, arguing that the Biological Opinion violates the ESA and "new information" that the FWS did not consider challenges the Biological Opinion's conclusions.[129]   Conservation Groups take issue with the statement in the June 20 Order (143 FERC ¶ 61,249 at P 97) that the information provided by the groups:

> is not sufficiently relevant to the Coosa River Project relicensing to warrant questioning the BO's conclusions.  Specifically, the three articles consider different species that are not only located in different riverine systems, but are also located in a different state (Georgia).

125.    Conservation Groups argue that the three studies are in fact relevant, and the June 20 Order does not provide a sufficient explanation as to why the studies are not applicable.  They state that the studies address impacts on nine freshwater mussel species in the Sipsey River in Alabama and assess impacts on mussels, without differentiating species of mussels, in the Apalachicola-Chattahoochee-Flint River Basin, which is the next watershed to the east of the Coosa River Basin in Georgia and sufficiently similar to it.

126.    We disagree.  One of the studies addresses the effects of a long-term drought on aquatic habitat and nine mussel species in the Flint River Basin in Georgia, and in fact appears to support the biological basis for a minimum DO of 4.0 mg/L.  The other two studies address the effects of flows on mussel species, and while low streamflow can indirectly influence DO levels, these studies do not directly address DO impacts on mussels.  Accordingly, the studies do not support the Conservation Groups' assertions.  The Conservation Groups cite no specific evidence that operation of the Coosa River Project, with the mitigation and enhancement measures required in the license, will jeopardize threatened and endangered species:  the EA and the Biological Opinion reach a contrary conclusion.

127.    The June 20 Order explains that Conservation Groups fail to recognize the substantive and procedural responsibilities that section 7(a)(2) of the ESA[130] imposes and

---

and controversial, and in any event, monetary worth is only one measure of value and should not be the singular determinant in balancing competing uses in the public interest.  *See Duke Energy Progress,* 153 FERC ¶ 61,056, at P 113 (2015) (citing *Southern California Edison Co.,* 77 FERC ¶ 61,313 (1996)).

[129] Conservation Groups Request for Rehearing at 98-103.

[130] 16 U.S.C. § 1536(a)(2) (2006).

Page 208 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

USCA Case #16-1195     Document #1621558     Filed: 06/17/2016     Page 209 of 327

the interdependence of federal agencies acting under that section. Although a federal agency is required to ensure that its action will not jeopardize the continued existence of listed species or destroy or modify their critical habitat, it must do so in consultation with the appropriate agency, in this case, FWS. Because FWS is charged with implementing the ESA, it is the recognized expert with regard to matters of listed species and their habitats, and the Commission may rely on its conclusions.[131]

128.   The June 20 Order adds that in reviewing whether the Commission may appropriately rely on a Biological Opinion, the relevant inquiry is not whether the document is flawed, but rather whether the Commission's reliance was arbitrary and capricious.[132] Therefore, an agency may rely on a Biological Opinion if a challenging party fails to cite new information that the consulting agency did not take into account that challenges the Opinion's conclusions. The June 20 Order explains that the Commission was not presented with new information.[133] Conservation Groups do not dispute this on rehearing, and accordingly, we deny rehearing on this issue.

### J.   Consistency with Comprehensive Plans

129.   Section 10(a)(2)(A) of the FPA[134] requires the Commission to consider the extent to which a project is consistent with federal or state comprehensive plans for improving, developing, or conserving a waterway or waterways affected by the project.[135] Of the 42 comprehensive plans filed by agencies that address various resources in Alabama and Georgia, Commission staff identified and reviewed 14 that are relevant to this project.[136] No conflicts were found.

130.   On rehearing, Conservation Groups assert that the EA and June 20 Order fail to explain how the Coosa River license is consistent with the 14 plans.

---

[131] June 20 Order, 143 FERC ¶ 61,249 at P 95, citing *City of Tacoma, Washington v. FERC*, 460 F.3d 53, 75 (D.C. Cir. 2006).

[132] June 20 Order, 143 FERC ¶ 61,249 at P 95.

[133] *Id.* PP 96-98.

[134] 16 U.S.C. § 803(a)(2)(A) (2012).

[135] Comprehensive plans for this purpose are defined at 18 C.F.R. § 2.19 (2015).

[136] *See* EA at 254-55 for the list of relevant plans.

Page 210 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

131.   We deny rehearing.  None of the federal or state agencies that submitted the plans objected to Commission staff's finding, and Conservation Groups fail to identify any alleged inconsistencies.  Moreover, it is not clear what additional meaningful analysis staff could have added in justifying its finding of consistency.

## K.    Public Participation

132.   Finally, Conservation Groups assert that the Commission has thwarted meaningful public participation.  The Groups maintain that, by requiring ongoing consultation with numerous agencies, the license is "largely incomplete."[137]  Conservation Groups argue that this process "excludes meaningful participation by Conservation Groups and other concerned stakeholders…."[138]

133.   We deny rehearing.  Conservation Groups, and all stakeholders, have had ample opportunity to participate throughout this relicensing proceeding.  Conservation Groups may also file comments on plans and studies that are filed with the Commission pursuant to the license articles.  Moreover, it is generally not the Commission's practice to require post-licensing consultations with entities other than those state and federal agencies having statutory or regulatory responsibilities with respect to affected resources.  We have no reason to believe that the consulting resource agencies, including FWS, Alabama DCNR, and Alabama DEM, which are charged with protecting the natural resources subject to their jurisdiction, will not adequately protect Conservation Groups' interests.

## L.    Georgia EPD's Request for Rehearing

134.   Two large Corps projects, Carters and Allatoona, are located in Georgia, upstream of the Weiss development.

135.   Carters dam and reservoir and the immediately downstream Carters reregulation dam and reservoir are located on the Coosawattee River in northwest Georgia more than 70 miles upstream of the Coosa River Project.  The Corps operates the project for flood control, hydroelectric power, regulation of stream flow for downstream navigation, water

---

[137] Conservation Groups Request for Rehearing at 98.  The Groups cite as examples Articles 404 (*Weiss Bypass Flow Adaptive Management Plan*), 405 (*Minimum Flow Releases at the Jordan Development*), 406 (*Project Operation and Flow Monitoring Plan*), 407 (*Dissolved Oxygen Enhancement Plan*), 408 (*Water Quality Monitoring Plan*), 411 (*Fish Habitat Enhancement Plan*), 413 (*Recreation Plan*), 415 (*Erosion Repair and Monitoring Plan*), and 417 (*Threatened and Endangered Species Protection Plan*).

[138] Conservation Groups Request for Rehearing at 98.

supply, water quality, fish and wildlife conservation, and recreation.[139] The Corps Carters Project is a pumped-storage, peaking project that uses the reservoir behind the downstream reregulation dam. The Carters reregulation dam provides a minimum year-round flow of 240 cfs to the Coosawattee River. Farther downstream from the reregulation dam, the Coosawattee River is joined by the Conasauga River forming the Oostanaula River.

136. Allatoona dam and reservoir are located on the Etowah River in northwest Georgia about 80 miles upstream of the Coosa River Project. The Corps operates Allatoona dam and reservoir for flood control, regulation of streamflow for navigation, hydroelectric power, recreation, water supply, water quality, and fish and wildlife conservation. The Allatoona Project is normally operated as a weekday peaking project and has a minimum year-round flow of 240 cfs. Water withdrawals are made from the Cartersville and Cobb County-Marietta water systems, which serve the northern suburbs of Atlanta. Near Rome, Georgia, downstream of Allatoona reservoir, the Etowah River joins the Oostanaula River creating the Coosa River.

137. On rehearing, Georgia EPD argues that the operation of the Coosa River Project could have an impact on water resources in Georgia upstream of the Weiss development. Georgia EPD explains that Georgia relies on the Corps' Carters and Allatoona projects for municipal and industrial water supply, recreation, support for water quality, and fish and wildlife propagation.[140] It asserts that in 2007 Alabama Power "demanded that the Corps make greater releases from Lake Allatoona and Carters Lake to increase the flow into the Coosa River Project…," and "will likely make similar demands of the Corps in the future, particularly if [Alabama Power] is not operating its own reservoirs in a responsible and appropriately conservative manner or is subject to downstream flow requirements and demands that can only be met by drawing on storage in the federal reservoirs upstream."[141] Georgia EPD maintains that, for the above reasons, the EA is deficient because it failed to analyze the environmental impacts of the low-flow operations adopted in the license. It alleges that there may be major differences between the effects of the operations that Alabama Power originally proposed and the conditions that could result from the implementation of the low-flow protocol required by the license.

---

[139] *See* EA at 53.

[140] Georgia EPD Request for Rehearing at 2.

[141] *Id.*

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 211 of 327

138.   Under section 313 of the FPA, only a party that has been aggrieved by a Commission order may file a request for rehearing or a petition for judicial review.[142]   A party is aggrieved if it can show that it has both constitutional and prudential standing to challenge a Commission order.[143]   Specifically, a party must demonstrate that:

> (1) it has suffered an 'injury in fact' that is (a) concrete and particularized and (b) actual and imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[144]

139.   Georgia EPD has not shown that it is aggrieved by the low-flow protocol (referred to as ADROP) adopted in the Coosa River Project license.  Georgia EPD's primary concern appears to be the Corps' operation of the Carters and Allatoona projects.  The Coosa River Project license requires Alabama Power to implement ADROP in times of low-flow (i.e., drought) conditions.  ADROP establishes minimum flow releases from Jordan dam, the Coosa River Project's most downstream development, located approximately 314 and 258 miles, respectively, downstream from Lake Allatoona and Carter Lake.  The Corps did not include any component in ADROP that dictates flows from, or reservoir elevations for, the Corps reservoirs.[145]   Indeed, when considering an Alabama Power proposal to temporarily modify minimum flows downstream from Jordan during a drought in 2007, the Corps stated that it would "continue to independently operate its reservoirs at Carters Lake and Lake Allatoona according to current Water Control Manual guidelines."[146]   Accordingly, Georgia EPD has not demonstrated that it has suffered an injury in fact.

---

[142] *See* 16 U.S.C. §§ 825*l* (2012).

[143] *See Green Island Power Authority v. FERC*, 577 F.3d 148, 158 (2d Cir. 2009).

[144] *Id.* at 159 (citing *Pac. Capital Bank, N.A. v. Connecticut*, 542 F.3d 341, 350 (2d Cir. 2008)).

[145] The Corps' comprehensive drought management plan consists of three components that together comprise the Corps' Alabama-Coosa-Tallapoosa River Basin Drought Plan.  As relevant here, the headwaters component of the Corps plan manages reservoir levels and releases for drought at Allatoona Lake and Carters Lake.

[146] *Finding of No Significant Impact for Alabama Power Company Proposal for a Temporary Modified Minimum Flow Agreement in the Alabama River for Drought Water Management Operation in the Alabama-Coosa-Tallapoosa River Basin*, prepared by the Corps July 19, 2007, and filed with the Commission August 8, 2007, at 1.

USCA Case #16-1195     Document #1621558     Filed: 06/17/2016     Page 213 of 327

140.    In any event, we find no merit in Georgia EPD's argument.  As noted earlier, the EA recommended, as an interim measure until a drought management plan was finalized, that during drought conditions Alabama Power would consult with the Corps and file a request for Commission approval for each specific case in which the minimum flow would be less than the current navigation flow requirement.  Additionally, the EA referred to a July 2007 environmental assessment prepared by the Corps, which concluded that a 4,640-cfs navigation flow in the Alabama River would adequately protect environmental resources and that under extreme drought conditions a 20 percent reduction (approximately 3,712 cfs) would result in no significant adverse environmental impacts.[147]

141.    Accordingly, we find the Corps' 2007 EA provided a meaningful basis for the Commission to adopt ADROP in the June 20 Order.  A principal component of ADROP is the flow regime identified in the Corps 2007 environmental assessment.  Specifically, ADROP provides for a 7-day average minimum flow at the Alabama River gage from a high of 4,640 cfs to a low of 3,700 cfs during the early summer period.

142.    Moreover, the Coosa River Project EA evaluated the frequency of low flows and the ability of the project to meet navigation flows under the proposed operation.[148]  Staff did so by running a flow model derived from the one used by both Alabama Power and the Corps, with several parameters adjusted to support staff's independent analysis.  Staff concluded that the water storage at the Coosa Project would not be enough to avoid low downstream flows, particularly flows below the 4,640-cfs navigation target as measured on the Alabama River at Montgomery, Alabama.  Based on this conclusion, staff recommended Alabama Power develop a drought management plan to manage the resource effectively during those low flows.

143.    Therefore, while the EA did not specifically evaluate all the components of ADROP, it analyzed the need for drought management.  Given the above, as well as the thoroughness of ADROP, its wide acceptance, its coverage of the basin, and attention to drought conditions down to the worst possible scenarios, we find no compelling reason to

---

[147] EA at 231-32.  The Corps' July 18, 2007 *Environmental Assessment for Alabama Power Company Proposal for a Temporary Modified Minimum Flow Agreement in the Alabama River for Drought Water Management Operation in the Alabama-Coosa-Tallapoosa River Basin*, filed with the Commission August 8, 2007, analyzed Alabama Power's proposal to reduce minimum flows a total of 40 percent, in 10 percent increments over a four week period.  The EA concluded that under extreme drought conditions, impacts would be minor for up to a 20-percent reduction in flow (i.e., down to 3,712 cfs).

[148] EA at 78-84.

re-analyze the plan, as it will provide no additional information to meaningfully inform our decision.[149]

144.   As noted above, ADROP does not dictate flows or reservoir elevations for the Corps' Allatoona or Carters projects located in Georgia.  Moreover, Georgia EPD had ample opportunity to participate in the Corps' NEPA process for analyzing the environmental impacts of the Corps' comprehensive management plan for the Alabama-Coosa-Tallapoosa River Basin, including drought management.  In March 2013, the Corps released a draft EIS for its Update of the Water Control Manual for the Alabama-Coosa-Tallapoosa River Basin in Georgia and Alabama, which included ADROP as a component of several alternatives under analysis.  The Corps subsequently issued a final EIS in October 2014, which evaluated the alternatives that included ADROP.  On May 4, 2015, the Corps issued its Record of Decision, which selected one of the alternatives that included the ADROP.[150]  As noted above, the ADROP was subsequently included in the license for the Coosa River Project.

145.   In addition to claiming that the EA failed to provide a detailed analysis of operations under ADROP, Georgia EPD also argues on rehearing that in its license application, Alabama Power did not provide an accurate model of any of its proposed operations for staff's consideration of low flow in the EA.  Specifically, Georgia EPD notes that staff identified numerous errors in Alabama Power's HEC-5 models, which it asserts "significantly undercuts the efforts of the Commission to properly analyze the environmental impacts" of Coosa River Project operations.[151]  Georgia EPD asserts that

---

[149] As discussed in the June 20 Order and above, the portions of ADROP that apply to the Coosa River Basin were based on the experiences of Alabama Power, FWS, Commission staff, and others in drought operations procedures for the Coosa River Project.  Moreover, FWS found that the Coosa River Project portion of ADROP is sufficiently protective of listed species, and in its Biological Opinion includes terms and conditions requiring Alabama Power to implement the Coosa River Project portion of ADROP.  For all of these reasons, we see no need for an additional analysis of ADROP.

[150] The Corps Draft EIS makes reference to APCDOP, "Alabama Power Company draft Alabama Drought Operations Plan."  ADROP and APCDOP are the same plan.  APCDOP is one component of the Corps ACT Basin Drought Plan which also includes the State of Georgia Drought Plan, and the State of Alabama Drought Plan. The Corps EIS looked at the potential effects of the alternatives, including those using the ADROP, on numerous resources including water resources in Alabama and Georgia and fish and other aquatic biota.

[151] Georgia EPD Request for Rehearing at 9.

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 214 of 327

USCA Case #16-1195 Document #1621558 Filed: 06/17/2016 Page 215 of 327

without benefit of accurate models, "the Commission cannot be certain that it modeled conditions" that Alabama Power intended.[152]

146. We disagree. As discussed in the EA, Alabama Power modeled the ability to operate the Coosa River Project with its proposed reservoir levels, with releases of minimum flows to the Weiss bypassed reach, and with downstream navigation releases using HEC-5 and HEC-RAS.[153] However, during a review by agencies, including Georgia EPD, it was determined that these models contained numerous critical flawed assumptions or errors. Accordingly, staff issued an additional information request to verify and correct the model to accurately describe existing operations and flow conditions.[154] Based on the additional information, staff conducted its own modeling analysis of flows and revised Alabama Power's HEC-5 model to correct six questionable assumptions or errors.[155]

147. We find that Commission staff's independent review provided reasonable assurances of the validity of the HEC-5 and HEC-RAS models. For these reasons, we deny rehearing.

148. We also find unavailing Georgia EPD's claim that the Commission should have delayed issuance of the June 20 Order until the Corps issued its Water Control Manual for the Alabama-Coosa-Tallapoosa River Basin. The Corps did not approve its final Master Water Control Manual for the Alabama-Coosa-Tallapoosa River Basin until May 2015, six years after the EA was issued, and almost two years after issuance of the June 20 Order. Moreover, the Corps has not notified the Commission of any inconsistencies between the manual and its mandated operations set forth in the Coosa River portion of ADROP. We therefore deny rehearing on this issue.

149. Finally, for the reasons set forth above in the discussion on cumulatively significant impacts, we reject Georgia EPD's argument that the EA failed to consider the cumulative impacts of Alabama Power's projects on the Tallapoosa River, and deny rehearing.

---

[152] *Id.*

[153] EA at 73-74. HEC-RAS is a Corps-developed computer program that models the hydraulics of water flow through natural rivers and other channels. HEC-5, which has been superseded by HEC-ResSim, is a reservoir simulation model that is used by the Corps to simulate reservoir operations for flood management, as well as flow augmentation.

[154] *Id.*

[155] *Id.* B-9.

Page 216 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

## M.    Conclusion

150.    For the reasons discussed above, we grant in part and deny in part Alabama Power's request for rehearing and dismiss as moot its request for stay of certain license articles.  We deny the requests for rehearing filed by Conservation Groups, Georgia EPD, and Atlanta Regional Commission.  We provide clarification, below, as discussed in the body of this order.

The Commission orders:

(A)    The request for rehearing filed July 18, 2013, by Conservation Groups, is denied.

(B)    The request for rehearing filed July 22, 2013, by Alabama Power is granted as set forth below, and is denied in all other respects.

(C)    The request for rehearing filed July 22, 2013, by Georgia EPD and Atlanta Regional Commission, is denied.

(D)    Alabama Power's request for a stay of Articles 407, 408, and 417 is dismissed as moot.

(E)    Article 402 is modified by:  (a) requiring Alabama Power to consult only with the Corps before temporarily modifying flood control requirements; (b) extending the time to 10 days to notify the Commission of each incident; and (c) in addition to notifying the Commission of each incident within 10 days, notifying the U.S. Fish and Wildlife Service (FWS), Alabama Department of Environmental Management (Alabama DEM), and Alabama Department of Conservation and Natural Resources (Alabama DCNR).

Article 402 is revised to read:

The flood control requirements at the Weiss, Neely Henry, and Logan Martin developments may be temporarily modified if required by operating emergencies beyond the control of the licensee, and for short periods upon consultation with the Corps.  If the flood control provisions are so modified, the licensee shall notify the Commission, FWS, Alabama DEM, and Alabama DCNR as soon as possible, but not later than 10 days after such incident, and shall provide the reason for the change in project operation.

(F)    Article 405 is revised to read:

Recreational releases may be modified (either lower flow or shorter duration) if dissolved oxygen in the releases during the event would cause the dissolved oxygen level in the Jordan dam tailrace to fall below 4.0 mg/L with aeration systems operations.

Filed: 06/17/2016      Page 217 of 327

Document #1621558

USCA Case #16-1195

(G)    Article 406 is revised to include in the Project Operation and Flow Monitoring Plan a provision describing how the licensee will document compliance with the reservoir stabilization requirements in Article 410.

Article 406 is revised to read as follows:

(4)    flow releases from the Weiss and Jordan dams required in Article 404, *Weiss Bypass Flow Adaptive Management Plan* and Article 405, *Minimum Flow Releases at the Jordan Development;* and (5) reservoir stabilization requirements in Article 410, *Crappie and Black Bass Spawning Enhancement at Weiss and Logan Martin Reservoirs.*

(H)    Article 407 is revised to read as follows:

*Dissolved Oxygen Enhancement Plan.* By no later than October 31, 2016, the licensee must file for Commission approval, a Dissolved Oxygen Enhancement Plan for maintaining dissolved oxygen (DO) concentrations in the Weiss bypassed reach (measured at a point 1,200 feet downstream from the Weiss dam spillway), the Weiss tailrace, and the Neely Henry, Logan Martin, Lay, Mitchell, Jordan, and Bouldin tailwaters of no less than 4.0 mg/L at all times when the project is discharging (i.e., during periods of generation and in its minimum flow releases from the Weiss and Jordan developments) as directed by the water certification conditions in Appendix A of the license.

The plan shall include, at a minimum, the following provisions:

(a)    a description of the physical (e.g., forebay oxygen diffuser systems, turbine aeration systems, flow release mechanisms, spillway baffles, SDOX Technology, etc.) and operational measures to be implemented at each project development, including operation and maintenance protocols;

(b)    design drawings of physical structures identified in item (a);

(c)    a description of the guidelines under which the physical structures identified in item (a) will be operated; and

(d)    a schedule for (i) completing the installation of the DO enhancement measures at each project development no later than 18 months from the date of this order and (ii) operating and maintaining the measures for the license term.

Page 218 of 327          Filed: 06/17/2016          Document #1621558          USCA Case #16-1195

The plan must be developed after consultation with the Alabama Department of Environmental Management, the Alabama Department of Conservation and Natural Resources, and the U.S. Fish and Wildlife Service. The licensee must include with the plan documentation of consultation, copies of recommendations on the completed plan after it has been prepared and provided to the entities above, and specific descriptions of how the entities' comments are accommodated by the plan. The licensee must allow a minimum of 30 days for the entities to comment and to make recommendations before filing the plan with the Commission. If the licensee does not adopt a recommendation, the filing must include the licensee's reasons, based on project-specific information.

The Commission reserves the right to require changes to the plan. Implementation of the plan shall not begin until the licensee is notified by the Commission that the plan is approved. Upon Commission approval, the licensee shall implement the plan, including any changes required by the Commission.

(I)     The first sentence of Article 408 is revised to read as follows:

By no later than July 31, 2016, the licensee must file, for Commission approval, a Water Quality Monitoring Plan to implement the water quality monitoring, reporting, and remedial measures requirements outlined in conditions 3 through 7 of the project's water quality certification, attached as Appendix A to this license.

(J)     The first sentence of Article 417 is revised to read as follows:

By no later than October 31, 2016, the licensee shall file for Commission approval, a Threatened and Endangered Species Protection Plan detailing how it will implement the incidental take terms and conditions of the U.S. Fish and Wildlife's (FWS) Biological Opinion, filed on June 10, 2012, to minimize take of listed species.

(K)     The first sentence of Article 410 is revised to read:

The licensee shall maintain stable water levels in Weiss and Logan Martin reservoirs for a 14-day period in the spring.

By the Commission.

( S E A L )

Nathaniel J. Davis, Sr.,
Deputy Secretary.

USCA Case #16-1195          Document #1621558          Filed: 06/17/2016          Page 219 of 327


RECEIVED
Mail Room

JUN 1 7 2016

United States Court of Appeals
District of Columbia Circuit

Attachment 3

Attachment S

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 222 of 327



# United States Department of the Interior

FISH AND WILDLIFE SERVICE
1208-B Main Street
Daphne, Alabama 36526

IN REPLY REFER TO:
2012-F-0180

JUN 0 7 2012

Mr. George H. Taylor
Federal Energy Regulatory Commission
888 First Street, N.E.
Washington, D.C. 20426

Dear Mr. Taylor:

This document transmits the Fish and Wildlife Service's (Service) biological opinion based on the Service's review of the proposed relicensing of Alabama Power Company's (APC) seven hydropower developments on the Coosa River in Cherokee, Etowah, Calhoun, St. Clair, Talladega, Shelby, Coosa, and Chilton Counties, in Alabama, and Floyd County, in Georgia, and its effects on the 30 federally listed species in accordance with Section 7 of the Endangered Species Act (ESA) of 1973, as amended (16 U.S.C. 1531 et seq.). The November 4, 2011, request for formal consultation was received on November 8, 2011.

This biological opinion (opinion) is based on information provided in the November 4, 2011, biological assessment titled *Biological Assessment for the Coosa River Hydroelectric Project;* meetings listed below in the "Consultation History"; field investigations; and other sources of information. This opinion considered potential effects on a total of 30 listed species and 12 critical habitat units. After reviewing the biological assessment, we determined that 10 of the 30 species extant in the action area, 20 species that may be reintroduced into the action area in the near future, and 12 critical habitat units may be affected by the proposed action(s). A complete administrative record of this consultation is on file in the Service's Alabama Field Office located in Daphne, Alabama.

## Consultation History

- August 14, 2003 — FERC designated APC as its non-federal representative for informal consultation with the Service under Section 7 of the ESA.
- January 14, 2004 — Letter from APC to FWS requesting initiation of informal Section 7 consultation under the ESA for the Coosa River Project.
- February 18, 2004 — Initial Section 7 consultation meeting in Daphne, AL
- March 5, 2004 — Letter from FWS to APC with initial species list and critical habitat designations
- July 22, 2004 — Consultation meeting between APC and the Service to discuss the structure of the biological assessment (BA).

Filed: 06/17/2016    Document #1621558    USCA Case #16-1195

- August 5, 2004    Conference call between APC and the Service to continue development of the BA.
- September 2, 2004    Conference call between APC and the Service to develop methods of tracking species.
- September 30, 2004    Conference call between APC and the Service to discuss shoreline management.
- October 14, 2004    Conference call between APC and the Service to develop methods of tracking species.
- December 16, 2004    Consultation meeting between APC and Service to review the structure of the Draft BA.
- January 24, 2005    Consultation meeting between APC and Service in Auburn, AL to review the Draft BA. Participants included, Bill Simm, Stephen Gidere, Malcolm Pierson, Jim Lochamy, Shane Boring, Henry Mealing, Stan Cook, and Jeff Powell.
- February 25, 2005    Consultation meeting between APC and Service in Prattville, AL, to discuss the Shoreline Management Plan. Participants included Alan Peeples, Jim Crew, Barry Lovett, Bill Simm, Gary Moody, Joe Addison, Rick Claybrook, and Jeff Powell
- March 16, 2005    Consultation meeting between APC and Service to discuss components and upcoming field surveys in the Weiss Bypass. Participants included Jim Lochamy, Steve Krotzer, Malcolm Pierson, Henry Mealing, and Jeff Powell.
- April 6, 2005    Consultation meeting between APC and Service in Clanton, AL to discuss RCW management.
- April 12, 2005    Coordination meeting among the Geological Survey of Alabama (GSA), ADCNR, and Service to discuss the Weiss Adaptive Management Plan (AMP) and fish sampling methodologies. Participants included Dan Catchings, Steve Rider, Travis Powell, Pat O'Neil, Tom Shepard, Scott Mettee, and Jeff Powell.
- May 11, 2005    Coordination meeting among APC, ADCNR, and the Service to discuss the Weiss AMP. Participants included Jim Crew, Bill Simm, John Grogan, Stan Cook, Henry Mealing, Larry Goldman, and Jeff Powell.
- May 31, 2005    Per the request of Alabama Rivers Alliance (ARA), a conference call was held among ARA, World Wildlife Fund (WWF), ADCNR, and the Service to discuss status and updates to the Coosa River Project relicensing. Participants included April Hall, Judy Takats, Neal Warren, Steve Rider, Stan Cook, and Jeff Powell.
- June 15, 2005    Consultation meeting among APC, ADCNR, and Service to discuss topics that agencies did not believe were adequately covered during the consultation process. These topics were

2

compiled into what was called a "term sheet." Participants included Jim Crew, Jim Lochamy, Malcolm Pierson, Bill Simm, John Grogan, Henry Mealing, Kelly Schaffer, Stan Cook, Larry Goldman, and Jeff Powell.

- July 25, 2005     APC files Coosa License Application with FERC.

- October 21, 2005     Coordination meeting among APC, ADCNR, and the Service to discuss the "term sheet" development and settlement agreement. Participants included Jim Crew, John Grogan, Bill Simm, Chris Green, Jerry Moss, Stan Cook, Dan Catchings, Rick Claybrook, Henry Mealing, Kelly Schaffer (via phone), Larry Goldman, and Jeff Powell.

- August 4, 2005     Conference call between APC and the Service to review the draft RCW Management Plan.

- April 6, 2006     Conference call between APC and the Service to discuss incorporating additional information requested by the Service into the BA.

- August 18, 2006     Consultation meeting among APC, ADCNR, and the Service in Clanton, AL. regarding the settlement agreement and reintroductions. Participants included John Grogan, Jim Crew, Bill Simm, Jim Lochamy, Chad Fitch, Henry Mealing, Stephen Gidere, Stan Cook, Rick Gooch (via phone), and Jeff Powell.

- November 16, 2006     Consultation meeting between APC and the Service in Daphne, AL. to continue working on the BA. Participants included Jim Crew, John Grogan, Bill Simm, Steve Krotzer, Henry Mealing, Shane Boring, Stephen Gidere, and Jeff Powell.

- December 14, 2006     Consultation meeting between APC and the Service in Clanton, AL to discuss the RCW Management Plan for Lake Mitchell and upcoming management activities for 2007. Participants included John Grogan, Jim Lochamy, Chad Fitch, Brian Steale, Stephen Gidere, Bill Simm, Eric Spadgenske, and Jeff Powell.

- February 1, 2007     APC provided an updated species list and Draft BA to the Service via email.

- February 23, 2007     The Service provided APC, via email, acceptance of species list and components of Draft BA.

- February 27, 2007     First of the coordination meetings among APC, ADCNR, and the Service to begin drought discussions and the beginning of a drought operations plan. A series of at least weekly conference calls and meetings continued until the end of the 2007-2008 drought. Participants included Charles Stover, Alana Peeples, Willard Bowers, Bill Simm, John Grogan, Stan Cook, and Jeff Powell.

- March 5, 2007     Per the request of American Rivers (Robyn Marks and Gerrit

3

Jobbis), the Alabama Rivers Alliance (April Hall), and the Natural Heritage Institute (Julie G.), the Service (Sue Cielinski, Patty Woods, and Jeff Powell) participated in a conference call to discuss status and updates on the Coosa relicensing. Other participants included ADCNR (Stan Cook).

- February 22, 2009    Conference call with APC and FERC to discuss FERC's Final BA/EA.

- April 6, 2009    FERC issues Environmental Assessment (EA) for the Coosa River Project.

- April 17, 2009    Letter from FERC requesting Service's concurrence with EA and initiation of formal ESA consultation.

- May 20, 2009    Letter from Service requesting additional information before initiating formal consultation.

- July 9, 2009    Consultation meeting between APC and the Service to discuss and begin development of a Coosa BA Addendum.

- December 31, 2009    FERC issues Final EA.

- January 15, 2010    Letter from FERC to the Service requesting formal ESA consultation.

- February 4, 2010    Consultation meeting in Greenville, AL to discuss FERC's Final EA and Addendum to BA. Attendees: Angie Segars, John Grogan, Jim Lochamy, Steve Krotzer, Bill Pearson, and Jeff Powell.

- February 22, 2010    Conference call among FERC, APC, and Service to discuss FERC's request for formal consultation and the need to submit an addendum to the BA prior to initiating formal consultation.

- April 13, 2010    Conference call among FERC, APC, and Service to discuss topics that need to be incorporated in the BA Addendum.

- March 11, 2010    Consultation meeting in Montgomery, AL. Attendees: John Grogan, Jim Lochamy, Stephen Gidere, Steve Krotzer, Henry Mealing, Angie Segars, Paul Johnson, Stan Cook, Chris Greene, Karen Marlowe, Bill Pearson, and Jeff Powell.

- June 4, 2010    Consultation meeting with APC to discuss updates to ADROP. Attendees: Charles Stover, Ashley McVicar, and Bill Pearson.

- June 29, 2010    Consultation meeting with APC in Daphne, AL to review ADROP and the Addendum to the Biological Assessment. Attendees: Charles Stover, Angie Segars, Christy Nix, and Jeff Powell.

- October 1, 2010    APC files comment letter with FERC regarding the Final EA for the Coosa River Project.

- October 22, 2010    Corps of Engineers files comment letter with FERC regarding APC's comment October 1, 2010, letter to FERC.

- January 21, 2011    APC files Coosa BA Addendum with FERC.

- November 8, 2011    Service receives letter from FERC requesting formal ESA

4

consultation for the Coosa River Project.

- December 8, 2011 — Letter from Service to FERC initiating formal ESA consultation.
- March 15, 2012 — Email from Jeff Powell to APC, FERC, and the Service's Jackson, MS Field Office requesting comments on the draft BO.
- March 16, 2012 — FERC files a copy of the draft BO in FERC's eLibrary as a public document.
- April 4, 2012 — Consultation meeting held in Clanton, Alabama to discuss the Draft BO. Attendees included Jim Lochamy, Steve Krotzer, Charles Stover, Jason Carlee, Angie Segars, Henry Mealing, Mike Godfrey, and Jeff Powell.
- April 13, 2012 — Letter from Service to FERC requesting a 30-day extension on the BO.
- April 20, 2012 — Letter from FERC to Service granting the 30-day extension.
- May 1, 2012 — Consultation meeting held in Clanton, Alabama to discuss the draft BO. Attendees included Jim Lochamy, Steve Krotzer, Charles Stover, Jason Carlee, Angie Segars, Henry Mealing, Mike Godfrey, and Jeff Powell.
- May 25, 2012 — Email from Service to FERC notifying them that BO is still in review.
- May 31, 2012 — Email from Service to FERC notifying them that BO is still in review.
- Service provides FERC and APC with the Final BO.

# BIOLOGICAL OPINION
# FOR THE RELICENSING OF ALABAMA POWER COMPANY'S
# COOSA RIVER HYDROELECTRIC PROJECT

**Coosa River Hydroelectric Project**
**FERC Project No. 2146**
**Alabama and Georgia**

Prepared By:
U.S. Fish and Wildlife Service
Alabama Ecological Services Field Office
1208-B Main Street
Daphne, Alabama  36526

# Contents

**DESCRIPTION OF PROPOSED ACTION**     **10**

*STATUS OF THE SPECIES/CRITICAL HABITAT*     24

    Tulotoma Snail (*Tulotoma magnifica*) - Threatened     24
    Rough Hornsnail (*Pleurocera foremani*)     26
    Painted rocksnail (*Leptoxis taeniata*) - Threatened     28
    Interrupted rocksnail (*Leptoxis foremani*) - Endangered     28
    Cylindrical lioplax (*Lioplax cyclostomaformis*) - Endangered     30
    Lacy Elimia (*Elimia crenatella*) - Threatened     31
    Flat pebblesnail (*Lepyrium showalteri*) - Endangered     32
    Southern acornshell (*Epioblasma othcaloogensis*) - Endangered     33
    Upland combshell (*Epioblasma metastriata*) - Endangered     34
    Finelined pocketbook (*Hamiota (=Lampsilis) altilis*) - Threatened     35
    Alabama moccasinshell (*Medionidus acutissimus*) - Threatened     37
    Coosa moccasinshell (*Medionidus parvulus*) - Endangered     38
    Southern clubshell (*Pleurobema decisum*) - Endangered     39
    Southern pigtoe (*Pleurobema georgianum*) - Endangered     40
    Ovate clubshell (*Pleurobema perovatum*) - Endangered     42
    Triangular kidneyshell (*Ptychobranchus greenii=P. foremanianus*) - Endangered     43
    Southern combshell (*Epioblasma penita*) - Endangered     45
    Georgia pigtoe (*Pleurobema hanleyianum*) - Endangered     46
    Heavy pigtoe (*Pleurobema taitianum*) - Endangered     47
    Inflated heelsplitter (*Potamilus inflatus*) - Threatened     48
    Blue shiner (*Cyprinella caerulea*) - Threatened     50
    Amber darter (*Percina antesella*) - Endangered     51
    Goldline darter (*Percina aurolineata*) - Threatened     52
    Red-cockaded woodpecker (*Picoides borealis*) - Endangered     54

**ENVIRONMENTAL BASELINE**     **55**

*Action (1) Alabama Power's Proposal for Operations*     55
    *Status of the species within the action area*     55
    *Factors affecting species environment within the action area*     57

*Action (2) Implementation of a Shoreline Management Plan (SMP)*     61
    *Status of the species within the action area*     61
    *Factors affecting species environment within the action area*     67

*Action (3) Implementation of a Wildlife Management Plan*     68
    *Status of the species within the action area*     68
    *Factors affecting species environment within the action area*     69

7

*Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal - ADROP*      69
     *Status of the species within the action area*      69
     *Factors affecting species environment within the action area*      70

*Action (5) Drawdown of Lay Lake*      70
     *Status of the species within the action area*      70
     *Factors affecting species environment within the action area*      71

**EFFECTS OF THE ACTION**      **71**

*Action (1) Alabama Power's Proposal for Operations*      71
     *Factors to be considered*      71
     *Analysis for the effects of the action*      73
     *Species' response to the proposed action*      75

*Action (2) Implementation of a Shoreline Management Plan (SMP)*      76
     *Factors to be considered*      76
     *Analysis for the effects of the action*      77
     *Species' response to the proposed action*      78

*Action (3) Implementation of a Wildlife Management Plan*      78
     *Factors to be considered*      78
     *Analysis for the effects of the action*      79
     *Species' response to the proposed action*      79

*Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal - ADROP*      80
     *Factors to be considered*      80
     *Analysis for the effects of the action*      80
     *Species' response to the proposed action*      82

*Action (5) Drawdown of Lay Lake*      83
     *Factors to be considered*      83
     *Analysis for the effects of the action*      83
     *Species' response to the proposed action*      84

**CUMULATIVE EFFECTS**      **88**

**CONCLUSION**      **89**

**INCIDENTAL TAKE STATEMENT**      **90**

*AMOUNT OR EXTENT OF TAKE ANTICIPATED*      90

*EFFECT OF THE TAKE*      94

**REASONABLE AND PRUDENT MEASURES**      **94**

*TERMS AND CONDITIONS*      95

*CONSERVATION RECOMMENDATIONS*      98

USCA Case #16-1195     Document #1621558     Filed: 06/17/2016     Page 230 of 327

# BIOLOGICAL OPINION

## DESCRIPTION OF PROPOSED ACTION

According to the Service's section 7 regulations (50 CFR §402.02), an "action" is defined as "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by federal agencies in the United States or upon the high seas." The "action area" is defined as "all areas to be affected directly or indirectly by the federal action and not merely the immediate area involved in the action." The direct and indirect effects of the actions and activities must be considered in conjunction with the effects of other past and present federal, state, or private activities as well as the cumulative effects of reasonably certain future state or private activities within the action area. This Biological Opinion (Opinion) will only address those actions from which the Service believes listed species will be adversely affected or jeopardized and/or any critical habitat that could be adversely modified or destroyed.

Alabama Power Company (APC) currently operates three separately-licensed hydropower projects on the Coosa River that include seven different developments (Figure 1): (1) the Coosa River Project, which includes the Weiss, H. Neely Henry, Logan Martin, Lay, and Bouldin developments (FERC Project No. 2146); (2) the Mitchell Project (FERC Project No. 82); and (3) the Jordan Project (FERC Project No. 618). In 2005, APC applied for a new single operating license that would combine all seven developments under one new license, using the existing Project No. 2146. The newly combined 960.9-megawatt (MW) Coosa River Project spans portions of Cherokee, Etowah, Calhoun, St. Clair, Talladega, Shelby, Coosa, and Chilton counties in Alabama, and Floyd County in Georgia. Each development generally consists of a dam, a reservoir, a powerhouse, a substation, and transmission lines that connect the substation to APC's transmission system[1].

In FERC's November 4, 2011, letter to the U.S. Fish and Wildlife Service (Service) requesting formal consultation, FERC staff identified the following seven actions as part of the relicensing of the Coosa River Project: (1) continuation of current project operations; (2) implementation of a Shoreline Management Plan; (3) implementation of a Wildlife Management Plan; (4) improvements to dissolved oxygen; (5) implementation of Adaptive Management Plans at the Weiss Bypass and Logan Martin tailrace; (6) Implementation of the Coosa River Project portion of the Alabama-ACT Drought Response Operations Proposal (ADROP); and (7) the periodic drawdown of Lay Lake. This includes potential effects on 9 listed species and 12 critical habitat units that occur within the Project boundaries (refer to Table 1), and a total of 21 listed species that do not currently occur within the Project boundaries, but will likely be

---

1 Refer to APC's License Application (APC 2005) and FEA (FERC 2009) for a detailed account of project operations and scheduling

10

reintroduced during the term of the new license (Table 1). It also encompasses more than 255 river miles of the Coosa River and its tributaries.

Due to the nature and complexities of this Opinion, we have combined three of the FERC staff recommended actions together (continuation of current operations, improvements to dissolved oxygen, and implementation of an Adaptive Management Plan (AMP) at the Weiss Bypass and Logan Martin tailrace) into one action, which we have termed, Alabama Power's Proposal for Operations. The other four actions (Shoreline Management Plan, Wildlife Management Plan, ADROP, and the Lay Lake Drawdown) will be evaluated separately. A short description of each action and its action area follows:

### (1) Alabama Power's Proposal for Operations

i) Continuation of Project Operations[2]

The upper Coosa projects (Weiss, Neely Henry, and Logan Martin) are storage projects and are operated in a peaking mode[3]. Pool levels and generation schedules vary seasonally, depending upon basin inflows, and all projects follow a FERC approved Rule Curve. The lower Coosa projects (Lay, Mitchell, Jordan, and Bouldin) have very little storage and are operated in a run-of-river mode[4]. The only operational change APC is proposing is to raise winter pool levels at Weiss, Neely Henry, and Logan Martin reservoirs. No changes are being proposed for the lower Coosa developments. The proposed changes at the upper Coosa projects include:

- Weiss: raising the winter rule curve by 3 feet to elevation 561 feet mean sea level (msl) from December 1 through March 1. The summer rule curve would also be extended one month from August 31 to September 30 with the same summer elevation as currently operated.
- Neely Henry: continuing to operate the project according to the interim Flood Control Plan that was filed with FERC in 2001 and modified in 2004. This translates into a 1 foot daily fluctuation in elevation.
- Logan Martin: raising the winter pool elevation 2 feet from 460 to 462 feet msl beginning January 1 and extending to April 14. Beginning April 15, there would be a constant rise to the normal summer elevation of 465 feet msl. Beginning October 1, the elevation would decrease to the proposed 462 feet msl winter pool

---

2 APC's License Application (APC 2005) and FEA (FERC 2009) for a detailed account of project operations and scheduling
3 "Peaking" mode refers to the mode of operation. The reservoirs are typically deeper, thus having a greater storage capacity, and are only operated during times of peak electrical demand. In the Southeast, this usually corresponds to early morning and evening hours.
4 Reservoirs that operate as "run-of-river" projects are typically shallower, have less storage capacity, and generally release the same volume of water on a daily basis that flows into them.

11

elevation.

## ii)  Improvements to Dissolved Oxygen

Dissolved oxygen (DO) stratification occurs at every reservoir on the Coosa River on an annual basis, where DO levels often drop to less than 4 milligrams/liter (mg/L) at deeper depths. The release of these low DO waters through the project powerhouses, or through seepage in the case of Logan Martin, affects aquatic resources downstream of the dams by reducing DO levels in the tailwaters. APC is proposing to offset these effects by installing DO enhancement measures (aeration systems) at the Weiss and Neely Henry developments within 18 months of licensing, and to continue operating, or improving, (within 18 months of licensing) the existing aeration systems at the Logan Martin, Lay, Mitchell, and Jordan developments to ensure compliance with state water quality standards.

## iii)  Implementation of Adaptive Management Plans (AMP) at the Weiss Bypass and Logan Martin tailrace

Alabama Power Company, Alabama Department of Conservation and Natural Resources (ADCNR), and the Service have worked cooperatively to develop adaptive management plans (AMP) for the Weiss Bypass and Logan Martin tailrace.  The general goals for these plans are to assess and improve chemical and physical habitat conditions and ensure that operations are protective of listed species.

As part of the Logan Martin AMP, APC has proposed to enhance DO levels (as mentioned in the previous section), conduct pre- and post-licensing biological monitoring of target species (fish, mollusk, and crayfish), evaluate the habitat suitability for possible reintroduction of target species, and identify measures that can improve the growth and survival of target species[5].

As part of the Weiss Dam AMP, APC has proposed to release a variable continuous minimum flow into the Bypass.  The goal of this release is to provide a flow that more closely mimics the natural hydrograph, restore and enhance fish and mollusk diversity in the Bypass through reintroductions and natural recruitment, and improve and rehydrate available habitat.

The action area we defined for continuation of Project operations and the AMP includes

---

5  Refer to Table 1 for a list of the federally listed species and locations for which reintroductions are proposed. Refer to Appendix 7 of APC's Addendum to the Coosa River Project Biological Assessment for a complete list (listed and non-listed species), *see*, APC 2011.

12

all lands mentioned in the "geographic scope" section of the FEA (2009)[6], as well as those areas we believe are influenced by the operation of the Coosa River Project. This includes the entire channel of the Coosa River, as well as the lower reaches of its tributaries. In evaluating DO improvements, we consider the Project tailraces from the point of the discharge downstream to the next impoundment, or where the effects of the discharge are no longer discernible.

(2) *Implementation of a Shoreline Management Plan (SMP)*[7]

The purpose of the SMP is to serve as a comprehensive guide for managing Project shorelines in a manner that is consistent with license requirements and project purposes. The overall goal of the plan is to ensure that shoreline development is consistent with the protection and enhancement of environmental, scenic, cultural, and recreational values, while ensuring the continued safe and reliable production of hydroelectric power at the Project. The SMP covers approximately 1,600 miles of shoreline and 142,000 acres of project land (both inundated and non-inundated) and includes:

- Providing guidance for existing and future management actions within the Project's FERC boundary, including specifying long term shoreline management goals for the Coosa River Hydroelectric Projects;
- Addressing APC's policies relative to activities that may affect shoreline management (e.g., dredging, bank stabilization, channelization, etc.);
- Establishing a shoreline classification system to protect natural resources and guide future shoreline management actions;
- Describing, promoting and recommending property owner shoreline best management practices in three key areas: buffer zones and vegetation management, water quality, and property development and management;
- Summarizing APC's enhanced shoreline permitting guidelines;
- Description of an implementation plan and review cycle for the SMP.

The action area for the SMP will include the entire 1,600 miles of shoreline and 142,000 acres of project lands as defined in the license application.

(3) *Implementation of a Wildlife Management Plan (WMP)*

The purpose of the WMP is to develop a plan that protects and enhances the available wildlife habitat within the project boundaries of the Coosa Basin developments.

---

6 FEA: Coosawattee River from Carter's Dam, downstream to R.F. Henry Lock and Dam on the Alabama River.
7 The complete SMP document is found in the APC's license application submitted to FERC July 25, 2005 (APC 2005).

13

The WMP consolidates numerous ongoing wildlife management activities in the basin into a single document. Specific wildlife management objectives include:

- Management of shoreline areas for native vegetative communities and enhanced value as wildlife habitat;
- Continued management and enhancement of red-cockaded woodpecker (RCW) habitat on project lands;
- Implementation of timber management methods that result in enhanced value of project lands as wildlife habitat;
- Protection and monitoring of bald eagle nesting areas;
- Establishment of additional forest openings on project lands to provide foraging areas for wildlife;
- Establishment of additional public hunting areas for the physically disabled;
- Development of a waterfowl refuge and/or Waterfowl Management Area within the project boundaries for consumptive and non-consumptive uses.

The Coosa WMP was developed to benefit wildlife and wildlife habitat within the boundaries of the Coosa River developments. APC's proposal to seasonally flood agricultural fields within the Weiss development project boundary would increase foraging and resting habitat for resident and migrating waterfowl and provide breeding habitat for a variety of amphibians. The proposed management plan for red-cockaded woodpeckers (RCW) at the Mitchell development would effectively maintain existing habitat for this species and would provide resources for the population to expand. The creation of forest openings at the Mitchell development would increase habitat diversity by increasing the number of meadow areas. This action would also increase plant and wildlife diversity by providing additional meadow and forest edge habitat. General timber management would continue to follow past practices, which have effectively maintained a forest with a diversity of tree species and age classes. The proposed WMP also recommends APC's continued cooperation with ADCNR in monitoring bald eagle activity on project lands and protecting nest sites.

The action area for the WMP includes those lands[8] associated with the Weiss Waterfowl Management Area, RCW management lands on Lake Mitchell, the Coosa Wildlife Management Area, areas supporting bald eagles, and the handicapped hunting area on Jordan Lake.

(4) *Implementation of the Coosa River Project portion of the Alabama Drought Response*

---

8 Refer to the Wildlife Management Plan for the Coosa Hydroelectric Project for detailed site descriptions

14

*Operations Proposal - ADROP*[9]

Alabama Power has developed a drought response operations proposal that includes drought operations procedures for the Coosa River projects. Given the integrated nature of the Alabama-Coosa-Tallapoosa (ACT) River Basin, the proposal addresses all of Alabama Power's eleven hydropower dams in the basin and is known as the Alabama-ACT Drought Response Operations Proposal (ADROP).

For this consultation, we will only consider operational procedures for those projects in the Coosa River basin. Procedural changes are based on the experience of Alabama Power, the Service, and FERC in modifying normal operations to protect listed species and habitat during previous droughts. ADROP provides for three incremental drought intensity level (DIL) responses based on the severity of drought conditions. These incremental DIL responses are not rigid but provide a bracketed range of operations allowing for flexibility and smoother transitions into and out of a drought and from level to level. ADROP's drought response triggers are primarily based on past operating experiences and lessons learned during 2007, the current drought of record for the basin.

The overall action area for this project includes all lands included in the "geographic scope" section of the FEA (2009). However, the only project where operational changes are being proposed in ADROP is at Jordan Dam. Therefore, the primary action area will be from Jordan Dam downstream to impounded portions of Jones Bluff Lake.

## (5) *Periodic Drawdown of Lay Lake*

For the past 20 years, APC has temporarily lowered the level of Lay Lake during the fall months to facilitate leakage measurements and inspections in the Logan Martin Dam tailrace. This practice has been coordinated with the Federal Energy Regulatory Commission (FERC), and recently has changed from an annual event to a biennial activity performed in odd-numbered years. Temporarily lowering the lake also allows the Alabama Department of Conservation and Natural Resources (ADCNR) to inspect and maintain its public boat launches, and it allows shoreline property owners to perform maintenance and repairs on their shoreline facilities (i.e., docks, boat ramps, sea walls, etc.). Typically, the lake is lowered about 3 feet, measured at Lay Dam, for a period of 10 to 12 days. Alabama Power has also lowered the lake during severe drought conditions in order to reserve water in upstream storage projects while continuing to meet downstream flow requirements. The timing, level, and duration of a drought drawdown vary with the severity of the drought.

The boundary around Lay Lake (i.e., those lands included in the FERC license) includes

---

9 Taken in part from Alabama Power's 2011 Addendum to the Coosa River Biological Assessment (APC 2011)

the lake (12,000 acres) up to the normal pool elevation of 396 feet (ft) msl and flood easements between 397 and 410 mean sea level (msl) (APC 2000). The lake extends 48 miles upstream to Logan Martin Dam and has 289 miles of shoreline habitat and a maximum depth of 88 ft.  Since Lay is operated as a run-of-river project, daily inflow basically equals its outflow and water levels typically fluctuate within a range of one foot on a daily basis (APC 2000).  Therefore, the action area for the proposed drawdown will affect all areas upstream of Lay Dam between approximately the 396 and 393 foot contour lines.  This includes areas along the Coosa River as well as the lower reaches of several large tributaries, including Yellowleaf and Kelly creeks (refer to Figure 1 for the approximate action area).

16

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 238 of 327



Figure 1. Map of the Coosa River showing Alabama Power Company's hydropower developments.

17

Table 1. Listed species and critical habitat units that were considered in this consultation[10]. Bolded species represent species that occur within the action area and "may be affected" by the proposed actions.

| Species Name | Federal Status | Critical Habitat Unit(s) present in Action Area | Known or Suspected Occurrences within or near Coosa Developments |
|---|---|---|---|
| **Birds** | | | |
| Bald eagle [11] (*Haliaeetus leucocephalus*) | Bald and Golden Eagle Protection Act | No | One active nest within each of the Jordan/Bouldin and Mitchell developments; one adjacent to Mitchell development |
| Red-cockaded woodpecker (*Picoides borealis*) | Endangered | No | Active clusters within and adjacent to Mitchell development |
| **Fish** | | | |
| Blue shiner (*Cyprinella caerulea*) | Threatened | No | Little River and Spring Creek on the edge of the action area; Weogufka Creek just outside of the action area; Choccolocco Creek outside of the action area. Additional potential reintroduction site in the Weiss Bypass |
| Amber darter (*Percina antesella*) | Endangered | No | Not currently present in action area but targeted for reintroduction in the Weiss Bypass, Logan Martin tailrace, and in Choccolocco Creek and Terrapin Creek |
| Goldline darter (*Percina aurolineata*) | Threatened | No | Not currently present in action area but targeted for reintroduction in the Weiss Bypass and Jordan tailrace |

10 The primary source of the species list is Alabama Power Company's 2007 Biological Assessment (APC 2007) and 2011 Addendum to the Coosa River Project Biological Assessment (Attachment 3) (APC 2011)

11 The bald eagle is no longer listed under the ESA, therefore, it will not be considered in this consultation

| Plants[12] | | | |
|---|---|---|---|
| Alabama leatherflower (*Clematis socialis*) | Endangered | No | Terrestrial sites outside Neely Henry development |
| Mohr's Barbara's buttons (*Marshallia mohrii*) | Threatened | No | Southern shore of Weiss Lake near the Georgia/Alabama Stateline and outside of project boundary. Terrestrial sites outside Neely Henry development |
| Harperella (*Ptilimnium nodosum*) | Endangered | No | Little River drainage outside Weiss development. |
| Kral's waterplantain (*Sagittaria secundifolia*) | Threatened | No | Little River drainage outside Weiss development. |
| Green pitcher plant (*Sarracenia oreophila*) | Endangered | No | Little River drainage outside Weiss development; southern shore of Weiss Lake near Little Nose Creek and Big Nose Creek; Coosa River mainstem approximately 8 to 10 miles downstream of Weiss Dam within Neely Henry development. |
| **Snails** | | | |
| Painted rocksnail (*Leptoxis taeniata*) | Threatened | No | Choccolocco Creek; Coosa River downstream of Logan Martin Dam; Ohatchee Creek but outside of action area.<br><br>Additional potential reintroduction sites in the Weiss Bypass, Jordan tailrace, and in Big Canoe Creek; Terrapin Creek; Yellowleaf Creek; Hatchet Creek |

12 All of the following plant species occur just outside of the project boundary; therefore, they will not be included in this consultation

| | | | |
|---|---|---|---|
| | | | and Weogufka Creek |
| Interrupted rocksnail (*Leptoxis foremani*) | Endangered | IR1-Weiss Bypass/Terrapin; IR3-Jordan tailrace[13] | An unsuccessful test release was attempted in Coosa River downstream of Jordan Dam, in 2003, prior to listing. Not considered to be present in the action area. |
| Rough hornsnail (*Pleurocera foremani*) | Endangered | RH2-Yellowleaf Creek and RH1-Jordan tailrace[14] | Yellowleaf Creek and mainstem of Coosa River downstream of Jordan Dam. Potential reintroduction sites in the Weiss Bypass and in Choccolocco Creek; Weogufka Creek and Hatchet Creek; Weoka Creek; Kelly Creek; Talladega Creek and Tallaseehatchee Creek |
| Tulotoma snail (*Tulotoma magnifica*) | Threatened | No | Weogufka Creek and Hatchet Creek; Choccolocco Creek; Kelly Creek and Yellowleaf Creek; Weoka Creek; Coosa River downstream of Logan Martin Dam and Jordan Dam. |
| Cylindrical lioplax (*Lioplax cyclostomaformis*) | Endangered | No | Choccolocco Creek; occurs in Yellowleaf Creek but outside of action area; Additional potential reintroduction sites in the Weiss Bypass, Jordan tailrace, and in Big Canoe Creek; Choccolocco Creek; Terrapin; Hatchet Creek and Weogufka Creek |
| Lacy elimia (*Elimia crenatella*) | Threatened | No | Not currently present in action area but targeted for reintroduction in the Weiss Bypass, Jordan tailrace, and in Big Canoe Creek; Choccolocco Creek; Kelly Creek; Terrapin Creek; Hatchet Creek and Weogufka Creek |
| Flat pebblesnail (*Lepyrium* | Endangered | No | Not currently present in action area but targeted for reintroduction in the Jordan tailrace. |

13 USFWS 2010, *see* 75 FR 67512

| showalteri) | | | |
|---|---|---|---|
| **Freshwater Mussels** | | | |
| Southern acornshell (*Epioblasma othcaloogensis*) | Endangered | Units 18-Weiss Bypass/Terrapin, 19-Hatchet, 21-Kelly, 24-Big Canoe, 26-Jordan tailrace[14] | None |
| Upland combshell (*Epioblasma metastriata*) | Endangered | Units 18- Weiss Bypass/Terrapin, 19- Hatchet, 21-Kelly, 24-Big Canoe, 26-Jordan tailrace[15] | None |
| Finelined pocketbook (*Hamiota (=Lampsilis) altilis)*) | Threatened | Units 18- Weiss Bypass/Terrapin, 19-Hatchet, 21-Kelly, 23-Yellowleaf, 24-Big Canoe, 26-Jordan tailrace[15] | Coosa River in the Weiss Bypass; Chestnut Creek[15]<br><br>Potential reintroduction sites in the Weiss Bypass, Jordan tailrace, Big Canoe Creek; and Little River |
| Alabama moccasinshell (*Medionidus acutissimus*) | Threatened | Unit 26-Jordan tailrace[15] | Not currently present in action area but targeted for reintroduction in the Weiss Bypass, Jordan tailrace, and in Big Canoe Creek; Choccolocco Creek; Little River; Terrapin Creek; and Weogufka Creek |

14 USFWS 2004, *see* 69 FR 40084 40171
15 Population was not included in APCs 2007 Biological Assessment and 2010 Addendum. Species also occurs in Terrapin, Kelly, Yellowleaf, and Hatchet creeks, but known locations are upstream of the action area

| Species | Status | Units | Description |
|---|---|---|---|
| Coosa moccasinshell (*Medionidus parvulus*) | Endangered | Units 18- Weiss Bypass/Terrapin, 19-Hatchet, 21-Kelly, 23-Yellowleaf, 24-Big Canoe, 26-Jordan tailrace[15] | Not currently present in action area but targeted for reintroduction in the Weiss Bypass, Jordan tailrace, and in Little River; Choccolocco Creek; Hatchet Creek; and Terrapin Creek |
| Southern clubshell (*Pleurobema decisum*) | Endangered | Units 18- Weiss Bypass/Terrapin, 19-Hatchet, 21-Kelly, 24-Big Canoe, 26-Jordan tailrace[15] | Coosa River in Weiss Bypass; Terrapin Creek; Big Canoe Creek; Coosa River downstream of Logan Martin Dam and downstream of Jordan Dam. Additional potential reintroduction site in the Jordan tailrace. |
| Southern pigtoe (*Pleurobema georgianum*) | Endangered | Units 18- Weiss Bypass/Terrapin, 19-Hatchet, 21-Kelly, 23-Yellowleaf, 24-Big Canoe, 26-Jordan tailrace[15] | Coosa River in Weiss -Bypass; Terrapin Creek; Hatchet Creek; Yellowleaf Creek but no recent records from within the action area. Potential reintroduction sites in the Weiss Bypass, Jordan tailrace, and in Cheaha Creek: Choccolocco Creek; Little River; Weogufka Creek; and Yellowleaf Creek |
| Ovate clubshell (*Pleurobema perovatum*) | Endangered | Units 18- Weiss Bypass/Terrapin, 19-Hatchet, 21-Kelly, 24-Big Canoe, 26-Jordan tailrace[15] | Not currently present in action area but targeted for reintroduction in the Jordan tailrace. |
| Triangular kidneyshell | Endangered | Units 18- Weiss Bypass/Terrapin, | Occurs in Big Canoe Creek; Kelly Creek; and Yellowleaf Creek, but no recent records within the action area. |

| | | | |
|---|---|---|---|
| (Ptychobranchus greenii)[16] | | 19-Hatchet, 21-Kelly, 23-Yellowleaf, 24-Big Canoe, 26-Jordan tailrace[15] | Not currently present in action area but targeted for reintroduction in the Weiss Bypass, Jordan tailrace, and in Choccolocco Creek; Terrapin Creek; Weogufka Creek; and Yellowleaf Creek |
| Southern combshell (Epioblasma penita) | Endangered | No | Not currently present in action area but targeted for reintroduction in the Weiss Bypass and Jordan tailrace. |
| Georgia pigtoe (Pleurobema hanleyianum) | Endangered | Units GP3-Hatchetand GP 2-Weiss Bypass/Terrapin[1][4] | Coosa River downstream of Weiss Bypass<br><br>Not currently present in action area but targeted for reintroduction in the Weiss Bypass, Jordan tailrace, and in Big Canoe Creek; Choccolocco Creek; Terrapin Creek; Hatchet Creek and Weogufka Creek |
| Heavy pigtoe (Pleurobema taitianum) | Endangered | No | Not currently present in the action area but targeted for reintroduction in the Jordan tailrace. |
| Inflated heelsplitter (Potamilus inflatus) | Threatened | No | Not currently present in action area but targeted for reintroduction in the Jordan tailrace. |

16 Also referred to as the rayed kidneyshell (Ptychobranchus foremanianus) (Williams et al. 2008)

Page 245 of 327    Filed: 06/17/2016    Document #1621558    USCA Case #16-1195

**Tulotoma Snail (*Tulotoma magnifica*) - Threatened**
*Species Description and Life History*

The tulotoma snail is endemic to the Alabama River Basin. Historically, it was widespread across the Alabama River Basin, occurring from the Upper Coosa, near the present day location of Weiss Dam, downstream to the mouth of the Alabama River. It was described by Conrad in 1834, and its type locality is the Alabama River near the present-day location of Claiborne Lock and Dam. On January 9, 1991, tulotoma was listed as endangered under the Endangered Species Act (ESA) (USFWS 1991) and on June 2, 2011, it was downlisted to threatened (USFWS 2011). One of the largest contributing factors to securing its downlisting was APC's *minimum flow* releases below Jordan Dam. Today, the species is restricted to a few large tributaries in the Middle Coosa, two locations in the mainstem of the Coosa River, and three locations in the Alabama River. Critical habitat has not been designated for this species.

During the mid-twentieth century, habitat for the tulotoma snail was significantly reduced by the construction of several large hydropower dams on the Coosa and Alabama rivers. In fact, until its re-discovery downstream of Jordan Dam in 1988, the species was believed to be extirpated from the Coosa River altogether (Hershler et al. 1990).

Tulotoma is a gill-breathing operculate snail in the family Viviparidae. According to the literature and recent studies, it is restricted to cool, well-oxygenated, clean free-flowing waters of the Coosa River mainstem, the lower reaches of larger tributaries to the Coosa River, and the Alabama River (Christman et al. 1995; DeVries et al. 2003; J Powell, pers. obs.). Optimum habitat is characterized by a substrate with roughness values greater than 2, boulder densities greater than 2 per square meter ($m^2$), rocks of different sizes and currents fast enough to prevent the accumulation of silt. It is also believed that the availability of cracks and crevices in the bedrock and/or boulders may help protect the species from predation (Christman et al. 1995).

Tulotoma are live born during the months of May-July, and at sizes of about 3-5 mm height at the last whorl (Christman et al. 1995). They grow rapidly during their first year reaching sizes of 11 to 14 millimeters (mm). Females become reproductively active during the spring/summer of their second year, producing an average 16 offspring per year. Females that live beyond their second year grow more slowly, and produce an average 28 offspring per year. Christman et al. (1995) found that few tulotoma survived longer than 2 years of life in the lower Coosa River.

Recent surveys in the Coosa River downstream of Logan Martin Dam estimated a population size of approximately 5,780 in select marginal habitats (APC 2009). Although tulotoma is known in low numbers from deeper sections of the Coosa River in this area, population sizes were not estimated in this report.

According to Christman et al. (1995), tulotoma abundance appears to be highest in the Coosa River below Jordan Dam, with minimum densities of 86 snails per square meter ($m^2$). Total population numbers below Jordan Dam were estimated to be over 109 million snails in 1995, with annual recruitment estimated at 163 million tulotoma. During 1992-1994, population surveys of the tulotoma in Kelly Creek found average densities of 17.9 snails/$m^2$ with maximum density of 193 snails/$m^2$; while average densities in Hatchet Creek averaged 10.5 snails/$m^2$ with

maximum density of 262 snails/m$^2$ (Christman et al. 1995).

DeVries et al. (2003) looked at genetics of the tulotoma snail. Tissue samples were compared from the Coosa River below Jordan Dam, Choccolocco, Kelly, Hatchet, and Weogufka Creeks using electrophoretic analysis. It was determined that the Coosa River population was the most variable and distinctive with highest mean number of alleles per locus, percentage of polymorphic loci, and mean hetrerozygosity. The Coosa River main stem population also had three alleles not found in the other populations. Genetic similarity ranged from 0.88-0.97, and the populations clustered into one of two major groups: Hatchet Creek and Coosa River; and Weogufka, Choccolocco, and Kelly Creeks.

*Population Dynamics and Status and Distribution*

The primary threats to tulotoma remain the same as it was when it listed; habitat fragmentation and population isolation and elimination of habitat from the construction of large dams in the Alabama River system. When listed, the tulotoma snail was known from five small, localized and isolated populations that included the Coosa River below Jordan Dam, and Ohatchee, Weogufka, Hatchet, and Kelly creeks. In recent years, populations have been discovered in Choccolocco Creek, Yellowleaf Creek, Weoka Creek, and most recently, in the Alabama River below R.F Henry, Millers Ferry, and Claiborne lock and dams (DeVries 2005 and 2008; Garner pers. com 2006 and 2008, J. Powell, pers obs.). Since its listing, the population in Kelly Creek has been extended down to its confluence with the Coosa River (Garner *pers. com*, Lochamy pers. com 2005). Although densities have not been estimated, they are believed to occur in the "hundreds" at some locations (Lochamy pers. com 2007). The lower Coosa River population downstream of Jordan Dam is found throughout a 4.4 mile reach, and is considered stable to increasing (DeVries 2005, 2008). Christman et al. (1995) estimated the population here to be greater than 109 million. Tulotoma colonies also appear to be stable in an 8.5 mile reach of Weogufka Creek, an 8.8 mile reach of Hatchet Creek, and a 3.6 mile reach of Kelly Creek. However, the Ohatchee Creek population may have been extirpated (DeVries 2005, 2008). After more than a twenty year absence, a small colony of tulotoma was rediscovered during the summer of 2006 in the lower Alabama River downstream of Claiborne Lock and Dam (Garner pers. com 2006). Since this re-discovery, populations have also been found downstream of R.F. Henry and Millers Ferry lock and dams (Garner pers. com 2008, J. Powell, pers. obs.).

*Critical Habitat Description*

Critical habitat has not been designated for the tulotoma snail.

25

## Rough Hornsnail (*Pleurocera foremani*)[17]

*Species Description and Life History*

The rough hornsnail is a freshwater snail in the family Pleuroceridae. The shell is elongated, pyramid-shaped, and thick, and has two distinct rows of nodules or tubercles found along the anterior margin of the shell. According to Tryon (1873), these characters separate the rough hornsnail from all other hornsnails. It is endemic to the Coosa River where it was reported by Goodrich (1944) to occur, "in the Etowah River of Georgia downstream, and at the mouths of a few side streams." However, no museum records are available for the species from the Etowah River to validate it ever occurred there (P. Johnson pers. com 2009). Therefore, it is questionable as to whether or not the species ever occurred in the Upper Coosa Basin in Georgia. Credible records do exist from several Coosa River tributaries in Alabama, including, Big Wills, Kelly, Big Canoe, Beaver, Ohatchee, Choccolocco, Peckerwood, and Yellowleaf creeks in Etowah, St. Clair, Shelby, Talladega, and Elmore counties, in Alabama (P. Johnson pers. com 2009). Little to no information is available on its life history requirements. However, the lifespan of rough hornsnail is presumably 2-3 years based on information from other hornsnail species (P. Johnson pers. com. 2009). According to the *Federal Register* (74 FR 31116) the preferred habitat for the hornsnail is gravel, cobble, and bedrock in moderate currents; however, in Yellowleaf Creek, it has been found along the shorelines in 1-5 feet of water associated fine substrate and areas of dense aquatic vegetation (J. Powell, pers. obs.).

*Population Dynamics and Status and Distribution*

The rough hornsnail was listed as endangered under the ESA on November 2, 2010 (USFWS 2010, *see* 75 FR 67512). The primary cause for the decline in the rough hornsnail has been habitat loss from the construction of large dams throughout the Coosa River system. The loss of habitat have fragmented populations and eliminated the species from more than 99 percent of its historic range. It is currently known from only two locations; the lower reaches of Yellowleaf Creek, in Shelby County, Alabama; and the lower Coosa River below Wetumpka, in Elmore County, Alabama. Recent surveys in the lower reaches of Yellowleaf Creek reported the species from approximately the lower three miles of the creek (J. Powell, pers. obs.). It has also been recently reported from the Coosa River below Wetumpka (C. Crow pers. com. 2009).

There is little information available on the population size, variability, and stability of the species other than the population in the lower Coosa and in Yellowleaf Creek appear to be stable (P. Hartfield pers. com 2009; J. Powell, pers. obs.).

*Critical Habitat Description*

Critical habitat was designated for the rough hornsnail on November 2, 2010 (76 FR

17 For additional information on the rough hornsnail (*Pleurocera foremani*) refer to the listing rule USFWS (2010)

31866) and includes two units: Yellowleaf Creek and the Coosa River (Figure 2).



Figure 2.  Critical habitat for the rough hornsnail[18].

---

18 Source: USFWS 2010, *see*, 75 FR 67512

27

## Painted rocksnail (*Leptoxis taeniata*) - Threatened

*Species Description and Life History*

The painted rocksnail is a small to medium-sized, oval-shaped snail that reaches approximately 19 mm (0.8 in) in length. The species is typically found attached to cobble, gravel, or other hard substrate in rapids and shoals (USFWS 2000, MRBMRC 2010). It is a dioecious[19] species and the females lay eggs in a concentric clutch between March and May. Clutch sizes are generally smaller than other similar Mobile Basin snails (MRBMRC 2010).

*Population Dynamics and Status and Distribution*

The painted rocksnail was listed as threatened under the ESA on October 28, 1998 (USFWS 1998, *see* 63 FR 57610). It historically occurred throughout the middle and lower Coosa River and its tributaries, the Cahaba River below the Fall Line, and the Alabama River downstream to Claiborne Lock and Dam. Its current distribution includes Choccolocco, Buxahatchee, and Ohatchee creeks, and in the Coosa River immediately downstream of Logan Martin Dam. The strongest known population is in Choccolocco Creek. Reasons for the decline and current status of this species include habitat modification and water quality degradation (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the painted rocksnail. Recovery objectives for this species are listed in a subsequent USFWS Recovery Plan (USFWS 2005).In addition, restoration and conservation measures for the painted rocksnail are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat has not been designated for the painted rocksnail.

## Interrupted rocksnail (*Leptoxis foremani*) - Endangered

*Species Description and Life History*

The interrupted rocksnail is a small to medium-sized snail (growing to approximately 22 mm (1 in) in length) in the aquatic family Pleuroceridae. The shell is moderately thick, elongately globose in outline, generally with no more than three whorls. The periostracum is light brown to burnt orange, but the folds may be darker, giving the shell a mottled appearance. The operculum is red to maroon, with coarse growth lines widely spaced across the surface

---

19 Dioecious refers to organisms that have males and females (an individual can produce either an egg or sperm).

28

(Mirarchi 2004).

Interrupted rocksnails are found in shoal habitats with sand-boulder substrate, most commonly at water depths less than 40 centimeters (15 in) and in water currents between 20 and 40 cm/second (8-15 in/sec) (Mirarchi 2004). Preferred substrate is a mixture of smooth gravel, cobble, and boulders, free of sediment; it apparently does not occur on bedrock or aquatic vegetation (Johnson and Evans 2000). Females lay their adhesive eggs in a concentric circular pattern, in well-oxygenated areas within the same habitat (P.D. Johnson, pers. com 2009).

*Population Dynamics and Status and Distribution*

The interrupted rocksnail was listed as endangered under the ESA on November 2, 2010 (USFWS 2010, *see* 75 FR 6751267550). It historically occurred in the Coosa River and several of its tributaries in Alabama and Georgia. Intensive surveys conducted since 1999 have located the species solely in about 12 km (7.5 mi) of the Oostanaula River upstream of the Gordon/Floyd County line, Georgia (Johnson and Evans 2000).The interrupted rocksnail population size in the Oostanaula River declined from a high of 10 to 45 snails per square meter in 1999 (Johnson and Evans 2001) to only 20 snails found during 6 search-hours in 2004 (Johnson pers. com 2003, 2004). The cause of decline was suspected to be some form of water contamination (Johnson pers. com 2003, 2004; Hartfield pers. com 2006). A July 2006 search failed to locate any rocksnails in more than 2 search-hours (Hartfield pers. com 2006); however, a subsequent search in August 2006 under lower flow conditions resulted in the location of 89 snails in 4 search-hours at one shoal and 2 rocksnails in 4 search-hours at another shoal (Johnson pers. com 2007).

In coordination with the Tennessee Aquarium Research Institute (TNARI) and USFWS, the Alabama Department of Conservation and Natural Resources (ADCNR) developed a plan and strategy to reintroduce interrupted rocksnails into the Coosa River above Wetumpka, Elmore County, Alabama. In 2003, 2004, and 2005, approximately 3,200, 1,200, and 3,000 juvenile snails, respectively, were released into the Lower Coosa River. Since their reintroduction, a few of the 2003 hatchery-cultured interrupted rocksnails were observed in the vicinity of the release site in 2004 (Johnson pers. com 2005). An alternative site was selected for release in August 2005, and 18 snails were located three months following release (Pierson pers. com 2005). During a 40-minute search of this release area in 2006, two interrupted rocksnails were found (Johnson pers. com 2007). Observations of only small numbers of reintroduced snails may be due to habitat size and dispersal, low fecundity of the species, predation, reproductive failure due to dispersal, or habitat disturbance (Johnson pers. com 2005b).

*Critical Habitat Description*

Critical habitat (occupied and unoccupied) was designated for the interrupted rocksnail on November 2, 2010 (USFWS 2010, *see* 75 FR 67512 67550) and includes three units: Coosa River (unit IR1); Oostanaula River (unit IR2); and Lower Coosa River (unit IR3) (Figure 3).

29



Figure 3.  Critical Habitat for the Interrupted Rocksnail[20]

## Cylindrical lioplax (*Lioplax cyclostomaformis*) - Endangered

*Species Description and Life History*

The cylindrical lioplax is a gill-breathing viviparid snail with an elongate light to dark olive shell that reaches approximately 28 mm (1.1 in) in length. The shell color is light to dark olivaceous green externally and bluish inside of the shell opening (USFWS 2000).The species is

_____

20 Source: USFWS 2010, *see*, 67512

30

a depositional zone feeder, most often found burrowed in fine sediments under large rocks in rapid flowing center channels of streams and river shoals, or in finer sediments and gravel near channel margins where adequate water exchange exists (MRBMRC 2010).

*Population Dynamics and Status and Distribution*

The cylindrical lioplax was listed as endangered under the ESA on October 28, 1998 (USFWS 1998, *see* 63 FR57610). The historic range of this species included the mainstem and lower reaches of major tributaries of the Coosa, Black Warrior, and Alabama rivers. The species is currently known to exist in the Cahaba River between Helena and Centreville (Shelby and Bibb counties, AL) and in a few km of Yellowleaf Creek (Shelby Co., AL); in August 2010, an additional population was discovered in lower Choccolocco Creek. Reasons for the decline and current status of this species include habitat modification and water quality degradation (USFWS 2000). Much of the former range of the cylindrical lioplax has been inundated by dam construction. The surviving populations are threatened by sediments and nutrients from nonpoint source pollution.

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the cylindrical lioplax. Recovery objectives for this species are listed in a subsequent USFWS Recovery Plan (USFWS 2005). In addition, restoration and conservation measures for the cylindrical lioplax are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat has not been designated for the cylindrical lioplax.

## Lacy Elimia (*Elimia crenatella*) - Threatened
*Species Description and Life History*

The lacy elimia is a small pleurocerid snail, growing to about 11 mm (0.4 in) in length. The species typically inhabits highly oxygenated waters on rock shoals and gravel bars (USFWS 2000), where individuals are usually found in tight clusters or colonies on larger rocks within the calmer parts of the shoal (USFWS 2010). The reproductive biology of the lacy elimia is largely unknown (MRBMRC 2010).

*Population Dynamics and Status and Distribution*

The lacy elimia was listed as threatened under the ESA on October 28, 1998 (USFWS 1998, *see,* 63 FR57610 57620). It was historically abundant in the main stem of the Coosa River and was also known from several Coosa tributary streams. As recently as the early 1990s, the species was known from Cheaha, Emauhee, and Weewoka creeks; however, targeted efforts to

31

relocate the lacy elimia in Emauhee and Weewoka creeks have not been successful. The species remains locally abundant in lower Cheaha Creek. Reasons for the decline and current status of the lacy elimia include habitat modification and water quality degradation (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the lacy elimia. Recovery objectives for this species are listed in a subsequent USFWS Recovery Plan (USFWS 2005).In addition, restoration and conservation measures for the lacy elimia are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat has not been designated for the lacy elimia.

**Flat pebblesnail (*Lepyrium showalteri*) - Endangered**

*Species Description and Life History*

The flat pebblesnail is a small snail in the family Hydrobiidae but has a relatively large, distinct shell compared with other hydrobiid species. The shell is ovate in outline, flattened, up to 3.5-4.4 mm (0.1-0.2 in) high and 4 to 5 mm (0.2 in) wide. This species is found attached to clean, smooth stones in rapid currents of river shoals (USFWS 2000). Females lay eggs in capsules on hard surfaces between March and June (Thompson 1984), and life span appears to be one year (P. Johnson, pers. comm. 2005); little else is known of the natural history of this species.

*Population Dynamics and Status and Distribution*

The flat pebblesnail was listed as endangered under the ESA on October 28, 1998 (USFWS 1998 *see* 63 FR 57610). The species was historically known from the mainstem Coosa River in Shelby and Talladega counties; the Cahaba River in Bibb and Dallas counties; and the Little Cahaba River in Bibb County, all in Alabama (Thompson, 1984). Recent survey efforts have failed to locate any surviving populations outside of the Cahaba River drainage (USFWS 2005). The only known site in the Little Cahaba River may no longer support the flat pebblesnail, but the species appears to be common where it is found in isolated sections of shoal habitats in the Cahaba River (MRBMRC 2010). Reasons for the decline and current status of the flat pebblesnail include habitat modification and water quality degradation (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the flat pebblesnail. Recovery objectives for this species are listed in a subsequent USFWS Recovery Plan (USFWS 2005). In addition, restoration and conservation measures for the flat pebblesnail are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

32

*Critical Habitat Description*

Critical habitat has not been designated for the flat pebblesnail.

## Southern acornshell (*Epioblasma othcaloogensis*) - Endangered

*Species Description and Life History*

The southern acornshell is a small mussel that may grow up to 30 mm (1.2 in) in shell length. Shells are round to oval in outline and sexually dimorphic (two different forms of the same animal), with a swollen posterior ridge in females. The periostracum is smooth, shiny, and yellow in color (USFWS 2000). The species is a long-term brooder, presumably gravid from late summer or autumn to the following summer; its glochidial hosts are unknown, although other members of the genus are known to use darters (Percidae) and sculpins (Cottidae) as glochidial hosts (Williams et al. 2008). Preferred habitat for the southern acornshell is thought to be stable sand/gravel/cobble substrate in moderate to swift current of shoals in small streams to small rivers above the Fall Line (USFWS 2000).

*Population Dynamics and Status and Distribution*

The southern acornshell was listed as endangered under the ESA on March 17, 1993 (USFWS 1993, *see* 58 FR 14330). The species was historically known from the Coosa River drainage in Alabama, Georgia and Tennessee above the Fall Line (USFWS 2000). One record from the Cahaba River is deemed "questionable" by Williams et al. (2008), and the species is no longer considered to be part of the Cahaba River fauna. No living populations of the southern acornshell have been confirmed in recent years, and the species is likely extinct (MRBMRC 2010). Reasons for the decline and current status of the southern acornshell include habitat modification, sedimentation, and eutrophication; this species does not tolerate impoundment and is highly sensitive to water quality degradation (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the southern acornshell.

*Critical Habitat Description*

Critical habitat (unoccupied) was designated for the southern acornshell on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes seven units: Cahaba River, AL (unit 13); Coosa River, AL (unit 18); Hatchet Creek, AL (unit 19); Kelly Creek, AL (unit 21); Big Canoe Creek, AL (unit 24); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

33

## Upland combshell (*Epioblasma metastriata*) - Endangered

*Species Description and Life History*

The upland combshell is a small mussel species that rarely exceeds 60 mm (2.4 in) in shell length. Shells are squarish in outline and are sexually dimorphic (two different forms of the same animal); males have a broadly curved posterior ridge, while females have a sharply elevated posterior ridge that swells post-ventrally, forming a well-developed sulcus anterior to the posterior ridge. The periostracum color varies from yellowish-brown to tawny, and may have green spots or broken rays; hinge teeth are well-developed and heavy (USFWS 2000). The species likely releases glochidia during late spring or early summer, and the host fish species is/are unknown. Other members of the genus are known to use darters (Percidae) and sculpins (Cottidae) as glochidial hosts (Williams et al. 2008). The upland combshell was found on stable sand/gravel/cobble substrate in moderate to swift current of shoals in large streams and rivers (USFWS 2000).

*Population Dynamics and Status and Distribution*

The upland combshell was listed as endangered under the ESA on March 17, 1993 (USFWS 1993, *see* 58 FR 14330). The historical range of the species included the Black Warrior, Cahaba and Coosa River drainages in Alabama, Georgia and Tennessee, primarily above the Fall Line (Williams et al. 2008). The species has not been encountered since its listing, and some malacologists believe that it is likely extinct (MRBMRC 2010). Reasons for the decline and current status of the upland combshell include habitat modification, sedimentation, and eutrophication; this species does not tolerate impoundment and is highly sensitive to water quality degradation (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the upland combshell.

*Critical Habitat Description*

Critical habitat (unoccupied) was designated for the upland combshell on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes eight units: Locust Fork, AL (unit 12); Cahaba River, AL (unit 13); Coosa River, AL (unit 18); Hatchet Creek, AL (unit 19); Kelly Creek, AL (unit 21); Big Canoe Creek, AL (unit 24); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

34



This map is provided only for illustrative purposes of critical habitat. For the precise legal definition of critical habitat, please refer to the narrative unit descriptions.

Critical Habitat
Rivers
County Lines

0    30    60 Miles

Figure 4.  Critical habitat for 11 Mobile River Basin mussels[21]

## Finelined pocketbook (*Hamiota (=Lampsilis) altilis*) - Threatened

*Species Description and Life History*

21  Source:  USFWS 2004, see 69 FR 40084

35

The finelined pocketbook is a medium-sized mussel, rarely exceeding 100 mm (4 in) in length. The shell is sub-oval in shape; in females the ventral margin is angled posteriorly, resulting in a pointed posterior margin. The periostracum is yellow-brown to blackish and has fine greenish rays on the posterior half; the nacre is white, becoming iridescent posteriorly (USFWS 2000). This species has historically been placed in the genus *Lampsilis*; however, using genetic analyses, it was found to belong to a monophyletic clade of four species for which the genus *Hamiota* was erected (Roe and Hartfield 2005).

*Hamiota altilis* is most frequently found in small to medium-sized streams above the Fall Line, utilizing a wide variety of substrata from clean sand and gravel riffles to depositional areas along stream margins (Mirarchi et al. 2004). It is a long-term brooder, gravid from late summer or autumn to the following spring, and is one of only four freshwater mussel species known to produce glochidia in a single, large mass termed a superconglutinate, which is fusiforme in shape, creamy white with a dusky dorsal stripe, and lacking an eyespot (Haag and Warren 1999). Female finelined pocketbook mussels also display mantle flaps which mimic small fish. Glochidial hosts of this species in laboratory trials include the centrarchid species *Lepomiscyanellus* (green sunfish), *Micropterus coosae* (redeye bass), *Micropterus punctulatus henshalli* (spotted bass), and *Micropterus salmoides* (largemouth bass) (Haag et al. 1999).

*Population Dynamics and Status and Distribution*

The finelined pocketbook was listed as threatened under the ESA on March 17, 1993 (USFWS 1993, *see* 58 FR 14330). This mussel is endemic to the Mobile River Basin in Alabama, Georgia and Tennessee, with the historic range including the Alabama, Cahaba, Tallapoosa, and Coosa rivers and their tributaries. Specimens from the Black Warrior and Tombigbee River drainages are very similar to *H. altilis*, but their identity remains unresolved; some malacologists now consider them to belong to the closely related *H. perovalis* (Williams et al. 2008). The finelined pocketbook remains widespread in the eastern portion of the Mobile Basin, but populations are isolated and often small (Mirarchi et al. 2004).

Reasons for the decline and current status of the finelined pocketbook include habitat modification, sedimentation, eutrophication, and water quality degradation; surviving populations are threatened by surface mine drainage, industrial and sewage treatment plant discharges, urban and agricultural runoff, small stream impoundments, and/or sand and gravel mining (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the finelined pocketbook. In addition, restoration and conservation measures for this species are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat (occupied and unoccupied) was designated for the finelined pocketbook

36

on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes twelve units: Cahaba River, AL (unit 13); Tallapoosa River, AL, GA (unit 16); Uphapee complex (unit 17); Coosa River, AL (unit 18); Hatchet Creek, AL (unit 19); Shoal Creek (unit 20); Kelly Creek, AL (unit 21); Cheaha Creek (unit 22); Yellowleaf Creek (unit 23); Big Canoe Creek, AL (unit 24); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

## Alabama moccasinshell (*Medionidus acutissimus*) - Threatened

*Species Description and Life History*

The Alabama moccasinshell is a small, delicate mussel species, with a maximum shell length of 55 mm (2 1/8 in) (Mirarchi et al. 2004). The shell is narrowly elliptical with a well-developed acute posterior ridge terminating in a sharp point on the posterior ventral margin; the posterior slope is finely corrugated (USFWS 2000). The umbo is broad and low, barely elevated above the hinge line. The periostracum is yellowish to tawny or greenish brown, covered with chevrons or zigzag lines that sometimes form rays; the nacre is white but may be tinted with salmon or green (Williams et al. 2008).

The Alabama moccasinshell inhabits sand and gravel substrates in medium creeks to rivers; it may occur in slow to swift current (Williams et al. 2008). Gravid females migrate to the surface of the stream bottom between March and June, and have been observed anchored to the gravel by a byssal thread (USFWS 2000). Females attract host fish by rapidly moving a lure located along the posterior portion of the mantle margin (Mirarchi et al. 2004). Fishes reported to serve as glochidial hosts for the Alabama moccasinshell in laboratory trials include *Fundulusolivaceus* (blackspotted topminnow) and a variety of darters in the genera *Ammocrypta*, *Etheostoma* and *Percina* (Williams et al. 2008).

*Population Dynamics and Status and Distribution*

The Alabama moccasinshell was listed as threatened under the ESA on March 17, 1993 (USFWS 1993, *see* 58 FR 14330 14340). The species historically occurred throughout the Mobile River Basin in Alabama, Georgia, Tennessee and Mississippi, both above and below the Fall Line, with the exception of the upper Tallapoosa River (USFWS 2000; Williams et al. 2008). Populations in the Escambia, Yellow and Choctawhatchee River drainages along the Gulf Coast, where no individuals have been collected since the 1960s, are currently assigned to this species (Williams et al. 2008); further studies, however, may show that they represent an undescribed species (Mirarchi et al. 2004). The Alabama moccasinshell is known to be extant in the Tombigbee River system in Mississippi and Alabama; the Black Warrior River system in Alabama; and the Coosa River system in Alabama, Georgia and Tennessee. The Sipsey and Buttahatchee rivers (Tombigbee River system, AL and MS) are believed to currently support the most robust populations of the species (MRBMRC 2010).

37

Reasons for the decline and current status of the Alabama moccasinshell include habitat modification, sedimentation, eutrophication, and water quality degradation; the species does not tolerate impoundment or channelization, and is very sensitive to sedimentation and erosion. Surviving populations are threatened by surface mine drainage, industrial and sewage treatment plant discharges, urban and agricultural runoff, small stream impoundments, and/or sand and gravel mining (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the Alabama moccasinshell. In addition, restoration and conservation measures for this species are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat (occupied and unoccupied) was designated for the Alabama moccasinshell on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes sixteen units: East Fork Tombigbee River, MS (unit 1); Bull Mountain Creek, MS (unit 2); Buttahatchee River, MS, AL (unit 3); Luxapalila Creek, MS, AL (unit 4); Coalfire Creek, AL (unit 5); Lubbub Creek, AL (unit 6); Sipsey River, AL (unit 7); Trussels Creek, AL (unit 8); Sucarnoochee River, AL (unit 9); Sipsey Fork, AL (unit 10); North River, AL (unit 11); Locust Fork, AL (unit 12); Cahaba River, AL (unit 13); Bogue Chitto Creek, AL (unit 15); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

## Coosa moccasinshell (*Medionidus parvulus*) - Endangered

*Species Description and Life History*

The Coosa moccasinshell is a small mussel, occasionally exceeding 40 mm (1.6 in) in length. The shell is thin, elongate, and elliptical to squarish in outline; the posterior ridge is inflated, smoothly rounded, terminating in a broadly rounded point, with a finely corrugated posterior slope (USFWS 2000). The umbo is low and broad, barely elevated above the hinge line. The periostracum is yellowish green to green or greenish brown, with numerous weak zigzag lines that may be grouped together to form rays; the nacre is gray to greenish gray (Williams et al. 2008).

The Coosa moccasinshell occurs in shoal areas of medium creeks to rivers, with sand and gravel substrates (Williams et al. 2008). Little is known of the life history of this species, but gravid females are known to occur from late March to early May, and the percid fish *Etheostoma jordani* (greenbreast darter) is a known glochidial host (MRBMRC 2010).

*Population Dynamics and Status and Distribution*

The Coosa moccasinshell was listed as endangered under the ESA on March 17, 1993

38

USCA Case #16-1195        Document #1621558        Filed: 06/17/2016        Page 260 of 327

(USFWS 1993, *see* 58 FR 14330). The historic range of the species included the Coosa River and several of its tributaries in Alabama, Georgia and Tennessee; the Sipsey Fork of the Black Warrior River system, Alabama; and the Cahaba River, Alabama (USFWS 2000). The current distribution is restricted to a 3-km reach of Holly Creek in Murray County, GA and a 4-km section of the Conasauga River in Polk County, TN. Both populations are small; evidence of limited recruitment has been observed in the Conasauga River but not in Holly Creek (MRBMRC 2010).

Reasons for the decline and current status of the Coosa moccasinshell include habitat modification, sedimentation, eutrophication, and water quality degradation; the species does not tolerate impoundment or channelization, and is very sensitive to sedimentation and erosion. Surviving populations are threatened by surface mine drainage, household and agricultural runoff, and small stream impoundment projects (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the Coosa moccasinshell. In addition, restoration and conservation measures for this species are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat (occupied and unoccupied) was designated for the Coosa moccasinshell on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes nine units: Coosa River, AL (unit 18); Hatchet Creek, AL (unit 19); Shoal Creek, AL (unit 20); Kelly Creek, AL (unit 21); Cheaha Creek, AL (unit 22); Yellowleaf Creek, AL (unit 23); Big Canoe Creek, AL (unit 24); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

## Southern clubshell (*Pleurobema decisum*) - Endangered

*Species Description and Life History*

The southern clubshell is a medium-sized mussel, with a maximum reported shell length of 93 mm (3.7 in); the shell is thick, and the hinge plate and teeth are heavy. The shell outline is roughly rectangular, protruding posteriorly, and the umbos are nearly terminal with the anterior margin. The posterior ridge ends abruptly with little development of the posterior slope dorsally (USFWS 2000). The periostracum is tawny to dark brown, often with variable, broken green rays or concentric bands (Williams et al. 2008).

The southern clubshell is a species of flowing water in large streams and rivers; it most often occurs in gravel substrates with interstitial sand (Williams et al. 2008). The species is a short-term brooder, gravid from late May to late July, with glochidia mature by the second week of June; glochidia are released in thin, ovate conglutinates. One primary glochidial host (*Cyprinella venusta*, blacktail shiner) and one secondary host (*Luxilus chrysocephalus*, striped shiner) have been identified in laboratory trials (Haag and Warren 2003).

39

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 261 of 327

*Population Dynamics and Status and Distribution*

The southern clubshell was listed as endangered under the ESA on March 17, 1993 (USFWS 1993, *see* 58 FR 14330). The species' historic range included streams throughout the Mobile River basin excluding the Mobile Delta, including the Alabama River and tributaries, Alabama; Tombigbee River and tributaries, Mississippi and Alabama; Black Warrior River and tributaries, Alabama; Cahaba River and tributaries, Alabama; Uphapee and Chewacla creeks of the Tallapoosa River system, Alabama; and the Coosa River and tributaries, Alabama, Georgia and Tennessee (USFWS 2000). At present the southern clubshell is known to be extant in widely scattered populations in portions of the Tombigbee, Coosa, Cahaba, Tallapoosa, and Alabama River systems. Status varies among populations – the most robust population is believed to occur in the Sipsey River of the Tombigbee River system, and the best remaining Coosa River system population is apparently in Big Canoe Creek, St. Clair County, AL. The population in the Cahaba River appears to be small and highly localized (MRBMRC 2010).

Habitat modification, sedimentation and water quality degradation are the primary causes of the decline of the southern clubshell. The species is not tolerant of impoundment or channelization; surviving populations are threatened by household and agricultural runoff, channelization or channel maintenance projects, and sand and gravel mining operations.

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the southern clubshell. In addition, restoration and conservation measures for this species are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat (occupied and unoccupied) was designated for the southern clubshell on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes nineteen units: East Fork Tombigbee River, MS (unit 1); Bull Mountain Creek, MS (unit 2); Buttahatchee River, MS, AL (unit 3); Luxapalila Creek, MS, AL (unit 4); Coalfire Creek, AL (unit 5); Lubbub Creek, AL (unit 6); Sipsey River, AL (unit 7); Trussels Creek, AL (unit 8); Sucarnoochee River, AL (unit 9); Cahaba River, AL (unit 13); Alabama River, AL (unit 14); Bogue Chitto Creek, AL (unit 15); Uphapee complex, AL (unit 17); Coosa River, AL (unit 18); Hatchet Creek, AL (unit 19); Kelly Creek, AL (unit 21); Big Canoe Creek, AL (unit 24); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

## Southern pigtoe (*Pleurobema georgianum*) - Endangered

*Species Description and Life History*

The southern pigtoe is a small to medium-sized mussel that occasionally exceeds 60 mm (2.4 in) in length. The shell is elliptical to oval in outline and is somewhat compressed, with a

40

smoothly rounded posterior slope. The pseudocardinal teeth are small but well-developed, and the nacre is white (USFWS 2000). The umbo is broad, slightly inflated, and elevated slightly above the hinge line; the periostracum is yellowish to brown, often with interrupted green rays or radially arranged green blotches, usually disappearing ventrally (Williams et al. 2008).

The habitat of the southern pigtoe is lotic areas of medium streams to large rivers, where individuals are most frequently encountered in riffle habitats with gravel and sand substrates (Mirarchi et al. 2004). The species is a short-term brooder, gravid during spring and early summer, and females produce glochidia in conglutinates that are lanceolate, compressed and orange (MRBMRC 2010). Preliminary laboratory trials suggest that *Cyprinella callistia* (Alabama shiner), *Cyprinella trichroistia* (tricolor shiner) and *Cyprinella venusta* (blacktail shiner) serve as glochidial hosts for the southern pigtoe (P.D. Johnson, pers. com 2007).

*Population Dynamics and Status and Distribution*

The southern pigtoe was listed as endangered under the ESA on March 17, 1993 (USFWS 1993, *see* 58 FR 14330). The species was historically found throughout the Coosa River basin, occurring in the mainstem and its tributaries in Alabama, Georgia and Tennessee (MRBMRC 2010; USFWS 2000). Large collections of this species taken during the early 1900s suggest that it was at that time one of the more common and widespread species of *Pleurobema* in the Coosa River drainage; however, it is now very rare and occurs in only a few isolated populations (Williams et al. 2008). At present, the southern pigtoe is believed to be restricted to the following tributary streams: Conasauga River (GA, TN); Holly Creek (GA); Shoal Creek (AL); Big Canoe Creek (AL); Hatchet Creek (AL); Terrapin Creek (AL); and Yellowleaf Creek (AL). A fresh dead shell of this species was found in the Weiss bypass portion of the Coosa River in 2001, but additional specimens have not been located. The Shoal Creek population appears to be robust but is confined to an isolated stream reach in the Talladega National Forest; all other populations appear to be small (MRBMRC 2010).

Habitat modification, sedimentation, eutrophication and other forms of water quality degradation are the primary causes of the decline of the southern pigtoe. The species cannot tolerate impoundments; surviving populations are threatened by household and agricultural runoff on private lands and, to a lesser degree, by recreational activities on public lands (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the southern pigtoe. In addition, restoration and conservation measures for this species are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

41

Critical habitat (occupied and unoccupied) was designated for the southern pigtoe on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes nine units: Coosa River, AL (unit 18); Hatchet Creek, AL (unit 19); Shoal Creek, AL (unit 20); Kelly Creek, AL (unit 21); Cheaha Creek, AL (unit 22); Yellowleaf Creek, AL (unit 23); Big Canoe Creek, AL (unit 24); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

## Ovate clubshell (*Pleurobema perovatum*) - Endangered

### Species Description and Life History

The ovate clubshell is a small to medium-sized mussel that rarely exceeds 50 mm (2.0 in) in length; the shell is oval to elliptical in shape, and the umbos are nearly terminal. The posterior ridge is well-developed, broadly rounded, and often concave, with the posterior slope produced well beyond the posterior ridge (USFWS 2000). The periostracum is tawny, greenish brown, brown or black, usually without rays; nacre white to bluish white (Williams et al. 2008).

The ovate clubshell occurs in riffles, runs and shoals of small streams to large rivers, where it is usually found in sand and gravel substrates (Williams et al. 2008). However, in coastal plain streams it is found most frequently in silt or silty sand along the stream margin or in side channels, and is rarely found in main channel riffle or run habitat (W.R. Haag and M.L. Warren, USDA Forest Service, unpubl. data). Little is known of the life history of the ovate clubshell, but it is presumably a short-term brooder, gravid during late spring and early summer; glochidial hosts probably include cyprinids (Williams et al. 2008).

### Population Dynamics and Status and Distribution

The ovate clubshell was listed as endangered under the ESA on March 17, 1993 (USFWS 1993, *see* 58 FR 14330). The historic range of this mussel was reported to include the Tombigbee River and tributaries, Mississippi and Alabama; Black Warrior River and tributaries, Alabama; Alabama River, Alabama; Cahaba River and tributaries, Alabama; Chewacla, Uphapee and Opintlocco creeks in the Tallapoosa River system, Alabama; and the Coosa River and tributaries, Alabama, Georgia and Tennessee (USFWS 2000). However, Williams et al. (2008) do not list the Coosa River system above the Fall Line as part of the historic range for this species. Extant, localized populations are known to occur in the Tombigbee River system (Buttahatchee River, MS; Sipsey River, AL; Sucarnoochee River, AL, MS; Luxapalila Creek, AL; Coalfire Creek, AL; Wilson Creek, AL; Yellow Creek, MS), the Alabama River system (Bogue Chitto Creek, AL; Big Flat Creek, AL), the Tallapoosa River system (Chewacla Creek, AL), and the Cahaba River. The Sipsey River has the most robust population, but most of the populations are believed to be declining, and none are large (MRBMRC 2010).

Habitat modification, sedimentation, eutrophication, and other forms of water quality degradation are the primary causes of the decline of the ovate clubshell. This species cannot

tolerate impoundments or channelization; surviving populations are threatened by channel erosion, household and agricultural runoff, and channelization (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the ovate clubshell. In addition, restoration and conservation measures for this species are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat (occupied and unoccupied) was designated for the ovate clubshell on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes twenty units: East Fork Tombigbee River, MS (unit 1); Bull Mountain Creek, MS (unit 2); Buttahatchee River, MS, AL (unit 3); Luxapalila Creek, MS, AL (unit 4); Coalfire Creek, AL (unit 5); Lubbub Creek, AL (unit 6); Sipsey River, AL (unit 7); Trussels Creek, AL (unit 8); Sucarnoochee River, AL (unit 9); Sipsey Fork, AL (unit 10); North River, AL (unit 11); Locust Fork, AL (unit 12); Cahaba River, AL (unit 13); Uphapee complex, AL (unit 17); Coosa River, AL (unit 18); Hatchet Creek, AL (unit 19); Kelly Creek, AL (unit 21); Big Canoe Creek, AL (unit 24); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

## Triangular kidneyshell (*Ptychobranchus greenii*=*P. foremanianus*) - Endangered

*Species Description and Life History*

The triangular kidneyshell is a medium-sized mussel, with shell length reaching as much as 85 mm (3.3 in); the shell is thick, compressed, sometimes flattened ventral to the umbos. The outline is subtriangular to oval, with posterior margin narrowly rounded, anterior margin rounded, dorsal margin convex, and ventral margin straight to slightly convex. The posterior ridge is high and rounded, and the posterior slope is usually moderately steep. The umbo is broad, moderately inflated, elevated above the hinge line. The periostracum is tawny to brown, usually without rays; when rays are present they are thin, sparse, and usually confined to the posterior slope (Williams et al. 2008).

The triangular kidneyshell occurs in shoal habitats in a variety of stream sizes, ranging from small streams to large rivers; it is usually found in sand and gravel substrates (Williams et al. 2008). The species is a long-term brooder, gravid from autumn to the following spring or summer (Haag and Warren 1997). Glochidia are discharged bound as conglutinates that resemble dipteran larvae or darter eggs (MRBMRC 2010); those resembling dipteran larvae are adhesive and often attached to the substrate by a short, transparent filament or tube (Hartfield and Hartfield 1996). Fishes reported to serve as glochidial hosts based on laboratory trials include the percids *Etheostoma bellator* (Warrior darter), *Etheostoma douglasi* (Tuskaloosa darter), *Percinakathae* (Mobile logperch) and *Percina nigrofasciata* (blackbanded darter) (Haag and Warren 1997).

43

*Population Dynamics and Status and Distribution*

The triangular kidneyshell was listed as endangered under the ESA on March 17, 1993 (USFWS 1993, *see* 58 FR 14330). The historic range encompassed most of the Mobile Basin, primarily above the Fall Line, including the Black Warrior River and tributaries, Alabama; Cahaba River, Alabama; and Coosa River and tributaries, Alabama, Georgia and Tennessee (USFWS 2000). Some experts now believe that this species is restricted to the Black Warrior and Tombigbee river drainages, with the form in the remainder of the Mobile Basin being the very closely related *P. foremanianus* (rayed kidneyshell), based on the extent of development of dark green rays on the periostracum and on preliminary genetic analysis (Williams et al. 2008; K.J. Roe, pers. comm.). If this analysis is accurate, then the triangular kidneyshell is presently known to be extant from the Black Warrior River system (Sipsey Fork, Flannigan Creek, Capsey Creek, Brushy Creek, and Locust Fork) and the Tombigbee River system (Coalfire Creek). The rayed kidneyshell is presently thought to be extant in the Cahaba River system (Cahaba River and Little Cahaba River) and the Coosa River system (Big Canoe Creek, Yellowleaf Creek, and the Conasauga River). Most populations of both forms are small and highly localized; several recent droughts may have eliminated some of the populations of the triangular kidneyshell in smaller tributaries in the Black Warrior River system (MRBMRC 2010).

Habitat modification, sedimentation, eutrophication, and other forms of water quality degradation are the primary causes of the decline of the triangular kidneyshell (including the rayed kidneyshell). This species does not tolerate impoundment; surviving populations are threatened by urban and agricultural runoff, surface mine drainage, industrial and sewage treatment plant discharges, and localized household discharges (USFWS 2000).

In November 2000, the Service published the multi-species *Mobile River Basin Aquatic Ecosystem Recovery Plan* that included the triangular kidneyshell (including the rayed kidneyshell). In addition, restoration and conservation measures for this species are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat (occupied and unoccupied) was designated for the triangular kidneyshell (including the rayed kidneyshell) on July 1, 2004 (USFWS 2004, *see* 69 FR 40084) and includes thirteen units: Sipsey Fork, AL (unit 10); North River, AL (unit 11); Locust Fork, AL (unit 12); Cahaba River, AL (unit 13); Coosa River, AL (unit 18); Hatchet Creek, AL (unit 19); Shoal Creek, AL (unit 20); Kelly Creek, AL (unit 21); Cheaha Creek, AL (unit 22); Yellowleaf Creek, AL (unit 23); Big Canoe Creek, AL (unit 24); Oostanaula complex, GA, TN (unit 25); and Lower Coosa River, AL (unit 26) (Figure 4).

44

## Southern combshell (*Epioblasma penita*) - Endangered

*Species Description and Life History*

The southern combshell is a medium-sized mussel that reaches a maximum shell length of ca. 73 mm (2.9 in); the shell is thick, moderately inflated, becoming highly inflated with age. The male shell outline is triangular, the female outline irregularly elliptical. The species is highly sexually dimorphic, with the posterior of the shell swollen and radially sculptured in females, angulated and flattened in males. The umbo is broad, moderately inflated, elevated well above the hinge line. The periostracum is tawny to greenish brown, sometimes becoming dark brown with age, usually with thin, green to dark brown rays; the nacre is white (USFWS 2000; Williams et al. 2008).

The southern combshell occurs in lotic areas of small to large rivers, up to 1.5 m (4.9 ft) in depth, with moderate to swift current and predominantly gravel and sand substrates (Williams et al. 2008). The species is a long-term brooder, gravid from late summer or autumn to the following spring or summer. Females are known to entrap host fishes as part of the natural infestation process. Based on laboratory trials, the primary host fish for the southern combshell is *Percina kathae* (Mobile logperch); a secondary host is *Percina nigrofasciata* (blackbanded darter) (MRBMRC 2010).

*Population Dynamics and Status and Distribution*

The southern combshell was listed as endangered under the ESA on April 7, 1987 (USFWS 1987, *see* 52 FR 11162). The species is endemic to the Mobile Basin in Alabama and Mississippi; the historic range included the mainstem of the Coosa and Cahaba rivers in Alabama; the Black Warrior River below the Fall Line, Alabama; the Tombigbee River and tributaries, Mississippi and Alabama; and the Alabama River in Alabama (USFWS 2000). The southern combshell is currently restricted to less than 15 km (9.3 mi) of shoal habitat in the lower Buttahatchee River in Lowndes and Monroe counties, MS. Several individuals per hour have been encountered on several shoals during recent surveys, and there is evidence of recent recruitment at some of the sites (MRBMRC 2010).

Habitat modification in the form of channelization and impoundment, sedimentation, and water quality degradation are the primary causes of decline of the southern combshell; this species cannot tolerate impoundments. Surviving populations are threatened by agricultural runoff and by channel degradation initiated by sand and gravel mining within and adjacent to river channels.

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the southern combshell. A five-year review of the species was initiated on September 8, 2006 (USFWS 2006, *see* 71 FR 53127), and restoration and conservation measures for the southern combshell are discussed in the Mobile River Basin

45

Page 267 of 327     Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat has not been designated for the southern combshell.

## Georgia pigtoe (*Pleurobema hanleyianum*) - Endangered

*Species Description and Life History*

The Georgia pigtoe is a medium-sized mussel, reaching shell lengths of up to 50 mm (2.0 in). The shell is oval in outline, moderately thin and moderately inflated; the posterior margin is narrowly rounded, the anterior margin is rounded, the dorsal margin is convex, and the ventral margin is straight to slightly convex. The posterior ridge is low and rounded, and the posterior slope is moderately wide and flat. The umbos are broad, slightly inflated in some individuals, and elevated slightly above the hinge line. The periostracum is yellowish to dark brown and occasionally has concentric green rings that usually become thinner and less distinct ventrally (Williams et al. 2008).

The Georgia pigtoe inhabits shallow runs and riffles in shoals of large streams and small to large rivers, where it can be found in coarse sand-gravel-cobble substrata. The species is believed to be a short-term brooder, with females gravid in spring and summer (Williams et al. 2008). Its host fishes are unknown, but minnows of the genus *Cyprinella* are known glochidial hosts for other members of the genus *Pleurobema* and are therefore likely to be hosts for the Georgia pigtoe as well (MRBMRC 2010).

*Population Dynamics and Status and Distribution*

The Georgia pigtoe was listed as endangered under the ESA on November 2, 2010 (USFWS 2010, *see* 75 FR 67512). The species was historically found in large streams and rivers of the Coosa River drainage of Alabama, Georgia and Tennessee (Johnson and Evans 2000). There are historical records of the Georgia pigtoe from the Conasauga River (GA, TN); Coosa River (GA, AL); Etowah River (GA); Terrapin Creek (AL); Big Canoe Creek (AL); Little Canoe Creek (AL); Shoal Creek (AL); Morgan Creek (AL); and Hatchet Creek (AL) (Gangloff 2003). The only known extant populations for the species occur in the Conasauga River (GA) and in the Weiss bypass reach of the Coosa River (AL), and the population persists at very low levels at both of these locations (MRBMRC 2010). Habitat modification, sedimentation, eutrophication, and other forms of water quality degradation are thought to be the primary causes of the decline of the Georgia pigtoe.

*Critical Habitat Description*

46

Critical habitat (occupied and unoccupied) was designated for the Georgia pigtoe on November 2, 2010 (USFWS 2010, *see* 75 FR 67512) and includes three units: Conasauga River (unit GP1); Terrapin Creek and Coosa River (unit GP2), and Hatchet Creek (unit GP3) (Figure 5).



Figure 5. Critical habitat units for the Georgia Pigtoe[22]

## Heavy pigtoe (*Pleurobema taitianum*) - Endangered

*Species Description and Life History*

The heavy pigtoe is a medium-sized mussel, with an average shell length of about 50 mm

_____

22  Source: USFWS 2010, see 74 FR 67512

47

(2.0 in). The shell is thick, inflated anteriorly, with a triangular outline. The posterior margin is obliquely truncate to bluntly pointed; the anterior margin is straight to rounded; the dorsal margin is convex; and the ventral margin is broadly rounded. The posterior ridge is low to well-developed, rounded, with a steep posterior slope; there is a shallow sulcus just anterior of the posterior ridge. The umbos are narrow, inflated, anteriorly positioned, and elevated well above the hinge line. The periostracum is brown or olive brown to black, often darkening with age, usually without rays. The nacre is white or, occasionally, pale pink (USFWS 2000; Williams et al. 2008).

The heavy pigtoe is a large stream and river species, where it has been reported from gravel shoals (Williams 1982). In the Alabama River, the species is most often found in gravel/sand mixture, in water exceeding 6 m (20 ft) in depth, with variable current (Williams et al. 2008). The heavy pigtoe is a short-term brooder; gravid females are present during spring and summer (P.D. Johnson, pers. comm.). Glochidial fish hosts are unknown, but other members of the genus *Pleurobema* use members of the family Cyprinidae (Haag and Warren 2003), specifically shiners in the genus *Cyprinella* (MRBMRC 2010).

*Population Dynamics and Status and Distribution*

The heavy pigtoe was listed as endangered under the ESA on April 7, 1987 (USFWS 1987, *see* 52 FR 11162). The species is a Mobile Basin endemic, with a historic range that includes the mainstem of the Tombigbee, Cahaba, Coosa, and Alabama rivers in Alabama and Mississippi. The only known extant population of the heavy pigtoe is located in a short reach of the Alabama River in Dallas County, AL; an unconfirmed remnant population has been recently reported from the middle reaches of the Tombigbee River, Choctaw and Marengo counties, AL (MRBMRC 2010). Habitat modification for navigation is the primary cause of the decline of the species. Agricultural runoff, sand/gravel mining within or adjacent to the river channel, and low population levels also threaten the heavy pigtoe (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the heavy pigtoe. A five-year review of the species was initiated on September 8, 2006 (USFWS 2006, *see* 71 FR 53127), and restoration and conservation measures for the heavy pigtoe are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

*Critical Habitat Description*

Critical habitat has not been designated for the heavy pigtoe.

**Inflated heelsplitter (*Potamilus inflatus*) - Threatened**

*Species Description and Life History*

48

The inflated heelsplitter has a thin, oval, compressed to moderately inflated shell and reaches a length of up to 160 mm (6.3 in); males are considerably larger than females. The shell outline is triangular, winged, may become oval if dorsal wings are eroded or broken; the posterior margin is obliquely truncate to rounded; the anterior margin is narrowly rounded; the dorsal margin has a large rounded dorsal wing posterior to umbo and a small triangular dorsal wing anterior to umbo, wings are often broken or eroded; and the ventral margin is usually convex. The posterior ridge is low and rounded; the posterior slope is flattened to slightly concave, merging with the posteriodorsal wing; and the umbo is low, broad, and not or only slightly elevated above the hinge line. The periostracum is olive brown to nearly black, usually without rays (may have green rays in young individuals), and the nacre is bluish in females and young males, purple in large males (USFWS 2000; Williams et al. 2008).

The preferred habitat of the inflated heelsplitter is soft, stable substrates in streams with slow to moderate current. It is primarily a species of large rivers, but a few records exist from small to medium rivers, and it is rarely found in reservoirs. It has been found in sand, mud, silt and sandy gravel but avoids large or armored gravels. This species is usually associated with the protected side of bars, and it may occur in depths to greater than 6 m (20 ft).

The inflated heelsplitter is a long-term brooder, with females gravid from autumn to the following summer. The species is reported to discharge glochidia in June and July; the only reported host fish is the freshwater drum, *Aplodinotus grunniens*, which was determined by observations of natural infestations (Roe et al. 1997).

*Population Dynamics and Status and Distribution*

The inflated heelsplitter was listed as threatened under the ESA on September 28, 1990 (USFWS 1990, see 55 FR 39868). The historic range is usually listed as the Amite and Tangipahoa rivers, Louisiana; Pearl River, Mississippi; and the Tombigbee, Black Warrior, Coosa and Alabama rivers, Alabama, below the Fall Line. Extant populations of the species occur in the Alabama River below Claiborne Dam (AL); the Black Warrior River (AL); the Sipsey River (AL); the Tombigbee River (AL); and the Amite River (LA) (MRBMRC 2010). However, recent genetic analyses have indicated that the Amite River population is likely to be a distinct species (Roe and Lydeard 1998). The status of the Alabama populations is unknown, although the Black Warrior and Tombigbee river populations appear to be more robust than those in the Alabama and Sipsey rivers (MRBMRC 2010). Historic habitat for the inflated heelsplitter has been impacted by channel modification for navigation and flood control, impoundment, pollution, channel dredging for navigation, and gravel mining (USFWS 2000).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the inflated heelsplitter. In addition, a five-year review of the species was initiated on July 29, 2008 (USFWS 2008, *see* 73 FR 43947), and restoration and conservation measures for the inflated heelsplitter are discussed in the Mobile River Basin Mollusk Restoration Committee's 2010 Plan (MRBMRC 2010).

49

*Critical Habitat Description*

Critical habitat has not been designated for the inflated heelsplitter.

## Blue shiner (*Cyprinella caerulea*) - Threatened

*Species Description and Life History*

The blue shiner is a medium-sized cyprinid that can reach up to ca. 103 mm (4 in) in standard total length. It often appears to be a dusky blue color, with pale yellow fins, and has diamond-shaped scales outlined with melanophores and a distinct lateral line (USFWS 2000). The breeding males develop bright metallic blue color with an intense blue-green lateral stripe (Mirarchi et al. 2004). The fins become bright yellow to orange, edged in milky white, with the last two membranes of the dorsal fin becoming jet black; breeding tubercles develop on top of head and on mandibles. Breeding females also develop some yellow in the fins (Boschung and Mayden 2004).

The blue shiner usually inhabits pools with sand, gravel, or rubble substrates in small to medium, clear, cool streams; they are occasionally found over silt and mud in times of temporary higher flows and turbidity levels. Typically, individuals are found near the banks of the stream, where water depth is 0.6 m (2 ft) or less and current is negligible. Spawning usually begins in April, at water temperatures of about 16°C. The peak of the spawning season occurs later, usually in May/June, and spawning concludes in late July or early August. Individuals have been observed spawning in crevices of logs and other woody debris in relatively deep water with moderate flow (Johnston and Shute 1997). Like other *Cyprinella* species, the blue shiner is thought to produce multiple clutches of eggs during the reproductive period. The species is an opportunistic drift feeder whose diet consists primarily of terrestrial insects, supplemented by fish eggs, small fishes, and aquatic oligochaetes. In winter months, when insects are scarcer, the diet is supplemented with detritus and plant seeds. The maximum life span of the blue shiner is thought to be three years (USFWS 2000; Boschung and Mayden 2004).

*Population Dynamics and Status and Distribution*

The blue shiner was listed as threatened under the ESA on April 22, 1992 (USFWS 1992, *see* 57 FR 14786).The species is endemic to the Mobile Basin, and historically it was known from the Cahaba River in Alabama and from the Coosa River and several of its tributaries in Alabama, Georgia and Tennessee (USFWS 2000). Presently, the species is limited to the Coosa River system where it can still be found in the Conasauga River (GA, TN) and its tributary Minnewauga Creek (TN); Little River (AL); Choccolocco Creek (AL); Spring Creek (AL), and Weogufka Creek (AL). The blue shiner was last seen in the Cahaba River in the early 1970s (USFWS 2000).

50

Water quality degradation has reduced the blue shiner's range. Populations have been extirpated because of urbanization, sewage pollution, strip-mining activities, and poor land management practices. Construction of reservoirs has fragmented and isolated some populations (USFWS 2000). Late maturity and low fecundity make it difficult for this species to survive these types of disturbances (Boschung and Mayden 2004).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the blue shiner. In addition, a five-year review of the species was initiated on August 2, 2007 (USFWS 2007, *see* 72 FR 42425).

*Critical Habitat Description*

No critical habitat has been designated for the blue shiner.

**Amber darter (*Percina antesella*) - Endangered**

*Species Description and Life History*

The amber darter is a small, slender-bodied percid rarely exceeding 60 mm (2.5 in) in length; males have an elongate anal fin. The upper body is golden brown with four dark saddles, which may be narrowly haloed by a light greenish margin. The sides are marked with small, brown,indistinct blotches. The belly and underside of the head are generally light in color. The snout is pointed and a wide, dark teardrop extends below the eyes. The fins are clear or faintly banded. Breeding males develop tubercles on the belly, caudal peduncle, and on the anal, caudal, and paired fins (USFWS 2000; Freeman and Hagler 2010).

Amber darters typically occur in riffles or shoals with cobble and gravel substrates and moderate to swift currents; they are often found in shoals with the submerged aquatic macrophyte riverweed (*Podostemum ceratophyllum*). The species is rarely found in areas of reduced flow or accumulated silt, and they also tend to avoid very shallow (<20 cm/8 in) waters. Amber darters are known to burrow into loose gravel and sand, possibly to hide from predators. The diet includes snails, limpets and immature aquatic insects such as midge, black fly and caddisfly larvae (Freeman and Hagler 2010).

The reproductive life history of the amber darter is largely unknown. Spawning likely occurs in late winter/spring, based on collections of gravid females during these times. In the laboratory, female amber darters bury their eggs in gravel sediments. Based on the life history of closely related species, newly hatched amber darter young presumably drift downstream from the spawning sites and occupy lower velocity habitats until completing their development. Amber darter juveniles appear at the riffle habitat during the summer (Freeman and Hagler 2010).

*Population Dynamics and Status and Distribution*

51

The amber darter was listed as endangered under the ESA on September 5, 1985 (USFWS 1985, see 50 FR 31597). The species is endemic to the upper Coosa River system in Georgia and Tennessee, historically known only from the Conasauga River (GA, TN) and the Etowah River and its tributary Shoal Creek (GA). Recent (early 1990s) survey efforts for the amber darter documented it occurring at eight sites in the Etowah River as well as in the lower portion of its tributary Sharp Mountain Creek; it was also found at one site in Shoal Creek. More recently, the species has been found in the Etowah River from near the mouth of Amicalola Creek downstream from Canton, GA. The amber darter also still occurs in an approximate 55 km (33.5 mi) reach of the Conasauga River. In 2010, a single amber darter was collected in the Coosawattee River downstream of Carter's Lake Reservoir (Freeman and Hagler 2010).

Due to its limited range, any activities that degrade habitat and water quality, such as chemical spills, increased logging activity, road and bridge construction, or stream channel modifications could pose a threat to the amber darter (USFWS 2000).The species is also vulnerable to loss of quality habitat resulting from suburban and urban development; non-point source pollution from agricultural lands may also be a significant threat. Water-supply reservoirs constructed on tributaries and off-stream that discharge to the mainstems of the Etowah or Conasauga rivers could significantly alter water flow and thermal regimes in riffles that provide habitat for amber darters (Freeman and Hagler 2010).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the amber darter. In addition, a five-year review of the species was initiated on July 6, 2009 (USFWS 2009, see 74 FR 31972).

*Critical Habitat Description*

Critical habitat was designated for the amber darter on September 5, 1985 (USFWS 1985b, see 50 FR 31597), and includes the Conasauga River from the U.S. Route 411 bridge in Polk County, Tennessee, downstream approximately 33.5 miles through Bradley County, Tennessee and Murray and Whitfield Counties, Georgia, to Tibbs Bridge Road bridge (Murray County Road 109/Whitfield County Road 100).

## Goldline darter (*Percina aurolineata*) - Threatened

*Species Description and Life History*

The goldline darter is a slender, medium-sized percid fish in the subgenus *Hadropterus*, reaching a maximum length of about 75 mm (3 in). The species is dully colored, with a broad, light dusky middorsal area bordered by small elongate blotches that are more or less fused to form a dark dorsolateral stripe; a distinct brownish-red or amber dorsolateral stripe; 8 or 9 dark, partially fused, oval midlateral blotches; a white or dusky venter; and clear to dusky fins. Breeding males are typically darker than breeding females; the dorsum, spinous dorsal fin, and

52

the caudal fin base become bright yellow, and amber spots develop on the top of the snout and head (USFWS 2000; Boschung and Mayden 2004).

The usual habitat of the goldline darter is streams with moderate to swift flow, depths of 0.6 m (2 ft) or more, and substrates of sand, gravel interspersed among cobble and small boulders; shallow habitats are often vegetated with water willow (*Justicia* sp.) or river weed (*Podostemum* sp.). Very little is known about the life history of the species; gravid females have been collected from March – June, and males collected in early September had completely regressed testes, suggesting that spawning occurs from about early April to July. Eggs are deposited in sand or fine gravel just below large rocks in runs with moderate current, and no parental care is provided (Boschung and Mayden 2004). The goldline darter is a benthic feeder, preying on insects and possibly other macroinvertebrates from rocks.

*Population Dynamics and Status and Distribution*

The goldline darter was listed as threatened under the ESA on April 22, 1992 (USFWS 1992, *see* 57 FR 14786). The species probably once ranged throughout parts of the upper Mobile Basin in Alabama and Georgia. It was historically known from ca. 79 km (49 miles) of the Cahaba River, almost 11 km (7 miles) of the Little Cahaba River, and from Schultz Creek, all in the Cahaba River system of Alabama; more recently, the species was also found to occur in the lower portion of Shades Creek, another tributary to the Cahaba River. In the Coosa River system, it occurred in the Coosawattee River and its tributary Talking Rock Creek, the Ellijay River and its tributaries Mountaintown and Boardtown creeks, and the Cartecay River, all in Georgia. The goldline darter persists in most if not all of these streams, but the distribution in the Cahaba River is now believed to be restricted to ca. 43 km (27 mi), just over half the former range there, and the species is believed to be extirpated in parts of the Little Cahaba River as well. At all sites, populations of the species appear to be small and localized (USFWS 2000; Boschung and Mayden 2004).

Water quality degradation, particularly sedimentation, has reduced the goldline darter's range within the Cahaba River system and is the primary threat to the species throughout its range (USFWS 2000). Deforestation and agriculture have increased erosion by several orders of magnitude; strip mining, highway construction, and general urban development have also increased siltation rates. Municipal sewage effluents and pollutants that accompany industrialization have also seriously affected the goldline darter's habitat (Boschung and Mayden 2004).

In November 2000, the Service published the multi-species Mobile River Basin Aquatic Ecosystem Recovery Plan that included the goldline darter. In addition, a five-year review of the species was initiated on August 2, 2007 (USFWS 2007, *see* 72 FR 42425).

*Critical Habitat Description*

53

No critical habitat has been designated for the goldline darter.

## Red-cockaded woodpecker (*Picoides borealis*) - Endangered[23]

*Species Description and Life History*

The red-cockaded woodpecker (RCW) is a small black-and-white woodpecker with longish bill. RCWs are cooperative breeders, living in family groups that typically consist of a breeding pair with or without one or two male helpers. Females may become helpers, but do so at a much lower rate than males (USFWS 2003). A vital habitat feature for the species is the presence of live pine trees, which are used for constructing cavities - a task that commonly takes several years to complete. Family groups, or colonies, are non-migratory and defend a territory, or group of cavity trees, known as a cluster. Clusters typically consist of one to twenty trees that range in size from three to sixty acres, with an average cluster size of ten acres. RCWs require large continuous tracts of suitable habitat, with a typical family group occupying a home range of 100 to 400 acres, depending on the quality of foraging habitat (USFWS 2003).

RCWs exploit the ability of live pines to produce large amounts of resin. The resin is allowed to drip down the tree (often referred to as resin wells) forming a barrier to deter climbing snakes and other predators that try and enter the cavity via the stem of the tree. Longleaf pine is a preferred tree species for cavity excavation because it typically produces more resin, and for a longer period of time, than other southern pines species.

Suitable nesting habitat for the RCW generally consists of open pine forests and savannahs with large, older pines and a minimal amount of hardwoods. RCWs prefer excavating cavities out of living trees, especially those that are subject to red-heart disease, which makes it easier for birds to excavate. Suitable foraging habitat consists of open-canopy mature pine forests with low densities of small pines, little midstory vegetation, limited hardwood overstory, and abundance of bunchgrass and forbs (USFWS 2003).

*Population Dynamics and Status and Distribution*

The RCW is endemic to open, mature and old growth pine ecosystems in the southeastern United States. It was listed as endangered, under the ESA, in 1970, for the entire extent of its range. Currently, there are an estimated 14,068 RCWs living in 5,627 known active clusters across the eleven southeastern states. This is less than 3 percent of estimated abundance at the time of European settlement. Despite protection of the ESA, RCW populations continued to decline during the 1970's and 1980's. In the 1990's, in response to intensive management based on a new understanding of population dynamics and new management tools, most populations were stabilized and many showed increases.

---

23 Refer to the Recovery Plan for the Red-cockaded Woodpecker for a more information (USFWS 2003)

*Critical Habitat Description*

There is no critical habitat for the RCW.

## ENVIRONMENTAL BASELINE

The "environmental baseline" includes the past and present impacts of all Federal, State, or private actions and other human activities in the action area, the anticipated impacts of all proposed Federal projects in the action area that have already undergone formal or early section 7 consultation, and the impact of State or private actions which are contemporaneous with the consultation in process (50 CFR §402.02). We have listed below the environmental baseline for each action, including, the status of the species and the factors that may affect the species within each action area.

## Action (1) Alabama Power's Proposal for Operations

*Status of the species within the action area*

There are currently nine listed aquatic species (southern clubshell, finelined pocketbook, Georgia pigtoe, southern pigtoe, blue shiner, tulotoma snail, painted rocksnail, cylindrical lioplax, and rough hornsnail) and 12 critical habitat units that occur within the action area (refer to Table 1). Below is a description of the status of each species within the action area.

Southern clubshell: The southern clubshell occurs in the Coosa River in the Weiss Bypass, where it is common; in the Coosa River downstream of Logan Martin, where it is rare; and in the lower reaches of Big Canoe Creek, to the point where Big Canoe becomes impounded from the backwaters of Neely Henry Dam, where it is common. According to the USFWS (2004), the southern clubshell is present in approximately 394 stream miles across the Mobile River Basin. Its distribution within the action area represents approximately 8.5 miles which is slightly greater than 2 percent of its total range.

Finelined pocketbook: The finelined pocketbook occurs in the Weiss Bypass, where it is very rare; however, it has a rather wide distribution across the Coosa/Tallapoosa Basin. The Weiss Bypass population likely represents less than 1 percent of its current range.

Southern pigtoe: A single, fresh-dead southern pigtoe was collected in the Weiss Bypass in 2001. Although it has not been collected since that time, this location represents one of eight known locations where the species occurs.

Georgia pigtoe: The Georgia pigtoe was collected live in the Weiss Bypass, in 1997, and despite multiple attempts, it has not been collected since that time. The only other known

55

population occurs in the Conasauga River in Georgia.

Blue shiner:  The blue shiner occurs at the boundary of the action area in Little River and in Spring Creek in Weiss Reservoir.  These populations collectively represent one of only three known populations within the action area - the other two include upper Choccolocco Creek and Weogufka Creek.

Tulotoma snail:  Tulotoma is abundant in the Coosa River downstream of Logan Martin Dam[24] and Jordan Dam[25], and in lower Choccolocco Creek down to the summer pool elevation of Logan Martin. It is also found in lower numbers in Kelly and Yellowleaf creeks.  Its distribution within the action area represents approximately 80 percent of its known range, the strongest population occurring in the Coosa River downstream of Jordan Dam.

Painted rocksnail:  The painted rocksnail is extant in three known locations, two of which are within the action area (Choccolocco Creek and the Coosa River downstream of Logan Martin Dam).  It is fairly abundant in Choccolocco Creek down to the summer pool elevation of Logan Martin, and it is very rare in the Coosa River downstream of Logan Martin Dam. Within the action area, the painted rocksnail occurs in approximately 2.5 miles, which represents about 20 percent of its overall range.

Cylindrical lioplax:  Within the action area, the cylindrical lioplax occurs only in lower Choccolocco Creek, but is extremely rare. The Choccolocco Creek population potentially represents less than 1 percent of the overall range of the species.  Although this may seem insignificant to the overall range of the species, it likely represents a very important population because it is one of only two populations in the entire Coosa River system.

Rough hornsnail:  The rough hornsnail is known from two locations, both of which are within the action area, and include: lower Yellowleaf Creek near Alabama Highway 25; a 14 km (8 mi) reach downstream of Jordan Dam from about Corn Creek Shoals to just below the Fall Line at Wetumpka, Alabama[26].  Approximately 90 percent of its known range is within the action area.

In 2004, 26 critical habitat (CH) units were designated for 11 freshwater mussel species in the Mobile River Basin (Figure 4).  Six of the units are within the action area (Units 18, 19, 21, 23, 24, and 26).  Two units are on the mainstem of the Coosa River and include: the Coosa River below the Weiss Spillway[27] (Unit 18); the Coosa River below Jordan Dam (Unit 26).  The remaining four units are located on tributaries of the Coosa and include: Hatchet Creek (Unit 19); Kelly Creek (Unit 21); Yellowleaf Creek (Unit 23); and Big Canoe Creek (Unit 24).  Each

24 Refer to Lay Lake BO
25 Refer to Jordan Emergency BO
26 USFWS 2010, see, 75 FR 37512
27 Weiss Spillway = Weiss Bypass

56

CH unit is designated for multiple mussel species, many of which do not currently occupy the unit. Within the action area, only two species are present in CH units designated by this rule: the southern clubshell and the finelined pocketbook. The southern clubshell occurs in approximately 4.5 miles of the Coosa River downstream of Weiss Spillway and is known from a short reach in the Coosa River below Jordan Dam. The finelined pocketbook occupies a short reach of the Coosa River downstream of the Weiss Spillway.

In 2010, CH was designated for the rough hornsnail, interrupted rocksnail, and Georgia pigtoe (USFWS 2010). Each CH unit is listed below:

Rough hornsnail: Three CH units were designated for the rough hornsnail, two of which are within the action area and include: a 13 mile reach of the lower Coosa River extending from Jordan Dam, downstream to the confluence of the Tallapoosa River (RH1), and approximately 4 miles of Yellowleaf Creek from the confluence of Morgan Creek downstream to 1 mile below the Alabama Highway 25 crossing in Shelby County, Alabama (RH2).

Interrupted rocksnail: Three CH units were designated for the interrupted rocksnail, two of which are in the action area and include: a 13 km (8 mi) area between Jordan Dam and Alabama Highway 111 in Elmore County (IR1); an 11 km (7 mi) reach of the Coosa River extending from the Weiss Spillway downstream to about 1.6 km (1 mi) below the confluence of Terrapin Creek, Cherokee County, Alabama (IR2).

Georgia pigtoe: Three CH units were also designated for the Georgia pigtoe, two of which are within the action area and include: Terrapin Creek from Alabama Highway 9, downstream to the confluence of the Coosa River, and the Coosa River from Weiss Spillway downstream 1 mile below the confluence of Terrapin Creek (GP2); Hatchet Creek from County Road 4, downstream to the confluence of Swamp Creek (GP3)[28].

The primary constituent elements (PCEs)for all the CH units are very similar and generally include: stable stream and river channels, a flow regime necessary to maintain benthic habitats[29], water quality that supports the complete life cycle of the species, a diverse substrate with minimal filamentous algae, and for mussels, presence of suitable fish host(s).

*Factors affecting species environment within the action area*

There are several factors that potentially influence listed species and critical habitat within the action area, including: the continued inundation of habitat, habitat fragmentation, poor water quality (primarily DO levels and toxic substances), permitted and non-permitted discharges, random spills, water withdrawals, drought, and project releases. Some of these

---

28 USFWS 2010, *see*, 75 FR 67512

29 The magnitude, frequency, duration, and seasonality of discharge over time necessary to maintain benthic habitats where the species is found. Unless other information becomes available, existing conditions at locations where the species occurs will be considered as minimal flow requirements for survival

57

Filed: 06/17/2016    Page 279 of 327

USCA Case #16-1195    Document #1621558

factors are controllable within the action area, yet some originate outside of the action area and are beyond the scope of this consultation.

a.      Inundation of habitat.

Impoundments (inundation of riverine habitat) have already eliminated the majority of "big river" habitat in the Coosa River Basin. These activities began as early as the 1920's (starting with the construction of Lay Dam) and are beyond the scope of this consultation. However, the continued impoundment of these projects results in continual degradation of benthic habitats by sedimentation, reducing water velocities, changing flow patterns, and changing water chemistry both above and below dams. These impoundments/dams are also a barrier to the movement of fishes, as well as mussels and snail that could normally be transported upstream and downstream by migrating fishes. Because of this, fish and mollusk populations have become fragmented and genetic interchange has virtually been eliminated. As a result, imperiled aquatic species surviving in the unimpounded tributaries and mainstem river reaches have become isolated and are virtually without means of immigration and emigration (FWS 2000). However, there are small pockets of salvageable habitat remaining in some of the larger tributaries and project tailraces. These areas could offer the best opportunities for species restoration in the Basin.

b.      Dissolved oxygen.

Dissolved oxygen (DO) is probably one of the most important water quality parameters that affects listed aquatic species in the action area. DO is a basic life requirement of all living aquatic animals, and nearly all of the species in this consultation, to a certain extent, require well-oxygenated, flowing water. Determining DO levels is a complicated process that involves nutrient levels, temperature, and the amount of aeration that takes place in the system.

Temperature in the reservoirs is dictated by season and retention time, while temperature in the tailrace is dictated by depth at which waters are withdrawn from the reservoir for hydropower generation. Within the reservoirs, thermal stratification plays a big role. During the summer, waters tend to stratify, or separate into two layers: a warm surface layer that is relatively rich in dissolved oxygen and a colder bottom layer. The oxygen in the lower layer is gradually consumed by organic material—which is washed into the reservoir when it rains or is discharged from sewage treatment plants, industries, or other sources—as it settles to the bottom and decays. The two layers of water don't mix very well because of the temperature difference, so the oxygen in the lower layer is not replaced. By the end of the summer, oxygen supplies near the bottom of the reservoir can be entirely depleted.

Within the tailrace, DO and temperature are primarily influenced by the depth at which water is withdrawn for generation. During the spring and winter when streamflows are typically at their highest point, DO levels tend to maintain acceptable levels in the receiving reservoirs, as well as in the mainstem of the Coosa. However, when streamflows begin to decline in the

58

summer and early fall, and large portions of tributary inflows are captured and held in the reservoirs to maintain desired elevations, DO levels in the tailraces begin to suffer. The critical factors then become the frequency and depth at which water is released from the projects. As mentioned above, there is normally not an issue with DO levels in the winter and spring. Only during the warmer months when water is being conserved and hydropower is being generated on a routine schedule (morning and evening), with only minimal flows, if any, provided in the downstream tailrace is the potential problem. The short periods when APC is generating can be an issue, but it's typically during the when the project is not generating that become the bigger issue simply because the lack of flow in the tailrace is sufficient to maintain DO levels. The discharge of DO-poor waters can be mitigated by either natural aeration (mixing of surface releases) or by artificial or mechanical means (turbine vents).

c.     Discharges

Non-permitted and permitted discharges (including non-point source runoff) contribute large volumes of nutrients and other pollutants into the action area. There are several industrial dischargers in the reach downstream of Logan Martin Dam, near Childersburg, one municipal discharger in the Weiss Bypass, and one in the Coosa River downstream of Jordan Dam. There is also the potential for considerable amounts of non-point source pollution entering the system through activities such as residential development and agricultural practices (e.g., row crops, poultry and cattle farming, and commercial nurseries). Although nutrients are vital to the ecosystem, excessive amounts can be a major cause of low DO levels. DO levels can actually be depleted from systems by the processes that consume dissolved, suspended, or precipitated organic matter, especially in systems containing actively photosynthesizing biota (Hem 1985). According to APC's license application, there are a total 585 permitted discharges within the action area of the Coosa Project. Most discharges are associated with industrial NPDES[30] discharges (294) and stormwater permits (199). Other permits issued include: mining (17), confined animal feeding operations-CAFOs (24), municipal discharges (30), and private discharges (21). These discharges cumulatively have an effect on DO and overall water quality in the Coosa River.

Over the last century, industries, agriculture, and ordinary household activities have all benefited from the use of artificial chemicals. However, some of these chemicals have made their way into the environment. In the aquatic world, toxins often accumulate in sediments where they are taken up by plants, making their way up the food chain through macroinvertebrates and fish, and eventually reaching humans. Because of this bioaccumulation of chemicals, practically the entire mainstem of the Coosa River from the Georgia Stateline down to Lay Lake is under fish consumption advisory. The primary pollutant is polychlorinated biphenyls (or PCBs). PCBs are a group of over 200 synthetic organic compounds that were banned in 1979. Prior to that, PCBs were used extensively in hydraulic and cutting oils, paints, electrical transformers and

30 NPDES=National Pollutant Discharge Elimination System

59

capacitors, and other products due to their non-corrosive and fire-resistant properties and their electrical and thermal insulating properties. In the Coosa Basin, PCBs were manufactured exclusively at two sites, the General Electric (GE) plant in Rome, Georgia (which closed in 1997), and the Monsanto (now referred to as Solutia) plant in Anniston, Alabama[31].

d.    Water withdrawals

Reservoirs are also important sources of water for surrounding residential communities. According to APC, the vast majority of water use applications are for residential water supply, industrial uses, agriculture, recreational use and environmental stewardship.[32] APC tracks the number of users and volume of water withdrawn from reservoirs through Water Use Agreements. In 2003, there were 32 Water Use Agreements issued within the action area with withdrawals ranging from a minimum of 0.01 million gallons per day (mgd) at Dixie Sod Farm, Inc., to a maximum of 828 mgd at APC's Gaston Steam Plant.[33] Within the Weiss Bypass, there are a total of seven permitted intakes, one municipal intake that withdraws up to 1.9 mgd, and six agricultural/commercial farming permits that withdraw a combined 3.5 mgd.

e.    Releases

Only two projects have a continuous flow: Logan Martin and Jordan. Logan Martin has an approximate 820 cfs leakage flow that percolates laterally through the karst formations under the dam. Although this flow is not desired by APC and contains extremely low DO levels, it provides a continuous discharge from the dam. Jordan Dam is currently the only APC project in the Coosa Basin with a mandatory minimum flow requirement. Depending on the time of year, minimum required flows range from a base of 2,000 cfs to a maximum of 10,000 cfs during peak recreational events.

APC also provides the U.S. Army Corps of Engineers with releases from its hydroelectric projects to support commercial navigation in the Alabama River. The navigation flows are targeted at maintaining a navigation channel. Releases are shared between APC's Coosa and Tallapoosa Projects, since both systems contribute flow to the Alabama River. A minimum of 32,480 cfs/7-day is released from the Coosa/Tallapoosa Projects on a running daily basis. During any 3-day period, the releases must meet a minimum of 8,000 cfs/3-day. If the 7-day release exceeds 50,000 cfs, the flow should not be reduced more than 1,700 cfs per day. Releases from storage to meet this requirement are determined based on discussions with the Corps, relative storage project elevations and current basin inflows.[34]

31 Refer to APC's License Application for a complete list of pollutants and fish consumption advisories (APC 2005)
32 Refer to APC's License Application and FEA for a detailed account of their water use policy (APC 2005)
33 Gaston's 828 mgd is withdrawn and returned to the river, not consumed.
34 Refer to APC's License Application and FEA for a detailed description of Project releases (APC 2005)

60

**Action (2) Implementation of a Shoreline Management Plan (SMP)**

*Status of the species within the action area*

    The SMP covers every development in the proposed Coosa Project license. According to APC, the overall goal of the plan is to ensure that shoreline development is consistent with the protection and enhancement of environmental, scenic, cultural, and recreational values, while ensuring the continued safe and reliable production of hydroelectric power. The SMP proposes attaining these goals by implementing APC's shoreline land use classification system and placing conditions placed on shoreline development permits. Below is the list of projects in the Coosa Action Area and potential species concerns within each project.

    *Weiss*: Blue shiners occur in the flowing, lower reaches (unimpounded) of Little River and its tributary, Spring Creek. This represents less than 10 percent of the overall range of the species, but it is likely an important population since it represents one of only three known populations. As previously mentioned[35], one of the largest populations of the southern clubshell occurs in the Weiss Bypass downstream of the confluence of Terrapin Creek, along with a small population of finelined pocketbook, and possibly the southern pigtoe and Georgia pigtoe. Portions of the Weiss Bypass are also designated as CH for the upland combshell (unoccupied), southern acornshell (unoccupied), finelined pocketbook (occupied), Coosa moccasinshell (unoccupied), southern clubshell (occupied), southern pigtoe (unoccupied), ovate clubshell (unoccupied), and triangular kidneyshell (unoccupied), rough hornsail (unoccupied), and interrupted rocksnail (unoccupied) (Figure 6).

---

35 See "Status of the species within the action area" section for Action 1 for occurrence of species around the Weiss



Figure 6. Critical habitat units at Weiss (CH18, GP2, IR1, RH1)

*Neely Henry*: The southern clubshell is common in lower Big Canoe Creek. This population occupies about 3.5 creek miles and represents less than 1 percent of the overall species range. Although no live specimens have been reported within the action area in Big Canoe Creek, a relic triangular kidneyshell has been collected in lower Big Canoe in the last eight years. Big Canoe Creek is designated as CH for upland combshell (unoccupied), southern acornshell (unoccupied), finelined pocketbook (occupied), Coosa moccasinshell (unoccupied), southern clubshell (occupied), southern pigtoe (unoccupied), ovate clubshell (unoccupied), and triangular kidneyshell (occupied) (Figure 7). As mentioned above, the portion of the CH unit within the action area represents less than 1 percent of the species range.

62

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 284 of 327



Figure 7.  Critical habitat units at Neely Henry (CH24)

*Logan Martin*:  Species of interest within the Logan Martin project area include the painted rocksnail, cylindrical lioplax, and tulotoma snail, all of which occur within Choccolocco Creek.  The painted rocksnail is common throughout most of the lower and middle reaches of Choccolocco Creek; tulotoma is spotty but is common where it occurs; and the cylindrical lioplax is very rare (single individual collected in 2010). The population of painted rocksnail in Choccolocco Creek, which is within the action area of the Logan Martin Project, is undoubtedly the strongest remaining population within its range.  The species occurs in the 2.5 mile reach downstream of Jackson Shoals, which represents slightly less than 10 percent of the overall range of the species.  Tulotoma is known from a short section within Choccolocco Creek. Although it is an important population from a recovery aspect, it likely represents less than 2

63

Page 285 of 327     Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

percent of the overall range. Although cylindrical lioplax has only been reported from a single shoal in Choccolocco Creek, it likely represents a very important population because it is the only population on the eastern side of the Coosa River.

   *Lay*: The tulotoma snail is common in the Coosa River along the eastern river bank at approximately Coosa river mile 94.6 (pipeline/railroad crossings), where it is commonly found on rip-rap sized substrate. This population occurs over a six mile reach and represents approximately 10 percent of the overall range of the species. Tulotoma also occurs in Kelly Creek. Although tulotoma is relatively common in Kelly Creek, it is not very common in Kelly Creek within the action area. The 2.5 miles of Kelly Creek, within the Action Area, represents less than 2 percent of the range of the species. In the Coosa River, the southern clubshell is known from a single individual collected along the margin of Buzzard Island during baseline surveys in 2006. Also in 2006, the painted rocksnail was re-discovered in this section of the Coosa River. Absent for nearly 50 years, this represents the only known population of the painted rocksnail in the mainstem of the Coosa River. Range-wide, this population probably represents less than 5 percent of its range. Tulotoma also occurs near the mouth of Yellowleaf Creek and the rough hornsnail occurs along the shallower margins of Yellowleaf Creek. Yellowleaf Creek is also designated CH for the finelined pocketbook (not occupied within the action area), Coosa moccasinshell (unoccupied), southern pigtoe (unoccupied), triangular kidneyshell (unoccupied), and rough hornsnail (occupied) (Figure 8). Tulotoma is rare in Yellowleaf Creek. Limited observations have been made in the vicinity of Gaston Steam Plant. However, Yellowleaf Creek represents one of the only two known populations of rough hornsnail. Yellowleaf Creek, within the action area, represents approximately 75-80 percent of the known range of the species.

 

Figure 8.  Critical habitat units at Lay Lake (CH21, CH23, RH2)

*Mitchell*: Tulotoma snail occurs in lower Weogufka, Hatchet, and Swamp (tributary to Hatchet) creeks.  The size of these populations, within the action area, is uncertain, but likely represents a small portion of the overall range of the species.  The blue shiner is also known from lower Weogufka Creek, but it is uncertain if it occurs within the action area.  Hatchet Creek is also designated CH for the upland combshell (unoccupied), southern acornshell (unoccupied), finelined pocketbook (occupied), Coosa moccasinshell (unoccupied), southern clubshell (occupied), southern pigtoe (unoccupied), ovate clubshell (unoccupied), triangular kidneyshell (unoccupied), and Georgia pigtoe (unoccupied) (Figure 9). The red-cockaded woodpecker occurs along the eastern shore of Lake Mitchell in the Hatchet Creek embayment and represents the largest population on private land in Alabama.

65



Figure 9. Critical habitat units at Lake Mitchell (CH19, GP3)

*Jordan*: The only species that occurs in the Jordan project is the finelined pocketbook, which occurs in lower Chestnut Creek. This is likely a small population within the action area that represents less than 1 percent of the range of the species.

*Jordan Tailrace*: The tulotoma snail occurs in excellent numbers in the Coosa River, in shallow areas along the margins, as well as in deeper pools, between Jordan Dam and the Corn Creek Shoals confluence. This is the strongest known population of tulotoma and likely represents 60-70 percent of the range of the species. The rough hornsnail is found along the margins of the Coosa River and mid-channel from Corn Creek Shoals downstream to the backwaters of Jones Bluff Reservoir (just below Wetumpka). Although this is a short reach and may only represent a few river miles, it is one of only two known population of the species within its range. The Coosa River is designated CH for the upland combshell (unoccupied), southern acornshell (unoccupied), finelined pocketbook (occupied), Coosa moccasinshell (unoccupied), southern clubshell (occupied), southern pigtoe (unoccupied), ovate clubshell

66

(unoccupied), triangular kidneyshell (unoccupied), and Georgia pigtoe (unoccupied) (Figure 10).

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 288 of 327



Figure 10. Critical habitat units in the Jordan Tailrace (CH26, IR3, RH1)

## *Factors affecting species environment within the action area*

APC issues Land Use Permits when a property owner proposes to affect the shoreline of the Project. Activities requiring permits include, but are not limited to, construction of or modifications to boat docks, boathouses, piers, or shoreline stabilization materials (*e.g.*, seawalls, riprap), as well as any activity that requires conveying an interest into or across Project lands. Other general factors that could affect species within the action area are listed in the "*Factors affecting species environment within the action area*" section for Action (1).

To assist in the evaluation of Land Use Permit applications, APC groups Project shorelines according to five shoreline classifications that include: Project Operations, Recreation, Multiple Use Lands, Natural/Undeveloped, and Sensitive Lands. The land use classification

67

generally describes what types of activities that can take place, and how they are to be implemented. For example, all lands that have wetlands, cultural resources, or threatened and endangered (T&E) species present are treated as "Sensitive Resource Lands".

"Sensitive Resources Lands" is a designation that is used in conjunction with the other land use classifications (*e.g.*, Multiple Use or Natural/Undeveloped). For example, a portion of an area that is classified as "Multiple Use" may also be designated as "Sensitive Resources". The Sensitive Resource Lands designation contains Project lands managed for protection and enhancement of sensitive resources. Sensitive Resources include resources protected by state and/or federal law. Other natural features considered important to the area or natural environment. This includes archaeological resources, sites/structures listed on or eligible for listing on the National Register of Historic Places, wetlands, floodplains, Rare, Threatened and Endangered (T&E) species, significant scenic areas, and other sensitive ecological areas are also Sensitive Resources. Activities, if permitted, may be highly restrictive or may be completely prohibited in order to avoid potential impacts to Sensitive Resources.

When a Land Use Permit application is submitted, APC conducts an internal environmental review. A geographic information system (GIS) data layer that includes all known Sensitive Resource areas (including T&E locations and CH) has been developed that provides APC staff pertinent information. Areas designated as Sensitive Resources are also dynamic, meaning they may expand and contract as more information becomes available (*e.g.*, T&E species distributions).

As previously mentioned, the PCEs for all the CH units are very similar and generally include: stable stream and river channels, a flow regime necessary to maintain benthic habitats, water quality that supports the complete life cycle of the species, a diverse substrate with minimal filamentous algae, and for mussels-presence of suitable fish host(s).

**Action (3) Implementation of a Wildlife Management Plan**

*Status of the species within the action area*

As mentioned in the "*Description of the proposed action*" section, the action area for the WMP includes the Weiss Waterfowl Management Area, RCW management lands on Lake Mitchell, the Mitchell Project lands that are a part of the Coosa Wildlife Management Area (WMA), areas supporting bald eagles, and the handicapped hunting area on Jordan Lake. Of these areas, the only one known to support listed species is the Coosa WMA (which includes the RCW management lands). Within the Coosa WMA lands, tulotoma occurs in Weogufka and Hatchet Creeks, and the blue shiner occurs in upper Weogufka Creek just upstream of the Project boundary. Hatchet Creek is also designated CH for the upland combshell (unoccupied), southern acornshell (unoccupied), finelined pocketbook (occupied), Coosa moccasinshell (unoccupied), southern clubshell (occupied), southern pigtoe (unoccupied), ovate clubshell (unoccupied), triangular kidneyshell (unoccupied), and Georgia pigtoe (unoccupied) (Figures 4, 5). The most noted species in this area is the RCW, which occurs predominately along the eastern shore of

68

Lake Mitchell in the Hatchet Creek embayment. Of the 3,000 acres APC manages in the Coosa WMA, 1,087 acres are managed exclusively for RCWs.

*Factors affecting species environment within the action area*

　*RCW management*:  There are several factors that could affect the RCWs within the action area, including natural disturbance (wildfire, wind damage, lightning), actively managing for RCWs, and not actively managing for RCWs.  When actively managing for RCW habitat, there is always the possibility of damaging an active or potential nest tree during a controlled burn, or killing the baby chicks or eggs within a nest during a nesting season burn.  However, these types of accidents can be minimized by burning frequently and taking the proper precautions to protect a cavity tree.

　*Timber management in non-RCW areas*:  There are two aquatic species that occur within and just outside of the action area of the Coosa WMA - the blue shiner in Weogufka Creek and tulotoma in Hatchet and Weogufka Creeks.  Any forestry practice(s) that could impact these watersheds are of concern, including activities that could cause excessive sedimentation, and any use herbicides that are unsafe to aquatic invertebrates and invertebrates.

　As  previously mentioned, the PCEs for all the CH units are very similar and generally include; stable stream and river channels, a flow regime necessary to maintain benthic habitats[36], water quality that supports the complete life cycle of the species, a diverse substrate with minimal filamentous algae, and for mussels-presence of suitable fish host(s) (Table 4).

## Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal - ADROP

*Status of the species within the action area*

　There are currently nine listed aquatic species (southern clubshell, finelined pocketbook, Georgia pigtoe, southern pigtoe, blue shiner, tulotoma snail, painted rocksnail, cylindrical lioplax, and rough hornsnail) and 12 CH units that occur within the action area (refer to Table 1).  However, only four listed species (tulotoma, finelined pocketbook, southern clubshell, and rough hornsnail) and three CH units are within the operational zone of Jordan Dam, which is the only project where operational changes are being proposed in ADROP (refer to the "*Status of the species within the action area*" under Action 2 for specific information on species and CH in Jordan tailrace).

---

36 The magnitude, frequency, duration, and seasonality of discharge over time) necessary to maintain benthic habitats where the species is found. Unless other information becomes available, existing conditions at locations where the species occurs will be considered as minimal flow requirements for survival

69

*Factors affecting species environment within the action area*

In the Coosa River, the same factors apply as mentioned in the "*Factors affecting species environment within the action area*" section for Action (1). Although the Coosa River downstream of Jordan Dam is within the historic range of nine listed mussel species, it is only occupied by two, the finelined pocketbook and southern clubshell, which are both extremely rare, and two snail species, tulotoma and rough hornsnail. Many experts recognize this section of the Coosa River as the best remaining example of high-quality, big river habitat remaining in the entire Mobile River Basin, and view it as a high priority restoration area for several imperiled mussels, snails, and fishes. In Lay reservoir upstream of Jordan, effects of pool level fluctuations during times of drought have not been addressed in previous Section 7 consultations.

Table 2. Triggers for Drought Intensity Levels (DIL) in the Coosa River Basin[37]

| DIL 1 Trigger | Low Basin Inflows **or** Low Composite Storage **or** Low State Line Flow |
|---|---|
| DIL 2 Trigger | DIL 1 criteria + (Low Basin Inflows or Low Composite Storage **or** Low State Line Flow) |
| DIL 3 Trigger | Low Basin Inflows + Low Composite Storage + Low State Line Flow |

## Action (5) Drawdown of Lay Lake

*Status of the species within the action area*

Tulotoma occurs in Kelly Creek downstream to the first railroad trestle over the Coosa River. Based on the most recent survey data, tulotoma is not present in the shallow, marginal areas (less than three feet deep) of Kelly or Yellowleaf Creeks, including the rip-rap at the Kelly Creek boat ramp. It does occur in the deeper sections of Kelly and Yellowleaf Creeks, and in the mainstem of the Coosa River downstream of Buzzard Island. It is also present in the mainstem of the Coosa River in the shallower areas (less than three feet deep) at the pipeline right-of-way, at the railroad trestle, and along the bank at Glover's Point Park. Although tulotoma is present in the shallower areas at these locations, densities generally increase at depths greater than three feet (J. Powell, pers. obs.). Kelly Creek also supports the cylindrical lioplax, finelined pocketbook, southern pigtoe, and triangular kidneyshell, as well as CH for four freshwater mussels (CH23) (Figure 4). However, the cylindrical lioplax, finelined pocketbook, southern pigtoe, and triangular kidneyshell are not known from within the action area.

The strongest and most stable population of rough hornsnail is found in Yellowleaf Creek. On August 12, 2009, biologists from the ADCNR, APC, and the Service assessed the extent of the rough hornsnail in the shallow marginal habitat (less than three feet deep) in lower Yellowleaf Creek. Deeper habitats were not assessed at this time. According to survey results, the hornsnail was present from approximately 1 mile downstream of Hwy 25, upstream to near

---

37 Source: APC License Application and Addendum to the Biological Assessment, *see*, APC 2005 and 2011.

70

the confluence of Morgan Creek, which totals approximately 3.5 miles. The species was fairly common in most areas where suitable habitat was present, and the highest densities occurred along the west streambank at the Hwy 25 Bridge. The hornsnail was associated with stands of fairly dense aquatic vegetation including, water willow (*Justicia americana*) and milfoil (*Myriophyllum* sp.). Yellowleaf Creek is also CH for four freshwater mussel species (CH23) and the rough hornsnail (RH2) (Figures 2, 4).

*Factors affecting species environment within the action area*

The tulotoma snail and rough hornsnail are generally affected by the same suite of factors that are mentioned in the "*Factors affecting species environment within the action area*" section for Action (1). Many of these factors originate outside (i.e., upstream) of the action area, yet could still have a significant impact on the species. For example, in Kelly and Yellowleaf creeks, both species can be affected by natural factors such as, drought, but also by anthropogenic factors such as nonpoint source pollution and habitat degradation, random spills, or violation of permitted discharges, all of which would typically originate upstream. The primary factors originating within the action area are rapid changes in water quality and water levels from hydropower-peaking operations at Logan Martin Dam. Also, because both lower Kelly and Yellowleaf creeks are within the influence of the Lay Lake operational pool, fish communities have been substantially altered from their natural state. The presence of reservoir-tolerant fishes, and especially a predominance of those that feed on mollusks (e.g., freshwater drum – *Aplodinotus grunniens*), can have a significant impact on tulotoma and hornsnail populations.

EFFECTS OF THE ACTION

"Effects of the action" refers to the direct and indirect effects of an action on the species or critical habitat, together with the effects of other activities that are interrelated or interdependent with that action, which will be added to the environmental baseline. Indirect effects are those that are caused by the proposed action, are later in time, but still are reasonably certain to occur. Interrelated actions are those that are part of a larger action for their justification. Interdependent actions are those that have no independent utility apart from the action under consideration. Cumulative effects are those effects of future State or private activities, not involving Federal activities, that are reasonably certain to occur within the action area of the Federal action subject to consultation (50 CFR §402.02).

**Action (1) Alabama Power's Proposal for Operations**

*Factors to be considered*

In the "Environmental Baseline" section, we determined that the primary factors impacting listed species are the continued inundation of habitat, habitat fragmentation, poor

71

water quality (primarily DO levels and toxic substances), permitted and non-permitted discharges, water withdrawals, and project releases. Additional effects added to our analysis include those effects related to the proposed action. These include raising the pool levels at Neely Henry and Logan Martin, implementing a new flow regime in the Weiss Bypass, and enhancing DO levels at Weiss and Neely Henry, and the other projects as needed.

The proposed rule curve changes at Neely Henry and Logan Martin could slightly increase the flood risk potential (i.e., inundation of habitat) during the winter months in Big Canoe Creek (CH Unit 24) and Choccolocco Creek, respectively. The adjustment at Neely Henry could also cause waters to back up further into the Weiss Bypass, and the raising of Weiss would back waters up towards the Georgia state line and up low-gradient tributaries. In Choccolocco Creek, it could increase the flood risk potential for biologically sensitive areas up to Jackson Shoals.

There is a small risk that the new flow regime in the Weiss Bypass could negatively affect water chemistry (e.g., high temperatures and low DOs) downstream of the Terrapin Creek confluence. However, the intended purpose of this release is to improve aquatic habitat conditions, and create opportunities for species recovery in the Weiss Bypass upstream of Terrapin Creek. Water temperature, which is the primary constituent of interest, will be closely monitored (according to the Weiss AMP) in the embayment prior to the initial flow release to ensure conditions are favorable.

As mentioned in the *"Environmental Baseline"* section for Action (1), Jordan Dam is the only project in the Coosa with a mandated minimum flow. Because the releases were created for multiple purposes: listed species (tulotoma snail), fish spawning (paddlefish), and recreation (whitewater canoeing and kayaking), flows are extremely variable and unnatural at times[38].

---

38 Since 2000, the following release schedule has been in effect at Jordan Dam:
- From April 1 through May 31, Alabama Power releases continuous base flows of 4,000 cfs for 18 hours per day from 3:00 p.m. through 9 a.m. For the remaining 6 hours, Alabama Power should release an 8,000 cfs pulse flow from 9 a.m. through 3 p.m.
- Beginning June 1 through June 15, Alabama Power reduces the continuous 4,000 cfs base flow at a rate of 66.7 cfs per day, and the daily 8,000 cfs pulse flow at a rate of 133.3 cfs per day.
- From June 16 through June 30, Alabama Power ceases release of the daily pulse flow but continues to release the continuous base flow reducing it to 66.7 cfs per day.
- From July 1 through March 31, Alabama Power releases a continuous minimum base flow of 2,000 cfs regardless of inflow.
- *On weekends only from June 16 through October 31, Alabama Power releases flows of either 4,000, 6,000, or 8,000 cfs continuously from 11 a.m. to 5 p.m. and the following schedule for holidays:*
  - On one day during the Memorial Day weekend, Alabama Power releases up to 10,000 cfs continuously between 10 a.m. and 6 p.m.
  - On one day during the Labor Day weekend, Alabama Power releases up to 10,000 cfs continuously between 10 a.m. and 6 p.m.

72

As part of APC's proposal to meet state water quality standards for DO levels in the tailraces, turbine aeration devices will be installed at Weiss and Neely Henry, and APC will be continuing, or improving, operations at Logan Martin, Lay, Mitchell, and Jordan. Since 1990, APC has been using a speece cone and turbine venting in an attempt to increase DO levels in the Logan Martin tailrace, and for the last few years, they have also been voluntarily pulsing turbines in an attempt to improve DO during periods of non-generation.

Data collected by APC downstream of Logan Martin Dam (at the railroad trestle – which is not its normal monitoring station for collecting 401 compliance data), between June 10, 2009 and July 4, 2009 (at 15-minute intervals), indicate that DO levels are still well below the desired levels for a healthy river system. According to APC, during the time these data were collected, Unit 2, the best aerating unit at Logan Martin, was in an outage. Therefore, according to APC these data are not representative of the typical DO levels seen downstream under current operations, and are not representative of the DO levels APC anticipates following aeration enhancements post-license issuance. APC does recognize, however, that at times DO levels are less than 4 mg/L, and that DO restoration is warranted for this section of the Coosa River.

*Analysis for the effects of the action*

The raising of the Neely Henry pool is not expected to significantly reduce the amount of mussel habitat in Big Canoe Creek. In a flood event, the reservoir could back up further into the creek, but the event should be short term in nature. The raising of Logan Martin from 460 msl to 462 msl is potentially significant because of the presence of the painted rocksnail, tulotoma snail, and the cylindrical lioplax in lower Choccolocco Creek. Of particular interest is the protection of the 2-3 river miles from Jackson Shoal's downstream to Schmidt's Mill. In 2010, APC modeled the extent of the impact in Choccolocco Creek[39]. According to results, the proposed modification would result in only slight changes to the habitat for several reasons. First, the duration of the flood events themselves are at most a few days, not unlike the natural flooding that would normally take place on the creek. Second, the frequency of flood events that could inundate this area is relatively insignificant occurring less than once every 10 years.

As long as water quality is monitored according to the proposed Weiss AMP, the variable flow release at the Weiss Spillway will only improve aquatic habitat in the Bypass, especially above the confluence with Terrapin Creek. The new flow regime should increase the wetted perimeter of the channel, create additional habitat, and encourage fish and mollusk migration upstream towards the Weiss spillway. Minimizing habitat fragmentation will be accomplished by reintroducing species into appropriate habitats. This not only includes the Weiss and Logan

---

> On July 4, Alabama Power releases up to 10,000 cfs continuously between 10 a.m. and 6 p.m. using the following schedule: if July 4 is on Tuesday, a Monday release would be required in addition to the required release on July 4; if July 4 is on a Wednesday, the Monday release would be forfeited for the July 4 release. if July 4 is on a Thursday, the Monday release would be changed to Friday, July 5 to give a 4 day release; if July 4 is on a Saturday, Sunday, or Monday, the normal recreational release schedule would be followed.

39 APC's December 2010 study entitled: Habitat Evaluation for: Choccolocco Creek

Martin tailraces, but also suitable tributaries (e.g., Kelly, Hatchet, and Choccolocco creeks) within the project boundaries. The propagation and culture of the reintroduced animals will be partially accomplished through the settlement agreement established between APC and the ADCNR in 2007.[40] Funds in this agreement will go directly towards habitat enhancement and the culturing of listed and other imperiled aquatic species at the ADCNR's Alabama Aquatic Biodiversity Center (AABC). The effects of reintroducing species are completely beneficial.

The Alabama Department of Environmental Management (ADEM) manages a variety of programs designed to protect Alabama's waterways and it and the U. S. Environmental Protection Agency (EPA) are ultimately the agencies responsible for regulating water quality at the Coosa developments. These responsibilities are met through state and federal statues, implementing regulations, and permitting programs through the authorities, such as Section 10 of the Rivers and Harbors Act, and Sections 401 and 404 of the Clean Water Act (CWA).

On July 5, 2005, ADEM issued APC a Water Quality Certification (WQC)[41] for the relicensing of the Coosa River Project under §401 of the CWA. The WQC is intended to ensure that water quality downstream of the hydroelectric projects is not degraded due to the discharges from the projects and that the discharge complies with state water quality standards adopted under the CWA[42]. The EPA regulations implementing §401 require that the certification issued by the state certifying agency contain a statement that there is "reasonable assurance that the activity will be conducted in a manner which will not violate applicable water quality standards" 40 C.F.R. § 121.2(a)(3).

Although a 401 Certificate was issued for the Coosa Project, it was clear in the WQC, as well as in FERC's Final Environmental Assessment (FEA), that DO standards were not being met at all times. In fact, the FEA clearly states that DO levels may not be completely within compliance of §401 of the Clean Water Act (CWA) and 33 U.S.C. Section 1251, et seq[43], stating, minimum DO standards were not met at some projects up to 20 percent of the time. As part of the WQC, ADEM issued a compliance schedule for APC to operate each of the Coosa River developments[44]. Both ADEM and FERC believe this schedule will provide a reasonable

---

40 In January 2007, APC filed a settlement agreement with FERC that supplemented the 2005 license application. This agreement establishes $7.5 million in funds that would go directly towards aquatic habitat enhancement and species propagation.

41 "WQC" = Water Quality Certification issued under Section 401(a)(1) of the CWA, 33 U.S.C. Section 1251, et seq.

42 It should be noted that the overall goal of the CWA is to "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters."

43 ADEM Admin. Code R. 335-6-10-.09 states, *"in no event shall the dissolved oxygen level be less than 4 mg/L due to discharges from existing hydroelectric generation impoundments. All new hydroelectric generation impoundments, including addition of new hydroelectric generation units to existing impoundments, shall be designed so that the discharge will contain at least 5 mg/l dissolved oxygen where practicable and technologically possible."*

44 401 Certificate Letter from ADEM to APC, *see*, ADEM 2005

74

approach to address DO levels in the tailraces. The Service agrees with this schedule, in part, but also recognizes that the WQC issued by ADEM does not address "non-discharge periods" (periods when the project is not generating), which is not within ADEM's regulatory authority according to Alabama Code (ADEM Admin. Code R. 335-6-10-.09). The failure of the WQC to address none discharge periods is a major concern, since the current WQC does not consider that the biological needs of fish and mollusks must still be met when a hydroelectric project is not generating.

### *Species' response to the proposed action*

The raising of the pool elevations at Neely Henry and Logan Martin will not likely have a significant impact on listed fish, mollusks, or CH, due to the timing and duration of the events where these species occur. On a larger scale, the loss of habitat that these animals have endured over the last century, and continue to deal with today, is one of the largest impacts in the Coosa Basin, as well as across the entire southeastern U.S. (Marcinek et al. 2005). As discussed previously, the fragmentation of populations into small isolated pockets in tributaries, or in small sections of tailraces, has undoubtedly contributed to their level of impairment. It's been reported that the Coosa Basin (primarily the main channel of the Coosa River) has experienced one of the largest extinction rates in North America during the 20th century, with the extinction or extirpation of nearly 40 freshwater species (primarily snails). This is a sobering fact, but it can be partially remedied by reintroducing species into suitable habitats. The proposed AMPs at Weiss and Logan Martin can greatly assist in this recovery process, but only if implemented in a fashion that recognizes the biological needs of the species.

In addition to improving physical habitats, chemical habitat (water quality) is one of the major factors affecting species downstream of dams, and one of the primary constituents of water quality is DO. Dissolved oxygen is an essential constituent that affects the biological health, as well as the hydrochemical composition of all streams, rivers, and the animals that reside in them. However, relatively little information exists on the requirements for freshwater mollusks and fishes that reside in southeastern streams. Most of the data used for establishing minimum DO levels in freshwater systems are based upon studies conducted on common species like the salmonids, centrarchids (sunfish), and other organisms that may or may not even be native to the Coosa River (EPA 1986).

Literature shows that depressed DO levels can adversely affect behavior, growth, feeding, and reproduction in freshwater fishes (EPA 1986). Spoor (1977) observed lethality of largemouth bass larvae when DO concentrations were at 2.5 mg/L after a 3-hour exposure. Cech and others (1979) reported that critical DO concentrations for largemouth bass were 2.8 mg/L at 30°C, < 2.6 mg/L at 25°C, and < 2.3 mg/L at 20°C. Brinley (1944) observed increased sickness, deformities, and parasitization when DO concentrations were between 3 and 5 mg/L. He also concluded that DO concentrations below 5 mg/L represented a dividing line between good and bad conditions for fish. Although largemouth bass is not a listed species under the ESA, it, as well as several other centrarchid species, could serve as host for several of the mussel species

75

included in this consultation.

Freshwater mussels, like fish, respond negatively to depressed DO levels. The most noted responses are decreases in respiration and energy metabolism. Chen (2001) compared oxygen consumption (OC) rates versus DO levels in nine species of mussels. They discovered that most of the nine species evaluated were able to maintain acceptable OC rates between about 2 and 5 mg/L at $16^0$C. However, when water temperatures increased to $24^0$C, mussels required DOs in the range of 2 to 6 mg/L to maintain acceptable OC rates. According to Dr. Paul Johnson (pers. com 2009), mussels are most sensitive to depressed DO concentrations during the summer because of the energy being expended on shell mass development. Barnhart (2001) reported that DO gradients likely occur with depth in the streambed, as well as, longitudinally across riffle-pool habitats. He also noted the likely importance of the poorly understood interstitial spaces in the streambed (i.e. hyporheic zone). These microscopic gradients may influence oxygen availability and limit metabolism directly and may also directly or indirectly influence other chemical parameters such as ammonium, nitrate, and pH. Barnhart further speculates that some juvenile mussels may even be adapted to tolerate low DO conditions, possibly as a mechanism to avoid predators, but more research is needed. In a more recent study, Barnhart (2007) evaluated the effects of hypoxia on brooding females and immature mussels. Results suggested that in 4-day continuous exposures, survival of juveniles was reduced when DOs were less than 0.9 mg/L. During a 28-day intermittent exposure, survival and growth of juvenile mussels was inferred to lie below 0.43 and 1.6 mg/L, respectively, at $23^0$C.

There are several southeastern case studies that have demonstrated dramatic biological response to DO and flow enhancement. Since the Tennessee Valley Authority (TVA) implemented its reservoir-releases-improvement (RRI) program in the early 1990's, DO levels have increased substantially in more than 300 miles of river downstream of their dams. TVA has also observed an increase in the number and diversity of fishes and aquatic insects in the tailraces. For example, in the Douglas Dam tailwater, the number of native fishes present increased from 14 species in 1987 (pre-RRI) to over 35 species in recent years. In the Duck River, the number of mussel species more than tripled, and densities increased 11 fold, at 17 sites between 1979 and 2002 following the release of a minimum flow (Ahlstedt et al. 2004).

The proposed actions to continue current operations (with DO enhancements), raise the reservoir levels at Weiss, Neely Henry, and Logan Martin, have the potential to affect at least three PCEs (Table 4). However, if APC maintained adequate DO levels downstream of each of the projects, the chance of one or more PCEs being adversely modified would be reduced.

## Action (2) Implementation of a Shoreline Management Plan (SMP)

### *Factors to be considered*

The SMP is a broad document that APC uses to evaluate Project activities and assist in issuing Land Use Permits. As a part of the SMP, APC has developed a general list of protective measures for applicants to consider when applying for a Land Use Permit. For example, APC

76

may require that riprap be placed in front of all newly constructed seawalls. On APC owned lands within the Project boundary, APC will also encourage property owners to maintain a minimum strip of 15 feet of unmanaged vegetation that will serve as a shoreline buffer zone. Additionally, APC encourages the use of Best Management Practices (BMPs) by all land owners through a combination of public education and outreach efforts. To assist and educate stakeholders on the permitting process and the BMPs is planning stakeholder workshops, an enhanced website, and educational materials.

Although the concept behind these measures is good, the current BMPs may not be sufficiently stringent to protect T&E species and CH on Sensitive Resource Lands (e.g., APC's "guidelines" for vegetated buffers is 15 feet). Vegetated buffers are a critical component of a stream's (or reservoir's) shoreline. They act as natural filters, increase water infiltration, help regulate water temperature, and trap pollutants before they enter the water. In addition to filtering pollutants, vegetated shorelines also preserve the physical integrity of the shoreline by preventing erosion and keeping harmful sediments out of the water body. Excess sediment blankets the substrates that are needed by listed snails and mussels.

Other factors to be considered in assessing APC's shoreline management include land clearing in areas where RCWs are potentially present (especially on lands that are not included in the WMP), clearing of power line rights-of-way to a residence where a listed plant may be present, withdrawals of excessive amount of water, use of some herbicides by homeowners along the shoreline (as mentioned above, healthy vegetated buffers can minimize the effects of herbicide runoff), and the use of seawalls to maintain the shorelines.

*Analysis for the effects of the action*

Maintaining vegetated shorelines (buffers) is one of the best lines of defense against shoreline erosion. As mentioned above, buffers act as natural filters and maintain the structural integrity of the shoreline. They also act as important sinks for nutrients like phosphorus, which tend to bind with sediments as they move across the landscape during a runoff event. Wenger (1999) generally recommends buffer widths between 50-100 feet, composed of native vegetation, for sufficient protection of aquatic resources, which is similar to that recommended by the U.S. Department of Agriculture-USDA (Bentrup 2008, AFC 1999). To fine tune these distances, it's important to consider the slope, soil type, and vegetation type at the site.[45] If adequate buffers were maintained, APC will be able to reduce erosion and sedimentation in the reservoirs, minimize impacts to listed aquatic species and CH's (this directly addresses 3-4 of the PCEs), and enhance the aesthetic and economic qualities of the reservoirs.

Seawalls (aka, bulkheads) are also frequently used as shoreline "protective" measures. Although seawalls are intended to prevent erosion, they can actually initiate erosion and eliminate spawning habitat for fishes and habitat for some invertebrates. On Lake Martin,

---

45 See Bentrup (2008) and Wenger (1999) for criteria for determining buffer width and composition.

Purcell (2011) found that fish and invertebrate diversity was much lower where seawalls were constructed and much higher when the shoreline was left in its natural state. Where seawalls were present, diversity was much improved when rip rap was placed in front of the structure. In situations where seawalls are really needed to prevent loss of human property, using rip rap with a seawall may bode well for animals like the tulotoma snail and small fishes that serve as hosts for freshwater mussels.

*Species' response to the proposed action*

Sediment continues to be the major pollutant that affects habitats for freshwater fishes and mollusks (O'Neil 2011, McGregor and Garner 2005, Powell 2003). Although sediment movement is a natural process, excessive amounts can degrade habitat for freshwater mussels, snails, and fishes. Excessive amounts of sediment cover fish habitat, thus, eliminating habitat for their food base (macroinvertebrates) and spawning areas. For mussels, sediment degrades habitat by blanketing the substrate and reducing water clarity, which decreases the opportunity for a potential host fish to find a female mussel when she is spawning. For snails, sediment once again blankets the substrate most species use to feed and reproduce. By implementing the SMP (e.g., maintaining adequate SMZs and using BMPs) sedimentation from shoreline erosion will continue to occur, but can be minimized if proper measures are taken.

As indicated in Table 4, the SMP has the potential to affect several of the PCEs of designated critical habitat. For the reasons just discussed, the method of shoreline protection used can affect erosion rates, water temperature, nutrient and toxic pollutant inputs, habitat availability for fish hosts, and even presence of invasive species. Although the nature of these effects could degrade habitat quality within the action area, it is not likely to have a severe impact on the overall extent of CH.

## Action (3) Implementation of a Wildlife Management Plan

*Factors to be considered*

*RCW Management*: The two major factors considered in the WMP are natural disasters (wind damage, wildfire, and lightning) and active land management. Active land management which provides a net benefit for RCWs includes the use of controlled burns to reduce the amount of non-herbaceous (woody) vegetation in the understory and control of hardwood trees/shrubs that have entered the midstory. All RCW cavity trees need to be protected from accidental ignition during prescribed burning operations by removing fuels at the base of cavity trees[46].On the other hand, failing to actively burn and manage the forest (i.e., "do nothing approach") is potentially the worst impact the RCW colonies at Lake Mitchell could encounter.

*Timber management on non-RCW lands*: As previously mentioned, there are two aquatic species that occur slightly outside of Project lands in Weogufka and Hatchet Creeks. Both of

---

46  For more details on the WMP refer to the 2005 License Application (APC 2005)

these species are sensitive to sedimentation and could be affected by poor forestry practices within the watershed. APC manages about 12,700 acres of land within the Coosa River Project boundaries for timber harvest. In the last few years, APC has committed to managing some of these lands for longleaf pine. Since the majority of the timber is currently in loblolly pine, there will likely be a considerable amount of loblolly pine harvested and sold over the next few years. Although this will ultimately benefit the RCWs, care has to be taken in the removal and transport of existing pine trees so as not to further impact Weogufka and Hatchet Creeks. Given the steep terrain in these areas, extreme care needs to be taken to ensure proper streamside management zones (SMZs) and stream crossings (if applicable) are maintained along all water bodies. Another factor of interest is the choice of silvicultural herbicides used to treat understory and pre-emergent vegetation. Some of these chemicals (mainly the surfactants) are toxic to aquatic life and can easily reach streams during periods of surface runoff.

## Analysis for the effects of the action

In order to maintain RCW foraging habitat, forest must be burned on a regular basis; this includes approximately 1,057 acres within the Project boundaries. The preferred controlled burning method sometimes causes accidents that damage cavity trees and injure birds. If forests are burned on a regular basis, the chance that a cavity could be damaged is minimal. However, if lands are not burned for several years and understory is allowed to expand, the chance that a cavity tree will be damaged during a burn increases considerably.

As discussed earlier, APC has committed to converting much of the existing loblolly forest into longleaf pine. This is undoubtedly a major long term benefit for the RCW. However, as the loblolly are harvested and removed from the site, there will likely be pre-emergent herbicides applied to control understory and unwanted vegetation following the cut. Although most of these products (including the surfactants) are usually safe, they can be toxic to aquatic organisms. Also of concern are how trees will be removed from the site and how the impacts of stream crossings will be addressed. As logging equipment traverses streams and waterways, a tremendous amount of damage can be done to the stream bed and banks.

## Species' response to the proposed action

*RCW Management*: The excavation of a RCW cavity is a complex and difficult task. After the male bird selects an appropriate tree, it can take years to complete the task (USFWS 2003). Therefore, when one is damaged or destroyed from wildlife, wind, or from a prescribed burn, it can be devastating to the entire colony. If and when this occurs, APC should provide artificial cavities and take steps to replace the destroyed cavity as quickly as possible.

*Timber management on non-RCW lands*: Excessive sedimentation and the presence of improperly applied herbicides can directly impact the quality and condition of habitat for the tulotoma snail and blue shiner by degrading feeding and spawning areas, as well as directly impacting the health of the species. This has the potential to negatively affect at least three of the PCEs for CH in Hatchet Creek. By using only EPA-approved herbicides and leaving intact and adequate SMZs, the factors that could adversely modify CH in Hatchet Creek could be

79

removed.

## Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal - ADROP

### *Factors to be considered*

Since the drought of 2007, APC has worked with the FERC, Corps, Alabama Office of Water Resources (OWR), Alabama Department of Conservation and Natural Resources (ADCNR), Alabama Department of Environmental Management (ADEM), and the Service to collectively develop a drought plan for APC's reservoirs within the ACT Basin. In order to determine when the system is entering and exiting a drought, APC and the OWR, along with various state and federal agencies, monitor a suite of rainfall and stream flow gauges within the ACT basin. When drought indicators reach specified levels, responses are triggered, resulting in predetermined incremental reductions or increases of flow from APC's reservoirs[47].

ADROP has three incremental drought intensity levels (DIL) that are based on the severity of conditions (Table 2). These incremental DIL responses are not rigid, but provide a bracketed range of operations allowing for maximum flexibility and smoother transitions in and out of a drought and from level to level. The drought response triggers are primarily based on past operating experiences and lessons learned during the 2007 drought - the current drought of record for the ACT basin.

According to the most recent version of ADROP, releases from Jordan would be the only project that would be modified on the Coosa River; the newly proposed flows at Weiss would continue (according to flows at Mayo's Bar) and the leakage flows at Logan Martin will undoubtedly continue. Although ADROP describes the DIL triggers and how releases from Jordan Dam will be managed, it does not describe how reservoir levels upstream of Jordan will be managed. For example, what are the anticipated water levels at Logan Martin, Mitchell, and Lay going to be during each DIL? A description of these water levels is necessary for a comprehensive drought plan.

### *Analysis for the effects of the action*

As previously mentioned, the procedures in ADROP are based upon past experiences from the 2007 drought. In 2007, water quality and snail movement were monitored on a weekly basis, as flows from Jordan Dam were incrementally reduced to conserve water. Starting the week of July 14, 2007, flows were between 2,300 and 2,400 cfs and began to gradually decline at 66 cfs per day. By July 30th, flows were approximately 1,891 cfs and the first signs of habitat stress were observed. Although the river stage only decreased by 2-3 inches, algal mats were beginning to form along the channel margins; however, water temperature and DOs remained

---

[47] Refer to Alabama Power Company's 2011 Addendum to the Coosa River Project Biological Assessment (Attachment 3) (APC 2011).

80

stable in mid-channel. By August 7th, flows were at 1,700 cfs, isolated pools were beginning to form in elevated areas in the middle of the channel downstream of Moccasin Gap, and the first stranding and mortality of tulotoma were observed. Temperatures continued to increase along the channel margins, but temperatures and DO levels remained acceptable in mid-channel, or in areas where water continued to flow. By August 13th, flows were down to 1,600 cfs, water temperatures ranged from 29$^0$C in the channel to 35$^0$C along the margins, and conditions were further deteriorating. Further reductions in releases were immediately halted and flows were returned to 2,000 cfs[48].

From the 2007 drought experiences, we determined that two primary factors appeared to impact tulotoma in the Jordan tailrace. First, as water temperatures reached 35$^0$C along the margins, large algal mats began to form, waters became stagnant, and habitat began to deteriorate. Second, when flows reached 1,600 cfs, isolated pools began forming in large, elevated areas in the middle of the channel and temperatures continue to rise along the margins. In an attempt to minimize these impacts, ADROP does not allow flows to drop below 2,000 cfs during the summer months when temperatures can potentially reach their highest levels (Table3). However, ADROP does allow flow reductions to 1,600 cfs during the winter months, when temperatures should remain at safe levels, and when tulotoma do not spawn.

As mentioned in the previous section (*Factors to be considered*), ADROP does not address reservoir pool management upstream of Jordan Dam. As flows are reduced out of Jordan, pool levels upstream of Jordan will undoubtedly rise and/or fall in an attempt to conserve water. In most cases, the reduction in upstream pool levels will not likely have a significant impact on listed species, or CH, except in Lay Lake and in Yellowleaf Creek where the tulotoma and rough hornsnail occur, respectively. Yellowleaf Creek is a very low gradient system and vulnerable to small fluctuations in stage. Typically, the fluctuation zone at Lay ranges from 395 to 397 msl, and rarely does it drop below 395 msl. Between 1970 through 2007, the pool level dropped to 393 msl (the proposed elevation of the Lay Lake drawdown) only four times (1975, '94, '97, and 2007). In those first three years, it dropped to 393 msl for only a day or two; however, it stayed at approximately 393.5 msl for one to two weeks on an annual basis. Even in 2007, the drought of record, it only dropped to 393 msl for a couple days, and then stayed at 393.5 msl for nearly 12 weeks from October through December.

As APC mentions in their Addendum to the Biological Assessment (APC 2011), ADROP is a dynamic plan; it will likely evolve or be expanded in the future as requirements within the basin shift. Moving forward, any revisions made to ADROP should be made in consultation with relevant state and federal agencies.

---

[48] Refer to 2007 FWS Field Notes which was included in the 2008 After-the-Fact Emergency Consultation

81

Table 3. Summary of Coosa River Operations (at Jordan Dam) under ADROP[49]

| Jan | Feb | Mar | Apr | May | June | July | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Normal Operations | | | | | | | | | | | |
| DIL 1: Low Basin Inflows **or** Low Composite Storage **or** Low State Line Flow | | | | | | | | | | | |
| DIL 2: DIL 1 criteria + (Low Basin Inflows **or** Low Composite Storage **or** Low State Line Flow) | | | | | | | | | | | |
| DIL 3: Low Basin Flows + Low Composite Storage + Low State Line Flow | | | | | | | | | | | |
| 2000 cfs | | | 4000 (8000) | | 4000-2000 | 2000 cfs | | | | | |
| 2000 cfs +/- | | | 4000 cfs +/- | | Ramp | 2000 +/- cfs | | | | | |
| 1600-2000 cfs +/- | | | 2500 cfs +/- | | Ramp | 2000 cfs +/- | | | 1800 cfs +/- | | |
| 1600 cfs +/- | | | 1600-2000 cfs +/- | | | 2000 cfs +/- | | | 1800 cfs +/- | | 1600 cfs +/- |

## Species' response to the proposed action

All aquatic organisms, to some extent, utilize a behavior called rheotaxis (Fraenkel and Gunn 1940). This simply means that aquatic animals use the current to orient themselves. Since tulotoma prefers the swifter flowing habitats, a rheotaxic behavior allows them to hold their position rather than being swept away by the current. This behavior in the water column could be further strengthened by the clustered formations that tulotoma creates under large rocks.

In the Coosa River downstream of Jordan Dam, Christman et al. (1995) found that tulotoma did not respond favorably to receding water levels. Prior to scheduled flow reductions at Jordan Dam in 1992, 1993, and 1994, they marked a total of 652 individuals in shallow habitats less than 0.5 meters deep to determine dispersal and stranding rates. Of the 652 snails that were marked during this study, only 240 were recovered after the flow reduction and overall mortality was estimated at 93 percent.

Although the rough hornsail typically prefers gravel, cobble, and bedrock in moderate currents it has been found along the shorelines of Yellowleaf Creek, a tributary to Lay Reservoir, in 1-5 feet of water associated with fine substrate and areas of dense aquatic vegetation. Crow (pers. com 2009) reported the rough hornsnail in the Coosa River, downstream of the Jordan Tailrace near Wetumpka, at depths of 4-20 ft and located 20-60 ft from the river bank. Because of the location and depth where Crow reported hornsnails, it is unlikely that the rough hornsnail will be impacted by a temporary reduction in flow at the Jordan Project associated with ADROP.

As a result of ADROP, two PCE's for CH have the potential to be adversely affected (Table 4). The first PCE generally states that stream and river channels and banks should be geomorphically stable (e.g., channels that maintain lateral dimensions, longitudinal profiles, and sinuosity patterns over time without an aggrading or degrading bed elevation). Although the

49 Source: APC's 2010 Addendum to the Coosa River Biological Assessment (Attachment 3)

82

Filed: 06/17/2016     Document #1621558     USCA Case #16-1195

ADROP reduction in flow is temporary, previously wetted streambeds will undoubtedly be degraded by the reduction. The second PCE states that flows should reflect seasonal variability necessary to maintain benthic habitats.

## Action (5) Drawdown of Lay Lake

### *Factors to be considered*

Historically, the drawdown was required for APC to measure seepage flows and conduct maintenance inspections on Logan Martin Dam. However, due to more advanced flow measuring devices, a drawdown is no longer necessary to collect these data. In recent years, property owners and the ADCNR have become accustomed to the draw down and taken advantage of it to perform maintenance on boat docks and boat ramps. The drawdown of Lay Lake is also used during periods of drought. The timing, rate of drawdown, and duration of the drawdown could vary with the severity of the drought.

### *Analysis for the effects of the action*

The primary effect of the drawdown on tulotoma, rough hornsnail, and the two CH units (CH23, RH2) is the temporary reduction in water level (from 396 to 393 msl). The effects of the proposed drawdown directly involve the reduction of water levels in Lay Lake by approximately three feet and the resulting exposure and dewatering of littoral habitat (refer to "Analysis for the effects of the action" section under Action (4) for a description of historic water levels at Lay Lake). For tulotoma, the drawdown will result in exposure of habitats at several marginal locations as indicated in Figure 11. These areas are not very large due to the steep gradient along the river margins. For the rough hornsnail and its critical habitat, a much broader area will be affected. The Yellowleaf Creek embayment is relatively shallow and wide, and the proposed drawdown will affect a much larger area.

83

USCA Case #16-1195    Document #1621558    Filed: 06/17/2016    Page 305 of 327



Figure 11. Locations of tulotoma snail within the Lay/Logan Martin tailrace action area

## *Species' response to the proposed action*

Tulotoma presumably orients itself in a positive, upstream direction, similar to that of *Campeloma decisum* (Bovbjerg 1952). This is particularly important when evaluating the impacts of the drawdown on the numerous rocky islands and shoals downstream of Jordan Dam. However, these types of habitats no longer exist in the Lay Lake pool because of inundation by the reservoir. The only suitable habitat for tulotoma in this reach (the drawdown zone) is artificially-placed rip rap found along the margins (refer to Figure 11). From observations made during the August 2009 surveys, it is our opinion that many of the rocks that held tulotoma will remain wet at the end of the drawdown (J. Powell, pers. obs.), primarily because of rock size and gradient along the banks. The habitat Christman et al. (1995) evaluated along the margins at Jordan is quite different (lower gradient and smaller rocks) than the habitat found along the banks at Lay. At Lay, rocks are larger and the gradient at which they are placed is steeper. Also, very few tulotoma were found in the upper one foot of the water column  Therefore, when the proposed levels at Lay Lake begin to recede, tulotoma may be able to orient themselves upstream, crawl down the rock to its lowest point, and minimize the stranding effect that was observed in the Coosa River below Jordan Dam by Christman et al. (1995).

Based on recent survey data provided in the BA, there are approximately 5,780 tulotoma occupying the shallow marginal areas within the action area at Lay. Once water levels begin to recede, tulotoma can either remain in the same location, or they can follow the waterline down as levels recede. If they do not move, mortality or predation will inevitably occur. If they are able to follow the waterline, they will likely survive and then re-populate the area once water levels return to normal.

84

We do not have population data for the rough hornsnail within the action area. However, during qualitative surveys in August 2009, the species was widely distributed along the margins of Yellowleaf Creek. The width and gradient of the occupied habitat will determine whether hornsnails will be able to follow the waterline as levels decline. In the broad, flat areas of Yellowleaf Creek, where hornsnail densities are not as high, it is unlikely that the snails will be able to move fast enough to follow the waterline which will result in mortality and/or predation. In the higher gradient areas, where habitats are located closer to the creek channel, snails will likely be able to follow the waterline and survive.

In Kelly Creek, the drawdown is not anticipated to have a negative effect on tulotoma or its habitat.

As a result of the drawdown, two of the PCE's could be affected (Table 4). The first PCE states that stream and river channels and banks should be geomorphically stable (e.g., channels that maintain lateral dimensions, longitudinal profiles, and sinuosity patterns over time without an aggrading or degrading bed elevation). Although the nature of this action is temporary, previously wetted streambeds will undoubtedly be degraded by the dewatering. The second PCE states that flows should reflect seasonal variability necessary to maintain benthic habitats. Again, the rapid reduction in wetted shoreline will produce an unnatural change in the flow regime. As mentioned in previous sections, Yellowleaf Creek represents approximately 75-80 percent of the range of the rough hornsnail, and therefore, any changes to its PCEs could have a significant impact on the population as a whole.

85

Table 4. Summary of perceived effects of the proposed actions on critical habitat.

| Action* | Primary Constituent Elements - PCEs | | | | | |
|---|---|---|---|---|---|---|
| | Stable stream channels | Flow regime necessary for normal behavior, growth, and survival of all life stages | Water quality to support all life stages | Diverse and clean substrate with minimal algal growth | Fish Host(s) Presence and Survival | Few or no nonnative, or predator species |
| *Action (1) APC's Proposal for Ops* New flow regime at Weiss | No impact- beneficial effects to IR1, Unit 18, or GP2 | No impact- beneficial effects to IR1, Unit 18, or GP2 | No impact-beneficial effects to IR1, Unit 18, or GP2 | No impact- beneficial effects to IR1, Unit 18, or GP2 | No impact to IR1, Unit 18, or GP2 | Red shiners and Asian clam present. No anticipated response. |
| Changes to the rule curve at Weiss, Neely Henry, and Logan Martin | NA | NA | NA | NA | NA | NA |
| Reintroductions | NA | NA | NA | NA | NA | NA |
| Logan Martin current ops | NA | NA | NA | NA | NA | NA |
| DO enhancements at Weiss and Neely Henry | No impact to IR1, Unit 18, or GP2 | No impact to IR1, Unit 18, or GP2 | No impact to IR1, Unit 18, or GP2 | No impact to IR1, Unit 18, or GP2 | No impact to IR1, Unit 18, or GP2 | No impact to IR1, Unit 18, or GP2 |
| Jordan current ops | No impact to RH1 or IR3; Unit 26 undetermined because none of the species are currently present | No impact to RH1 or IR3; Unit 26 undetermined because none of the species are currently present | No impact to RH1 or IR3; Unit 26 undetermined because none of the species are currently present | No impact to RH1 or IR3; Unit 26 undetermined because none of the species are currently present | No impact to RH1 or IR3; Impacts may be present in Unit 26 due to the abrupt rises in stage during generation | The dominant fish in RH1, IR3, and Unit 26 is the molluscan – eating freshwater drum |
| *Action (2)* SMP | Shoreline erosion could impact channel integrity in IR1, IR3, RH2, RH1, GP3, GP2, Units 18,19, 21, 24, and 26 | No Impact | Shoreline erosion could impact water quality (e.g., herbicide usage along shorelines) in IR1, IR3, RH2, RH1, GP3, GP2, Units 18,19, 21, 24, and 26 | Shoreline erosion could result in increased substrate embeddedness in IR1, IR3, RH2, RH1, GP3, GP2, | Method of shoreline protection (e.g., seawalls, rip-rap, etc.) could affect fish and mollusks in IR1, IR3, RH2, RH1, GP3, GP2, Units 18,19, 21, 24, | No Impact |

| | | | | Units 18,19, 21, 24, and 26 | and 26 | |
|---|---|---|---|---|---|---|
| Action (3) WMP | Potential impacts from timbering activities in GP3 | No Impact | Potential impacts from timbering activities in GP3 | Potential impacts from timbering activities in GP3 | No Impact | No Impact |
| Action (4) ADROP | Potential impacts from dewatering of shoreline habitats in IR3, RH1, and RH2 | Potential impacts from reducing flows in IR3, RH1, and RH2 | DOs and temperature likely affected in IR3, RH1, and RH2 | No Impact | No Impact | No Impact |
| Action (5) Lay Lake Drawdown | dewatering of large areas in RH2 | moderate changes in stage in RH2 | No Impact | No Impact | No Impact | No Impact |

*; WMP=Wildlife Management Plan; SMP= Shoreline Management Plan; ADROP=Alabama Drought Response Operations Proposal.

## CUMULATIVE EFFECTS

Cumulative effects include the effects of future State, tribal, local or private actions that are reasonably certain to occur in the action area considered in this biological opinion. Future Federal actions that are unrelated to the proposed action are not considered in this section because they require separate consultation pursuant to section 7 of the Act.

*Action (1) Adaptive Management Plans for Improving Operations*

By enhancing DO levels at Logan Martin, DO demand could increase due to an increase in NPDES permit requests, specifically in the 14 mile reach between Logan Martin Dam and the Hwy 231 Bridge in Childersburg, which already has several large industrial dischargers. The new flow regime in the Weiss Bypass could encourage additional water withdrawals in an area that already has a heavy irrigation demand. During the 2007 drought, there were several reports of landowners adjacent to the river "ponding" waters and continuing to withdraw irrigation water even though we were in a severe drought. In fact, one anonymous report indicated a large section of river was pumped completely dry.

As part of the relicensing process, APC has committed to establish and maintain three funds to support restoration and enhancement activities. The first of these is the "Enhancement and Restoration Fund," an agreement with ADCNR to provide $2.8 million in funding to support the Alabama Aquatic Biodiversity Center (AABC) and the reintroduction efforts (includes culture and propagation activities). The second is a "Fish Habitat Enhancement and Restoration Fund," which is an agreement with the ADCNR to provide $4.7 million to enhance aquatic habitats. This will likely include a variety of activities from installation of reservoir fishing structures to instream habitat work in tributaries. The third is the "Wildlife Habitat Enhancement and Restoration Fund," an agreement with the ADCNR to provide $3.15 million to support land management activities that benefit wildlife (including the RCW). All three funds have incremental payment plans that generally extend throughout the term of the FERC license.

*Action (2) Implementation of a Shoreline Management Plan (SMP)*

We do not anticipate any cumulative effects outside of what has been proposed.

*Action (3) Implementation of a Wildlife Management Plan*

As discussed in the "*effects of the action*" section, APC is participating in the state's longleaf pine initiative. This program and will benefit many longleaf dependent species; however, there will likely be a large removal/sale of existing loblolly as this gets underway. Precautions will need to be made to insure that the removal of these trees does not further impact listed species and CH, particularly in Hatchet and Weogufka Creek watersheds.

*Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal - ADROP*

During drought conditions there will likely be additional demands placed on the river for

withdrawals. In areas that support listed species or CH, APC, ADEM, and the Service will continue to work cooperatively to address these issues, as they have in the past.

*Action (5) Drawdown of Lay Lake*

Due to the short term nature of this action, we do not anticipate any cumulative effects within the two week drawdown period, outside of what has been proposed.

## CONCLUSION

The modifications to the Coosa River and the construction of APC's hydro developments began nearly a century ago (Weiss-1964, Neely Henry-1966, Logan Martin-1964, Lay-1914, Mitchell-1923, Bouldin-1967, Jordan-1929) and their cumulative effects (e.g., fragmented habitats, impeded fish passage, altered hydrology and water quality) have undoubtedly changed the landscape in the Coosa Basin forever, impacting many aquatic species and likely contributing to the extirpation and extinction of several. However, the relicensing of the Coosa Project at this time cannot take into account the historic impacts of these actions, but rather only the current and proposed future operations and their impacts. The Service and ADCNR have worked very closely with APC during this re-licensing process to address many resource issues that we believe are important to conserving and restoring the fauna of the Coosa River Basin. Although many of the actions proposed by APC do have a bearing on listed species, several are completely beneficial, including the new flow regime in the Weiss Bypass, DO enhancements at several projects, APC's commitment to provide funding to the AABC for culturing listed species and improving aquatic habitats, enhancing RCW habitat at Lake Mitchell, developing a SMP that is protective of species and CH, and developing a drought plan that minimizes impacts to species.

Like most river systems, the Coosa River is a multi-use resource that has many demands placed on it for drinking water, irrigation, waste assimilation, recreation, and an extremely diverse, and imperiled, freshwater fauna. These demands are undoubtedly going to increase as water availability becomes even more and more critical to the people of Alabama in the coming years. We have already experienced some of these struggles in the tri-state water wars between Georgia, Florida, and Alabama. Our role as a resource agency in this relicensing process is to recognize these challenges and work with the applicants, stakeholders, and other agencies to make the best decision we can for the conservation and restoration of listed species. Therefore, this opinion represents our best effort at identifying these demands and making the best science-based decision we can to the proposed actions that will preserve and benefit listed species until the next relicensing process.

After reviewing the current status of the nine species and 12 critical habitat units, the environmental baseline for the action area, the effects of the proposed relicensing of the Coosa River Project, and the cumulative effects, it is the Service's biological opinion that the

relicensing of the Project, as proposed, is not likely to jeopardize the continued existence of any species, nor is it likely to destroy or adversely modify any critical habitat.

This biological opinion does not rely on the regulatory definition of "destruction or adverse modification" of critical habitat at 50 C.F.R. 402.02. Instead, we have relied upon the statutory provisions of the ESA to complete the following analysis with respect to critical habitat.

## INCIDENTAL TAKE STATEMENT

Section 9 of the Act and Federal regulation pursuant to section 4(d) of the Act prohibit the take of endangered and threatened species, respectively, without special exemption. Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or to attempt to engage in any such conduct. *Harm* is further defined by the Service to include significant habitat modification or degradation that results in death or injury to listed species by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering. *Harass* is defined by the Service as intentional or negligent actions that create the likelihood of injury to listed species to such an extent as to significantly disrupt normal behavior patterns which include, but are not limited to, breeding, feeding or sheltering. Incidental take is defined as take that is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity. Under the terms of section 7(b)(4) and section 7(o)(2), taking that is incidental to and not intended as part of the agency action is not considered to be prohibited taking under the Act provided that such taking is in compliance with the terms and conditions of this Incidental Take Statement.

The measures described below are non-discretionary for listed species, and must be undertaken by the FERC so that they become binding conditions of any grant or permit issued to the APC, as appropriate, for the exemption in section 7(o)(2) to apply. The FERC has a continuing duty to regulate the activity covered by this incidental take statement. If the FERC (1) fails to assume and implement the terms and conditions or (2) fails to require the APC to adhere to the terms and conditions of the incidental take statement through enforceable terms that are added to the permit or grant document, the protective coverage of section 7(o)(2) may lapse. In order to monitor the impact of incidental take, the FERC or APC must report the progress of the action and its impact on the species to the Service as specified in the incidental take statement. [50 CFR §402.14(I)(3)]

## AMOUNT OR EXTENT OF TAKE ANTICIPATED

*Action (1) Alabama Power's Proposal for Operations*

a. The Service anticipates that the southern clubshell, finelined pocketbook, southern pigtoe, and Georgia pigtoe that occur in the 11-mile stretch of the Coosa River from the confluence of Terrapin Creek downstream to the Weiss Powerhouse could be taken as a

90

result of the new flow regime. The incidental take is expected to be in the form of harm and harassment. It is reasonable to expect that take, in the form of harm, would affect less than 10% of these mussel populations in this section of the Coosa; therefore, 90% of the populations in this reach could be temporarily harassed due to poor water quality conditions.

b.  The Service anticipates that the tulotoma snail, painted rocksnail, and southern clubshell occurring in the 7.2 miles of Coosa River from Logan Martin Dam downstream to the confluence of Flipper Creek could be taken as a result of the current operations at Logan Martin Dam. The incidental take is expected to be in the form of harassment. This take will be difficult to detect because of the size of the animals, the depth at which they occur, and the extremely small population size (except for tulotoma), but will affect 100 percent of the individuals present in this section of the Coosa River.

c.  The Service anticipates that the tulotoma snail occurring in approximately 10 miles of the Coosa River from Jordan Dam downstream to the Alabama Highway 14 Bridge could be taken as a result of current operations. Take, in the form of harm and harassment, is expected due to the rapid rising and falling of the river, and the subsequent stranding of tulotoma in the elevated bedrock outcroppings that occur throughout this section of the river. Incidental take was established in a prior Opinion (FWS 1995) for the take of 50,000 individuals during a 2,000 cfs release. This level of take will remain effective unless new data becomes available. This level of take essentially covered the rapid fall of the river following a period of generation.

d.  The Service anticipates that the 21 listed species proposed for reintroduction in various locations in the action area could be taken as a result of current operations. Although no species will be reintroduced unless the agencies believe conditions are suitable for their survival, there is still some uncertainty associated with their survival. Therefore, incidental take will be in the form of harm and will include 100 percent of all individuals reintroduced into the action area.

*Action (2) Implementation of a Shoreline Management Plan (SMP)*

a.  The Service anticipates that the southern clubshell, finelined pocketbook, Georgia pigtoe, southern pigtoe, blue shiner, tulotoma snail, painted rocksnail, cylindrical lioplax, and rough hornsnail could be adversely affected by activities permitted under the SMP. The effects of permitted construction activities may cause a temporary increase in sediment in habitats classified as "Sensitive Resource Lands". The incidental take is expected to be in the form of harassment. Harassment could occur in Big Canoe, Kelly, Yellowleaf, Choccolocco, and Hatchet Creeks upstream to the Project boundaries, as well as in the main channel of the Coosa River where listed species occur.

*Action (3) Wildlife Management Plan-WMP*

91

a.  The Service anticipates that, on average, one RCW cavity every three years could be harmed as a result of active land management practices (i.e., prescribed burning) at Lake Mitchell. In addition, the Service also anticipates that take of up to five chicks/eggs could be taken once every six years as the result of nesting season burns. This level of take is provided only after APC (or their contractor) has taken all necessary precautions to protect the cavity tree from burning activities (i.e., raking). Accidental burning of a cavity tree because of inadequate site prep (raking) is not covered by this opinion, nor are cavities that are damaged because of a lack of active land management. "Lack of active land management" refers to lands that have not been actively managed and/or burned for several years leading up to the event and where fuel levels are high.

b.  The Service anticipates that the tulotoma snail and blue shiner occurring in the lower reaches of Hatchet and Weogufka Creeks could be taken as a result of the WMP. The incidental take is expected to be in the form of harassment, resulting from land management activities that degrade stream habitat by causing excessive sedimentation. This take will be difficult to detect because of the small size of these animals and the small population sizes, but will include the entire channels of Hatchet and Weogufka Creeks within the project boundaries up to approximately 317 msl and affect 100% of the populations.

*Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal - ADROP*

f.  The Service anticipates that the tulotoma snail occurring in the approximately 10 miles of the Coosa River from Jordan Dam downstream to the Alabama Highway 14 Bridge could be taken as a result of the ADROP. Although not addressed in ADROP, incidental take is also expected in the Lay Lake pool for the rough hornsnail, in Yellowleaf Creek, and the tulotoma snail in the Coosa River downstream of Logan Martin, resulting from operational changes upstream of Jordan Dam during periods of drought. The incidental take is expected to be in the form of harm and harassment as a result of habitat desiccation during periods of flow reduction. The amount of take will be difficult to detect because of small size of the animals, small population sizes, the depth at which they occur, access to the locations to sample, and consumption by predators (e.g., freshwater drum). During the DIL 1 drought scenario, the level of take for tulotoma will rely upon the numbers provided in the 1995 "Modification to the Jordan Dam Consultation,"[50] and during DIL 2 and 3, the level of take will be based upon the numbers provided in the 2008 Emergency BO[51]. The rough hornsnail in the Coosa River downstream of Jordan Dam will not likely be adversely affected by ADROP due to the areas of the channel where it currently occupies. Although it was not addressed in

---

50  50,000 individuals
51  73,443 individuals

ADROP, at Lay Lake upstream of Jordan, the level of take during a drawdown due to drought conditions will likely be very similar to what would occur during the Lay Lake drawdown under Action (5). For a description of the level of take anticipated in Yellowleaf Creek and the Coosa River downstream of Logan Martin, refer to Action (5) (a) and (b) in the following section.

*Action (5) Drawdown of Lay Lake*

a.  The Service anticipates that the tulotoma snail occurring in the Coosa River from Logan Martin Dam downstream to Flipper Creek, and in lower Yellowleaf Creek could be taken as a result of the Lay Lake drawdown. Based on previous studies, as many as 5,780 individuals of tulotoma could be taken as a result of this proposed action. The incidental take is expected to be in the form of harm and harassment. Based on the previous studies (Christman et al. 1995) and a worst case scenario, it is reasonable to expect that 7 percent of the take will be in the form of harassment and as much as 93 percent will be in the form of harm. Because of the difficulty in measuring the level of harm and harassment, it is estimated that approximately 405 individuals will be harassed and 5,375 individuals will be harmed along the margins of the Coosa River in the Lay Lake operational zone.

b.  The Service also anticipates incidental take of the rough hornsnail as a result of the proposed action. The incidental take is expected to be in the form of harm and harassment. However, it will be difficult to detect for the following reason(s): we do not have density estimates of the number of rough hornsnails present in the impact zone; due to its small body size, finding a dead or impaired specimen is unlikely; some individuals will likely be consumed by mollusk-eating predators (i.e., freshwater drum); and some individuals will be able to presumably follow the waterline as the stage decreases.

93

Filed: 06/17/2016    Page 315 of 327

Document #1621558

USCA Case #16-1195

In the accompanying Biological Opinion, the Service determined that this level of expected take is not likely to result in jeopardy to any of the listed species or destruction or adverse modification of critical habitat.

## REASONABLE AND PRUDENT MEASURES

Regulations (50 CFR §402.02) implementing section 7 of the Act define reasonable and prudent alternatives as alternative actions, identified during formal consultation, that: (1) can be implemented in a manner consistent with the intended purpose of the action; (2) can be implemented consistent with the scope of the action agency's legal authority and jurisdiction; (3) are economically and technologically feasible; and (4) would, the Service believes, avoid the likelihood of jeopardizing the continued existence of listed species or resulting in the destruction or adverse modification of critical habitat.

The Service believes the following reasonable and prudent measure(s) are necessary and appropriate to minimize take of the nine species covered in this opinion:

*Action (1) Alabama Power's Proposal for Operations*

    a. Weiss: Reduce the probability of releasing water of poor quality down the Bypass;

    b. Logan Martin: Maintain (if adequate) and enhance (if not) water quality conditions in the tailrace to ensure listed mussels and snails are able to carry out basic life cycle requirements;

    c. Jordan: Adhere to RPMs and T&Cs outlined in the 1995 BO;

    d. Project-wide: Reduce the effects of habitat fragmentation and Project operations by participating in the reintroductions and monitoring of listed aquatic species throughout the Coosa River system.

*Action (2) Implementation of a Shoreline Management Plan (SMP)*

    a. Reduce the impacts from activities permitted under the SMP by minimizing excessive shoreline erosion and preventing herbicides from entering the water;

*Action (3) Implementation of a Wildlife Management Plan*

    a. Ensure that RCW cavity trees are protected to the maximum extent possible during land management activities;

    b. Ensure that blue shiner and tulotoma habitat in Weogufka and Hatchet Creeks is protected from Alabama Power timber harvesting activities.

*Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal - ADROP*

a. Reduce the stranding/mortality rate of tulotoma in the Coosa River downstream of Jordan Dam and follow the RMPs and T&C's from 2008 Biological Opinions;

b. Minimize releases of water through Bouldin Dam during drought conditions;

c. Identify how reservoir pool levels will be managed upstream of Jordan, primarily Lay Lake.

*Action (5) Drawdown of Lay Lake*

a. Re-evaluate, in consultation with the Service and ADCNR, the need to continue the biannual drawdown on a predetermined schedule. Whether a drawdown occurs biannually or during drought conditions, the following RPMs should be observed:

> i. Increase the time which tulotoma and the rough hornsnail will have to follow the waterline as water levels recede;
>
> ii. Reduce the stranding/mortality rate of tulotoma and rough hornsnail.

TERMS AND CONDITIONS

In order to be exempt from the prohibitions of Section 9 of the Act, the FERC must comply with the following terms and conditions, which carry out the reasonable and prudent measures, described above and outline required reporting/monitoring requirements. These terms and conditions are non-discretionary.

The reasonable and prudent measures, with their implementing terms and conditions, are designed to minimize the impact of incidental take that might otherwise result from the proposed action. If, during the course of the action, the level of incidental take is exceeded, such incidental take represents new information requiring reinitiation of consultation and review of the reasonable and prudent measures provided. The FERC must immediately provide an explanation of the causes of the taking and review with the Service the need for possible modification of the reasonable and prudent measures.

*Action (1) Alabama Power's Proposal for Operations*

a. Weiss AMP: Minimize the temporary releases of warm or low DO waters in the initial flow releases by implementing the water quality monitoring plan as described in the AMP;

b. Logan Martin AMP: Following the issuance of the FERC license, APC will develop and

95

implement the DO improvement directives as listed in the 401 WQC issued by ADEM. APC will also revise within 18 months the Logan Martin AMP to ensure that non-generation conditions are protective of listed species and begin developing plans and an implementation schedule, that is agreeable with the Service, to enhance DO during non-generation periods with the goal of ensuring the survival of listed mussels (and their hosts), snails, and fishes, and ensuring that they are able to carry out basic life cycle requirements.

c. Project-wide: In cooperation with the agencies, APC will participate in studies, included, but not limited to, *in situ* (e.g., "cage experiments") and laboratory experiments, species reintroductions, and studies to evaluate habitat and water quality conditions in the Coosa River.

*Action (2) Implementation of a Shoreline Management Plan (SMP)*

a. Project-wide:

    i. All shorelines that are adjacent to, or could affect, listed species or CH, are to be designated as Sensitive Resource Lands under APC's Shoreline Classification System. The Sensitive Resource layer is to be addressed or updated at least annually, to account for new T&E survey data or any new listing and/or CH designations;

    ii. Actively promote, through homeowner publications and/or articles in APC's newsletter (Shorelines), the benefits of using BMPs and the proper use of EPA-regulated herbicides and their effects on aquatic organisms;

b. Project-specific monitoring plans:

    i. Neely Henry: To ensure that listed species and CH are being protected in lower Big Canoe Creek, a baseline mussel and fish survey shall be conducted, within 36 months of the issuance of the license. This survey is to include the location(s) and extent of extant mussel populations, general population estimates, and fishery IBIs. In addition to biological information, shorelines should be mapped to document existing conditions (e.g., riparian zones distance and condition and areas with high erosion potential). The survey will establish a baseline and will used to insure no further decline in the population of southern clubshell and habitat in lower Big Canoe Creek occurs.

    i. Logan Martin: To ensure that listed species are being protected in lower Choccolocco Creek, a baseline mussel, snail, and fish survey shall be conducted within 36 months of the issuance of the license - similar to that in Big Canoe Creek. The survey will establish a baseline and will be used to insure no further decline in tulotoma, cylindrical lioplax, or painted rocksnail populations and

96

habitat in lower Choccolocco Creek occurs.

ii. Mitchell: To ensure the protection of the blue shiner and tulotoma snail in lower Hatchet and Weogufka Creeks, baseline surveys shall be conducted and completed, within the Project boundary, within 36 months following the issuance of the license. The surveys will determine the range and extent of tulotoma and blue shiner in lower Hatchet and Weogufka Creeks (within the Project boundary) and will be used to ensure that logging activities conducted on Project lands do not adversely affect CH or listed species.

*Action (3) Implementation of a Wildlife Management Plan*

a. Implement procedures in the RCW Management Plan;

b. In lower Hatchet and Weogufka Creeks, where tulotoma and blue shiners occur, all activities conducted under the Timber Management section of the WMP shall use the appropriate BMPs and SMZs for the environment and conditions being managed[52].

*Action (4) Implementation of the Coosa River Project portion of the Alabama Drought Response Operations Proposal - ADROP*

a. Maintain flow reductions at 67 cfs per day, and monitor water temperatures at multiple locations, agreed to by the Service, between Jordan Dam and Corn Creek Shoals during drought conditions. Monitoring sites shall be located in areas where tulotoma occurs;

b. All excess water in Jordan/Bouldin Reservoir shall be used to maintain the wetted perimeter of the channel in the Coosa River below Jordan Dam and not passed through Bouldin Dam, unless system reliability is jeopardized;

c. Although Action (4) (ADROP) and Action (5) (Drawdown of Lay Lake) are completely different actions, the same level of incidental take is expected for both actions. Therefore, the T&Cs listed below are applicable to both Actions (4) and (5).

i. Studies shall be conducted to determine the extent of the margins that will be exposed in Yellowleaf Creek from the drawdown and rough hornsnail population data shall be *collected that* can be used to estimate the population size within this area. Results of these studies must be suitable for use to develop methods for evaluating the effects on the rough hornsnail during future drawdown's and droughts;

ii. Each drawdown time shall be increased to three days. This will provide an approximate drawdown rate of less than 12 inches per day, which should provide

---

52 Notable references include those listed in the WMP, as well as, Bentrup (2008) and Wenger (1999).

tulotoma and rough hornsnail a better chance at following the waterline as reservoir levels decline;

    iii.    Efforts shall be made daily, during the initial drawdown and one day following the lowest point, to salvage all exposed individuals. All salvaged individuals shall be translocated to an area safe from drawdown levels and the number of individuals shall be recorded and reported to the Service within 30 days following the completion of the action;

    iv.    Shoreline surveys shall be conducted at all areas occupied by tulotoma and the rough hornsnail prior to and at the lowest point of the drawdown to determine the amount (e.g., acres) of exposed habitat.

*Action (5) Drawdown of Lay Lake*

    *a.*    Refer to the T&Cs listed under Action (4)(c).


## CONSERVATION RECOMMENDATIONS

Section 7(a)(1) of the Act directs Federal agencies to use their authorities to further the purposes of the Act by carrying out conservation programs for the benefit of endangered and threatened species. Conservation recommendations are discretionary agency activities to minimize or avoid adverse effects of a proposed action on listed species or critical habitat, to help implement recovery plans, or to develop information.

- Because of a lack of quantitative information on the distribution of rough hornsnail in the Coosa River downstream of Jordan Dam, we recommend APC coordinate with the agencies to conduct surveys, within 36 months following the issuance of the license.

- Shoreline habitats in the area surrounding the Mohr's Barbara's buttons and green pitcher plant locations at Weiss should be classified as "Sensitive Resource Lands" for the Weiss SMP maps.

- Although the Bald eagle is no longer listed under the ESA, it is still protected under the Bald and Golden Eagle Protection Act. The original WMP was developed prior to its delisting and recommended annual surveys; however, there is only a two week window allowed for surveys and it is unlikely that all projects can be surveyed in that timeframe. Therefore, we recommend that APC coordinate with the agencies to determine a modified schedule.

- To expedite APC's permitting actions, a SMP decision matrix could be an "evaluation

98

matrix" that will streamline the Land Use permit application process. This not only benefits APC, but it ensures the protection of listed species and CH. Once a detailed plan is developed for the Sensitive Resource land use classification, conditions should be reviewed programmatically. The final programmatic decision to this "evaluation matrix" will become an amendment to this opinion (see Table 6 for an example of the "matrix").

Table 6. Example of an Evaluation Matrix for Sensitive Resource Lands on the Coosa Projects.

| Shoreline Activity | Mussels and/or Snails Present (including CH) | Fish Present | Plants Present |
|---|---|---|---|
| Dredging | May Affect- Restrictions may apply | May Affect- Restrictions may apply | *NLAA - No restrictions required for permit |
| Construction and maintenance of overwater and floating structures (boat docks and boat houses) | NLAA - No restrictions required for permit | NLAA - No restrictions required for permit | NLAA - No restrictions required for permit |
| Construction of Boat Ramps and Marine Rails | May Affect- Restrictions may apply | May Affect- Restrictions may apply | NLAA - No restrictions required for permit |
| Bank Stabilization - including use of rip-rap and/or seawalls | May Affect- Restrictions may apply | May Affect- Restrictions may apply | NLAA - No restrictions required for permit |
| Repair of an existing erosion site – requires agency approved stabilization plan | NLAA - No restrictions required for permit | NLAA - No restrictions required for permit | NLAA - No restrictions required for permit |

c.   *NLAA=Not Likely to Adversely Affect

In order for the Service to be kept informed of actions minimizing or avoiding adverse effects or benefiting listed species or their habitats, the Service requests notification of the implementation of conservation recommendations.

## REINITIATION NOTICE

This concludes formal consultation on the action outlined in the November 4, 2010 request. As written in 50 CFR §402.16, reinitiation of formal consultation is required where discretionary FERC involvement or control over the action has been retained (or is authorized by law) and if: (1) the amount or extent of incidental take is exceeded; (2) new information reveals effects of the FERC action that may affect listed species or critical habitat in a manner or to an extent not considered in

this opinion; (3) the FERC action is later modified in a manner that causes an effect to the listed or critical habitat not considered in this opinion; or (4) a new species is listed or critical habitat designated that may be affected by the action. In instances where the amount or extent of incidental take is exceeded, any operations causing such take must cease until reinitiation.

For this biological opinion the incidental take is exceeded is the take exceeds those levels discussed in the "Amount or Extent of Take Anticipated" section, which is what has been exempted from the prohibitions of Section 9 by this opinion. We appreciate the opportunity to work with you and your staff regarding the relicensing of the Coosa River Project. For further coordination please contact Jeff Powell at (251) 441-5858.

Sincerely,

William J. Pearson
Field Supervisor
Alabama Ecological Services Field Office

cc:   Mike Godfrey, APC, Birmingham, AL
      Charles Stover, APC, Birmingham, AL
      Angie Segars-Anderlegg, APC, Birmingham, AL
      Jim Lochamy, APC, Calera, AL
      Jim Crew, Southern Company, Birmingham, AL
      Henry Mealing, Kleinschmidt, Columbia, SC
      Pete Yarrington, FERC, Washington D.C.
      Sean Murphy, FERC, Washington D.C.
      Stan Cook, ADCNR, Montgomery, AL
      Dr. Paul D. Johnson, ADCNR, Marion, AL
      Ken Graham, FWS, Atlanta, GA
      Paul Hartfield, FWS, Jackson, MS
      Will McDearman, FWS, Jackson, MS

100

# LITERATURE CITED

Ahlstedt, S.A., P.D. Johnson, J.R. Powell, R.S. Butler, M.T. Fagg, D.W. Hubbs, S.F. Novak, S.R. Palmer. 2004. Historical and current examination of freshwater mussels (Bivalvia: Margaritiferidae, Unionidae) in the Duck River basin Tennessee. 213 pp.

Alabama Forestry Commission (AFC). 1999. Alabama's Best Management Practices for Forestry. 33 pp.

Alabama Power Company (APC). 2000. Lay Development, Initial Information Package for the Coosa and Warrior Relicensing. Prepared by Alabama Power Company and Kleinschmidt Associates. 128 pp.

---. 2005. Application for License for Major Project – Existing Dam: Coosa River Project (FERC Nos. 2146, 82, 618). 10 CD package filed with FERC.

---. 2007. Biological Assessment for threatened and endangered species for the Coosa River (FERC No. 2146), Mitchell (FERC No.82), and Jordan (FERC No. 618) projects.

---. 2009. Assessment of Impacts to Proposed and Listed Species and Critical Habitat in the Lay Lake Drawdown Area (Biological Assessment). FERC eLibrary. 9 pp.

---. 2011. Addendum 1 to Biological Assessment for threatened and endangered species for the Coosa Hydroelectric project (FERC No. 2146). FERC eLibrary. 108 pp.

Barnhart. 2001. Fish Hosts and Culture of Mussel Species of Special Concern. Report to the FWS and Missouri Department of Conservation.

Barnhart, C, and B. Kaiser. 2007. Effects of hypoxia on freshwater mussels. Final Report, Missouri State University. 76 pp.

Bentrup, G. 2008. Conservation buffers: design guidelines for buffers, corridors, and greenways. Gen. Tech. Rep. SRS-109. Asheville, NC: Department of Agriculture, Forest Service, Southern Research Station. 110 p.

Boschung, H.T. Jr. and R.L. Mayden. 2004. Fishes of Alabama. Smithsonian Books, Washington, DC. xviii + 736 pp.

Bovbjerg, R.V. 1952. Ecological aspects of dispersal of the snail Campeloma decisum. Ecology 33: 169-176.

Brinley, F. J. 1944. Biological studies. House Document 266, 78th Congress, 1st Session; Part II, Supplement F. p. 1275-1353.

101

Cech, J. J., Jr., C. G. Campagna, and S. J. Mitchell. 1979. Respiratory responses of largemouth bass (*Micropterus salmoides*) to environmental changes in temperature and dissolved oxygen. Trans. Amer. Fish. Soc. 108: 166-171.

Chen, Li-Yen, A.G. Heath, R.J. Neves. 2001. Comparison of oxygen consumption in freshwater mussels (Unionidae) from different habitats during declining dissolved oxygen concentration. Hydrobiologia 450: 209-214.

Christman, S.P., F.G. Thompson, and E.L. Raiser. 1995. *Tulotoma magnifica* (Conrad) (Gastropoda: Viviparidae) status and biology in the Coosa River below Jordan Dam, Alabama. Final Report to Alabama Power Company. Birmingham, AL. 63 pp.

DeVries, D.R., D.L. Armstrong, Jr., M. Topoloski, W.E. Pine, III, J.A. Johnson, R.A. Dunham, L. Robison, J. Dibona, K. Norgren, P. Hartfield and S. Cook. 2003. Distribution, habitat use, and genetics of *Tulotoma magnifica* (Gastropoda: Viviparidae). Southeastern Naturalist 2(1):35-58.

DeVries, D. R. 2005. Evaluating changes in the *Tulotoma magnifica* populations in the Coosa River and its tributaries during 1992 through 2004. Final Report to U.S. Fish and Wildlife Service, Jackson, MS. 50 pp.

DeVries, D. R. 2008. Rapid-Response Post-Drought Survey for *Tulotoma magnifica* at Five Coosa River Tributary Sites. Report to the Alabama Field Office, 16 pp.

Federal Energy Regulatory Commission (FERC). 2009. Final Environmental Assessment for hydropower license: Coosa River Hydroelectric Project – FERC Project No. 2146-111, Alabama and Georgia. December 2009.

Fraenkel, G. S. & Gunn, D. L. 1940. The Orientation of Animals: Kineses, Taxes and Compass Reactions. Oxford: Clarendon Press. 352 pp

Freeman and Hagler 2010. In: Georgia Department of Natural Resources. Rare Fish Species Profiles. http://www.georgiawildlife.com/sites/default/files/uploads/wildlife/nongame/pdf/accounts/fishes/percina_antesella.pdf

Gangloff, M.M. 2003. The status, physical habitat associations, and parasites of freshwater mussels in the upper Alabama River drainage, Alabama. Doctoral dissertation, Auburn University, Alabama. 237 pages.

Goodrich, C. 1944. Pleuroceridae of the Coosa River basin. Nautilus, 58(2): 40-48.

Haag, W.R., M.L. Warren, Jr. and M. Shillingsford. 1999. Host fishes and host-attracting behavior of *Lampsilis altilis* and *Villosa vibex* (Bivalvia: Unionidae). The American

Page 324 of 327    Filed: 06/17/2016    Document #1621558    USCA Case #16-1195

Midland Naturalist 141(1):149-157.

Haag, W.R. and M.L. Warren, Jr. 1997. Host fishes and reproductive biology of 6 freshwater
mussel species from the Mobile Basin, U.S.A. Journal of the North American
Benthological Society 16(3):576-585.

--- . 2003. Host fishes and infection strategies of freshwater mussels in large Mobile Basin
streams, U.S.A. Journal of the North American Benthological Society 22(1):78-91.

Hartfield, P.D. and E. Hartfield 1996. Observations on the conglutinates of *Ptychobranchus
greeni* (Conrad, 1834) (Mollusca: Bivalvia: Unionoidea). The American Midland
Naturalist 135(2):370-375.

Hem, J. D. 1985. Study and Interpretation of the chemical characteristics of natural water: U.S.
Geological Survey Water-Supply Paper 2254, 264 p.

Hershler, R., J.M. Pierson, and R.S. Krotzer. 1990. Rediscovery of *Tulotoma magnifica*
(Conrad) (Gastropoda:Viviparidae). Proc. Biol. Soc. Wash. 103(4):815-824.

Johnson, P.D. and R.R. Evans 2000. A freshwater gastropod survey of selected drainages in the
Chattooga River, Oostanaula River and the Big Cedar Creek basins in northwest Georgia.
Report for Georgia Natural Heritage Program. 45 pp.

--. 2001. The status of *Leptoxis foremani* in the upper Coosa River system of Georgia and
Alabama. Tennessee Aquarium Research Institute, Field Headquarters. 66 pp.

Johnston, C.E. and J.R. Shute 1997. Observational notes on the spawning behavior of the blue
shiner (*Cyprinella caerulea*) and the holiday darter (*Etheostoma brevirostrum*), two rare
fishes of the Conasauga River, Georgia and Tennessee. SFC Proc. 35:1-2.

McGregor, S.W., and J.T. Garner. Results of qualitative sampling for protected mussel species
at selected stations in the Cahaba River system, Alabama, 2005. Geological Survey of
Alabama Open-File Report 0524. 14 p.

Mercinek, P.A., P.J. Gangnon, M.C. Freeman, C. Straight, M.D. Merrill, and B.J. Freeman.
2005. Ecological importance and conservation status of southeastern river shoal habitat. A
report submitted to the USFWS. 29p.

Mirarchi, R.E., J.T. Garner, M.F. Mettee and P.E. O'Neil, editors. 2004. Alabama Wildlife
Volume Two: Imperiled Aquatic Mollusks and Fishes. The University of Alabama Press,
Tuscaloosa, AL. xii + 255 pp.

Mobile River Basin Mollusk Restoration Committee (MRBMRC). 2010. Plan for the population
restoration and conservation of freshwater mollusks of the Mobile River Basin. iv + 101

pages.

O'Neil, Patrick E., S.W. McGregor, and E. Anne Wynn. 2011. Watershed assessment of the North River System for recovery and restoration of rare mussel species. Alabama Geological Survey Bulletin 183, 65 p.

Powell, Jeffrey R. 2003. Response of fish communities to cropland density and natural environmental setting in the Eastern Highland Rim ecosystem of the lower Tennessee River basin, Alabama and Tennessee, 1999. U.S. Geological Survey Water-Resources Investigations Report 02-4268, 48 p.

Purcell, T.R. 2011. Unpublished Master's Thesis. Auburn University.

Roe, K.J., A.M. Simons and P. Hartfield. 1997. Identification of a fish host of the inflated heelsplitter *Potamilus inflatus* (Bivalvia: Unionidae) with a description of its glochidium. The American Midland Naturalist 138)1):48-54.

Roe, K.J. and C. Lydeard 1998. Molecular systematics of the freshwater mussel genus *Potamilus* (Bivalvia:Unionidae). Malacologia 39(1-2):195-205.

Roe, K.J. and P.D. Hartfield 2005. *Hamiota*, a new genus of freshwater mussel (Bivalvia: Unionidae) from the Gulf of Mexico drainages of the southeastern United States. The Nautilus 119(1):1-10.

Spoor, W. A. 1977. Oxygen requirements of embryo and larvae of the largemouth bass, (*Micropterus salmoides*) (Lacepede). J. Fish. Biol. 11:77-86.

U.S. Environmental Protection Agency (EPA). 1986. Ambient water quality criteria for dissolved oxygen. 46 pp.

U.S. Fish and Wildlife Service (USFWS). 1985. Endangered and Threatened Wildlife and Plants: Endangered Status Determined for the Amber Darter. Federal Register 50 FR 31597-31604.

---. 1985b. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for the Amber Darter. Federal Register 50 FR 31597-31604.

---. 1987. Endangered and Threatened Wildlife and Plants: Endangered Status Determined for the Southern combshell. Federal Register 52 FR 11162-11169.

---. 1991. Endangered and Threatened Wildlife and Plants: Endangered Status Determined for the Tulotoma Snail. Federal Register 56 FR 797-800.

---. 1992. Endangered and Threatened Wildlife and Plants: Endangered Status Determined for

the Goldline Darter. Federal Register 57 FR 14786-14790.

---. 1993. Endangered and Threatened Wildlife and Plants: Endangered Status Determined for Eleven Mobile Basin Mussel Species. 58 FR 14330-14340.

---. 1998. Endangered and Threatened Wildlife and Plants: Endangered Status Determined for the Painted Rocksnail. Federal Register 63 FR 57610-57620.

---. 2000. Mobile River Basin Aquatic Ecosystem Recovery Plan. Atlanta, GA. 128 pp.

---. 2003. Recovery Plan for the Red-cockaded Woodpecker (*Picoides borealis*) Secomd Revision. 296 pp.

---. 2004. Endangered and Threatened Wildlife and Plants; Designation of Critical Habitat for Three Threatened Mussels and Eight Endangered Mussels in the Mobile River Basin; Final Rule. Federal Register 69 FR 40084-40171.

---. 2005. Recovery Plan for 6 Mobile River Basin Aquatic Snails. U.S. Fish and Wildlife Service, Jackson, Mississippi. v + 46 pp.

---. 2006. Endangered and Threatened Wildlife and Plants; 5-Year Status Reviews. 71 FR 53127-53129.

---. 2007. Goldline Dater (*Percina aurolineata*), 5-year review: Federal Register 72 FR 42425-42426.

---. 2008. Tulotoma snail (*Tulotoma magnifica*), 5-year review: summary and evaluation. Jackson, MS. 14 pp.

---. 2009. Endangered and Threatened Wildlife and Plants; Proposed Endangered Status for the Georgia Pigtoe Mussel, Interrupted Rocksnail, and Rough Hornsnail with Critical Habitat; Proposed Rule. Federal Register 74 FR 31114-31151.

---. 2010. Endangered and threatened and plants; determination of endangered status for the Georgia pigtoe mussel, interrupted rocksnail, and rough hornsnail and determination of critical habitat. Federal Register 75 FR 67512 67550.

---. 2011. Endangered and Threatened Wildlife and Plants; Reclassification of the Tulotoma Snail From Endangered to Threatened. Federal Register 76 FR 31866-31874.

Thompson, F.G. 1984. North American freshwater snail genera of the hydrobiid subfamily Lithoglyphinae. Malacologia 25:109-141.

Tryon, G.W. 1873. Land and fresh-water shells of North America. Part IV. Strepomatidae.

(*American Melanians*). Smithsonian Miscellaneous Collections 16(253): lv, 1-435 + 837 text figs.

Wenger, S. 1999. A review of the scientific literature on riparian buffer width, extent and vegetation. Office of Public Service and Outreach, Institute of Ecology, University of Georgia. 59pp.

Williams, J.D. 1982. Distribution and habitat observations of selected Mobile Basin unionid mollusks. Pages 61-85. In: A.C. Miller (compiler). Report of Freshwater Mollusks Workshop, U.S. Army Corps of Engineers, Waterways Experiment Station, Vicksburg, Mississippi.

Williams, J.D., A.E. Bogan and J.T. Garner. 2008. Freshwater Mussels of Alabama and the Mobile Basin in Georgia, Mississippi and Tennessee. The University of Alabama Press, Tuscaloosa, AL. xv + 908 pp.

**Other:**

Crow, C. 2009. CCR Environmental. Personal communication.

Garner, J. 2003, 2006, 2008. ADCNR. Personal communication

Lochamy, J.S. 2007. Alabama Power Company. Personal communication.

Hartfield, P.D. 2006, 2009. USFWS. Personal Communication

Johnson, P.D. 2003, 2004, 2005, 2007, 2009. ADCNR. Personal communication

Pierson, M. 2005. Alabama Power Company. Personal communication

Powell, J. USFWS. Personal Observation